IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **Case No. 3:14-cr-140** |
| ) | **The Honorable Henry E. Hudson** |
| IREK ILGIZ HAMIDULLIN,[1] ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The second superseding indictment seeks to upend several hundred of years of legal doctrine and practice founded on the principle that combatants in an armed conflict commit no crime as long as their conduct is in accordance with the laws of armed conflict.  In plain terms, "[s]oldiers are not committing crimes; as such, they are immune from prosecution (unless they engage in nonroutine means of waging war, that is, war crimes). . . . As a result, there has never been a general practice of trying enemy soldiers as soldiers in any court."  Samuel Issacharoff & Richard Pildes, *Targeted Warfare: Individuating Enemy Responsibility*, 88 N.Y.U. L. Rev. 1521, 1545-46 (Nov. 2013).  This basic understanding has been followed in the United States since it was founded, and is embedded both in our common law and in international legal norms incorporated into domestic law.  *See, e.g.*, *Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357, 362 (Pa. Sup. Ct. 1788) (noting that in war "many things are lawful in that season, which would not be permitted in a time of peace").  Because the indictment does not allege a war crime, and instead

---

[1]  The defendant spells his last name "Khamidullah" and the Motion thus adopts this spelling.

alleges merely that Mr. Khamidullah participated in hostilities in an armed conflict, the indictment should be dismissed.

This Motion is organized as follows.  First, it contains a brief background section on the Afghanistan conflict and the charges contained in the second superseding indictment, followed by a review of the authority under Rule 12(b)(1) to dismiss based on undisputed facts.  Second, the Motion examines the substantive offenses charged, and concludes that all of the substantive offenses in this case either (1) expressly or by implication incorporate an exception for conduct that is otherwise consistent with the laws of armed conflict, or (2) were not intended by Congress to apply to armed conflict at all.  Third, the Motion discusses the well-established common law tradition of combatant immunity, as well as the incorporation of combatant immunity as a subset of the public authority defense.  Finally, the Motion explains why Mr. Khamidullah is entitled to prisoner of war status under the Geneva Convention Relative to the Treatment of Prisoners of War.  For all of these reasons, the pending indictment in this case should be dismissed.

## BACKGROUND

In 2001, the United States attacked Afghanistan, a party to the Geneva Conventions, in accordance with the Joint Resolution enacted by Congress in the wake of the September 11, 2001, terrorist attacks in the United States.  Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF").  Although the Taliban government was deposed by December 2001, the ousted government has continued to fight against U.S. and Afghan government forces, and continued to control large parts of Afghanistan's territory.  Kenneth Katzman, *Afghanistan: Post-Taliban Governance, Security, and U.S. Policy*, Congressional Research Service at 23-24 (Dec. 30, 2009) (noting that while Afghan government controlled 30

2

percent of Afghan territory, insurgents controlled, influenced, or operated in 34 percent, Taliban had named "shadow governors" in 33 of 34 provinces, and operated a "shadow government" from redoubt in Pakistan).  By 2009, Afghanistan indisputably "remain[ed] a theater of active military combat."  *Al Maqaleh v. Gates*, 605 F.3d 84, 88 (D.C. Cir. 2010).  Indeed, the government maintains that the armed conflict in Afghanistan continues to the present.  *See* Respondent' Opp'n Pet'r's Mot. Grant Petition at 7-16, *Al Warafi v. Obama*, No. 09-CV-2368 (D.D.C.), filed April 24, 2015 (describing active and protracted hostilities in Afghanistan).

The indictment alleges that in Afghanistan in 2009, while Mr. Khamidullah was affiliated with Taliban insurgents and the Haqqani Network, a "Taliban-affiliated group of militants that operates out of . . . Pakistan,"[2] he commanded a group of insurgents fighting against the International Security Assistance Force (ISAF) and Afghan government forces.  Second Superseding Indictment p.2-3, ¶ 2-3.  On November 29, 2009, Mr. Khamidullah purportedly led an attack on Camp Leyza, an Afghan Border Police ("ABP") compound in Khost Province.  During the attack, Mr. Khamidullah allegedly "fired upon the combined U.S. and Afghan forces with a machine gun.  At the time, the defendant was carrying two grenades and an AK- or Kalashnikov-style assault weapon, which he used to shoot at the U.S. and ABP forces with the intent to kill them."  *Id.* p.4, ¶ 6.

On the basis of these factual allegations, the second superseding indictment charges that Mr. Khamidullah committed fifteen felony offenses in violation of Title 18:

---

[2]     Approximately three years after the alleged conduct in this case, the Secretary of State designated the Haqqani Network as a Foreign Terrorist Organization.  77 Fed. Reg. 58203 (Sep. 19, 2012).

(1) conspiracy to provide material support in the preparation and carrying out of (a) attempting to damage U.S. military aircraft in violation of 18 U.S.C. § 32; (b) attempting to kill an officer of the United States in violation of 18 U.S.C. § 1114; (c) attempting and conspiring to kill a national of the United States in violation of 18 U.S.C. § 2332; and (d) attempting and using a destructive device against a U.S. national and against U.S. property overseas in violation of 18 U.S.C. § 2332a; all in violation of § 2339A;

(2) providing material support in the preparation and carrying out of these same offenses in violation of § 2339A;

(3) conspiring to destroy a U.S. military aircraft in violation of 18 U.S.C. § 32;

(4) attempting to destroy a U.S. military aircraft in violation of § 32;

(5) conspiring to kill U.S. military members and those assisting them in violation of § 1117;

(6) & (7) attempting to kill U.S. military members and Afghan Border Police in violation of § 1114;

(8) conspiring to murder U.S. nationals in violation of § 2332(b);

(9) & (10) attempting to murder U.S. nationals in violation of § 2332(b);

(11) & (12) engaging in physical violence with the intent to cause serious bodily injury to a national of the United States in violation of § 2332(c);

(13) conspiring to use a destructive device against a U.S. national and U.S. property outside the United States in violation of § 2332a;

(14) violating § 924(c) in discharging a machine gun and a destructive device during in furtherance of counts seven, ten, and twelve; and;

(15) conspiring to possess a machine gun and destructive device in furtherance of counts one through six, eight, nine, eleven, and thirteen.

**ARGUMENT**

I.      **Fed. R. Crim. P. 12(b)(1) Permits the Court to Determine Pre-Trial Any Matter Capable of Resolution Without a Trial on the Merits**

A party in a criminal case may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1) (as revised December 1, 2014; nearly identical language earlier appeared in Fed. R. Crim. P. 12(b)(2)). While this authority is not as broad as the summary judgment rule in civil cases—in that the court cannot decide which facts are genuinely in dispute—the court may rule pretrial on purely legal matters. The Court may also rule on the application of law to undisputed facts. *See United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) (trial court may dismiss indictment under Rule 12(b)(2) [now Rule 12(b)(1)], and in doing so may consider facts beyond those in the indictment where government "does not dispute the pertinent facts"); *see also United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005); *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000); *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998); *United States v. Hall*, 20 F.3d 1084, 1087–88 (10th Cir.1994); *United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988).

