IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 3:14cr140 |
| | ) | The Honorable Henry E. Hudson |
| IREK ILGIZ HAMIDULLIN,1 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT IREK KHAMIDULLAH'S MOTION TO DISMISS
INDICTMENT BASED ON DUE PROCESS CONCERNS,
NOTICE AND JURISDICTIONAL DEFECTS**

COMES NOW the defendant, Irek Khamidullah, through undersigned counsel, and respectfully moves to dismiss all counts of the Second Superseding Indictment based on deprivation of due process rights of the defendant, notice and jurisdictional defects, because Mr. Khamidullah could not have "reasonably anticipate[d] being haled into court" in this country for his conduct in Pakistan and Afghanistan. *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998).

**Introduction**

This motion and memorandum of law challenges the government's unprecedented attempt to assert jurisdiction over, and prosecute for offenses in a United States court, a foreign national who is alleged to have committed crimes on the battlefield on foreign soil against other foreign nationals. He did not kill or injure any officer, employee or national of the United States, or any person assisting an officer or employee of the United States; he did not injure or destroy any United States property, and he himself suffered serious injuries and the loss of approximately 18 of his fellow soldiers. The allegations against him range from conspiracies to engage in attempts and

---

1 The defendant would spell his last name "Khamidullah," and will be referred to herein that way.

conspiracies, to attempts to engage in conspiracies and attempts, to aiding and abetting in conspiracies and attempts.  There are no completed crimes of killing, injuring or destroying alleged in the 15-count indictment against him.  The only arguable intent he had to damage or injure interests of the United States is based on the contingency that air support - not necessarily American[2] - *might* respond when an attack was made on the Afghan Border Police ("ABP") at Camp Leyza.  Once aerial support became apparent, no efforts were ever made to engage nor were there reports that any aircraft were fired upon; the defendant and his brothers withdrew from any plan of attack and left the scene.[3]  Most of them were killed.

Mr. Khamidullah and his cohorts endured a relentless attack by responding aircraft over a two-hour period, which included gunfire, grenades and bombs.  Bates 1064, 1097.  The defendant was severely injured by grenades tossed at him by the ABP several hours after the initial attack. Under all of the facts and circumstances in this case, there can be no valid claim that Mr. Khamidullah could have "reasonably anticipate[d] being haled into court" in this country.  *See United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998).

The evidence against the defendant rests substantially upon interrogation by the FBI as a prisoner of war at Bagram Air Force Base in Afghanistan starting in March of 2010 and continuing though 2014.  In November of 2009, approximately four months prior to his interrogation, he

---

[2]  According to numerous news reports from Reuters, BBC, and the Associated Press, there were large numbers of NATO and other international troops in Afghanistan in 2009, which included troops from Britain, France, Germany, Italy, Poland, Estonia, Slovakia, Canada, Turkey, Spain, Australia and Denmark.  In 2011, there were 40,000 NATO troops in Afghanistan.  See http://www.bbc.com/news/world-south-asia-11371138.

[3]  The defendant during his interviews with the government at Bagram Air Force Base stated, "[w]hen came helicopter, [UI] we left our position and go,"  Bates 733; "When spy airplane came . . . we then go away,"  Bates 61; "came two Apache and exit," Bates 16.

suffered serious wounds from grenades launched at him on the battlefield; he was recovering from those wounds when most of the inculpatory statements he made were extracted.  The statements obtained were almost entirely in English, which was the third or fourth language he had learned. He continually had difficulty understanding the questions of his interrogators.  For a significant period of the time he was subjected to interrogation, he was fasting.  During his questioning, he was never informed of the charges he may face in American court, or that he would be brought to court in America to face charges.  In fact, the government did not anticipate bringing him to court in the United States either, because it failed to preserve critical evidence in the case from the scene of the alleged crime.  *See* Accompanying Motion to Suppress Lost Firearm.

Mr. Khamidullah could not have reasonably anticipated being brought to court here.  Just as our soldiers cannot reasonably anticipate being brought to a foreign civilian court for engaging in an armed conflict on foreign soil, Mr. Khamidullah, as a Russian national, cannot reasonably expect to be brought to this Court for engaging in a foreign armed conflict in Afghanistan.  See Accompanying Combatant Immunity Motion to Dismiss at 14-15.