II.     **Congress Did Not Intend for the Substantive Statutes Charged in the Indictment to Apply to Combatants in an Armed Conflict**

The statutory offenses charged in this case prohibit violent conduct under a variety of circumstances — against aircraft, against U.S. soldiers and those assisting them, and through the use of an assortment of weaponry. But in the context of an armed conflict, such conduct against military targets is both lawful and commonplace. Accordingly, the application of ordinary

domestic criminal law to combatants in an armed conflict makes little sense, and was not so intended by Congress. *See Dow v. Johnson*, 100 U.S. 158, 165 (1879) (calling the application of domestic law to enemy soldiers "absurd").

Aside from the immunities discussed below, the statutes at issue in this case either implicitly or explicitly (1) exclude conduct authorized by law, or (2) were not intended to apply at all in the context of armed conflict. Specifically, the substantive and predicate offenses described in counts 1 and 2, 5 through 10, and 13 through 15 (18 U.S.C. § 1114, 18 U.S.C. § 2332(b), and 18 U.S.C. § 2332a) exempt conduct that is otherwise condoned by a legal authority from the scope of criminal liability. The offense charged in counts 11 and 12, 18 U.S.C. § 2332(c), necessarily incorporates a similar exception. 18 U.S.C . § 32, which is charged as a predicate in counts 1 and 2, and as a substantive offense in counts 3 and 4, on the other hand, was never intended to apply to an armed conflict.

### A. The Predicate and Substantive Offenses Charged in Counts 1, 2, and 5-15 (18 U.S.C. § 1114, § 2332(b), and § 2332a) Exclude Conduct that is Otherwise Supported by Lawful Authority

Statutes that proscribe conduct done "unlawfully" or "without lawful authority" necessarily exclude conduct that is otherwise legally justifiable or excusable. Indeed, the word "unlawfully" in a statute means "contrary to law." *See, e.g.*, *Middlebrooks v. United States*, 23 F.2d 244, 245 (6th Cir. 1928). Statutes such as §§ 1114, 2332(b), and 2332a that include or incorporate by reference the requirement that conduct be committed "unlawfully," or "without lawful authority," therefore, explicitly exclude conduct that is supported by legal authority. *See, e.g.*, *Mullaney v. Wilbur*, 421 U.S. 684, 685 (1975) (noting that Maine's murder statute required that homicide "be unlawful—i.e., neither justifiable nor excusable").

6

For example, section 1114 of Title 18 provides:

> Whoever kills or attempts to kill any officer or employee of the United States . . . . (including any member of the uniformed services) . . . shall be punished—(1) in the case of murder, as provided under Section 1111; (2) in the case of manslaughter, as provided under section 1112; or (3) in the case of attempted murder or manslaughter, as provided in section 1113.

18 U.S.C. § 1114.  Section 1114 is essentially a "jurisdictional statute. . . . in which a prosecution [cannot be] based on § 1114 alone.  Rather, particular offenses are invariably defined by reference to § 1111 and 1112."  *United States v. Harrelson*, 754 F.2d 1153, 1173 (5th Cir. 1985). Section 1114's proscription on the killing of federal employees thus simply refers to the definition of murder contained in § 1111.  That section, in turn, prohibits "the *unlawful* killing of a human being with malice aforethought."  18 U.S.C. § 1111(a) (emphasis added); *see also United States v. Wallace*, 368 F.2d 537, 538-39 (4th Cir. 1966) ("the antecedents of §§ 111 and 1114 were enacted to assure that those who *unlawfully* attacked or interfered with federal officials engaged  in their official duties were triable in a federal court") (emphasis added).  As such, § 1114 proscribes only "unlawful" killings that are not otherwise justifiable or excusable.

Section 2332(b), likewise, proscribes killing a person "that is a murder" as defined by § 1111.  The indictment thus specifically references § 1111 in counts eight, nine, and ten.  As noted, § 1111 prohibits only "unlawful" homicides.  18 U.S.C. § 1111(a).

Finally, § 2332a only prohibits the use, attempted use, and conspiracy to use a weapon of mass destruction (including a destructive device) "without lawful authority."  18 U.S.C. § 2332a. Therefore, the use of destructive devices with lawful authority are excluded from the scope of the statute.  *Cf. United States v. Abdelshafi*, 592 F.3d 602, 609 (4th Cir. 2010) (explaining that

7

"without lawful authority" in 18 U.S.C. 1028A means "without a form of authorization recognized by law").

These statutory limitations on the scope of the charged offenses are significant because they constitute legislative recognition that conduct that is traditionally found to be justified or excused is not criminal. And conduct by a "soldier in battle" is a prototypical example of conduct that is otherwise exempted from criminal liability. *See Mullaney*, 421 U.S. at 685 n.1 ("As examples of justifiable or excusable homicides, the court mentioned a soldier in battle, a policeman in certain circumstances, and an individual acting in self-defense."); Model Penal Code § 3.03 ("conduct is justifiable when it is required or authorized by . . . (d) . . . the lawful conduct of war"); *see also Finger v. State*, 117 Nev. 548, 574, 27 P.3d 66, 84 (2001) ("An individual who labors under the total delusion that they are a soldier in a war and are shooting at enemy soldiers is not capable of forming the intent to kill with malice aforethought.").

Section 2332(c), by contrast, contains no explicit reference to conduct that is otherwise supported by lawful authority. Nonetheless, the absence of such language does not mean the statute necessarily applies in the context of an armed conflict. Indeed, in the context of an armed conflict, its proscription on "physical violence . . . with intent to cause serious bodily injury to a national of the United States" makes no sense. That is because ordinary acts of violence by combatants in an armed conflict against military targets are lawful. *See, e.g.*, 1 Wharton's Criminal Law § 40 at 270 (15th ed. 1993) ("[t]he killing of an enemy who is part of a belligerent army is not murder when committed in the due course of war."); *United States v. List (The Hostage Case)*, XI Trial of the War Criminals before the Nuremberg Tribunal 1228, 1236 (1950) ("It cannot be questioned that acts done in times of war under the military authority of an enemy

cannot involve any criminal liability on the part of officers or soldiers if the acts are not prohibited by the conventional or customary rules of war.").  Accordingly, § 2332(c) should be interpreted in a manner that it is consistent with both domestic law and the law of war authorizing the use of ordinary force against enemies in an armed conflict.  *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) (acts of Congress should be construed in a manner consistent with the law of nations).  Similarly, the statute should be construed like the other provisions of § 2332 as excluding conduct that is otherwise done with lawful authority. *See Nardone v. United States*, 302 U.S. 379, 384 (1937) (noting that federal statute should be construed to exclude public authorization where contrary reading "would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm.").