The defendant's ability to defend charges against him have been severely handicapped by the government's failure to preserve evidence for inspection, investigation, and presentation at trial by the defense in this United States court, and failure to document evidence for review by the defendant.  See Accompanying Motion to Suppress Lost Firearm.  Upon questioning regarding an alleged firefight with United States troops and ABP, the defendant adamantly insisted that he never fired his weapon and that a simple check of the weapon would reveal that all bullets remained in the cartridge.  See Bates Nos. 33, 267-68.  The weapon was never preserved for review or inspection and was never inspected, even by United States officials.  See Bates Nos. 1141, 1144, 1220-21.

The defendant stated numerous times that he had no desire to fight Americans. *See* Bates 275 ("don't fight America . . . and we fight only Afghan traitors"); Bates 65 ("I didn't fight [UI - meaning 'unintelligible'] and America, right? I . . . because fighting only Afghan traitors."). This is not a "terrorist" case in the sense of any attempt or effort to kill or injure civilians; Mr. Khamidullah "detests" the idea of terrorist attacks on civilian populations. Bates 187-88 (regarding terrorist attacks on civilians, like the actions of Bin Laden, the defendant stated that he "detests" such attacks, is "disgusted" by them, "hates" them).

Where, as here, a foreign defendant is charged for conduct taking place outside the United States, the Due Process Clause of the Fifth Amendment requires that the defendant both (i) have a "sufficient nexus" to the United States; and (ii) receive "fair notice" that the alleged conduct was criminal. The government's attempt to prosecute Mr. Khamidullah in a country with which he has no connection, for conduct that has *never* before been prosecuted in this country, when he could not have reasonably anticipated being brought to trial here, fails both of these requirements. These constitutional deficiencies require dismissal of the Second Superseding Indictment.

**Overview**

The counts of the Second Superseding Indictment generally charge Mr. Khamidullah with conspiring to, and attempting to, kill and injure unnamed individuals under a variety of circumstances. The "General Allegations" section discusses three separate scenarios under which the defendant is alleged to have conspired and attempted to kill or injure officers, employees, or nationals of the United States, or persons assisting officers or employees of the United States. To be clear, no Americans or persons allegedly assisting Americans were killed or injured during any of these scenarios.

The first scenario involved the alleged plot to attack Camp Leyza (Second Superseding Indictment at ¶ 4-5); the second addressed the allegations of a plan to shoot American aircraft (Second Superseding Indictment at ¶ 5); and the third involved allegations that, after the alleged attack on Camp Leyza, while personnel were "conducting a battle damage assessment in the area of the attack," Mr. Khamidullah "fired upon the combined U.S. and Afghan forces with a machine gun." Second Superseding Indictment at ¶ 6.

**Charges Under the Indictment**

Counts 1 and 2 of the Second Superseding Indictment allege that the defendant conspired to and attempted to provide material support to terrorists in violation of 18 U.S.C. § 2339A, through four separate allegations of criminal activity. The first allegation involves the conduct charged under Counts 3 and 4, conspiracy and attempt to destroy American aircraft under 18 U.S.C. § 32. The second, third and fourth allegations involve allegations of violence - conspiracies and attempts to kill and injure - against American officers, employees, nationals, and persons assisting American officers and employees under 18 U.S.C. §§ 1114, 2332, and conspiring to use weapons of mass destruction under § 2332a. Reliance upon any of these four separate conspiracy allegations of can result in a conviction under Counts 1 and 2.

Counts 5, 6 and 7 of the Second Superseding Indictment charge the defendant with conspiring to and attempting to kill an officer or employee of the United States, or a person assisting an officer or employee of the United States, under 18 U.S.C. §§ 1117 and 1114, respectively. These counts do not specifically identify the person or persons whom the defendant was allegedly targeting. Counts 5 and 6 relate to a conspiracy and attempt to kill an officer or employee of the United States, and a person assisting an officer or employee of the United States, under the circumstances of the alleged attack on Camp Leyza and the alleged attack on helicopters. Count 7

relates to the attempt to kill officers and employees of the United States, and a person assisting an officer or employee of the United States, under the circumstance of the alleged attack by Mr. Khamidullah during the damage assessment following the attack.