>       **B.     Congress Did Not Intend 18 U.S.C. § 32 To Apply to Armed
>               Conflict**

Section 32 of Title 18, which broadly prohibits the destruction of aircraft, is a statute that is designed to comply with international treaty obligations initially focused on the scourge of airplane hijacking.  It was never meant to apply to armed conflict.  As such, the Court should reject the government's effort to apply the statute such that it has the "surprising and almost certainly unintended effect of criminalizing actions by military personnel that are lawful under international law and the laws of armed conflict."  *See* United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking, 18 Op. O.L.C. 148, 164 (1994) (concluding that the Aircraft Sabotage Act of 1984, 18 U.S.C. § 32(b)(2) (2006), which prohibits the willful destruction of civil aircraft, should not apply to armed conflict).

9

When § 32 was originally enacted, it prohibited damage to civil aircraft in interstate, overseas, or foreign air commerce.  Pub. L. No. 84-709, 70 Stat. 538 (1956).  In 1984, as part of the Aircraft Sabotage Act, 18 U.S.C. § 32 was amended to apply to aircraft "in the special aircraft jurisdiction of the United States" as defined by the Federal Aviation Act.  The definition of "special aircraft jurisdiction of the United States" includes "an aircraft of the armed forces of the United States" — but this definition was never designed to apply in an armed conflict.

Congress enacted the Federal Aviation Act ("FAA") in 1958.  Federal Aviation Act of 1958, Pub. L. 85-726, 72 Stat. 731 (1958).  However, the legislation

> left outside the jurisdiction of the United States offenses committed by non-military personnel in U.S. military aircraft flying over foreign territory or even over the territory of the United States.  Yet thousands of such personnel (dependents, government employees, disaster victims, and others), including some foreign nationals, fly every year in aircraft operated by U.S. Military Airlift Command (MAC) and other air transport components of the U.S. armed forces.

Oliver J. Lissitzyn, *In-Flight Crime and United States Legislation*, 67 Am. J. Int'l L. 306, 307 (Apr. 1973).  Accordingly, when the FAA was amended in 1970 to implement an international convention, the definition of "special aircraft jurisdiction of the United States" was expanded to include "aircraft of the national defense forces of the United States."  An Act to Implement the Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Pub. L. 91-449, 84 Stat. 921 (1970).[3]  The expansion of jurisdiction over "military or state aircraft" was designed to ensure that crimes committed by civilians aboard such aircraft would be prohibited "considering the number of civilians who travel aboard many of these aircraft and the

---

[3]       In 1994, the definition of "special aircraft jurisdiction of the United States" was amended to replace "aircraft of the national defense forces" with "aircraft of the armed forces" of the United States.  Pub. L. 103-272, 108 Stat. 1241 (1994).

10

jurisdictional problems that can arise should crimes be committed on board." Allan I.

Mendelsohn, *In-Flight Crime: The International and Domestic Picture Under the Tokyo*

*Convention*, 53 Va. L. Rev. 509, 551 (1967).

In 1984, to implement another international aircraft convention concluded in Montreal,[4]

Congress enacted the Aircraft Sabotage Act, which amended 18 U.S.C. § 32 to expand its

application to include the FAA's definition of "special aircraft jurisdiction of the United States."

Consequently, § 32 was expanded to cover military aircraft in 1984.  But, as the O.L.C. has

concluded in the context of § 32(b), the statute "was intended to implement the United States's

obligations under the Montreal Convention. That Convention does not appear to apply to acts of

armed forces that are otherwise governed by the laws of armed conflict."  United States

Assistance to Countries That Shoot Down Civil Aircraft Involved in Drug Trafficking, 18 U.S.

Op. Off. Legal Counsel 148, 163 (1994); *accord Bond v. United States*, 134 S. Ct. 2077, 2087

(2014) (noting that interpretation of statute designed to implement international convention

"begin[s] with that international agreement").  Indeed, the O.L.C. concluded that applying the

statute to armed conflicts "could readily lead to absurdities."  18 U.S. Off. Legal Counsel at 164.

As with 18 U.S.C. § 2332(c), § 32 cannot reasonably be construed to outlaw efforts to

shoot down military aircraft in an armed conflict.  In the absence of express Congressional intent

to the contrary, the statute should be understood to apply outside areas of armed conflict that are

governed by the laws of war.  *See Charming Betsy*, 6 U.S. (2 Cranch) at 118.  As such, the Court

should dismiss all counts alleging violations of 18 U.S.C. § 32.

---

[4]     Convention for the Suppression of Unlawful Acts Against the Safety of Civil
Aviation, concluded on Sept. 23, 1971, 974 U.N.T.S. 14118, art. 1 (entered into force Jan. 26,
1973) ("Montreal Convention").

### III.    Combatants in the Armed Conflict in Afghanistan Are Immune from Criminal Liability Due to the Common Law Doctrine of Public Authority

A cornerstone principle embedded in our common law forecloses the prosecution in this case.  Specifically, civilian law must be displaced by the law of armed conflict with respect to soldiers engaged in ordinary military conduct during the course of an armed conflict.  That is because acts of violence that are proscribed by domestic criminal law have no application in an armed conflict, where violence as a matter of first resort against legitimate military targets is entirely lawful.

### A.    Combatant Immunity Is Established in Federal Common Law

"There would be something singularly absurd," the Supreme Court has explained, "in permitting an officer or soldier of an invading army to be tried by his enemy, whose country it had invaded. . . . [F]rom the very nature of war, the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army."  *Dow v. Johnson*, 100 U.S. 158, 165 (1879); *accord Coleman v. Tenn.*, 97 U.S. 509, 516 (1879) ("Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them."); *Freeland v. Williams*, 131 U.S. 405, 416 (1889) ("For an act done in accordance with the usages of civilized warfare, under and by military authority of either party, no civil liability attached to the officers or soldiers who acted under such authority."); *Orleans v. S.S. Co.*, 87 U.S. (20 Wall.) 387, 394 (1874) ("In such cases the laws of war take the place of the Constitution and laws of the United States as applied in time of peace."); Instructions for the Government of the Armies of the United States in the Field, General Orders No. 100, Art. 41 (Prepared by Francis Lieber, 1863)

12

(hereinafter "Lieber Code") ("All municipal law of the ground on which the armies stand, or of the countries to which they belong, is silent and of no effect between armies in the field.");[5] Geo. A. Finch, *Jurisdiction of Local Courts to Try Enemy Persons for War Crimes*, 14 Am. J. Int'l L. 218, 223 (Jan-Apr. 1920) ("In these cases, the highest judicial authority in the United States has declared it to be a principle of public international law that the local territorial courts have no jurisdiction to try enemy persons for acts committed during and as a part of belligerent operations . . . ."); *see also Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 266 (4th Cir. 2012) (Niemeyer, J., dissenting) (explaining continued vitality of *Dow* law-of-war immunity and displacement of civil law in an armed conflict, notwithstanding en banc majority's finding that merits were not immediately appealable).