Counts 8, 9 and 10 of the Second Superseding Indictment charge the defendant with conspiring to and attempting to kill a national of the United States in violation of 18 U.S.C. §2332(b). These counts do not identify any "national" who was allegedly targeted or the circumstances under which a national was allegedly targeted. Count 8 alleges a general conspiracy by the defendant to kill a national of the United States, and that the defendant "attacked U.S. military personnel and Afghan Border Police." Count 9 relates to the attempt by the defendant to kill a national of the United States under the circumstance of the alleged attack by Mr. Khamidullah on helicopters that responded to Camp Leyza. Count 10 relates to the attempt by the defendant to kill a national of the United States under the circumstance of the alleged attack by Mr. Khamidullah during the damage assessment following the attack.

Counts 11 and 12 of the Second Superseding Indictment charge the defendant with engaging in physical violence with the intent to cause serious bodily injury to a national of the United States, in violation of 18 U.S.C. § 2332(c). These counts do not identify the "national" who was allegedly targeted. Count 11 relates to the attempt by the defendant to kill a national of the United States under the circumstance of the alleged attack by Mr. Khamidullah on helicopters that responded to Camp Leyza. Count 12 relates to the attempt by the defendant to kill a national of the United States under the circumstance of the alleged attack by Mr. Khamidullah during the damage assessment following the attack.

Count 13 of the Second Superseding Indictment charges the defendant with conspiring to use a weapon of mass destruction against a national and property of the United States, in violation

of 18 U.S.C. § 2332a.  This count does not identify the "national" who was allegedly targeted, or the property that was allegedly targeted.  It further fails to identify the circumstances under which the national and property was allegedly targeted.

Count 14 of the Second Superseding Indictment charges the defendant with possessing, brandishing and discharging a firearm - a "machine gun and a destructive device" (an AK and grenades) - in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c).  In this count, the government identified Counts 7, 10 and 12 as the crimes of violence associated with this firearm charge.   These counts generally relate to the alleged attack during the battle damage assessment.

Count 15 of the Second Superseding Indictment alleges a conspiracy to possess a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(o).  In this count, the government identified Counts 1 through 6, 8, 9, 11, and 13 as the crimes of violence associated with this conspiracy count.  These counts generally relate to the attack on Camp Leyza and the alleged attack on helicopters.

### Argument

When the Government seeks to prosecute a non-citizen for conduct occurring entirely abroad, the Fifth Amendment requires "a sufficient nexus between the defendant and the United States, so that such application [of the criminal law] would not be arbitrary or fundamentally unfair." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (internal quotation marks and citations omitted).  This "sufficient nexus" test in the criminal context "serves the same purpose as the 'minimum contacts' test in [civil] personal jurisdiction.  It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country.'"  *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Under *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012), the Fourth Circuit held that "[t]hough a criminal statute having extraterritorial reach is declared or conceded substantively valid under the Constitution, its enforcement in a particular instance must comport with due process. Some courts have, as a proxy for due process, required 'a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary and fundamentally unfair.'" citing to *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990) and *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003).4 "In the context of non-U.S. citizens, 'due process requires the Government to demonstrate that there exists 'a sufficient nexus between conduct condemned and the United States' such that application of the statute would not be arbitrary or fundamentally unfair to the defendant.'" *United States v. Lawrence*, 727 F.3d 386, 396 (5th Cir. 2013), citing to *United States v. Perlaza*, 439 F.3d 1149, 1160 (9th Cir. 2006). "The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial . . . . [I]t serves the same purpose as the 'minimum contacts' test in personal jurisdiction." *United States v. Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006), citing to *Klimavicius-Viloria*, 144 F.3d at 1257 and *Moreno-Morillo*, 334 F.3d at 830, n.8.

The Fourth Circuit acknowledged in *Brehm* that a prosecution against a foreign national for conduct that occurs entirely overseas cannot be "arbitrary or fundamentally unfair." *Brehm*, 691 F.3d at 553. Nothing could be more arbitrary than the fact that, of all of the Taliban and other fighters who have fought against the United States in the longest continuous armed conflict in the nation's history, only one has ever been brought to the United States for criminal prosecution. There

---

4 Although the Fourth Circuit in *Brehm* did not address the "sufficient nexus" issue, it found that extraterritorial prosecutions must comport with notions of fairness and consistency. *See Brehm*, 691 F.3d at 553.

Case 3:14-cr-00140-HEH   Document 68   Filed 05/04/15   Page 9 of 14 PageID# 323

is nothing unusual about the allegations in this case.  No Americans died, and the allegations involve

an unremarkable attack on an Afghan post in 2009.  Further, there is nothing unusual about this

defendant.  He is alleged to be a mid-level commander in the Taliban armed forces.  It is hard to

understand why the defendant, out of all the combatants over the years in Afghanistan, was plucked

out of obscurity to be prosecuted for domestic criminal offenses in the United States.  Such is the

arbitrary and unfair nature of this prosecution.