This doctrine of immunity for ordinary violence against an enemy committed in the course of an armed conflict is deeply rooted in the common law. *See* 4 Blackstone, *Commentaries on the Laws of England* 198 (1769) (noting that killing an enemy "in time of war" is not murder); 1 Joel P. Bishop, Commentaries on the Criminal Law § 131 p.78 (7th ed. 1882) (noting that "the men who compose the respective armies are not deemed criminal for what they do in the heat and conflict of battle; or, in general, for belligerent acts."); 2 *id.* at § 631 p.352 ("a homicide committed in the actual heat of battle in time of war is not criminal; for the person killed had not, at the moment and in the place, a right to his life, if the other could take it away."); 1 Hale, Pleas of the Crown § 433 (1847) ("If a man kill an alien enemy within this

---

[5]     Gen. J.V. Dillon, *The Genesis of the 1949 Convention Relative to the Treatment of Prisoners of War*, 5 Miami L.Q. 40, 42 (1950) (noting that the Lieber Code, commissioned by President Lincoln for use in the Civil War, "was perhaps the first formal codification of rules governing the treatment to be accorded prisoners of war").

kingdom, yet it is felony, unless it be in the heat of war, and in the actual exercise thereof."). And this doctrine has been applied equally in the context of civil wars as in international armed conflicts. *See Underhill v. Hernandez*, 168 U.S. 250, 253 (1897) ("If the political revolt fails of success, still, if actual war has been waged, acts of legitimate warfare cannot be made the basis of individual liability.") (citing *Dow* among other authorities).[6]

Essentially, the common law acknowledged immunity for the armed forces of belligerents in an armed conflict. *See The Prize Cases*, 67 U.S. (2 Black) 635, 666-67 (1861) ("When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war."). In other words, organized military groups acting on behalf of parties in a protracted armed conflict are not subject to the municipal laws of their enemy.

Consequently, it is settled that foreign criminal laws do not apply to American soldiers serving in an armed conflict overseas. *See Dostal v. Haig*, 652 F.2d 173, 176 (D.C. Cir. 1981) ("The U.S. military, entering Berlin as conquerors, were immune from the jurisdiction of the courts of the conquered country, or would have been if any such courts had remained.") (citing *Coleman*); *Bennett v. Davis*, 267 F.2d 15, 18 (10th Cir. 1959) (noting that an American soldier participating in post-World War II occupation of Austria was not subject to Austrian law) (citing

---

[6]     Of course, if no state of armed conflict exists in the place where the conduct occurs, then prosecution under domestic law is permitted. See *People v. McLeod*, 1 Hill 377, 25 Wend. *483, *585 (N.Y. Sup. Ct. 1841) (allowing prosecution of British citizen who killed a Canadian insurgent within United States territory because "[w]ithin the territory of a nation at peace, all belligerent power, all belligerent right, is paralyzed. They have passed from the dominion of arms to that of law.").

14

*Coleman* and *Dow*); *Hamilton v. McClaughry*, 136 F. 445, 447-48 (C.C.D. Kan. 1905)

(observing that American soldier participating in operation to quell the Boxer Rebellion was not

subject to Chinese criminal laws); *Tennessee v. Hibdom*, 23 F. 795, 797 (C.C.M.D. Tenn. 1885)

(holding that a Union soldier participating in occupation of Confederate Tennessee was not

subject to Tennessee's criminal laws); *In re Lo Dolce*, 106 F. Supp. 455, 460-61 (W.D.N.Y.

1952) (holding that an American soldier serving behind enemy lines in German-occupied Italy,

who confessed to murdering a fellow American soldier, was not subject to Italian criminal laws);

*United States v. Fleming*, 2 C.M.R. 312, 316 (A.B.R. 1951) ("At the outset, it is observed that

members of the armed forces which occupy an enemy's territory are not subject to the laws or the

jurisdiction of the courts of the enemy.").

   And the same is true of soldiers who fight against American soldiers in an armed conflict.

*See Dow*, 100 U.S. at 169 ("This doctrine of non-liability to the tribunals of the invaded country

for acts of warfare is as applicable to members of the Confederate army, when in Pennsylvania,

as to members of the National army when in the insurgent States."); *Johnson v. Eisentrager*, 339

U.S. 763, 793 (1950) (Black, J., dissenting) ("[L]egitimate 'acts of warfare,' however murderous,

do not justify criminal conviction . . . . [I]t is no 'crime' to be a soldier."); William Winthrop,

Military Law and Precedents 778 (2d ed. 1920) (noting that Indian chief Pretty Horses was not

guilty of "the alleged murder of an officer of our army, on the ground that the killing was

legitimate as being incidental to a state of war then pending");[7] *cf.* Geneva Convention Relative

to the Treatment of Prisoners of War, Aug. 12, 1949, art. 87, 6 U.S.T. 3316, 3384, 75 U.N.T.S.

---

[7]   The Supreme Court has referred to Colonel William Winthrop as "the Blackstone of Military Law." *Hamdan v. Rumsfeld*, 548 U.S. 557, 597 (2006) (quoting *Reid v. Covert*, 354 U.S. 1, 19 n. 38 (1957)) (plurality opinion).

135, 202 ("GPW") ("Prisoners of war may not be sentenced . . . to any penalties except those provided for in respect of members of the armed forces of the said power who have committed the same acts.").  In fact, common law immunity applies even to civilians who act under the authority of enemy soldiers.  *Ford v. Surget*, 97 U.S. 594, 607 (U.S. 1878) (noting that civilian was entitled to the "same defense as any soldier, regularly enlisted in the Confederate army, acting under like orders, could have made").  As such, criminal law treatises describe this well-established principle with no distinction between United States and enemy soldiers in the context of the public authority defense.

### B.      The Public Authority Defense Encompasses Combatant Immunity

Public authority is a well-established justification that excuses criminal liability.  *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001) (discussing public authority defense in general).  It applies in the context of soldiers who take lawful military orders from superiors in an armed conflict.  Indeed, the reason that combatants are immune under domestic law from ordinary criminal liability is because their actions are taken not for personal reasons but by virtue of the direction and authority of a belligerent or insurgent force within the ordinary course of an armed conflict.

"In time of war," Wharton's criminal treatise explains, "acts done *under the authority of the enemy or insurgent government* do not support criminal liability, except that the actor may be captured and treated as a prisoner of war, and may also in an appropriate case be convicted of espionage or treason."  1 Wharton's Criminal Law § 41 at 272 (15th ed. 1993) (emphasis added).  Likewise, Lafave's criminal law treatise notes that "if a soldier intentionally kills an enemy combatant in time of war and within the rules of warfare, he is not guilty of murder; but if he

intentionally kills a prisoner of war, then he commits murder." 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.2 (2d ed. 2003); *accord* 1 Wharton's Criminal Law § 40 at 270 ("[t]he killing of an enemy who is part of a belligerent army is not murder when committed in the due course of war."); Roy Moreland, *The Law of Homicide* 255 (1958) ("a soldier who kills an enemy on the field of battle as an act of war and within the rules of war is acting under command of the state and is legally blameless."); Francis Wharton, *The Law of Homicide* § 485 at 731 (3d ed. 1907) ("It is legal for a soldier to kill an alien enemy in the heat and excitement of war.").