**Mr. Khamidullah Did Not Receive Sufficient Notice for Purposes of the Due Process Clause That His Alleged Conduct Was Criminal.**

The Government Must Show That a Foreign Defendant Had Fair Notice That He Could Be Held Criminally Responsible for His Conduct.

In addition to requiring a sufficient nexus "between the defendant and the United States, the

Due Process Clause also requires that foreign defendants receive fair warning that their conduct

could expose them to criminal liability."  The idea of fair warning is that 'no man shall be held

criminally responsible for conduct which he could not reasonably understand to be proscribed.'  *Al

Kassar,* 660 F.3d at 119 (quoting *Bottle v. City' of Columbia,* 378 U.S. 347, 35 1(1964)).  In the

international context, "fair warning does not require that the defendants understand that they could

be subject to criminal prosecution *in the United States* so long as they would reasonably understand

that their conduct was criminal and would subject them to prosecution somewhere.  *Id.; see also

United States v. Ahmed,* No. 10-CR-131, 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011)

(considering a due process challenge based on lack of fair warning in the context of a motion to

dismiss); *United States v. Bin Laden,* 92 F. Supp. 2d 189, 218 (S.D.N.Y. 2000) (same), *abrogated

on other grounds by United States v. Gatlin,* 216 F.3d 207, 212 n.6 (2d Cir. 2000).

In analyzing due process claims by foreign defendants based on a lack of notice, courts have

considered whether the alleged acts are "self-evidently criminal," *Ahmed,* 2011 WL 5041456, at *3

9

(internal quotation marks and citation omitted), or, as the Eleventh Circuit has put it, "condemned universally by law-abiding nations." *United States v. Saac,* 632 F.3d 1203, 1210 (11th Cir. 2011) (internal quotation marks omitted). To the extent that a given crime is universally condemned, a defendant cannot reasonably complain that he did not know his conduct would render him subject to prosecution. *See Bin Laden,* 92 F. Supp. 2d at 218 (defendant could not reasonably be surprised to learn that mass murder was illegal in the United States or anywhere else). By the same token, however, where an alleged crime is not self-evidently criminal and is not universally condemned, constitutionally sufficient notice is less likely to exist.

Not a single Taliban soldier has previously been prosecuted for violations of municipal criminal law solely because of their participation in the armed conflict in Afghanistan *See* Combatant Privilege Motion to Dismiss. This type of conduct was prevalent throughout Afghanistan at the time, over several years from 2001 through 2009, with far more severe consequences to Americans and allies, yet this is the first and only case of its kind to be prosecuted here. This defendant never fired his weapon ("I didn't shoot," Bates 33), and his cohorts abandoned any contingency plan to engage aircraft. Bates 61 ("when spy airplane came . . . we then go away"). There could be no reasonable expectation by this defendant that this act of war would render him subject to prosecution in any court.

<u>The Government Cannot Establish That Mr. Khamidullah Had Fair Notice That His Alleged Conduct Could Expose Him to Criminal Liability.</u>

The allegedly criminal conduct charged against the defendant is premised on theories of criminal liability that are largely untested and substantially untenable. *See* Accompanying Motions (ABP agents were not "assisting" United States officers under 18 U.S.C. § 1114; no corroboration exists to support the defendant's admissions; failure to preserve evidence is fatal to government

allegations).  The charges against Mr. Khamidullah are inconsistent with domestic and international law (see Combatant Privilege Motion to Dismiss at 12-30), which other Circuits have found relevant in assessing whether an extraterritorial prosecution comports with the Fifth Amendment. *See In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (noting that Sections 402 and 403 of the Restatement (Third) of Foreign Relations Law provide guidance on whether a foreign defendant's contacts with the United States are sufficient to sustain a prosecution for purposes of due process); *United States v. Davis,* 905 F.2d 245, 249 n.2 (9th Cir. 1990).  This Court need not reach this issue under the *Al Kassar* standard - which turns on the straight-forward question whether the defendant had the *"intent* to harm" United States citizens or interests, 2014 WL 1378772, at *8 (emphasis added) - but it provides yet another reason for concluding that the government's prosecution of the defendant is arbitrary and fundamentally unfair.