This immunity from criminal liability is simply a subset of the public authority justification, because "[w]here the exercise of military authority relies upon the law governing the armed forces or upon the conduct of war, . . . military authority is not significantly different from the exercise of most other forms of public authority." 2 Paul Robinson, *Criminal Law Defenses* § 148(a) at 208 (1984); *see also* Model Penal Code § 3.03 ("conduct is justifiable when it is required or authorized by . . . (d) the law governing the armed services or the lawful conduct of war"). In fact, a violent act done in the course of an armed conflict is a prototypical example of conduct excused from criminal liability by virtue of public authority. *See* Boyce, Dripps, & Perkins, *Criminal Law & Procedure* 886 (11th ed. 2010) ("Nothing done under valid public authority is a crime if such authority is in no way exceeded or abused . . . . The typical instances in which even the extreme act of taking human life is done by public authority are (1) the killing of an enemy as an act of war and within the rules of war . . . .").

This understanding of combatant immunity as a component of the public authority justification has been adopted by the Department of Justice in the Office of Legal Counsel's Memorandum for the Attorney General regarding the authority of the CIA to engage in drone

17

strikes against members of al-Qaida.  In response to the argument that such civilian employees could be subject to criminal prosecution in the United States for killing an American citizen overseas,[8] the OLC explained that the public authority defense extended even to civilian employees of the CIA who would not otherwise be eligible for prisoner of war status under international law.  *See* Office of Legal Counsel's Memorandum Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi, at p.33 n.44, attached as an appendix to *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 144 (2d Cir. 2014) ("lethal activities conducted in accord with the laws of war, and undertaken in the course of lawfully authorized hostilities, do not violate the laws of war by virtue of the fact that they are carried out in part by government actors who are not entitled to the combatant's privilege.").  As such, as long as the conduct itself does not violate the law of armed conflict, participation in the armed conflict with al Qaida, even by a civilian, "would constitute the 'lawful conduct of war' — a well-established variant of the public authority justification." *Id*. at 132.

The rationale behind the OLC's drone memorandum is that members of al Qaida are legitimate targets for the use of military force, regardless of whether civilians or United States

---

[8]     Drone strikes operated by the CIA have resulted in the intentional death of at least one American overseas.  Craig Whitlock, Missy Ryan, & Greg Miller, *Two Killed in U.S. Drone Strike*, Wash. Post. A1 (Apr. 24, 2015).  Because CIA employees are not members of the armed forces, they are potentially subject to criminal prosecution both in the United States and in the location where the strike occurred for these deaths.  *See* Jordan J. Paust, *Self-Defense Targetings of Non-State Actors and Permissibility of U.S. Use of Drones in Pakistan*, 19 J. Transnat'l L. & Pol'y 237, 277-78 (2010) (noting that civilian government employees "are unprivileged fighters who, like members of al Qaeda, are not entitled to 'combatant' status and 'combatant immunity' for what otherwise would be lawful targetings during war and they can be prosecuted under relevant U.S. or Pakistani domestic law for murder.").

18

military personnel are involved in the application of such force.  ISAF and Afghan forces in the

armed conflict in Afghanistan are, like the Taliban and its associated forces there, equally

legitimate military targets.  Indeed, individuals in an armed conflict who are members of an

organized armed group (other than non-combatants such as, for example, medical personnel and

chaplains)[9] are legitimate targets of conventional attack at all times.  Nils Melzer, *Interpretive*

*Guidance on the Notion of Direct Participation in Hostilities under International Humanitarian*

*Law*, 90 Int'l Rev. Red Cross 872, 995 (2008), available at

http://www.cicr.org/eng/assets/files/other/irrc-872-reports-documents.pdf (stating that organized

armed groups are targetable under international law based on status); Lieber Code, Art. 57 ("So

soon as a man is armed by a sovereign government and takes the soldier's oath of fidelity, he is a

belligerent; his killing, wounding, or other warlike acts are not individual crimes or offenses.").

As such, all armed parties to the conflict in Afghanistan — the ISAF and Afghan

government forces, as well as the Taliban and associated forces — are legitimate military targets.

Consequently, violent actions as a matter of first resort against such targets are by definition

lawful.

Under domestic law, the public authority justification applies to combatants who engage

in conduct that does not violate the law of armed conflict, regardless of whether the combatant is

otherwise entitled to the protections of prisoner of war status under international law.  In

Afghanistan, that means that Taliban combatants are immune under U.S. law for conduct that is

consistent with the use of ordinary military force against legitimate military targets.  Because the

---

[9]      *See* Convention for the Amelioration of the Condition of the Wounded and Sick
in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, art. 24.

indictment solely alleges conduct that is consistent with acts ordinarily undertaken in the course

of armed conflict, the public authority justification precludes criminal liability in this case.

IV.     **Combatants Affiliated with the Taliban in Afghanistan in 2009 Are Entitled to Combatant Immunity Due to Binding International Treaty Obligations Incorporated into Domestic Law**

Independent of common law combatant immunity, Mr. Khamidullah is also protected

from criminal prosecution for acts consistent with the laws of armed conflict by the Geneva

Convention Relative to the Treatment of Prisoners of War.  In the aftermath of World War II, and

in recognition of the need for even stronger humanitarian protections during wartime than those

provided by extant international treaties, nations around the world, including the United States,

ratified the four Geneva Conventions in an effort to eliminate inhumane conduct during warfare.

The third convention, the Geneva Convention Relative to the Treatment of Prisoners of War,

Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter the "Third Geneva Convention" or

"GPW"], bestows upon captured soldiers substantive and procedural protections from inhumane

and unlawful treatment.  The most basic of these protections is a detainee's right to be treated as

a prisoner of war ("POW"), unless and until his status has been determined by a "competent

tribunal."  See Third Geneva Convention, art. 5, 6 U.S.T. at 3322-24, 75 U.N.T.S. at 140-42.

The United States has ratified all four Geneva Conventions, which thereby constitute the

law of the land by virtue of the Supremacy Clause. U.S. Const. art. VI.  The protections afforded

by the GPW are also incorporated into domestic law and binding military regulations.  Finally,

the practice of the United States has been to adhere to the requirements of the GPW in every

conflict since World War II.

In light of this history and the provisions of the GPW, numerous scholars have recognized

that Taliban detainees are entitled to the protections afforded to prisoners of war by the Third

Geneva Convention, including protection from municipal criminal liability.  *See* George H.

Aldrich*, The Taliban, Al Qaeda, and the Determination of Illegal Combatants*, 96 Am. J. Int'l L.

891, 894-95 (2002) (arguing that Taliban should be afforded POW status); Miriam J. Aukerman,

*War, Crime, or War Crime?  Interrogating the Analogy Between War and Terror*, in Enemy

Combatants, Terrorism, and Armed Conflict Law: A guide to the Issues 145-164, 153 (David K.

Linnan ed. 2008) ("Taliban soldiers are lawful combatants entitled to the combatant's privilege

and prisoner of war status."); Jordan J. Paust, *Responding Lawfully to al Qaeda*, 56 Cath. U. L.