Contributing to this Court's consideration of the unfairness and arbitrariness of the government's choice to present these charges against Mr. Khamidullah are the government's failures to preserve evidence favorable to the defendant.  *See* Accompanying Motion to Suppress Lost Firearm.  Despite the fact that the defendant adamantly denied ever firing a shot from his Kalashnikov, and that a simple check of his weapon would confirm his position (Bates 33, 267-68), and that the government is responsible for spoliation of the weapon (Bates 1141, 1144, 1220-21), the government has presented charges against the defendant that subject him to the possibility of life in prison.  Additionally, no hand grenades that he allegedly possessed were recovered or documented by the government.  This Court cannot condone this misconduct by the government, and should consider these matters in assessing the arbitrariness and unfairness of this prosecution.

Section 402 also provides that a state has jurisdiction to prescribe law with respect to "certain conduct outside its territory by persons not its nationals that is directed against the security of the

state or against a limited class of other state interests." RESTATEMENT § 402(3).  This basis of jurisdiction, sometimes referred to as the "protective principle," applies to "a limited class of offenses . . . directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems." RESTATEMENT § 402, comment (1).  Courts have exercised extraterritorial jurisdiction based on this principle only when the defendant's conduct caused, or was aimed to cause, harm to the *state itself;* as opposed to citizens of that state.  *See, e.g., United States v. lbarguen Mosquera,* 634 F.3d 1370, 1379 n.5 (11th Cir. 2011) ("Under the protective principle, Congress may criminalize behavior that may threaten the security of the United States."); *United States v. Cardales,* 168 F.3d 548, 553 (1st Cir. 1999) ("In addition, under the 'protective principle' of international law, a nation is permitted 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.'") (internal citation omitted).  This basis of jurisdiction also fails.

Considering the feeble attempt of the defendant and his cohorts to attack an Afghan Border post (Bates Nos 1064, 1097), there can be little credence to any theory that these efforts "threatened the nation's security."  If anything, these facts and circumstances from November 29, 2009 demonstrated the senselessness of such attacks and the overwhelming superiority of the American military and resources.  This country's prosecutorial efforts would be far better expended on targets that have made a far more measurable impact on national interests, and who demonstrate a far more significant threat to this country.

As courts have explained in analogous contexts, to qualify as direct, "an effect must 'follow as an immediate consequence of the defendant's activity.'" *Republic of Argentina v. Weltover,* Inc., 504 U.S. 607, 61 8 (1992) (interpreting the term "direct" in the Foreign Sovereign Immunities Act); *accord Lotes Co., Ltd. v. Hon Hai Precision Indus. Co. Lid., No.* 12-CV-7465, 2013 WL 2099227,

at *7 (S.D.N.Y. May 14, 2013) (same interpretation in the context of the Foreign Trade Antitrust Improvements Act). "But for" causation is insufficient, as are "secondary and indirect effects" that occur as "the by-product of numerous factors." *See Lotes Co.. Ltd.,* 2013 WL 2099227, at *8-*9 (internal quotation marks and citations omitted). The best the government can say in the context of this case is that Mr. Khamidullah's efforts had a tangentially indirect effect on American efforts to curb the Taliban effort in Afghanistan. It was the defendant's cohorts who suffered losses, and the ABP and Americans who repelled the attack.

**Conclusion**

Because the charges in the Second Superseding Indictment fail to protect the defendant's Due Process rights by failing to draw a sufficient nexus between American interests and the defendant's conduct, and by presenting charges that are arbitrary and unfair, and because the defendant could not reasonably believe that his conduct would lead to prosecution in this country, the Second Superseding Indictment must be dismissed.

Respectfully submitted,

By: _____/s/_____

Robert J. Wagner
Paul Gill
VA Bar No. 27493 and 31461
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
804.565.0808
804.648.5033 (fax)
robert_wagner@fd.org

Claire G. Cardwell
Stone, Cardwell & Dinkin, PLC
101 Shockoe Slip, Suite K
Richmond, VA 23219
Ph. (804) 359-0000
Fax (804) 257-5555
clairegcardwell@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Michael R. Gill
James Gillis
Jennifer Levy
Assistant United States Attorneys
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219-2447
mike.gill@usdoj.gov

       /s/
Counsel

Robert J. Wagner, Esq.
VA Bar No. 27493
Counsel for Defendant
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia 23219
(804) 565-0808
(804) 648-5033 (fax)
robert_wagner@fd.org