Rev. 759, 774-75 (2007) ("members of the regular armed forces of the Taliban involved in the

international armed conflict in Afghanistan are entitled to prisoner of war status and combatant

status under treaty-based and customary laws of war"); Lawrence Azubuike, *Status of Taliban*

*and al Qaeda Soldiers: Another Viewpoint*, 19 Conn. J. Int'l L. 127, 148 (2003) ("The arguments

against treating captured Taliban soldiers as other than persons entitled to Geneva Convention

protection are weak, to put it mildly."); John Ip, *Comparative Perspectives on the Detention of*

*Terrorist Suspects*, 16 Transnat'l L. & Contemp. Probs. 773, 818 (2007) ("Denying the Taliban

POW status is problematic.  Taliban fighters were members of the armed forces of Afghanistan, a

party to the conflict."); Allison Marston Danner, *Beyond the Geneva Conventions: Lessons from*

*the Tokyo Tribunal in Prosecuting War and Terrorism*, 46 Va. J. Int'l L. 83, 103 (2005) ("The

Taliban fighters apprehended in Afghanistan, therefore, seem to have a strong claim to POW

status under the plain terms of the Third Geneva Convention, although members of al Qaeda do

not."); Marco Sassoli, *Use and Abuse of the Laws of War in the "War on Terrorism"*, 22 Law &

Ineq. 195, 204 (2004) ("There are good reasons to view the Taliban as belonging" to a category of POW).[10]

### A.    The Geneva Conventions Are Incorporated into Domestic Law

Article VI, clause two, of the United States Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.

By virtue of the Supremacy Clause, a ratified treaty "is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute."  *Head Money Cases*, 112 U.S. 580, 598-99 (1884).  As such, under the Supremacy Clause, the Third Geneva Convention is "binding alike [on] National and state courts, and is capable of enforcement and must be enforced."  *Maiorano v. Baltimore & Ohio R.R. Co.*, 213 U.S. 268, 273 (1909); *see also, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 191 (1961) (relying on treaty as rule of decision to determine legality of state action in taking of property); *Jordan v. Tashiro*, 278 U.S. 123, 130 (1928) (relying on treaty provisions to uphold issuance of writ of mandamus against state official); *Cook v. United States*, 288 U.S. 102, 121 (1933) (holding that

---

[10]    See Major General John D. Altenburg, Jr., *Just Three Mistakes!*, 42 Case W. Res. J. Int'l L. 11, 16 (2009) (explaining that "[t]he most troubling and obvious error was the decision not to conduct Third Geneva Convention Article 5 tribunals in Afghanistan," a decision that was "made in the face of unanimous opposition from all uniformed attorneys (judge advocates) at every level of command.").

treaty limited jurisdiction of United States to seize vessel); *United States v. Rauscher*, 119 U.S. 407, 430-31 (1886).

To be sure, international agreements that simply encourage future action by political institutions do not have the force of domestic law in the absence of implementing legislation. *Medellin v. Texas*, 552 U.S. 491, 505-08 (2008) (holding that provision of UN Charter regarding respect for ICJ decisions was not self executing because it used language that contemplated future implementation). But the text of the Third Geneva Convention makes clear that its provisions relating to the rights of combatants are not merely precatory.

As an initial matter, the Supreme Court recognized in *Hamdan v. Rumsfeld* that "the 1949 Geneva Conventions were written 'first and foremost to protect individuals, and not to serve State interests.'" 126 S. Ct. 2749, 2794 n.57 (2006). Article 2 provides that the "Present Convention shall apply" in all international armed conflicts, including in "all cases of partial or total occupation of the territory of a High Contracting Party." GPW, art. 2, 6 U.S.T. at 3318, 75 U.N.T.S. at 136. Article 4 expressly secures rights to "persons who have fallen into the power of the enemy." GPW, art. 4, 6 U.S.T. at 3320, 75 U.N.T.S. at 138. And article 6 states that no agreement among States "shall adversely affect the situation of prisoners of war, as defined by the present Convention, nor restrict the rights that it confers upon them." GPW, art. 6, 6 U.S.T. at 3324, 75 U.N.T.S. at 142. The GPW also repeatedly refers to "persons protected by the present Convention," and to "protected persons." GPW, art. 10-11, 6 U.S.T. at 3326, 75 U.N.T.S. at 144.

The legislative history surrounding the ratification of the Geneva Conventions by the United States also reveals a basic understanding that the act of ratification created legally binding

domestic obligations.  In recommending advice and consent to ratification of the conventions, the Senate Foreign Relations Committee emphasized that, with ratification, the United States would make binding what had previously been matters of mere policy and practice.  S. Rep. No. 84-9, at 32 (1955), reprinted in 84 Cong. Rec. 9962-72 (1955).  The Committee urged strict adherence to the conventions, despite "the possibility that at some later date a contracting party may invoke specious reasons to evade compliance with the obligations of decent treatment which it has freely assumed in these instruments."  *Id.*, 84 Cong. Rec. 9971.  The Committee also concluded that adoption of these rights was the best way to secure better treatment for U.S. soldiers, based on the experiences of U.S. soldiers captured during the Korean War.

Importantly, the Senate Foreign Relations Committee examined the provisions of each of the four conventions to determine which provisions, if any, required implementing legislation.  In reviewing the conventions, the Committee concluded that "it appears *very little in the way of new legislative enactments will be required to give effect* to the provisions contained in the four conventions." *Id.* at 30, 84 Cong. Rec. 9971 (emphasis added).[11]  The Committee's conclusion that some but not all provisions required implementing legislation is consistent with the Supreme Court's recognition that treaties that contain provisions enforceable by the state parties may also include provisions that confer rights upon individuals "which are capable of enforcement as

---

[11]     The Committee found only a small number of provisions required implementing legislation, none of which are applicable here. Specifically, legislation was required to address the use of the Red Cross emblem by private parties, to provide workmen's compensation for civilian internees, to exempt relief shipments from import, customs and other dues, and to enforce provisions that prisoner of war camps must be identified by the letters PW, PG or IC. Senate Ratifying Report at 30-31, 84 Cong. Rec. 9971.  Congress also enacted the War Crimes Act of 1996, 18 U.S.C. § 2441 (2000), to bring the U.S. into compliance with its obligation to proscribe grave breaches of the Geneva Conventions. *See* H.R. Rep. No. 104-698, at 1 (1996).

between private parties in the courts of the country." *Head Money Cases*, 112 U.S. at 598 (analyzing provisions of treaty separately to determine whether they are self-executing).

Given the language and history of the ratification of the Geneva Conventions, it is therefore unsurprising that numerous courts have recognized the binding nature of these conventions. *See United States v. Khadr*, CMCR 07-001 at 4 n.4 (Ct. Mil. Comm'n Rev. 2007) (Geneva Conventions "generally viewed as self-executing treaties"); *United States v. Lindh*, 212 F. Supp. 2d 541, 553-554 (E.D. Va. 2002) ("[T]he GPW provisions in issue here are a part of U.S. law and thus binding in federal courts under the Supremacy Clause.") (footnotes omitted); *United States v. Noriega*, 808 F. Supp. 791, 799 (S.D. Fla. 1992) ("[I]t is inconsistent with both the language and spirit of [the GPW] and with our professed support of its purpose to find that the rights established therein cannot be enforced by individual POWs in a court of law"); *accord* Derek Jinks & Neal Katyal, *Disregarding Foreign Relations Law*, 116 Yale L.J. 1230, 1241 (Apr. 2007) ("The text, structure, and history of the Conventions strongly support the conclusion that they are self-executing in the sense that they directly establish binding legal obligations.").

Indeed, the Supreme Court has recognized that the basic provisions of the Geneva Conventions reflect state practice and are widely accepted as binding on the international community. *See Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2794 (2006) ("[R]egardless of the nature of the rights conferred on Hamdan, [the Geneva Conventions] are, as the Government does not dispute, part of the law of war."). Likewise, a plurality of the Court in *Hamdi v. Rumsfeld* held that practices inconsistent with "a clearly established principle of the law of war" fall outside the scope of Congressional authorization in the AUMF. *Hamdi v. Rumsfeld*, 542 U.S. 507, 520-21 (2004) (plurality) (citing GPW art. 118 regarding repatriation); *id.* at 549 (Souter, J., concurring

in part, dissenting in part, and concurring in judgment) (noting that detainee who "was taken

bearing arms on the Taliban side of a field of battle . . . . would therefore seem to qualify for

treatment as a prisoner of war under the Third Geneva Convention").

     As such, the provisions of the Third Geneva Convention, ratified by the United States

over fifty years ago, are indisputably the "supreme Law of the Land," and this Court may employ

them as a rule of decision regardless of whether they otherwise create a private cause of action.

*See, e.g., Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (holding that bilateral agreements

between the United States and European governments preempted California law even though

none of the bilateral agreements created a private right of action).

### B.    Combatants Affiliated with the Taliban in Afghanistan Are Entitled to Prisoner of War Status Under International Law

### 1.    The Conflict in Afghanistan is Subject to the Provisions of the Third Geneva Convention

     There is no dispute that the conflict in Afghanistan began as an international armed

conflict involving an attack by the United States upon Afghanistan. GPW, art. 2, 6 U.S.T. at

3318, 75 U.N.T.S. at 136 ("the present Convention shall apply to all cases of declared war or of

any other armed conflict which may arise between two or more of the High Contracting Parties,

even if the state of war is not recognized by one of them").  As such, "no Contracting Party can

offer any valid pretext, legal or otherwise, for not respecting the Convention in its entirety."

Commentary on III Geneva Convention at 16 (Jean Pictet ed. 1960).  Moreover, the conflict

remains "international in several respects, including (1) participation by U.S. combat troops in

sustained hostilities for more than eight years, (2) participation by Taliban forces (initially by

armed forces of the de facto government of Afghanistan), (3) general control of large areas of

Afghanistan by the Taliban, and (4) the expanded theatre of war into portions of Pakistan outside the effective control of the government of Pakistan."  Jordan J. Paust, *Self-Defense Targetings of Non-State Actors and Permissibility of U.S. Use of Drones in Pakistan*, 19 J. Transnat'l L. & Pol'y 237, 280 (2010).

Given the ongoing protracted conflict in Afghanistan, the displacement of the Taliban government in December 2001 did not fundamentally alter the fact that the conflict began as an international armed conflict between two contracting parties to the Geneva Conventions.  Indeed, article 4(A)(3) of the GPW was designed to encompass the armed forces of a government that was deposed by an invading state.  Specifically, the language defines prisoners of war to include "members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power."  GPW, art. 4(A)(3),  6 U.S.T. at 3320, 75 U.N.T.S. at 138. This provision was an innovation over previous international treaties, and was specifically drafted to cover "members of regular armed forces, like the Free French in the Second World War."  George Aldrich, *Symposium: the Hague Peace Conferences: the Laws of War on Land*, 94 Am. J. Int'l L. 42, 43 (Jan. 2000).  In other words, the GPW was intentionally crafted to include the armed forces of a deposed government as prisoners of war, even when a successor government (i.e., the Vichy regime or the government of Hamid Karzai) is recognized by the detaining power (i.e., Germany or the United States) as the legitimate government of the territory.

The Commentary to the GPW likewise explains that this provision "covers armed forces which continue to fight in a 'national redoubt', under the orders of an authority or Government which has its headquarters in that part of the country while the occupying authorities may have

recognized a Government, which may or may not support them, in that part of the country occupied by their troops."  Commentary on III Geneva Convention at 63-64 (Jean Pictet ed. 1960).  Article 4(A)(3) thus applies in the context of a "partial or total occupation of the territory of a High Contracting Party," GPW art. 2, 6 U.S.T. at 3318, 75 U.N.T.S. at 136, a condition under which the provisions of the Third Geneva Convention "shall apply."  *Id.*

The conclusion that the GPW is applicable to the armed conflict in Afghanistan is also supported by the United States' submission to the International Criminal Tribunal for Yugoslavia in 1995.  Submission of the Government of the United States of America Concerning Certain Arguments Made by Counsel for the Accused in the Case of The Prosecutor of the Tribunal v. Dusan Tadic, Case No. IT-94-1 AR72 (ICTY App. Chamber) (July 1995).  In that pleading, the United States explained that "the fighting in the former Yugoslavia since 1991 must be seen as a whole, constituting an international armed conflict to which the rules of international armed conflict apply.  We believe it is artificial and improper to attempt to divide it into isolated segments, either geographically or chronologically, in an attempt to exclude the application of these rules."  *Id.* at 28.  "Attempting to identify elements of the conflict as 'internal,'" the United States explained, "is the kind of pretext for avoiding full application of the Conventions that is not permissible."  *Id.* at 28 n.43.

The conflict in Vietnam also supports the applicability of the Geneva Conventions to the conflict in Afghanistan.  "Although North Vietnam made a strong argument that the conflict in Vietnam was essentially an internal domestic struggle, the official position of the United States, stated as early as 1965, and repeated consistently thereafter, was that the hostilities constituted an armed international conflict, that North Vietnam was a belligerent, that the Viet Cong were

28

agents of the government of North Vietnam, and that the Geneva Conventions applied in full."

Major General George S. Prugh, Law at War: Vietnam 1964-1973 at 63 (1975).  Consequently,

the United States military directed that all combatants captured during military operations were

to be accorded prisoner-of-war status, regardless of the type of unit to which they belonged.  U.S.

Military Assistance Command for Vietnam ("MACV"), Directive No. 381-46, Annex A (Dec.

27, 1967), reprinted in *Contemporary Practice of the United States Relating to International*

*Law*, 62 Am. J. Int'l L. 754, 766-67 (1968).

Accordingly, because Afghanistan in 2009 "remain[ed] a theater of active military

combat," *Al Maqaleh v. Gates*, 605 F.3d 84, 88 (D.C. Cir. 2010), between the United States and

the armed forces of the Taliban government that it deposed, the Third Geneva Convention

applies to Taliban detainees seized by the United States in Afghanistan.

### 2.    Taliban Detainees Are Entitled to POW Status

Article 4A of the GPW defines prisoners of war, in part, as follows:

> Prisoners of war, in the sense of the present Convention, are persons belonging to *one of the following categories*, who have fallen into the power of the enemy:
>
> (1) Members of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces.
>
> (2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions: (a) that of being commanded by a person responsible for his subordinates; (b) that of having a fixed distinctive sign recognizable at a distance; (c) that of carrying arms openly; (d) that of conducting their operations in accordance with the laws and customs of war.

> (3) Members of regular armed forces who profess allegiance to a government or
> an authority not recognized by the Detaining Power.

GPW, art. 4A, 6 U.S.T. at 3320, 75 U.N.T.S. at 138 (emphasis added).

Moreover, the GPW requires contracting parties to treat those captured in the course of armed conflict as POWs "from the time they fall into the power of the enemy and until their final release and repatriation." GPW, art. 5, 6 U.S.T. at 3322, 75 U.N.T.S. at 140. This is the sole mechanism by which POW protections may be denied by the detaining power:

> Should any doubt arise as to whether persons, having committed a belligerent act
> and having fallen into the hands of the enemy, belong to any of the categories
> [deserving of POW status], such persons shall enjoy the protection of the present
> Convention until such time as their status has been determined by a competent
> tribunal.

GPW, art. 5, 6 U.S.T. at 3324, 75 U.N.T.S. at 142. The GPW also requires prisoners of war to be tried solely by a military court unless civil courts are expressly permitted to try U.S. armed forces for the "particular offence alleged to have been committed by the prisoner of war." GPW, art. 84, 6 U.S.T. at 3382, 75 U.N.T.S. at 200. Although the GPW contemplates criminal prosecution of prisoners of war, the offenses to which prisoners may be prosecuted are limited to acts that are unconnected to the armed conflict, war crimes and crimes committed by political and military leaders in initiating an aggressive war, and crimes against humanity. Commentary on III Geneva Convention at 418-22 (Jean Pictet ed. 1960).

Accordingly, prisoners of war may not be sentenced "to any penalties except those provided for in respect of members of the armed forces" of the United States. GPW, art. 87, 6 U.S.T. at 3384, 75 U.N.T.S. at 202. And, courts are not "bound to apply the minimum penalty prescribed" for any offenses of conviction. *Id.* Finally, article 99 provides that "[n]o prisoner of

war may be tried or sentenced for an act which is not forbidden by the law of the Detaining

Power or by international law, in force at the time the said act was committed."  GPW, art. 99, 6

U.S.T. at 3392, 75 U.N.T.S. at 210.

These provisions apply not only to combatants who comply with the provisions of Article

4(A)(2) of the GPW.  "Prisoners of war . . . are persons belonging to one of the following

categories," including "[m]embers of the armed forces of a Party to the conflict, as well as

members of militias or volunteer corps forming part of such armed forces" under article 4(A)(1),

and "[m]embers of regular armed forces who profess allegiance to a government or an authority

not recognized by the Detaining Power" under Article 4(A)(3).  GPW, art. 4(A),  6 U.S.T. at

3320, 75 U.N.T.S. at 138.

The Bush Administration, and the sole court in this District to have considered the

application of the Geneva Conventions to the Taliban, essentially ignored Articles 4(A)(1) and

4(A)(3) (not to mention article 5) of the GPW in determining that Taliban detainees were not

entitled to the protections of the Third Geneva Convention.  *See United States v. Lindh*, 212 F.

Supp. 2d 541, 557 (E.D. Va. 2002) (solely considering whether Taliban satisfy four criteria of art.

4(A)(2)).

As numerous scholars have recognized, however, "Article 4A sub-paragraphs (1) and (3)

indicate that members of regular armed forces, including those professing allegiance to a

government or authority not recognized by the Detaining Power, are entitled to prisoner of war

status.  Neither sub-paragraph makes applicable to these regulars the express requirements

enumerated in sub-paragraph (2)."  Robert Goldman & Brian Tittemore, *Unprivileged*

*Combatants and Hostilites in Afghanistan: Their Status and Rights Under International and*

31

*Human Rights Law*, Am. Soc. Int'l L. at 9 (Dec. 2002); *accord* George H. Aldrich, *The Taliban, Al Qaeda, and the Determination of Illegal Combatants*, 96 Am. J. Int'l Law 891, 894 (2002) (suggesting that Bush administration should have been asked, "what happened to the first provision of Article 4"?). While "compliance with [the provisions of 4(A)(2)] might reasonably be *expected* of members of regular armed forces, it is not *required* for their obtaining prisoner of war status. . . . Indeed, U.S. practice since the end of World War II tends to corroborate the view that the right to prisoner of war status for members of regular armed forces is unconditional, if not absolute, except in the case of regulars caught spying while out of uniform." Goldman & Tittemore, Am. Soc. Int'l L. at 10.[12]  As such, members of Taliban armed forces are entitled to POW status under articles 4(A)(1) and 4(A)(3) of the GPW.

## CONCLUSION

Because the second superseding indictment is predicated upon conduct that constitutes the ordinary use of force against legitimate military targets in an armed conflict, it falls outside the scope of the charged statutes, is contrary to common law immunity and the public authority defense, and violates the basic provisions of the GPW. As such, for all of these reasons, the indictment should be dismissed in its entirety.

---

[12]     The Defense does not concede that the Taliban do not also qualify for POW status under 4(A)(2).  *See* Goldman & Tittemore at 26-28 ("consistent with the law and past U.S. practice, members of the Taliban's armed forces should either have been unconditionally granted prisoner of war status, or, at a minimum, been presumed prisoners of war unless and until subsequently determined otherwise as required by the Third Geneva Convention").  But this question requires the evaluation of expert testimony.

Respectfully submitted,
Irek Ilgiz Khamidullah
By counsel,
Geremy C. Kamens
Acting Federal Public Defender

Claire G. Cardwell

_____/s/_____

Stone, Cardwell & Dinkin, PLC

Geremy C. Kamens

Va. Bar No. 23812

Va. Bar No. 41596

101 Shockoe Slip, Suite K

Robert J. Wagner

Richmond, VA 23219

Va. Bar No. 27493

Ph. (804) 359-0000

Paul G. Gill

Fax (804) 257-5555

Va. Bar No. 31461

clairegcardwell@gmail.com

Counsel for Defendant
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 565-0870
(804) 648-5033 (fax)
Robert_Wagner@fd.org

33

## CERTIFICATE OF SERVICE

I hereby certify that on May 4th, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following counsel of record:

Michael R. Gill
James Philip Gillis
Jennifer E. Levy
Assistant United States Attorneys
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219-2447


_____/s/_____
Robert Wagner
Va. Bar No. 27493
Counsel for Defendant
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 565-0870
(804) 648-5033 (fax)
Robert_Wagner@fd.org