1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | Richmond Division |

```
 3   UNITED STATES OF AMERICA      }
                                   }
 4   v.                            }      Criminal Action No.
                                   }      3:14 CR 140
 5   IREK ILGIZ HAMIDULLIN         }
     a/k/a IREK ILGIZ KHAMIDULLAH  }
 6
```

7                                    June 17, 2015

8          **COMPLETE TRANSCRIPT OF MOTIONS**
        **BEFORE THE HONORABLE HENRY E. HUDSON**
9          **UNITED STATES DISTRICT COURT JUDGE**

10   APPEARANCES:

11   Michael R. Gill, Esquire
     James P. Gillis, Esquire
12   Jennifer E. Levy, Esquire
     OFFICE OF THE UNITED STATES ATTORNEY
13   600 East Main Street, Suite 1800
     Richmond, Virginia  23219
14
          Counsel on behalf of the United States
15

16   Robert J. Wagner, Esquire
     Geremy C. Kamens, Esquire
17   Paul G. Gill, Esquire
     OFFICE OF THE FEDERAL PUBLIC DEFENDER
18   701 East Broad Street, Suite 3600
     Richmond, Virginia  23219
19
     and
20
     Claire G. Cardwell, Esquire
21   STONE CARDWELL & DINKIN PLC
     101 Shockoe Slip, Suite K
22   Richmond, Virginia  23219

23        Counsel on behalf of the Defendant

24              KRISTA L. HARDING, RMR
             OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

| | | **E X A M I N A T I O N S** | | |
|---|---|---|---|---|
| | DIRECT | CROSS | REDIRECT | RECROSS |
| S.I.O. Barclay Adams | 7 | 50 | 56 | -- |
| John Dempsey | 59 | 79 | -- | -- |
| Colonel Hays Parks | 83 | 146 | 203 | 211 |
| Prof. Jordan Paust | 216 | 258 | 292 | --- |

```
 1              (The proceeding commenced at 9:07 a.m.)

 2        THE COURT:  Good morning.

 3        MR. GILLIS:  Good morning.

 4        MS. CARDWELL:  Good morning.

 5        MR. WAGNER:  Good morning.

 6        THE COURT:  All right.  Call our case for today,

 7  Ms. Pizzini.

 8        THE CLERK:  Case Number 14 CR 140.  United States of

 9  America v. Irek Hamidullin.

10        The United States is represented by Mr. James P.

11  Gillis, Mr. Michael R. Gill, and Ms. Jennifer E. Levy.

12        The defendant is represented by Mr. Geremy C. Kamens,

13  Mr. Paul G. Gill, Ms. Claire G. Cardwell, and Mr. Robert

14  J. Wagner.

15        Are counsel ready to proceed?

16        MR. GILLIS:  We are, Your Honor.

17        I'd like to introduce to you Tonya Dandrige.  She's a

18  paralegal with our office.

19        THE COURT:  You need to speak a little more loudly so

20  my court reporter can hear you, Mr. Gillis.

21        MR. WAGNER:  Excuse me, Judge.  I think the

22  interpreter needs to be sworn in, please.

23        THE COURT:  All right.  Fine.  Just one second.  I'll

24  attend to that, Mr. Wagner.  I appreciate you bringing it

25  to my attention.
```

1     Go ahead, Mr. Gillis.  You have the floor.

2     MR. GILLIS:  Your Honor, thank you.

3     I just wanted to introduce Tonya Dandrige of our

4  office.  She's a paralegal who has been assisting us

5  greatly in the matter.

6     THE COURT:  We're delighted to have her here.

7     MR. GILLIS:  And Special Agent Marlow Arigando, who

8  is the lead case agent.

9     THE COURT:  Yes, ma'am.  Glad to have you here this

10  morning.

11     All right.  Very well.  Fine.

12     Mr. Wagner, you're absolutely correct.  We probably

13  do need to swear the interpreters in.

14     THE CLERK:  Your Honor, I need one moment.

15     THE COURT:  You go right ahead.

16     If each of the interpreters will please rise and

17  raise your right hand, please.

18     THE CLERK:  Please say "I affirm" or "I do" after the

19  oath.

20     You do solemnly swear that you will justly and truly

21  interpret all questions, and the answers thereto, which

22  may be propounded to you by the Court or by counsel, so

23  help you God?

24     INTERPRETER:  I do.

25     INTERPRETER:  I do.

1    THE COURT:  Ladies, you may be seated.

2    The matter is before the Court today on a number of

3 pretrial motions that have been filed.  And my prior

4 agreement with counsel is we're going to proceed in the

5 following order.

6    First, we're going to take up the motion to dismiss

7 the indictment, both on immunity grounds as well as due

8 process, notice, and jurisdiction.

9    We will move to -- then we'll progress to the motion

10 to suppress statements made by the defendant.

11    We'll move then to the motion to suppress seizure of

12 the firearm on the battlefield.

13    A motion to strike reference to the Afghan Border

14 Patrol, Camp Leyza, in the indictment.

15    Next, we'll move to the motion *in limine* to exclude

16 portions of a video.

17    And then to the motions for exculpatory evidence and

18 bill of particulars.

19    So that's the order in which we'll proceed.  Those

20 motions that are not completed today, we'll take up

21 tomorrow.

22    All right, Mr. Gill.

23    MR. MIKE GILL:  Your Honor, we're ready to proceed on

24 the Geneva Convention issue and law of war.

25    THE COURT:  All right.

1       Mr. Kamens, is there any opening statement, or are

2  you all prepared to put in evidence?

3       MR. KAMENS:  We're prepared for the evidence, Your

4  Honor.

5       THE COURT:  All right, sir.

6       Go right ahead, Mr. Gill.

7       MR. MIKE GILL:  Your Honor, we call Senior

8  Intelligence Officer Barclay Adams.

9       THE COURT:  All right.

10      Before we proceed further, is there a request for any

11  kind of rule on witnesses?

12      MR. MIKE GILL:  With respect to other witnesses,

13  except for the law of war experts, which I understand the

14  defense has a law of war expert, the United States does as

15  well, we'd like for them to remain in the courtroom.

16      THE COURT:  All right.

17      Any objection, Mr, Kamens?

18      MR. KAMENS:  No objection.  And we would like our

19  expert to remain.

20      THE COURT:  Yes, sir.  They may.

21      All right, sir, if you would raise your right hand,

22  left hand on the Bible, and face the Clerk of the Court.

23      THE CLERK:  You do solemnly swear that the testimony

24  which you are about to give, in this case, before this

25  Court, shall be the truth, the whole truth, and nothing

 1  but the truth, so help you God?

 2      MR. ADAMS:  I do.

 3      THE COURT:  Have a seat on the witness stand, sir.

 4      Whereupon, **S.I.O. Barclay Adams**, having been

 5  duly sworn in, testifies as follows:

 6                    **DIRECT EXAMINATION**

 7  BY MR. MIKE GILL:

 8  Q    Good morning, sir.  Would you please introduce

 9  yourself to Judge Hudson.

10  A    I would.  Your Honor, my name is Barclay Adams.  I'm

11  currently serving as a Senior Intelligence Officer for

12  Afghan political security issues at U.S. Central Command,

13  which is the military command responsible for the Middle

14  East, Central Asia and South Asia.

15      THE COURT:  Just to make sure that our record is

16  accurate, would you be kind enough to spell your name for

17  my court reporter so she can confirm that it's correct.

18      MR. ADAMS:  Absolutely, Your Honor.  That's

19  B-A-R-C-L-A-Y.

20  BY MR. MIKE GILL:

21  Q    Tell us what your responsibilities are as the senior

22  intelligence officer at USCENTCOM.

23  A    So I oversee a team of intelligence analysts who

24  provide assessments to the USCENTCOM commander, General

25  Austin, regarding all aspects of the conflict in

1  Afghanistan to support his decisions, as well as the

2  decisions of currently General Campbell, who's the

3  commander of the Armed Forces in Afghanistan.

4       THE COURT:  Mr. Gill, before you ask the next

5  question.

6       Commenting to the interpreters.  If any witness is

7  speaking too quickly for you to interpret, you raise your

8  hand and I'll have them slow down and repeat it.

9       INTERPRETER:  Thank you, Your Honor.

10      THE COURT:  Go right ahead.

11  BY MR. MIKE GILL:

12  Q    And I don't believe you mentioned, how long have you

13  been doing this job?

14  A    I've been in this current job for four years.  Prior

15  to this, I was doing the same -- essentially the same

16  function on the Joint Staff Afghanistan/Pakistan Task

17  Force in the Pentagon where we were focused specifically

18  on the Afghan insurgency, and other militant groups in

19  South Asia.

20  Q    In your current position, how many analysts do you

21  oversee?

22  A    About 60, currently.

23  Q    Would you please explain to Judge Hudson how it is

24  that you keep abreast of issues that are going on in

25  Afghanistan, and particularly the insurgent groups that

1  are located there.

2  A    Sure.  So, I, on a rotational basis, myself and some

3  of my other senior colleagues, we deploy out to

4  Afghanistan usually for about six to eight months every

5  two years.  And so we're able to maintain situational

6  awareness that way.

7       When we're not in Afghanistan, we're back in Tampa at

8  USCENTCOM headquarters.  We're in daily contact with our

9  colleagues who are deployed.  As well as monitoring all

10 the operational reporting and the intelligence reporting

11 coming out of Afghanistan.

12 Q    I believe you mentioned from, is it ballpark,

13 November 2009 through August 2011, that you were with the

14 joint staff, but still with responsibility over this area

15 in Afghanistan?

16 A    That's correct.

17 Q    Tell Judge Hudson about previous experience you've

18 had before that job with respect to Afghanistan, and

19 groups operating there.

20 A    Your Honor, in 2000 -- April of 2003, I deployed to

21 Afghanistan for the first time.  I was working as an

22 adviser and trainer with the Afghan National Army.  And

23 then following that, following that deployment, I earned a

24 master's degree in strategic intelligence, with emphasis

25 on terrorism.  And specifically, terrorism and terrorist

1  groups in the Afghanistan and Pakistan region.

2      In 2006, I was back out in Afghanistan as a senior

3  analyst in the U.S. Headquarters supporting the U.S.

4  Commander in Afghanistan at that time.

5      And then in 2009, I deployed back out to Afghanistan

6  again as a senior analyst for insurgency issues in

7  Afghanistan.  And was there from May until November of

8  2009, working for the NATO commander at that time, General

9  Stanley McChrystal.

10 Q    Describe for Judge Hudson your educational and

11 military background.

12 A    So I'm a graduate of the U.S. Military Academy where

13 I studied Mandarin Chinese and Arabic.  And was an

14 Infantry Officer initially for about three, three and a

15 half years, before changing over to military intelligence.

16     And then received my master's degree, which I

17 mentioned before, from American Military University.

18     And I currently work as an adjunct professor at

19 Henley-Putnam University, where I teach courses in

20 intelligence analysis and Islamic terrorism.

21 Q    I know there are many parts to your job with respect

22 to work in Afghanistan, and the areas around that region.

23 Is it fair to say, though, that for over 10 years you've

24 been focused on this area, as well as the groups operating

25 there, including the Haqqani Network and the Taliban?

1  A    Absolutely.  For -- for I would say over 12 years

2  now, that's been really my singular professional focus.

3       MR. MIKE GILL:  Your Honor, we tender Mr. Adams as an

4  expert on insurgency --

5       THE COURT:  Is there any challenge to his

6  credentials, Mr. Kamens?

7       MR. PAUL GILL:  No, Judge.

8       THE COURT:  All right.

9       He'll be received.  In what specific area do you want

10 to have him accepted in?

11      MR. MIKE GILL:  Insurgency issues in Afghanistan,

12 Your Honor, particularly with respect to the Haqqani

13 Network and the Taliban.

14      THE COURT:  All right.  He'll be received for that

15 purpose.

16      You may proceed.

17 BY MR. MIKE GILL:

18 Q    Sir, would you please tell Judge Hudson a brief

19 history on these two groups, the Taliban and the Haqqani

20 Network, and how it is that they're related.

21 A    Your Honor, both of those groups stem from the

22 rebellion against the Communist Afghan government, and

23 their Soviet supporters, in the 1980s.  The Taliban formed

24 predominately in southern Afghanistan in the early '90s.

25 And the Haqqani Network splintered off of one of the

1   mujahideen groups who had fought the Soviets in the 1980s.

2   And so in about 1994 is when the Taliban, under Mullah

3   Omar as the leader, were expanding very rapidly throughout

4   Afghanistan; when they expanded into southeastern

5   Afghanistan, where the Haqqani Network was active, where

6   they controlled that area, the two groups merged.

7        And Jalaluddin Haqqani, who was the leader of the

8   Haqqani Network, pledged loyalty to Mullah Omar.  He was

9   given a ministerial position within the Taliban

10  government.  And in exchange, Jalaluddin Haqqani

11  contributed forces to the Taliban's army that was then

12  fighting against the Northern Alliance.  And so, that's

13  where that marriage between the two groups happened.  And

14  the groups have remained closely aligned since then.

15       After 2001, the Haqqani receded across the border

16  into Pakistan, just as the Taliban did, into different

17  areas of Pakistan.  But as the insurgency grew and

18  expanded in the early 2000s, those two groups remained

19  closely aligned to the point where the Haqqani Network was

20  represented in the senior echelons of the core Taliban

21  leadership.  And that remains the case today.

22       THE COURT:  For the benefit of my court reporter,

23  could you spell Haqqani so I make sure it's correct in the

24  record, sir.

25       MR. ADAMS:  Absolutely, Your Honor.

1        That's H-A-Q-Q-A-N-I.

2        THE COURT:  Thank you.

3        Go right ahead, Mr. Gill.

4        MR. MIKE GILL:  As well as in anticipation of some of

5   the words we're going to have today, we did provide the

6   court reporter with a list of anticipated words.

7        THE COURT:  Thank you, Mr. Gill.

8        MR. MIKE GILL:  And if she can look at us and let us

9   know if they're not on the list, then we'll have him spell

10  each one, because that's going to be a lot.

11       THE COURT:  Thank you, Mr. Gill.  We appreciate that.

12  BY MR. MIKE GILL:

13  Q    Would you take a look at Government's Exhibit Number

14  1 that is there in front of you.  And is this map of

15  Afghanistan that focuses on specific provinces?  Does it

16  fairly and accurately represent the boundaries of the

17  country as they existed back in 2009, and up to today?

18  A    Yes, it is.  In the area of the country that's

19  highlighted in the cutout is the Khost Province.

20       MR. MIKE GILL:  Your Honor, we move the admission

21  of --

22       THE COURT:  Any objection to Government's Exhibit

23  Number 1?

24       MR. PAUL GILL:  No objection, Judge.

25            (Government's Exhibit 1 is received.)

1    THE COURT:  Go right ahead.

2  BY MR. MIKE GILL:

3  Q    Now, sir, we are focused in on the Khost Province,

4  and events that occurred there involving the defendant,

5  and others.  Would you explain to Judge Hudson the

6  significance of the Khost Province, and what connection,

7  if any, it has to the Haqqani Network and the Taliban back

8  in 2009, and even today.

9  A    So the Khost Province is important because it's one

10 of the provinces, the Afghan provinces, that borders

11 Pakistan.  And it borders specifically an area of Pakistan

12 known as the Federally Administered Tribal Areas, or the

13 FATA.  And this is an area of Pakistan that is -- that is

14 not under the tight control of the Pakistani government.

15 There are Pakistani military units that are there, but

16 they do not maintain control over the tribal groups

17 that -- that are in that area.  And that's under agreement

18 with those tribes.

19 Q    Let me ask you to slow down just a touch to help the

20 translator a little bit.

21 A    Sure.

22 Q    Continue on.

23 A    So as a result of that, these areas along the border

24 with Khost Province are not well governed by the state of

25 Pakistan.  And so -- so this is an area where -- as the

1   U.S. and the coalition came into Afghanistan, many of the

2   Taliban militant groups, especially the Haqqani Network,

3   receded into this area of Pakistan.  And they remain there

4   today.

5       The Khost Province is also significant in that that

6   is the tribal homeland of Jalaluddin Haqqani and -- and

7   his group, the Zadran faction of the Pashtun people.

8       Zadran is Z-A-D-R-A-N.

9       So that's the traditional homeland for the Haqqani

10  Network.

11  Q   And is this back before 2009, during 2009, and even

12  today, is this their primary area?

13  A   It is.  It is.  Even in the 1980s, Jalaluddin Haqqani

14  fought in the Khost Province.  That's where he and his

15  fighters concentrated specifically.

16  Q   Tell Judge Hudson, based on your understanding, is

17  the Haqqani Network a foreign designated terrorist

18  organization by the United States?

19  A   The Haqqani Network is a state-sponsored -- I'm

20  sorry -- a foreign terrorist organization as designated by

21  the State Department.

22  Q   Was that designation roughly around September of

23  2012?

24  A   It was.

25  Q   Now, in this area, the Khost Province, are there

1  other groups also that are operating in that area?

2  A    There are.  In that area, you have what we would say

3  are the more traditional Taliban.  There are -- they're

4  kind of some fringe Taliban elements, not closely

5  controlled and monitored by the senior Taliban leadership,

6  which focuses more in southern Afghanistan.

7      In addition to the Taliban, you've got a number of

8  Pakistani militant groups, tribal groups, in that area who

9  are mostly focused on fighting the Pakistani government,

10  but have also contributed materially to the insurgency in

11  Afghanistan.  Specifically in 2009, there was a group

12  under the command of an individual named Baitullah Mehsud

13  who was one of the tribal leaders in south Waziristan in

14  the FATA.

15      There is an individual, a Commander Nazir, who is

16  also a Pakistani militant fighter who -- who is in north

17  Waziristan.  And then -- then there are -- there was in

18  2009, there were remnants of al-Qaeda still operating in

19  north and south Waziristan as well.  And there are a small

20  number of other foreigners who have been identified in

21  that area.  Small numbers of Chechens, Uzbeks, Turks, and

22  some fighters from Dagestan.  And so there's a real -- a

23  real mixture of militants across the border from Khost

24  Province.

25  Q    In your experience, and what you know about the

1 Taliban operating in Afghanistan, do they, as far as their

2 insurgent forces, do they rely primarily on Afghan

3 nationals or do they accept people from other

4 nationalities and origins?

5 A    They've shown a great willingness to accept support

6 from anyone willing to contribute to their effort.

7 Q    Explain to us briefly also the significance of the

8 Khost Province to the United States, and our

9 responsibilities in Afghanistan back in 2009, and even

10 today.

11 A    In 2009, eastern Afghanistan was under the

12 operational control of U.S. forces specifically.  And so

13 there was a brigade of the 82nd Airborne Division in 2009

14 that was responsible for Khost Province, and the

15 surrounding area.  And -- and so from that respect, it

16 was -- it was of significant importance to the U.S.

17 military, because that was our area of responsibility in

18 Afghanistan.

19 Q    There to assist the Afghans with respect to control?

20 A    Correct.  Correct.

21     As we were still developing the Afghan security

22 forces, we were providing that -- that additional military

23 capability that they needed as their forces were

24 developing.

25 Q    Now, you mentioned that after 2001, the United States

1  came in, the Taliban pulled back, and that they divided

2  out.  What part of the countries did the Taliban and

3  Haqqani Network pull back to, as looking at the map?

4  A    Right.  So as we look at the map, they receded into

5  Pakistan.  So the Haqqani Network moved predominately

6  directly across the border from Khost Province, in north

7  Waziristan, centered around the town called Miran Shah in

8  north Waziristan.

9       The Taliban core, with the core leadership, retreated

10 across the border into Balochistan Province of Pakistan,

11 which is along the southern border of Afghanistan,

12 centered around the City of Queued.

13 Q    I would like for you to explain to Judge Hudson,

14 leading up to 2009, the Taliban's structure as far as

15 their command structure that was in place, based on your

16 understanding and experience.

17 A    So in 2009, at the -- at the top echelon of the

18 Taliban leadership, you had Mullah Omar, who was still the

19 head of the Taliban.  And immediately under him was a --

20 was a group of individuals, about two dozen, who

21 constituted an organization called the Senior Shura, or

22 the Quetta Shura.  And *shura* means council.  So this was

23 a council of senior Taliban leaders who interpreted and

24 disseminated Mullah Omar's guidance to the Taliban

25 movement at large.

1    So beneath those -- beneath that Senior Shura there

2  were various committees.  There was a military committee,

3  a political committee, an informational committee.  And

4  beneath the military committee, you had -- you had a

5  structure at the provincial and district levels of

6  commanders.

7    Now, this is the theoretical design of the Taliban

8  command and control structure.

9  Q    Now, tell us, you said "theoretical design."

10 A    Right.

11 Q    In reality, tell Judge Hudson about your observations

12 as far as command structure and whether it's working and

13 being enforced top to bottom.

14 A    So in reality, the structure once you got to the

15 provincial level and down to the district level, in

16 southern Afghanistan, it -- I would say that it was much

17 better.  There was a much more cohesive command and

18 control network because -- for a number of cultural and

19 tribal reasons.  That's where the Taliban came from.

20 That's where they had their connection with the

21 population, and so they were better able to enforce their

22 rules and enforce their orders in southern Afghanistan.

23    Outside of southern Afghanistan, as you go to the

24 west and the north, and even in the east, there was a

25 much -- the connections between the Taliban leadership and

1  the fighter and the commanders on the ground was much less

2  defined.  And so the Taliban leadership did not have good

3  command and control over those forces in the other areas

4  of the country.

5  Q    Based on your observation, we're going to be talking

6  about some rules that the Taliban put in in 2009.  Are you

7  aware of the Taliban actually enforcing their own rules,

8  and that being their own rules designed to protect, you

9  know, civilian -- against civilian casualties?  If

10  something happens and somebody goes off the reservation,

11  are you aware of the Taliban cracking down and enforcing

12  their rules?

13  A    Not enforcing in terms of a judicial sense.  In some

14  cases, we have seen commanders who have been moved out of

15  their positions and moved into other positions in other

16  areas where the local populous has complained about a

17  particularly harsh commander.  Because the Taliban

18  understands the necessity of having the support of the

19  population, so when the population complains about a

20  specific individual, they will move that individual out of

21  that area.  But they have not enforced in a judicial sense

22  the rules that they have published for their forces.

23  Q    And with respect to shadow government, do they have a

24  shadow government set up, based on your observations back

25  in 2009?

1  A    In some areas of the country it was set up.  There

2  were shadow governors appointed for all but one of the

3  Afghan provinces in 2009.  But most of those -- most of

4  those shadow provincial governors never went to the

5  provinces that they were governors over.  This was more a

6  form than a function.

7       And so they -- the Taliban was able to claim that

8  they had a government that was responsible for the

9  country, but in reality, that was not the case.

10 Q    And based on your observations since 2001, after that

11 and with the elections that occurred afterwards, have you

12 observed the Taliban exercise any governmental controls in

13 Afghanistan?

14 A    No.  That has -- that's not changed.  In some rural

15 areas where the legitimate Afghan government does not have

16 tight control or representation, we see the Taliban

17 functioning more as a force that is enforcing rule of law.

18 But again, these are very localized areas where the

19 legitimate Afghan government is not able to enforce rule

20 of law.

21 Q    And are those just isolated instances?

22 A    Yes.  Yes.

23 Q    And the structure that you just described for us, I

24 put it in context of 2009.  Is that the same general

25 structure that we have in place even today?

1  A     It is.

2  Q     Now let's talk about the Haqqani Network that

3  operates primarily in the Khost Province.  Tell Judge

4  Hudson about their structure and how they're set up.

5  A     So -- so, Your Honor, I mentioned previously

6  Jalaluddin Haqqani, who, again, was a very prominent

7  mujahideen commander in the 1980s.  And remained a

8  prominent power-broker and warlord through the 1990s to

9  the point where he joined the Taliban, and has remained in

10 that role since.  He has a number of sons who have come of

11 age and are currently those who are running the day-to-day

12 operations of that network.

13       One in particular, Siraj Haqqani, is seen as the

14 primary leader for -- for the movement at this point, with

15 Jalaluddin still serving mainly in a symbolic role.  And

16 so Siraj, with his brothers, maintain a better military

17 structure, I would say, than what the Taliban has been

18 able to do.  The group is smaller, so it lends itself to

19 that better command and control over the commanders that

20 they have working in Afghanistan.

21 Q     Are you aware of the Taliban enforcing, you know,

22 their own rule violations with respect to protecting

23 civilians against the Haqqani Network?

24 A     Absolutely not.

25 Q     Just explain to Judge Hudson the importance of the

1  Taliban and the Haqqani Network, and what that partnership

2  really means back in 2009, and today.

3  A    Well the Taliban, as they were coming to power,

4  recognized that they could not -- they could not supplant

5  the Haqqani Network, and the control that Jalaluddin

6  Haqqani and his family had in that southeastern network of

7  the country, and so they -- they merely adopted them and

8  allowed them to continue to function as the dominant power

9  in that area.  And that continues to be the case now.

10      So the Taliban leadership, when they disseminate

11  rules, when they disseminate guidance, if the Haqqani

12  Network, for whatever reason, decides not to follow that

13  guidance, or blatantly violates that guidance, the Taliban

14  leadership has not cracked down on the Haqqani Network

15  because they recognize the -- the impossibility of

16  operating in southeastern Afghanistan without the

17  compliance of the Haqqani Network and without keeping them

18  as an ally.

19  Q    Can you characterize for us the level of violence,

20  particularly towards civilians, exhibited by the Haqqani

21  Network versus the Taliban?

22  A    The Haqqani Network is a much more brutal network

23  than the core Taliban.  Their targeting of civilians has

24  been less discriminate, particularly in the capitol city

25  of Kabul.  They have -- they've committed kidnappings that

1  the core Taliban would not have advocated.  They have

2  taken, in particular, foreign journalists captive and

3  attempted to exchange them for money.

4      And, again, as I mentioned, the targeting of

5  civilians or the indiscriminate killing of civilians, many

6  of the complex attacks, including suicide attacks that

7  they've conducted in the capitol, is particularly strong.

8  Q    And with respect to any insurgent operations that

9  might be conducted by the Taliban in the Khost Province,

10 based on your experience, would the Haqqani Network be

11 aware of any approval process for that occurring within

12 that province?

13 A    Yes.  And if they were not, then the leadership of

14 the Haqqani Network would be looking for who is

15 responsible for that attack in order to reign them in,

16 because they do see Khost Province, and the surrounding

17 area, as their area of responsibility, their purview, and

18 that no one would conduct operations there without their

19 approval.

20 Q    You mentioned earlier the, I want to get it right,

21 the *Senior Shura*?

22 A    Yes.

23 Q    Would you spell that for the court reporter, and tell

24 us what it is and whether the Haqqani Network has a

25 position on that.

1  A     So shura is S-H-U-R-A.

2       And again, this is about two dozen of the core

3  Taliban leaders.  Most of them from the original group of

4  Taliban that founded the movement in the early '90s in

5  Kandahar.  But since -- I would say since at least 2003,

6  as the Taliban was getting on its feet again after the

7  U.S. had gone into Afghanistan, since about 2003, the

8  Haqqani Network has had representation on the Senior Shura

9  with one of the Senior Haqqani Networks a part of that

10 council.

11 Q     And that continues today, based on your knowledge?

12 A     Yes.

13 Q     Now, I want to talk to you about a code of conduct

14 that was installed by the Taliban in Afghanistan.  Would

15 you give Judge Hudson a little background as far as what

16 your understanding is in the Genesis for that code of

17 conduct?

18 A     So in 2006, we saw the first, what we call *The

19 Taliban Code of Conduct"* that was disseminated.  It was

20 a -- a fairly short document that addressed organizational

21 issues, and tried to define what the organizational

22 structure of the movement would be in addition to

23 providing guidance to Taliban fighters on what kinds of

24 operations they should be conducting and the types of

25 targets they should be avoiding, or particularly focused

1  on attacking.  In the summer of 2009, we saw that document

2  superseded by an updated version of that code of conduct.

3       THE COURT:  What year was that?

4       MR. ADAMS:  In 2009, Your Honor.

5       THE COURT:  Go ahead.

6  BY MR. MIKE GILL:

7  Q    Go ahead.

8  A    And so, in -- so with this code of conduct that was

9  disseminated in 2009, it expanded upon the 2006 version

10 and clarified some points where the Taliban leadership

11 essentially determined that the fighters were either not

12 paying attention to the 2006 version, or clarifying issues

13 that had come up since the 2006 version.

14 Q    Take a look at Government's Exhibit 3.  Is that a

15 translation of the 2009 rules that were recovered by the

16 U.S. military in or about July of 2009?

17 A    It is.

18      MR. MIKE GILL:  Your Honor, we'd move for admission

19 of Exhibit 3.

20      THE COURT:  Any objection to Exhibit 3?

21      MR. PAUL GILL:  No, Judge.

22      THE COURT:  Be received.

23          (Government's Exhibit 3 is received.)

24 Q    And to move things along, let's focus on some

25 specific provisions.  I'll have you turn to Page 3.  Each

1  paragraph has an individual number.

2  A    Yes.

3  Q    Okay.  Let's go ahead and turn to Page 4.  And

4  looking at Section 2, "*Regarding Prisoners.*"  Tell Judge

5  Hudson about Rule Number 9, and what your experience is

6  with that rule, and what's going on in reality in

7  Afghanistan back in 2009, and even today.

8  A    So Rule Number 9, when it mentions "*IMAM*" in Rule

9  Number 9, that is specifically referring to Mullah Omar.

10 And when it mentions his "*assistant,*" that is his

11 immediate deputy.  And so what this rule says is that if

12 any Afghan national personnel are captured by the Taliban

13 forces, that the disposition of those prisoners is to be

14 decided by Mullah Omar or his immediate deputy.  And they

15 will decide whether to kill them, to use them for prisoner

16 exchange, or to exchange them for money.

17     In reality, what we've -- what we have seen is that

18 the Taliban do not have any process for processing

19 prisoners that they have captured back to the Taliban

20 leadership for that determination to be made by their

21 senior leaders.  Rather, what we will see -- what we see

22 most commonly is that if Afghan National Army personnel

23 are captured, they're summarily executed.  Either shot,

24 we've seen beheadings.  And we don't see an effort to

25 maintain these prisoners in any form that we would

1  recognize as legal.

2  Q    In fact, aside from instances where there are

3  kidnappings or ransom type situations, are you aware of

4  the Taliban or Haqqani Network maintaining any type of

5  prisoner of war camps to protect and maintain the

6  integrity of individuals that they capture, whether they

7  be Afghan or U.S. or other coalition forces?

8  A    No.  No, there are no camps.  And to my knowledge,

9  the Taliban has not provided access to the Red Cross or

10  other non-governmental organizations to any prisoner that

11  they have taken.

12  Q    And just to be clear, just to make sure the record is

13  perfectly clear, when we're talking about the application

14  of these rules, we're talking about back in 2009?

15  A    Correct.

16  Q    But also it's events that happened after 2009 to

17  date?

18  A    Correct.

19  Q    Okay.  Let's talk about Number 10 on the same page.

20  A    So -- so this -- this particular rule tells the

21  Taliban fighters, if you happen to take prisoners, to take

22  hostages, and if you can't get them back to your place,

23  you know, meaning back to your strongholds, whether they

24  be in Afghanistan or Pakistan, and if they're "*infidel*

25  *fighters,*" meaning members of the coalition or government

1  workers, representatives of the Afghan government, *"then*

2  *the Mujahideen have the right to kill them."*

3  Q    It goes without saying, are you aware of them

4  transporting prisoners anywhere when they capture them?

5  A    They have-- we do have, you know, the most prominent

6  example of this is Bowe Bergdahl, the U.S. soldier who was

7  taken by the Haqqani Network in the summer of 2009 and was

8  transported back to Pakistan where he was held.  But that

9  is the only circumstance that I know of.

10       There was another -- there was another situation that

11  happened in early 2010.  Two U.S. soldiers had gotten lost

12  and were captured by the Taliban south of Kabul, and both

13  were executed because they could not get them back to

14  Pakistan.

15  Q    Let's talk about Rule Number 11 relating to the

16  Afghan National Army, the Afghan National Police.

17  A    Right.  And this relates back to Number 9.  If a

18  member of the Afghan National Army or the Afghan National

19  Police surrenders to the Taliban, they should not be

20  killed.  But again, this is a regular occurrence.  We find

21  this very frequently.  If the Taliban attack an isolated

22  post and they're able to capture members of the Afghan

23  Army or the Afghanistan Police, they are habitually

24  killed.

25  Q    Are you aware of instances where the Taliban upper

1  management structure enforced this rule?

2  A    No.  I'm aware of no instances where that's been

3  enforced.

4  Q    Now then, Number 12.

5  A    Number 12.  So -- so here again speaks to the -- to

6  the designs, the theoretical design, of the Taliban's

7  judicial structure where they say if a Taliban judge or

8  other *"authorities sentence a captured enemy to death,*

9  *they can not kill him unless the IMAM or"* the Omar or his

10 *"assistant gives permission."*  But here again, we have not

11 seen instances where that decision has gone back to Mullah

12 Omar or his assistant.  If someone has been sentenced to

13 death, they are killed there on the battlefield rather

14 than going through a judicial process.

15 Q    Turning to the next page, which is Page 5 of Exhibit

16 3.  The rule at the very bottom, Number 18.

17 A    Yes.  *"If someone is sentenced to death, he should be*

18 *killed by gun."*  That is, we've seen hangings, we've seen

19 individuals beheaded, as I said.  Particularly, the Afghan

20 Police or Afghan Army soldiers that they captured.

21 Q    Now then let's turn to Page 6 of Exhibit 3 at the

22 top, and talk about Rules 19, 20, and 21.

23 A    So these rules deal specifically with the civilian

24 contractors, whether they be -- whether they be Afghan

25 civilian contractors or third country nationals, the

1  Pakistanis or Indians, who are assisting in the coalition

2  efforts in Afghanistan.  That's as drivers, or as

3  construction workers, building or repairing bases.  Those

4  kinds of things.

5      And Rule Number 19 talks about personal vehicles of

6  those who are working for the infidels or the coalition.

7  That those vehicles have to be burned.  And if they -- if

8  they don't want to burn the vehicles, the Taliban are not

9  allowed to have them for personal use.  But we know for a

10  fact that the Haqqanis, in particular, are driving U.S.

11  vehicles in Pakistan.

12      Rule Number 20.  *When you capture drivers or*

13  *contractors transporting infidel equipment, you need to*

14  *take them to the provincial authority.  If you can catch*

15  *them, then you are allowed to kill them."*

16      And we have a number of cases of that where

17  Afghanistan truck drivers who are either transporting

18  equipment or transporting fuel for the coalition forces

19  are attacked or ambushed.  Their trucks are ambushed and

20  the trucks are destroyed or the drivers are simply killed

21  there on the spot for supporting the coalition.

22      And Number 21 talks about construction companies.

23  Again, a lot of those are coming out of India or out of

24  Egypt.  These companies that are there, either working on

25  coalition bases, or doing other development type projects,

1  building roads, building bridges, working on dams.  And it

2  says specifically if *"the Mujahidin warn them and they do*

3  *not stop working for the infidels,"* and they don't, and

4  *"if they are captured they should be taken into provincial*

5  *authority, who has the right to decide their fate."*

6      But we see the Taliban routinely attacking these

7  construction workers.  They'll mortar their camps, they

8  lay IEDs for their vehicles.  And so the civilian

9  construction workers operating in Afghanistan are under

10  considerable threat from the Taliban.

11 Q    All right.  If we can move forward two pages to

12 Section 7, which is on Page 8 of Exhibit 3.  And let's

13 talk about Rule Number 36, *"Mujahidin Personnel Issues."*

14 A    So it says there, *"If a Mujahid commits a crime and*

15 *his commander takes him out of his group,"* he *"should take*

16 *the issue to the provincial authority."*

17      Then later says that, *"The commanders in different*

18 *areas have no right to take them into their groups."*

19      So this speaks to what I mentioned earlier.  If a

20 particular commander has been -- has been highlighted by

21 the local population as being particularly harsh, and that

22 issue is raised to the Taliban leadership, we have seen

23 instances where those individuals have been removed from

24 their positions.  And according to this rule, should not

25 be taken into other groups.  That the individuals should

1    be expelled from the Taliban.

2        But we've seen a number of examples, some of the most

3    harsh commanders may be removed from one area but are

4    assigned to other areas where the population has been less

5    acquiescent and where the Taliban feels they need to

6    intimidate the populace into supporting them.

7    Q    And then Rule 41, which is at the bottom of that same

8    page.

9    A    This is very interesting.  This rule addresses the

10   four conditions that must be met in order to conduct

11   suicide attacks.  The first being that the individual

12   conducting the attack "*should be very educated in his*

13   *mission.*"

14       We have -- there have been a few cases where we've

15   been able to interdict the suicide bombers before they

16   conduct attacks.  We found -- we've found individuals who

17   are -- who are not mentally developed.  We found children.

18   There have been cases where we've got individuals who have

19   a bomb strapped to them with no means of removing it and

20   someone else has the trigger device.  And the individuals

21   had no desire to be part of this, but have been forced

22   into it.

23       In "*B - Suicide attacks should be done always against*

24   *high ranking people.*"  And this is a way that the Taliban

25   leadership tried to limit the negative press that they

1   were receiving for having conducted so many indiscriminate

2   attacks.  And they only use them against high-ranking

3   individuals in the government.

4       But there have been countless examples, hundreds over

5   the years, of suicide bombings that have occurred in

6   hotels, in restaurants, and in -- against buses.  And so

7   that is a rule that has not been applied and has not been

8   enforced.

9       In *"C - Try your best to avoid killing local people."*

10  Again, over the years, hundreds of examples where the

11  suicide bombings have happened and have killed only Afghan

12  civilians.  That is more than not the case.

13      And finally, *"D - Unless they have special permission*

14  *from higher authority, for every suicide attack must be*

15  *approved by the provisional authority."*  So the Taliban

16  have tried to centrally manage the use of suicide

17  bombings.  And they've tried to be the ones that determine

18  where they would be employed, what they would target.  But

19  there again, given the many ways in which these other

20  rules have been violated, we don't believe that the

21  Taliban leadership has good control over the suicide

22  bombings that are happening.

23  Q   I know that we mentioned earlier there's other

24  groups, smaller groups, that are operating around

25  Afghanistan that are not part of the lawful government.

1  A     Right.

2  Q     With respect to suicide bombings, and these types of

3  attacks you're describing, is the information that you

4  have that it's the Taliban and the Haqqani Network that

5  are behind the vast majority of these type of attacks?

6  A     I am not aware of any non-insurgent groups employing

7  suicide bombers.

8  Q     So these -- the Taliban and the Haqqani Network are

9  the groups that are doing that?

10  A     Yes.

11  Q     And when we're talking about suicide bombings, is it

12  fair to say that in general the explosives are concealed

13  where somebody wouldn't be able to see them until the

14  person is able to get right up on them?

15  A     That's correct.  Either concealed under the clothing

16  or concealed in vehicles.

17  Q     Let's move up two additional pages to what would be

18  Page 10 of Exhibit 3.  *"Prohibited Items, Section 11."*

19  Tell Judge Hudson about Rule Number 51, and what you've

20  noticed on that rule with respect to presidential

21  elections occurring in Afghanistan.

22  A     So Rule 51 states that the Taliban are not to cut

23  *"noses, lips and ears of people."*  And that this *"is*

24  *completely prohibited."*  And this goes back to, again, a

25  lot of negative publicity that the Taliban had received

1  for these kind of mutilations.

2      And as you mentioned specifically following the 2009

3  elections, as after the 2004, 2005 elections, what we saw

4  was -- particularly in the rural areas, we saw individuals

5  who were mutilated for having participated in the

6  elections.  Specifically as a way to avoid double voting

7  or voting multiple times, people voting would stick their

8  fingers in indelible ink.  And so for a number of days,

9  their fingers would be colored by this ink.  And we saw in

10 some of these rural areas, the Taliban would go through

11 the villages looking for people who had voted and had this

12 ink on their fingers, they would cut their fingers off.

13 Q    Rule Number 52 with respect to donations.  That they

14 should not force donations from people.

15 A    Right.  So this is again focused on maintaining or

16 winning the support of the local population.  But what we

17 routinely see is the Taliban will come into a village and

18 demand to be -- demand to be fed, demand to be housed.

19 And in some cases, demand money from the local villagers.

20 Q    And Rule Number 54 with respect to "kidnapping people

21 for money."

22 A    This -- this is fairly common that individuals

23 calling themselves Taliban will kidnap people and demand

24 money for -- to include businessmen, but also foreign

25 journalists have been targeted.  Various NGO workers that

1  have been targeted over time.  And again, all -- always by

2  individuals claiming to be Taliban.

3  Q    Tell us also about the Taliban's policies or

4  practices with respect to Afghanistan citizens who were

5  seen as cooperating with coalition forces or the infidels.

6  A    Right.  So they're -- they are considered apostate.

7  They are considered to have renounced Islam in that they

8  are working with the coalition forces.  And so in doing

9  so, the Taliban justifies killing such individuals really

10  with impunity.

11  Q    Also are you aware of the use of night letters?

12  A    Yes.

13  Q    Describe for us what night letters are.

14  A    So night letters is one of the ways that the Taliban

15  will intimidate the local population.  So if you have a

16  village, for example, that is -- that is open to receiving

17  a coalition presence, if the coalition comes into the

18  village and the elders of that village will sit with the

19  coalition members and talk to them and share meals with

20  them, and then what typically happens that night is the

21  Taliban will come into the village and post a letter on

22  the door of the mosque or on the door of the elder's home

23  that essentially threatens them and says, you know, if you

24  continue to work with the coalition or continue to support

25  the coalition, then we, the Taliban, are not responsible

1  for the repercussions.

2      And so we have seen instances where after these night

3  letters has been disseminated and the people continue to

4  do whatever it is the Taliban has told them not to do,

5  homes have been burned, individuals have been

6  assassinated.  All those kinds of things.

7      This is particularly prevalent around the election

8  time periods where the Taliban will go into these villages

9  and post these night letters telling the people they are

10  not to participate in the elections, and that if they do

11  so then they can be targeted.

12 Q    All right.  We'll get to a specific instance in a

13  couple of minutes.  Let's turn to the next page, which

14  will be Page 11 of Exhibit 3.  Tell us about Rule Number

15  63.

16 A    Rule Number 63 states that, *"The Mujahidin should*

17 *always have the same uniform as the locals because it will*

18 *be difficult for the enemy to recognize them, and also it*

19 *is easy for the Mujahidin to go from one location to*

20 *another."*

21      So the Taliban leadership is telling their fighters

22  to adopt and to wear the uniform of the enemy so as to not

23  be identifiable as they go out to conduct their

24  operations.  And this is a very common tactic that we've

25  seen that the Taliban employed.  When they attacked U.S.

1  bases, for example, there have been a number of cases

2  where the Taliban have attempted to breach U.S. bases and

3  conduct attacks inside the bases.  They will routinely

4  wear U.S. Army uniforms when they conduct those attacks.

5  We see them wear Afghan Army uniforms, Afghanistan police

6  uniforms when conducting suicide bombings because it

7  allows them to get into -- in and among the population

8  without being identified.

9  Q    And also as a group outside those instances where

10 you're talking about infiltrating wearing either U.S. or

11 Afghan police uniforms, are you aware of them just wearing

12 ordinary Afghan traditional clothing?

13 A    Yes.

14 Q    To comply with blending in with the population?

15 A    When not wearing our uniforms, they have no other

16 uniform.  So they will wear traditional Afghan clothing so

17 it's really impossible when you go into a village to

18 identify who is Taliban and who is not in a village

19 because they're all dressed the same.

20 Q    And aside from uniforms, are you aware of, you know,

21 from 2009 forward to the present of the Taliban or Haqqani

22 Network having any type of distinctive insignia that they

23 wore that you can look at and identity them as part of the

24 Taliban or Haqqani Network?

25 A    No.

1  Q    Now, the rule at the very bottom, 65.

2  A    Yes.  So it states that, *"All military centers are*

3  *responsible for the implementation of these rules and*

4  *regulations in their provinces."*  Against the Taliban's

5  theoretical design that they have a military structure

6  that will enforce these rules down to the local level, but

7  throughout the country, we see -- we see that that effort

8  to control is, at best -- is, at best, sporadic.  In some

9  local areas, it's better than others, but in most of the

10  country we see no effort at all.

11  Q    Now then if you will take a look at Government's

12  Exhibit Number 2 that is there in the envelope before you,

13  or folder.  And is this a sampling of some Taliban acts of

14  violence confirmed that you pulled with respect to 2009,

15  as well as some general information, and then a couple of

16  representative instances for other years, and then a few

17  more that you verified for 2014 and 2015?

18  A    Yes, it is.

19  Q    And to be clear, is this just a sample, the type of

20  conduct that we're talking about, is it going on

21  regularly?  Has it been that way since 2009 all the way up

22  to today?

23  A    Yes.  As this is -- as you said, this is merely a

24  sampling of some of the kinds of instances that happen

25  regularly in 2009, and continue to happen today.  In 2009,

1  we were looking at unscaled -- in the summer of 2009,

2  about 60 to 70 insurgent attacks a day around the country.

3  And so you're --

4       THE COURT:  When you say *around the country,* do you

5  mean Afghanistan?

6       MR. ADAMS:  Around Afghanistan.  Yes.  Yes, Your

7  Honor.

8       THE COURT:  Okay.

9       Go ahead.

10 BY MR. MIKE GILL:

11 A    So you're looking at tens of thousands of attacks a

12 year that are happening.  So this is just a sampling of

13 some of the attacks that we have seen.

14 Q    And with respect to some of those attacks, a lot of

15 them are military-type attacks, but also these civilian

16 instances?

17 A    Correct.  So, many of those attacks are attacks on

18 coalition military forces or directly against Afghan

19 security forces.  But many, including these that we've

20 thrown out here, have specifically targeted civilians.

21      MR. MIKE GILL:  Your Honor, we move for admission of

22 Exhibit 2.

23      THE COURT:  Any objection, Mr. Gill?

24      MR. PAUL GILL:  No, Judge.

25      THE COURT:  It will be received.

1          (Government's Exhibit 2 is received.)

2  BY MR. MIKE GILL:

3  Q    And if you can just give us just the overview of

4  2009, some of the statistics that we have.

5  A    As stated in the exhibit, and again I've drawn this

6  from --

7       THE COURT:  When you say *the exhibit,* are you

8  referring to Exhibit 2?

9       MR. ADAMS:  Yes, Your Honor.  Exhibit 2.

10       THE COURT:  Okay.  Go ahead.

11  BY MR. MIKE GILL:

12  A    As stated in Exhibit 2, in 2009, violence increased

13  numerically, but also in terms of complexity.  And

14  according to the U.S. State Department, 67% of all

15  civilian casualties that year were attributed to the

16  Taliban.  And so 2009 was during a period of time when

17  year on year we were seeing progressively more violence,

18  and so it was a bad year, 2009, in terms of what we'd seen

19  prior to that.

20       Suicide bombings were becoming more prevalent.  There

21  were twice as many suicide bombings in 2009 as what we had

22  seen in 2008.  And in Kabul, the capitol specifically, we

23  had 36 suicide and IED attacks that year, in addition to

24  19 rockets that had been fired on the capitol.

25       And in talking about those rockets, these rockets are

1  normally propped up against a rock and merely fired at an

2  angle so that they will land in the city.  So not

3  targeting any particular building or any military target,

4  but merely trying to induce terror by firing the rockets

5  into the city.

6       There was also targeting of Afghan religious figures

7  who opposed the Taliban, or had spoken out against the

8  insurgency.  The Afghan Ministry of Interior for the year

9  2009 identified 71 religious figures who had been killed

10  by the Taliban, and 17 acts of violence that occurred in

11  mosques that year.

12  Q    Now let's talk specifically on just a few of the

13  instances that occurred in 2009 that you pulled.

14       MR. PAUL GILL:  I'm actually going to object at this

15  point.  I think this is very cumulative.  I think it's

16  also of marginal relevance to what actually was described

17  by all parties and all witnesses as the event involving

18  Mr. Khamidullah.  Exhibit 2 is in evidence.  There's been

19  a discussion --

20       THE COURT:  Well, this is being offered to determine

21  whether or not the Taliban and/or any group to which your

22  client is affiliated is a lawful or an unlawful combatant.

23  So your objection is overruled.

24       You may proceed.

25       MR. MIKE GILL:  Thank you.

1  BY MR. MIKE GILL:

2  Q    The document speaks for itself.  So if you can just

3  hit these at a high level.  The Judge has the exhibit.

4  A    Sure.

5  Q    February 11, 2009?

6  A    February 11, 2009, there was an attack on multiple

7  Afghan Government Ministry buildings in Kabul where

8  suicide bombers with small arms and grenades went into

9  these buildings and killed -- at least 20 civilians were

10 killed, and 50 more wounded in that attack.  And the

11 Taliban claimed credit for that attack.

12 Q    And August 15, 2009, with NATO headquarters?

13 A    There was a very large vehicle-borne improvised

14 explosive device that detonated outside the gate of the

15 NATO headquarters in Kabul.  Also, across the street from

16 the NATO headquarters, the Afghan Ministry of

17 Transportation, there were a number of Afghan civilians

18 who worked on the NATO compound who were lined up outside

19 the gate waiting to be inspected before going onto the

20 base.

21      There were also a number of children who were outside

22 the base who sell trinkets to the soldiers as they leave

23 the base.  And there were seven of those individuals

24 killed, 90 more were wounded.  And, again, most of those

25 were Afghan civilians.

1  Q    Were you actually in that area that day?

2  A    I was.  I had walked through the gate about three

3  minutes prior to the bomb going off.  So when the bomb

4  went off, I went back to the site to help out there, and

5  personally saw that this was predominately Afghan

6  civilians who has been injured.

7  Q    And I don't know if you mentioned, but the Taliban

8  claimed credit for that attack?

9  A    They did.

10  Q    August 20, 2009, was that an election day?

11  A    August 20, 2009, was an election.  It was the second

12  democratic election for an Afghan president.

13       And on that date -- well, in preparation for that

14  day, the Taliban leadership had given guidance to their

15  fighters to disrupt and, if possible, prevent the election

16  from happening.  And so we saw a lot of intimidation of

17  the Afghan populace prior to the election day.  And

18  leading up to election day, we saw attacks on election

19  workers.  We saw attacks on the election materials as they

20  were being disseminated throughout the country.  We saw

21  attacks on the polling places themselves as a way to

22  intimidate people from going there on election day.

23       And according to the United Nations on election day,

24  there was over 300 insurgent attacks.  Most of these

25  targeting the civilians who were lined up to vote in that

1   presidential election.

2   Q    September 2nd of 2009 speaks for itself.  But that

3   event involved a suicide bomber with nearly 20 civilians

4   killed, as well as 54 more civilians injured?

5   A    Inside a mosque.

6   Q    October 9, 2009.  Tell us what happened at the Indian

7   Embassy in Kabul.

8   A    So this was another large vehicle-borne improvised

9   explosive device that detonated outside the Indian Embassy

10  in Kabul where 17 police officers and civilians were

11  killed, and 76 civilians were wounded.

12      And this was another event that the Taliban claimed

13  credit for.  And that actually followed a very similar

14  attack on the Indian Embassy that had happened a year

15  prior where 58 people were killed, including two senior

16  Indian government officials, and 141 more were injured.

17  Q    And it's not on here, but November 2009, are you

18  aware of an attack on a U.N. facility?

19  A    Yes.  This was also related to the presidential

20  election of that year.  There was to be a runoff election

21  between the top two candidates from the first round of the

22  presidential elections, and literally days prior to that

23  election happening, three suicide bombers attacked a U.N.

24  guest house in Kabul.  And in the fighting that ensued,

25  and the suicide bombs that went off, if my memory serves

1  me correctly, I believe it was seven civilians were

2  killed, and a number of -- to include a number of U.N.

3  personnel.  And the Taliban claimed credit for that attack

4  and said that it was directly intended to disrupt the

5  elections.

6  Q    February 19, 2011.  Is this an incident involving one

7  of those Afghan Army uniform employees?

8  A    Correct.  So seven gunmen in suicide vests carrying

9  small arms went into a bank in Jalalabad where a number of

10 Afghan Army and Afghan Police personnel were lined up to

11 receive their monthly paychecks.  Because the banking

12 system in Afghanistan is not very robust, when they're

13 paid electronically, they have to go to the bank to

14 withdraw that money in order to take the cash back to

15 their homes.

16      And so on the day when they were paid, and were lined

17 up to pull their money, those seven gunmen went into that

18 bank and killed 18 Afghans, including civilians, and

19 wounded 70 more.  And the Taliban took credit for that,

20 claiming that they had inflicted heavy casualties on the

21 security forces of the "puppet government," referring to

22 the government of Afghanistan.

23 Q    June 28, 2011.  Document speaks for itself.  But did

24 that involve an attack on a five star intercontinental

25 hotel in Kabul?

1  A      Right.

2  Q      September 2011.  This is not on our list, but tell

3  Judge Hudson what happened there with respect to peace

4  negotiations that were supposed to be going on.

5       THE COURT:  What was the location of that, Mr. Gill?

6       MR. MIKE GILL:  I don't know the exact location,

7  Judge.

8       MR. ADAMS:  Your Honor, are you talking about the

9  intercontinental hotel?

10      THE COURT:  I'm talking about the incident that you

11 were just going into in 2011.  You didn't specify where

12 that occurred.

13      MR. ADAMS:  That occurred in Kabul.  And what had

14 happened, the individual's name was Burhanuddin Rabbani,

15 who had been the President of Afghanistan in the early

16 '90s immediately after the communist government of

17 Afghanistan had fallen.  He was the President of

18 Afghanistan after that.

19      And he was a very respected elder statesmen in

20 Afghanistan.  And President Karzai had appointed him to be

21 the head of the High Peace Council.  The organization that

22 was designed to reach out to the Taliban in an effort to

23 establish negotiations, and ultimately to reach a

24 political settlement that would bring peace to the

25 country.

1    And the Taliban had reached out to the High Peace

2  Council.  They said that there was a midlevel Taliban

3  commandeer who wanted to meet with President Rabbani to

4  discuss reconciliation and to come in from the insurgency.

5  And when President Rabbani went to meet him, the

6  individual had a bomb sewn into his turban, and as

7  President Rabbani went to hug that man, he detonated that

8  bomb, killed President Rabbani, and injured several other

9  members of the High Peace Council.

10  Q    The other instances we have, June 2012, April 2013,

11  and into the next page, January of 2014, verified by you,

12  an instance where the Taliban claimed credit?

13  A    Yes.

14  Q    And then the final page of Exhibit 2.  These are

15  statistics that were released by the United Nations

16  Assistance Mission in Afghanistan for 2014.  And did you

17  verify that those statistics, and summaries, appear to be

18  accurate based on your knowledge and information?

19  A    Yes, I verified these.

20  Q    As well as the May 14, 2015, attack at the Kabul's

21  Park Palace, which the Taliban claimed responsibility for,

22  as reported in the Washington Post?

23  A    Yes.

24  Q    Is that also verified?

25  A    It is.

1        MR. MIKE GILL:  May I have one moment, Your Honor?

2        THE COURT:  Yes, sir.

3        MR. MIKE GILL:  No further questions, Your Honor.

4        THE COURT:  All right.

5        Mr. Gill.  Paul Gill.

6                        **CROSS-EXAMINATION**

7   BY MR. PAUL GILL:

8   Q    Good morning, Mr. Adams.  I am Paul Gill.  No

9   relation to the last counsel that spoke to you.

10       You and I, I don't think, have ever spoken before,

11  right?

12  A    We have not.

13       THE COURT:  Hold off one second and let the

14  interpreter get in place, Mr. Gill.

15       MR. PAUL GILL:  Thank you.

16       THE COURT:  Ready to go?

17       Go right ahead.

18  BY MR. PAUL GILL:

19  Q    I represent Mr. Khamidullah.  I'm going to ask you a

20  few questions.

21       So in at least as late as 2001, would you agree that

22  the Taliban were in control of Afghanistan?

23  A    They were in control of the majority of Afghanistan.

24  Q    All right.  And that is not simply your judgment or

25  your observation.  That is consistent observation by a lot

1  of authorities, the CIA, the Council on Foreign Relations,

2  the Department of State.  A lot of different United

3  States' entities recognize that?

4  A    Correct.  They had military control of Afghanistan.

5  They were not a recognized government by most of the

6  world, but they did have control.

7  Q    And that's a great observation that leads to my next

8  question.  I think you said on direct examination the

9  Taliban had an army.  You referred to it as the *Taliban's*

10 *army,"* correct?

11 A    Correct.

12 Q    All right.  Now, let me ask you, there was some

13 discussion about a designated foreign terrorist

14 organization.  The Haqqani Network was a designated -- was

15 designated a foreign terrorist organization by the United

16 States in 2012, right?

17 A    Correct.

18 Q    Not in 2009?

19 A    Correct.

20 Q    The Taliban, to this date, still have never been

21 designated a foreign terrorist organization, is that

22 correct?

23 A    That's true.

24 Q    I know you don't appear to have made any observations

25 about the particular facts of this case.  Were you exposed

1   to that?  Did you review materials about what

2   Mr. Khamidullah is accused of doing, or what occurred on

3   the battlefield in Afghanistan in November of 2009

4   involving him?

5   A     Only in general.  I've not gone looking for

6   information specifically about that event.

7   Q     All right.  Well, I just want to make sure we

8   understand each other in terms of what Mr. Khamidullah was

9   involved in versus what some of the atrocities you

10  recounted about Taliban generally involved.

11        Are you aware that in the November 29, 2009, incident

12  involving Mr. Khamidullah, there were, as far as I'm

13  aware, no American casualties, no Afghan Border Patrol

14  casualties, there were no enemies of Mr. Khamidullah

15  killed?

16  A     That is my understanding through what I've been told.

17  Q     All right.  And my understanding is that this was

18  never ever described by Mr. Khamidullah in his various

19  statements, or by the evidence as involving a suicide

20  bombing.  It was essentially a rocket and small arms

21  attack initiated on an Afghan Border Patrol, or are you

22  aware of that?

23  A     That's what I've been told.

24  Q     Okay.  And there's no evidence that Mr. Khamidullah

25  was involved in, or the group that he was in, was involved

1  in trying to attack a civilian population?

2  A    That sounds correct according to what I've been told.

3  Q    You mentioned -- let me ask you a little bit about

4  other atrocities.  I mean, there are soldiers of

5  recognized armies around the world who commit war crimes,

6  is that correct?

7  A    Yes.

8  Q    So, for example, the United States' soldiers, there

9  are some American soldiers that have committed war crimes

10  in Afghanistan, in Iraq, in Vietnam, in Korea, in World

11  War II, in all of our nation's wars, that has occurred?

12  A    Yes.

13  Q    All right.  Likewise, in North Vietnam -- in Vietnam,

14  the North Vietnamese committed what we would deem war

15  crimes during the Vietnam War?

16  A    I'm not an expert on what the North Vietnamese had

17  done.

18  Q    All right.  I think -- but in general, you would

19  acknowledge, again, as far as you're aware, there's no

20  army in the world that has no history of war crimes?  Some

21  soldiers are very obedient to the rules of engagement,

22  some are not?

23  A    Yes.

24  Q    I want to go back briefly to -- and does the fact

25  that people commit war crimes, does that prevent them from

1  being accorded POW status?

2       MR. MIKE GILL:  Your Honor, I object.  It's outside

3  his area of expertise.

4       THE COURT:  I don't know, Mr. Gill, Paul Gill, that

5  he has been accepted as an expert in the area of the law

6  of war.  I think he's much more an intelligence analyst.

7  I think that's probably beyond his ken.  I'm going to have

8  to sustain that.

9       MR. PAUL GILL:  That's fine, Judge.  Thank you.

10       THE COURT:  Okay.

11  BY MR. PAUL GILL:

12  Q    Returning to -- let's actually go to some of those

13  rules of the -- the rules in that exhibit describing the

14  rule changes you said took place in summer of 2009 for the

15  Taliban.

16  A    Right.

17       THE COURT:  Mr. Gill, you're referring to Exhibit

18  Number 3?

19       MR. PAUL GILL:  I'm sorry.  I think that is Exhibit

20  Number 3.  Yes, Judge.

21       THE COURT:  Go right ahead.

22  BY MR. PAUL GILL:

23  Q    Now, you spent some time on several of the rules that

24  talked about what is supposed to be done with people who

25  are captured, whether Afghan nationals or Afghan Police.

1  Those sorts of things.  Again, going back to the facts of

2  this case, are you aware that the Afghan Border Police

3  wanted to shoot and execute Mr. Khamidullah on the

4  battlefield?

5  A     I'm not aware of that.

6  Q     Are you aware that they got to the point of asking

7  to, and insisting they wanted to, shoot and kill him on

8  the battlefield, and U.S. soldiers had to prevent that

9  from occurring?

10 A     I'm not aware of that.

11 Q     Are you aware of whether the Afghan National Army

12 maintains POW camps itself?

13 A     It does not maintain prisoner of war camps because

14 they don't consider the Taliban an army.  They are

15 maintained -- they are held in prisons because they are

16 insurgents.  They're for criminals.

17 Q     Okay.  They are held in prisons, but, again,

18 Mr. Khamidullah was not going to be taken prisoner, it

19 appears.  He was going to be executed on the battlefield.

20 A     I don't know that.

21 Q     You mentioned about how the Senior Shura of the

22 Taliban included a Haqqani Network member.  Remind me

23 again, when did that occur?

24 A     Again, it's really -- it's really some speculation on

25 my part in terms of exactly when.  But at least by the

1  2003 time period that was the case.

2  Q    And how many members of the Haqqani Network were in

3  the Senior Shura?

4  A    Just one.

5  Q    Just one.  Do you know how many people were in the

6  Senior Shura?

7  A    About two dozen.

8       MR. PAUL GILL:  Judge, I have no other questions.

9  Thank you.

10      THE COURT:  Any redirect, Mr. Mike Gill?

11      MR. MIKE GILL:  Very briefly, Your Honor.

12                     **REDIRECT EXAMINATION**

13  BY MR. MIKE GILL:

14  Q    With respect to the conduct that we talked about that

15  the Taliban engaged in in 2009, violence against civilians

16  and treatment of any enemies that are captured, was that

17  the type of tactics that they were exercising back in

18  2001, and before, as well?

19  A    Are you talking about when they were in power?

20  Q    When they were in power.

21      MR. PAUL GILL:  Judge, I would object as outside the

22  scope of the issues presented in this motion.  I think

23  what they were doing prior to 2001 is not the issue.

24      THE COURT:  I think I have to sustain that objection.

25  I think that is beyond the scope not only of his

1  cross-examination, but also the scope of issues we have

2  before us today.

3      MR. MIKE GILL:  We are focused on 2009.  I apologize,

4  Judge.

5  BY MR. MIKE GILL:

6  Q    Final thing with respect to the Afghan Border Patrol.

7  Mr. Paul Gill asked you about events that occurred.  And I

8  know you don't know specifically about what happened

9  involving the defendant.  There were no coalition

10  casualties or deaths that day, fortunately.  But give

11  Judge Hudson an idea though with respect to the Afghan

12  Border Patrol, and the importance and the dangerousness of

13  what they do there on the border in the Khost Province.

14  A    Right.  So we -- we, the coalition, decided to

15  establish the Afghan Border Police as an augmentation to

16  the Afghan Army and the regular Afghan uniformed police,

17  specifically to manage the legitimate border crossings and

18  the customs' processing, legitimate border crossings, but

19  also to man this very long and very rugged and very harsh

20  border between Afghanistan and Pakistan.

21      And so the border police organized in a way where

22  they would put small bases, particularly in the more

23  mountainous regions like along the Khost Province border.

24  They would put these small bases up on the ridges where

25  they could oversee the border from two to three kilometers

1  away to watch for any illegal crossings where individuals

2  might be bringing weapons or drugs across the border.

3  Q    And we're not going to go into specifics.  I know you

4  know a lot about this subject.  But fair to say, they're

5  an important part of the U.S. counter-insurgency strategy?

6  A    They are a very important part.

7  Q    And how about with respect to no deaths that day, but

8  in general, Afghan Border Patrol, is it a dangerous job to

9  deal with the insurgents?

10       MR. PAUL GILL:  Judge, again, I'd object as both

11  outside the scope of what this motion is about, and

12  outside the scope of my cross-examination.

13       THE COURT:  I'm going to sustain the objection of

14  that.

15       MR. MIKE GILL:  No further questions, Your Honor.

16       THE COURT:  All right.

17       May Mr. Barclay be excused at this point?

18       MR. MIKE GILL:  He may, Your Honor.

19       THE COURT:  Mr. Gill?

20       MR. PAUL GILL:  That's fine, Judge.

21       THE COURT:  Mr. Barclay, you're excused and free to

22  go.  Thank you very much for coming, sir.  We very much

23  appreciate your time and testimony.

24       MR. ADAMS:  Thank you.

25       THE COURT:  Who will be the government's next

1  witness?

2      MS. LEVY:  The government calls John Dempsey.  He is

3  in the witness room right now.

4      THE COURT:  Okay, ma'am.  We'll bring him in.

5      Mr. Dempsey, if you would raise your right hand,

6  place your left hand on the Bible, and face the Clerk of

7  the Court.

8      THE CLERK:  You do solemnly swear that the testimony

9  which you are about to give, in this case, before this

10 Court, shall be the truth, the whole truth, and nothing

11 but the truth, so help you God?

12     MR. DEMPSEY:  I do.

13     THE COURT:  Have a seat on the witness stand, sir.

14        Whereupon, **John Dempsey**, having been

15 duly sworn in, testifies as follows:

16                 **DIRECT EXAMINATION**

17 BY MS. LEVY:

18 Q   Good morning, sir.  Can you state your full name for

19 the record, please.

20 A   John --

21 Q   Can you speak up, please.

22 A   John Roland Dempsey.

23 Q   Thank you, sir.  And before we start, please speak up

24 and speak relatively slowly so that the court reporter and

25 the interpreter can catch your testimony.

DIRECT EXAMINATION OF JOHN DEMPSEY     60

1          Mr. Dempsey, where do you currently work?

2    A    At the State Department in Washington.

3    Q    In Washington, D.C.?

4    A    Yes.

5    Q    And what's your position?  What role do you have at

6    the State Department?

7    A    I'm a senior adviser to the United States Special

8    Representative for Afghanistan and Pakistan.

9    Q    How long have you held that position?

10   A    Since August of 2010.

11   Q    Can you briefly describe your duties as a special

12   adviser to that office?

13   A    Sure.  Our office is responsible for diplomatic

14   engagement with Afghanistan and Pakistan, and other

15   countries on issues related to Afghanistan and Pakistan.

16   And I was hired as a specialist focusing primarily on

17   Afghanistan political matters.

18   Q    And so how long have you been an employee of the

19   Department of State?

20   A    Coming on five years in August.

21   Q    Okay.  Before that position, where were you employed?

22   A    Prior to the State Department, I worked for the

23   United States Institute of Peace based in Kabul,

24   Afghanistan.

25   Q    And what exactly is the United States Institute of

1  Peace, if you can explain?

2  A    Sure.  It's a quasi-governmental think tank that

3  focuses on conflict resolution around the world.  It's

4  funded annually through appropriations from Congress, and

5  does not take outside private donations to maintain its

6  independence.

7  Q    And what were your duties in that --

8  A    I was hired in 2007 to open a satellite office for

9  the U.S. Institute of Peace based in Kabul, Afghanistan,

10 where I ran the office, oversaw local staff, and

11 implemented some projects that we had received funding

12 from the United States government for on rule of law

13 issues.

14 Q    And was that the first time you lived in Afghanistan?

15 A    No.  I'd been living in Afghanistan since the

16 beginning of 2003 when -- and stayed there until I took my

17 job with the State Department in 2010.

18 Q    And what sort of jobs were you doing in Afghanistan

19 beginning in 2003?

20 A    I had four different jobs.  My first was working as a

21 lawyer for the International Rescue Committee working with

22 refugees who were returning from Pakistan and Iran to

23 Afghanistan after the fall of the Taliban.

24      Subsequent to that, I worked on rule of law and

25 justice sector development projects for two different

DIRECT EXAMINATION OF JOHN DEMPSEY          62

1  groups for the U.S. Agency for National Development.

2        And my fourth, and final job while I was based there,

3  was with the U.S. Institute of Peace.

4  Q    And can you briefly tell the Court what your

5  educational background is.

6  A    I received a master's in International Affairs from

7  Georgetown University, and a law degree, a JD, from

8  Georgetown University, a bachelor's from the University of

9  Massachusetts in Amherst.

10  Q    So since your first exposure to Afghanistan in 2003,

11  have you had a professional focus of your work in

12  Afghanistan?

13  A    Yes.  It's been entirely focused in Afghanistan.

14  Q    Okay.  And have you published any articles or papers

15  relating to your work in Afghanistan?

16  A    Yes.

17  Q    Have you taught any courses or appeared on any

18  panels, moderated any discussions, related to Afghanistan?

19  A    Yes.  That was a key function of my job when I was

20  with the U.S. Institute of Peace, was to moderate panels,

21  was to participate in panel discussions as a specialist,

22  and to provide lectures at various universities.

23  Q    Okay.  Have you ever taught any courses in the United

24  States related to Afghanistan?

25  A    I've never taught a course myself, but I've been a

1  guest lecturer in courses professors have invited me to.

2  Q    And what was the nature of your lectures at those

3  times?

4  A    The most recent one would have been at the end of

5  2014 where I lectured at the -- at American University's

6  School of International Service on the post-Taliban

7  formation of the government in 2001.

8        THE COURT:  Ms. Levy, do you intend to offer

9  Mr. Dempsey as an expert?

10       MS. LEVY:  Yes, Your Honor.

11       THE COURT:  In what field?

12       MS. LEVY:  I was just about to offer him as an expert

13  in the diplomatic activities related to Afghanistan.

14       THE COURT:  All right.

15       Mr. Gill, is there any objection?

16       MR. PAUL GILL:  No objection, Judge.

17       THE COURT:  He'll be received as an expert in

18  diplomatic issues related to Afghanistan.

19       MS. LEVY:  Thank you.

20  BY MS. LEVY:

21  Q    Mr. Dempsey, can you explain briefly what

22  circumstances existed in Afghanistan as of January of

23  2001?

24  A    The circumstances were that the Taliban were in de

25  facto control of much of the country.  There had been two

```
 1  decades of war to that point since the Communist
 2  Revolution in the '70s.  The country was largely
 3  devastated as a result of those conflicts.  The Taliban
 4  had been in control of the country for -- of most of the
 5  country for a few years, fighting what was known as the
 6  United Front, or the Northern Alliance.  And the level of
 7  social services and the quality of living was very, very
 8  low.
 9  Q    And did the United States have any diplomatic
10  relations with any authorities in Afghanistan in early
11  2001?
12  A    The United States recognized the government of
13  Burhanuddin Rabbani.
14  Q    Can you spell that name for the court reporter,
15  please.
16  A    Yes.  It's B-U-R-H-A-D-D-U-N.
17       THE COURT:  Would you spell that again for me,
18  please.
19       MR. DEMPSEY:  B-U-R-H-A-D-D-I-U-N.  Sorry.
20  R-A-B-B-A-N-I.
21       THE COURT:  Can you spell that last name again,
22  please.
23       MR. DEMPSEY:  R-A-B-B-A-N-I.
24       THE COURT:  Thank you very much.
25       Go ahead, Ms. Levy.
```

1          MS. LEVY:  Thank you, Your Honor.

2    BY MS. LEVY:

3    Q     And Mr. Rabbani, was he affiliated in any way with

4    the Taliban?

5    A     No.

6    Q     Was there a United States ambassador to Afghanistan

7    posted there in January of 2001?

8    A     No.

9    Q     Had there been a U.S. ambassador there before the

10   Taliban came in control?

11   A     There had been various U.S. ambassadors there.  The

12   last one I think was in 1979.

13   Q     So can you now explain what happened in late 2001 in

14   Afghanistan?

15   A     In late 2001, the Taliban, who had been in de facto

16   control of much of the country, and occupying government

17   buildings, had been well known to be providing sanctuary

18   to Osama bin Laden, and other members of the al-Qaeda

19   Network, for a number of years.  U.N. Security Council had

20   passed resolutions in the past condemning the activities

21   of al-Qaeda and the Taliban, and imposing sanctions on

22   them.  When it became clear, following the attacks here in

23   9/11 of 2001, that Osama bin Laden was responsible for

24   those, we made a demand that the Taliban regime hand him

25   over or face the consequences.  And they refused to hand

1  him over.

2        So in October of 2001, the United States, and some

3  coalition partners, invaded the country and quite quickly

4  killed and captured many of the Taliban leaders and drove

5  al-Qaeda leaders, and other remaining Taliban, into

6  hiding.

7  Q    And when you say we demanded, who do you mean

8  demanded the return of Osama bin Laden?

9  A    The United States government.

10 Q    Mr. Dempsey, after the Taliban was removed from

11 power, what happened politically in Afghanistan?

12 A    The Taliban was ousted from power in November of

13 2001, when the U.N. Security Council adopted a resolution,

14 1378, that mandated the United Nations should take a

15 central role in helping to reestablish a new government in

16 Afghanistan.  Subsequent to that --

17 Q    Before you go on, I'll ask you to look at

18 Government's Exhibit 22 marked for identification.

19       THE COURT:  Twenty-two?

20       MS. LEVY:  Twenty-two.

21       THE COURT:  Okay.

22 BY MS. LEVY:

23 Q    Do you recognize what that is?

24 A    Yes.

25 Q    And what is that?

1   A      This is the resolution I was just referring to.

2          MS. LEVY:  We would offer Exhibit --

3          THE COURT:  Any objection, Mr. Paul Gill?

4          MR. PAUL GILL:  No, Judge.

5          THE COURT:  Be received.

6              (Government's Exhibit 22 is received.)

7          MS. LEVY:  Thank you, Your Honor.

8   BY MS. LEVY:

9   Q      So after the U.N. Security Council issued that

10  resolution, what happened next, internationally?

11  A      Following that, a -- the United Nations convened a

12  conference that was held in Bonn, Germany on December 5th

13  of 2001, where major factions of Afghanistan leaders came

14  together to discuss the future government of their

15  country.  And following that was a conference document

16  called the Bonn Conference Communique.

17  Q      I'd ask you now to look at Government's Exhibit 18

18  for identification.  Can you identify that?

19  A      Yes.  This is the agreement on provisional

20  arrangements in Afghanistan pending the reestablishment of

21  permanent government institutions, also known as the Bonn

22  Conference Communique that I just referred to.

23         THE COURT:  Any objection, Mr. Gill?

24         MR. PAUL GILL:  No, Judge.

25         THE COURT:  Be received.

1        MS. LEVY:  We move it into evidence.

2            (Government's Exhibit 18 is received.)

3    BY MS. LEVY:

4    Q    Were representatives of the Taliban invited to the

5    conference?

6    A    They did not participate.

7    Q    Thank you.  Were there other indications of

8    endorsement of a transitional administration in

9    Afghanistan following this agreement?

10   A    Yes.  I mean, there were a number of indications over

11   the years.  Following this on December 22, 2001, the

12   United Nations also passed a Security Council Resolution

13   that created the International Security Assistance Force,

14   which was, I think, an international military force that

15   went into Afghanistan to maintain peace.  And it was

16   comprised of members of a number of different nations.

17        Also at that time, the interim administration that

18   was created pursuant to the Bonn Agreement of December 5th

19   officially took power under the leadership of Chairman

20   Hamid Karzai at the time.  And his interim administration

21   was to last for six months, until a transitional

22   administration could be put in power.

23        In January of 2002, Chairman Karzai came to

24   Washington, met with President Bush, and was a special

25   guest at the State of the Union Address.

DIRECT EXAMINATION OF JOHN DEMPSEY          69

1    Q    I'd ask you to look at Government's Exhibit 23 for

2    identification, as well as Exhibit 19.  I ask if you

3    recognize those?

4    A    Yes.

5    Q    And 23 is what?

6    A    Twenty-three is U.N. Security Council Resolution

7    1453.

8    Q    Go ahead.

9    A    Where the Security Council basically reaffirmed its

10   strong commitment to the sovereignty and independence of

11   Afghanistan, and recognized the transitional

12   administration that was selected in the summer of 2002 as

13   the sole legitimate government of the country, pending

14   democratic elections that followed in 2004.

15   Q    And Exhibit 19?

16   A    Exhibit 19 is from early 2002.  It's an article

17   discussing Hamid Karzai asking the United Nations Security

18   Council to expand its military and international forces in

19   the country.

20        MS. LEVY:  We would move Exhibits 23 and 19 into

21   evidence.

22        THE COURT:  Any objection, Mr. Gill?

23        MR. PAUL GILL:  No objection.

24        THE COURT:  They'll be received.

25        MS. LEVY:  Thank you.

1          (Government's Exhibits 23 & 19 are received.)

2    BY MS. LEVY:

3    Q      Did the General Assembly itself recognize Hamid

4    Karzai as the legitimate representative of the government,

5    the transitional government, of Afghanistan at that time?

6    A      Yes.  There's the -- the Credential Committee of the

7    General Assembly accepted the credentials of President

8    Hamid Karzai as the council to the U.N. to represent the

9    government.

10   Q      As you mentioned the credentials, what exactly is

11   presenting *"credentials"* to the United Nations all about?

12   A      That's to take the representative seat of a sovereign

13   nation among the U.N. General Assembly.  So every year,

14   each sovereign nation presents its credentials to the

15   General Assembly, which has a Credentials Committee, but

16   then decides whether or not to accept submitted

17   credentials.  Generally, it's usually a formality, but in

18   the case of a country like Afghanistan where, in the late

19   '90s, for example, the government of Rabbani had its

20   credentials presented and accepted by the Assembly, and

21   the Taliban offered competing credentials, which were

22   rejected.

23   Q      And I'd ask you to look at Government's Exhibit 17.

24   What is that?

25   A      This looks like the first report of the U.N. General

1  Assembly's Credentials Committee.

2  Q    Does it discuss the proposed credentials of competing

3  factions in Afghanistan, as you've just testified?

4  A    I don't believe so.  It talks about the communication

5  signed by President Rabbani.

6  Q    Okay.  Is there an indication in there about other

7  credentials being presented?

8  A    Not that I can see.

9  Q    All right.  So that -- so that particular exhibit

10 relates to the consideration of credentials for President

11 Rabbani?

12 A    Correct.

13      MS. LEVY:  We would move Government's Exhibit --

14      THE COURT:  Any objection, Mr. Gill?

15      MR. PAUL GILL:  No, Judge.

16      THE COURT:  Seventeen is received.

17      MS. LEVY:  Thank you.

18          (Government's Exhibit 17 is received.)

19 BY MS. LEVY:

20 Q    So going back to the activities of President Karzai.

21 Did he ever address the U.N. General Assembly in his role

22 as the head of the government of Afghanistan?

23 A    Yes.

24 Q    I'd like you to look at Government's Exhibit 20.  And

25 what is that?

1  A    This is the statement given by President Hamid

2  Karzai, the 57th session of the General Assembly of the

3  United Nations, in September of 2002.

4       THE COURT:  Any objection, Mr. Gill?

5       MR. PAUL GILL:  No, Judge.

6          (Government's Exhibit 20 is received.)

7       MS. LEVY:  Thank you, Your Honor.

8  BY MS. LEVY:

9  Q    Now, in preparation for this testimony, did you

10 prepare any summary of other U.N. resolutions and

11 activities for the Court?

12 A    I put together just an assembling of various U.N.

13 Security Council language that I thought might be

14 relevant.

15 Q    And I'll ask you to look at Exhibit 16 for

16 identification.  And is that your summary?

17 A    Yes.

18      MS. LEVY:  We would move the summary in for evidence

19 at this time.

20      THE COURT:  This is a summary of exactly what?

21      MR. DEMPSEY:  These are samples of various U.N.

22 Resolutions with respect to Afghanistan.

23      THE COURT:  All right.

24      Any objection, Mr. Gill?

25      MR. PAUL GILL:  No, Judge.

1        THE COURT:  They'll be received.

2            (Government's Exhibit 16 is received.)

3    BY MS. LEVY:

4    Q    So among the U.N. Resolutions, did you identify

5    certain resolutions about the international position of

6    the international community relating to the Taliban in

7    2005, for example?

8    A    The resolutions that I identified from 2005 were --

9    Q    Did you identify any resolutions?

10   A    In 2005?

11   Q    Yes.

12   A    Yes.

13   Q    Turning your attention to Exhibit 26.  Is that one of

14   those that you identified?

15   A    No.  This is a General Assembly resolution.  I

16   identified Security Council resolutions.

17   Q    Okay.  And Exhibit 26, is there an indication of the

18   U.N.'s reaction to the election of Hamid Karzai as

19   President of Afghanistan?

20   A    Yes.

21        MS. LEVY:  We would move Exhibit 26 into evidence at

22   this time.

23        THE COURT:  Any objection, Mr. Gill?

24        MR. PAUL GILL:  No, Judge.

25        THE COURT:  Received.

1          MS. LEVY:  Thank you.

2               (Government's Exhibit 26 is received.)

3    BY MS. LEVY:

4    Q    How about Exhibit 24?  What is that?

5    A    This is United Nations Security Council Resolution

6    1817, from 2008.

7    Q    And does it contain any reference to what the United

8    Nations' position was relating to the Taliban in 2008?

9    A    Yes.  It reiterates the United Nations' concern about

10   the continued violent and terrorist activities by the

11   Taliban.

12         MS. LEVY:  We would move Exhibit 24 into evidence.

13         THE COURT:  Any objection, Mr. Gill?

14         MR. PAUL GILL:  No, Judge.

15              (Government's Exhibit 24 is received.)

16   BY MS. LEVY:

17   Q    Finally, Exhibit 27 relating to action, international

18   action, in 2010.  Would you take a look at that and

19   identify what that is for the record.

20   A    U.N. General Assembly --

21         THE COURT:  Hold on just one second and let the

22   interpreter get in place.

23         Ready?

24         All right.  Go right ahead, Mr. Dempsey.

25   BY MS. LEVY:

1  A     This is a U.N. General Assembly resolution adopted

2  discussing the situation in Afghanistan.

3  Q     Again, does it make mention of concern about the

4  activities of the Taliban in 2010?

5  A     Yes.  It echos the same language reiterating their

6  concerns about the increase in violent criminal and

7  terrorist activities from the Taliban.

8         THE COURT:  Any objection, Mr. Gill?

9         MR. PAUL GILL:  No, Judge.

10        THE COURT:  Be received.

11        MS. LEVY:  Thank you, Your Honor.

12             (Government's Exhibit 27 is received.)

13  BY MS. LEVY:

14  Q     Were there ever any countries in the world that

15  recognized the Taliban from 2000 -- from the year 2000 on?

16  A     Yes.

17  Q     And can you explain what the circumstances or which

18  countries those might have been?

19  A     There were three countries that gave diplomatic

20  recognition to the government of Islamic Emirate of

21  Afghanistan, which the Taliban called itself.  Those were

22  Pakistan, United Arab Emirates, and Saudi Arabia.

23  Q     Does that recognition still exist today?

24  A     No.

25  Q     Was that recognition withdrawn at any time?

1  A    Yes.  It was withdrawn in the case of Saudi Arabia

2  and United Arab Emirates in the days following the

3  September 11th attacks.  In the case of Pakistan, a couple

4  months after this.

5       THE COURT:  So that was withdrawn in 2001?

6       MR. DEMPSEY:  2001.

7       THE COURT:  Okay.

8  BY MS. LEVY:

9  Q    So as of today, is there any country in the world

10 that recognizes the Taliban as a legitimate government of

11 Afghanistan?

12 A    No.

13 Q    And turning very briefly to the United States'

14 actions after the fall of the Taliban.  I'd ask you to

15 look at Exhibit 21.  Can you identify what that is?

16 A    This is a diplomatic note that was delivered from the

17 Embassy of the United States to the government of

18 Afghanistan.

19 Q    Was there -- were there agreements that were

20 generated as a result of the fall of the Taliban and the

21 installation of the transitional government?

22      THE COURT:  Hold off one second.

23      What is the date on that, Mr. Dempsey?

24      MR. DEMPSEY:  It is September 26, 2002.

25      THE COURT:  Okay.

1      Go right ahead.

2      MS. LEVY:  Thank you.

3  BY MS. LEVY:

4  Q    Were there agreements that the United States entered

5  with the transitional government of Afghanistan after the

6  fall of the Taliban?

7  A    Yes.

8  Q    And in relation to that, does Government's Exhibit 21

9  reflect such an agreement?

10 A    Yes.  I mean, this is a diplomatic note from the

11 embassy acknowledging the transitional government of

12 Afghanistan, and offering up examples of ways that we

13 could cooperate.

14 Q    And turning to Page 3, I guess, of that.  Is that

15 another diplomatic note?

16 A    Page 3 of the same exhibit?

17 Q    Yes.

18 A    It's the same diplomatic note, but it discusses some

19 of the specifics of the cooperation.

20     THE COURT:  Any objection to 21, Mr. Gill?

21     MR. PAUL GILL:  No, Judge.

22     THE COURT:  Be received.

23     MS. LEVY:  Thank you, Your Honor.

24         (Government's Exhibit 21 is received.)

25 BY MS. LEVY:

1    Q    I was actually referring to the United States' offer

2    of assistance.  Was there a response from the government

3    of Afghanistan included in that?

4    A    Yes.  The government of Afghanistan recognized the

5    importance of this cooperation, and willingly accepted it.

6    Q    Okay.  And turning to Exhibit 25 for identification.

7    Can you identify what that is?

8    A    Yes.  This is the joint declaration of the United

9    States' and Afghanistan's strategic partnership that was

10   entered into in May of 2005.

11   Q    And who signed that agreement?

12   A    It was signed, I believe, by President George Bush

13   and President Hamid Karzai.

14        MS. LEVY:  We would offer Exhibit --

15        THE COURT:  Any objection, Mr. Gill?

16        MR. PAUL GILL:  No, Judge.

17        THE COURT:  All right.  Be received.

18           (Government's Exhibit 25 is received.)

19   BY MS. LEVY:

20   Q    Mr. Dempsey, did the United States ever recognize the

21   Taliban as a legitimate government of Afghanistan?

22   A    No.

23   Q    Did the United States ever recognize the Taliban, in

24   2009, as having legitimate authority over the government

25   of Afghanistan?

```
 1   A     No.

 2         MS. LEVY:  No further questions.

 3                      CROSS-EXAMINATION

 4   BY MR. PAUL GILL:

 5   Q     Good morning, Mr. Dempsey.

 6   A     Good morning.

 7   Q     I'm Paul Gill.  I represent Mr. Khamidullah.

 8         You used the phrase, I think, "fall of the Taliban."

 9   And I want to talk about that and unpack that a little

10   bit.  The Taliban continues to exist as an entity.  We

11   acknowledge the existence of Taliban, is that correct?

12   A     Yes.

13   Q     And in fact, the Taliban -- I won't go through all

14   the exhibits Ms. Levy went through with you, but

15   especially in all those resolutions, a bunch of those

16   resolutions, whether they condemn or simply acknowledge,

17   they keep repeatedly referring to the Taliban all the way,

18   really up to the present, or up to latest of the

19   resolutions.  They recognize the existence of the Taliban,

20   correct?

21   A     Yes.

22   Q     And in fact the Taliban, one of the things that they

23   recognize and one of the things they emphasize, the

24   Taliban continues to engage in armed conflict with troops,

25   with police, with other authorities on the ground in
```

1   Afghanistan, is that correct?

2   A    Yes.

3   Q    And indeed, I think you were here earlier for the

4   testimony of Mr. Adams, and in fact --

5        MS. LEVY:  Your Honor, I don't think that the witness

6   was here for that testimony.

7        MR. PAUL GILL:  I'm sorry, Judge.  I will rephrase.

8        THE COURT:  Go right ahead.

9   BY MR. PAUL GILL:

10  Q    And, Mr. Dempsey, you would acknowledge that the

11  Taliban actually have a presence in western Pakistan?

12  A    Yes.

13  Q    And that the United States has engaged them in

14  battle?  Has made attacks upon the Taliban in western

15  Pakistan?

16  A    I'm not going to speak to any actions which the

17  United States may have taken in south Pakistan.

18  Q    All right.  When you say you're not going to engage

19  in it, is that for security reasons or you're just -- or

20  that's not your area of expertise?

21  A    I'm not authorized to speak to the United States'

22  activity inside Pakistan.  That is not what I was asked to

23  testify to.

24  Q    Okay.  And again, if this is outside your area of

25  expertise so be it, but you understand the United States,

1  among the things that it does with respect to its

2  identification of other nations or other groups, it can

3  identify an organization as a designated terrorist

4  organization?  Have you heard of that concept?

5  A    Yes.

6  Q    And in fact, the Taliban have never been designated

7  as a foreign terrorist organization under that process?

8  A    I don't want to speak to that either.  I'm not an

9  expert on that, nor is that my designation.

10  Q    You talked a lot when Ms. Levy was talking to you, or

11  asking you questions, about the creation of the Karzai

12  government.  The Karzai government had many aspirations,

13  but almost as many failures, did it not?

14  A    As with any young government coming off the

15  circumstances that they found themselves in, there were a

16  number of challenges that they had to overcome.  And they

17  weren't successful across the board.

18  Q    And certainly one of the problems they experienced

19  was in, essentially, the judiciary, or the idea of dispute

20  resolution, whether civil or otherwise, correct?

21  A    Yes.

22  Q    And in fact, you've written about that?  You've

23  authored, or co-authored, papers about that, is that

24  correct?

25  A    Yes.

1  Q     Do you remember co-authoring a paper with a Noah

2  Coburn in February of 2010, a United States Institute of

3  Peace Report, about that very issue?

4  A     Yes.

5  Q     And in fact, in that report, you identified how there

6  were many problems meeting those kind of justice needs in

7  Afghanistan, and that was causing a lot of provinces, a

8  lot of people, to turn to, essentially, Taliban justice

9  for some measure of relief?

10 A     Yes.  I think something along those lines.

11 Q     All right.

12        MR. PAUL GILL:  Just a moment, Judge.

13        Judge, I have no other questions.  Thank you.

14        Thank you, Mr. Dempsey.

15        THE COURT:  All right.

16        Ms. Levy, any further questions?

17        MS. LEVY:  No, Your Honor.

18        THE COURT:  May Mr. Dempsey be excused, Ms. Levy?

19        MS. LEVY:  Yes, Your Honor.

20        THE COURT:  Mr. Gill?

21        MR. PAUL GILL:  That's fine, Judge.

22        THE COURT:  Mr. Dempsey, you're excused and free to

23 go.  Thank you, sir.  We appreciate your time and

24 testimony today.

25        MR. DEMPSEY:  Thank you, Judge.

1                    **WITNESS STOOD ASIDE**

2        THE COURT:  We're going to take a 10 minute recess.

3  We'll come back and resume after 10 minutes.

4        Court will stand in recess until then.

5                         (Recess taken.)

6        THE COURT:  Who is your next witness, Mr. Gill?

7        MR. MIKE GILL:  We call Colonel Hays Parks, Your

8  Honor.

9        THE COURT:  Colonel Hays Parks.

10        Colonel, if you would raise your right hand, sir,

11  left hand on the Bible, and face the Clerk of the Court.

12        THE CLERK:  You do solemnly swear that the testimony

13  which you are about to give, in this case, before this

14  Court, shall be the truth, the whole truth, and nothing

15  but the truth, so help you God?

16        COLONEL PARKS:  I do.

17        THE COURT:  Have a seat on the witness stand, sir.

18        Whereupon, **Colonel W. Hays Parks**, having been

19  duly sworn in, testifies as follows:

20                      **DIRECT EXAMINATION**

21  BY MR. MIKE GILL:

22  Q    Good morning, Colonel.  Would you please introduce

23  yourself to Judge Hudson.

24  A    Sir, my name is Hays Parks.  H-A-Y-S.  P-A-R-K-S.

25  Q    And, sir, are you currently retired from the

1  Department of Defense?

2  A     I am.

3  Q     Would you describe for Judge Hudson what you were

4  doing prior to retirement.  What was your job right before

5  you left?

6  A     Worked in the office of General Counsel, Department

7  of Defense.  I was the senior law war adviser for the

8  Department of Defense.

9  Q     How long had you been in that position?

10  A     I was in that position for seven years.  Previously,

11  I worked with the Department of the Army for the Office of

12  the Judge Advocate General of the Army as a special

13  assistant for the General for global matters for 23 years.

14  Q     Now, with respect to your job as the Law of War Chair

15  for the Department of Defense, describe for us what your

16  responsibilities were.  Who did you advise?  What type of

17  information would you provide?

18  A     I advised the leadership for the Department of

19  Defense primarily through the General Counsel himself.  I

20  worked with all the four services, the Judge Advocate

21  Generals for each of the four services.  I worked with the

22  Department of State many times to try to gain coordination

23  and consensus on pending law war issues.

24  Q     Describe for us your educational background, and

25  we'll work up through your experience.

1  A    I received an undergraduate degree from Baylor

2  University.   Received my law degree from Baylor University

3  Law School in 1966.

4  Q    While you were at Baylor, were you involved with the

5  military?

6  A    I joined the Marine Corps in 1961 when I was in

7  undergraduate school.   I was commissioned upon graduation

8  from Baylor in 1963.   Stayed in the Marine Corps Reserves

9  through law school.   Graduated law school in '66, and then

10 came on active duty in 1966 for a period of three years.

11 Q    Did you attend basic training?

12 A    It's the basic school which is required for all

13 Marine lawyers regardless of what assignment they might

14 have.   It's basically six months of infantry training.

15 The Marine Corps philosophy being every Marine is a

16 rifleman, and so we all received that training.

17 Q    And would that have been ballpark around 1967?

18 A    Sixty-six, '67.

19 Q    And in what capacity, after you completed your basic,

20 did you join the United States Marine Corps?   What was

21 your role?

22 A    I initially, while in law school, was in the reserve

23 unit in San Antonio, the 4th Reconnaissance Battalion.   We

24 engaged in land and amphibious operation reconnaissance.

25 When I was on active duty, I was assigned to the 2nd

1   Marine Division at Camp Lejeune, North Carolina where I,

2   although I was a lawyer, I asked for an infantry company.

3   I was in that infantry company there for 18 months before

4   volunteering to go to Vietnam.

5   Q     When, roughly, was it that you went to Vietnam, and

6   what was your role in Vietnam?

7   A     Sir, in 1968, 1969 I was the senior prosecuting

8   attorney for the 1st Marine Division, but also volunteered

9   for the *reaction companies,* as we called them, in the

10  division headquarters.  There were two of us.  Basic two

11  companies.  We were made up of Marines who were the cooks,

12  clerks, bakers, military police, and band.  Again, every

13  Marine a rifleman.  And so we had a 3-day operation cycle.

14  Q     Colonel, let me ask you to slow down just a touch.

15  I'm sorry.  We all get rolling.  We need to make sure the

16  interpreter is able to get this.

17  A     One night we would be out on ambush patrols.  One

18  night we would be on standby in the division classroom

19  where we would have to respond within five minutes to any

20  type of attack.  And on one night we would have night --

21  Q     Slow down just a touch.

22  A     We would have the night off.  That is, we would have

23  to have a 20 minute warning rather than a five minute

24  warning.

25        THE COURT:  I assume you're going to offer him as an

```
 1  expert witness in the field of the law of war?

 2       MR. MIKE GILL:  We are indeed, Your Honor.

 3       THE COURT:  Any objection, Mr. Kamens?

 4       MR. KAMENS:  No objection, Your Honor.

 5       THE COURT:  The Colonel will be received.

 6       MR. MIKE GILL:  And, Your Honor, we offer for

 7  admission Exhibit 4, which is his CV for the Court.

 8       THE COURT:  Any objection, Mr. Kamens?

 9       MR. KAMENS:  No objection.

10       THE COURT:  Be received.

11           (Government's Exhibit 4 is received.)

12       MR. MIKE GILL:  And very briefly, if it's okay with

13  the Court, I will hit quickly on his other law of war

14  experience, and then we'll move right into his --

15       THE COURT:  Do it as briefly as you can.  The CV, I'm

16  sure, speaks for itself.

17       MR. MIKE GILL:  Absolutely, Your Honor.

18  BY MR. MIKE GILL:

19  Q    Briefly tell Judge Hudson about the work that you did

20  for the Secretary of the Navy, the Navy's Office of

21  Legislative Affairs, with respect to the Geneva

22  Convention, if you were involved in those type of issues.

23  A    During my period of active duty, which I left in 1979

24  to take a civilian position in the Office of the General

25  of the Army, initially I was in the Office of Legislative
```

1  Affairs working on various issues before Congress.

2  Subsequently, I went to the Office of the Judge Advocate

3  General of the Navy where I was the law of war expert

4  within that office.  And we did handle various types of

5  issues that arose with respect to the 1949 Geneva

6  Conventions, and other provisions.

7  Q    Tell us, have you represented the United States in

8  international meetings and negotiations with respect to

9  international law of war matters, including Geneva

10 matters?

11 A    Yes.  I began those activities in 1977 when I was

12 still on active duty.  I continued that to 2003 -- 2010,

13 I'm sorry, when I retired.

14 Q    And have you been to conferences in Geneva, The

15 Hague, Brussels, NATO, and other locations?

16 A    That is correct.

17 Q    Have you also, or were you also, involved in creating

18 the Law of War Course for the Navy that was used for the

19 Navy and Marine Corps?

20 A    We set up a program based upon the Department of

21 Defense law of war program that all servicemen must

22 receive training in the law of war consistent with their

23 duties and responsibilities.  Each of the services then

24 instituted their own programs.  I worked on both the Navy

25 and Marine Corps programs while I was in the Navy JAG as

1  an active duty officer.

2      Subsequently, when I left active duty, I went into

3  the Reserves and we established in that reserve unit a

4  5-day law of war course for Marine Corps officers from

5  Second Lieutenant to Colonel, which was taught around the

6  world to these various units.

7  Q    Slow down just a touch for the interpreter.

8  A    Yes, sir.  Sorry.

9      In 1986, the -- the course was established in 1986 --

10  or 1980.  In 1986, we were the recipient of the Secretary

11  of the Navy's Seamen's Award, which we were the smallest

12  unit in the Navy Marine Corps to ever receive that award.

13  Q    And you've also occupied the Charles H. Stockton,

14  Chair of International Law for Naval War College?

15  A    I did.  In 1984 and 1985.

16  Q    You taught on various law school faculties, and

17  remain active in that type of work today?

18  A    Yes.  I'm an adjunct faculty at the American

19  University Law School.

20  Q    Published in over 75 articles?

21  A    That's correct.

22  Q    Are you currently drafting a law of war book?

23  A    Yes.

24  Q    And just for the record, go ahead and tell us how

25  much you are receiving for your time in preparing to

1  testify, and your time that you are here in court

2  testifying before Judge Hudson.

3  A    I'm receiving whatever the standard basic armed

4  services justice school -- I forgot where I am.  The

5  Justice Department, I would call it, compensation

6  expenses, primarily.

7  Q    Is it $250 per hour for preparation, $350 per hour

8  for in court time?

9  A    That is correct.

10 Q    And tell Judge Hudson where does that money go?  Does

11 it go to you personally?  What do you do with it?

12 A    It comes to me personally.  I, as a matter of policy

13 for anything like this, will give that money to a

14 scholarship fund, a particular U.S. Army Special Forces

15 Unit for education of the widows and children of men from

16 that unit that have been killed in combat.

17 Q    Now, you're here to testify today as a recognized law

18 of war expert about application of the Geneva Convention

19 and common law dealing with law of war.  Take a look at

20 Government's Exhibit Number 5.  And is that a simple

21 summary reference that you created to help you in your

22 testimony with Judge Hudson to explain how things

23 developed, when the real body of law of war started, and

24 where it is today?

25 A    It is.  And actually, the events go back to 1648.

1  The Treaty of Westphalia where nation states systems was

2  recognized around the world for the first time.

3      Subsequently, beginning with the wars of Napoleon

4  when they went away from hiring private armies -- hiring

5  private armies and actually having governments establish

6  their armies.  And this goes back to the Just War Concept

7  of Right Authority.  But only a government can authorize

8  that.

9      MR. MIKE GILL:  And stop right there.

10     And, Your Honor, we move for admission of Exhibit 5.

11     MR. KAMENS:  No objection, Your Honor.

12     THE COURT:  It will be received.

13         (Government's Exhibit 5 is received.)

14 BY MR. MIKE GILL:

15 Q   Now, to start off, you were talking about the concept

16 of *right authority*."  Describe for Judge Hudson what it

17 is, and the importance of that, to the core of law of war.

18 A   The importance is first that nation states is a

19 law -- were desirous of not having wars begun between them

20 by private organizations.  That was the first one.

21     The second one, which was evolved more in the 1850s,

22 was the establishment of rules for combat primarily to

23 protect the civilian population and others who were not

24 taking direct part in hostilities.

25 Q   And tell us, what was the main event in the --

1          INTERPRETER:  Excuse me.  We're trying to switch the

2    interpreters.

3          MR. MIKE GILL:  Ma'am, if I get moving too fast,

4    raise your hand and we'll stop.

5          INTERPRETER:  Okay.

6          THE COURT:  Is the interpreter ready?

7          INTERPRETER:  Yes.

8          THE COURT:  Go right ahead, Mr. Gill.

9    BY MR. MIKE GILL:

10   Q    So explain to us what happened in the 19th Century

11   that started off this next step in a Law of War Right

12   Authority to the combatant conduct.

13   A    There was a professor of law at Columbia College in

14   New York City by the name of Francis Lieber.  He was

15   actually a veteran fighting Napoleon before he immigrated

16   to the United States.  Many of the questions that arose in

17   the United States following the attacks of September 11,

18   2001, were the same types of arguments or concerns being

19   expressed within the Union Army as to how members of the

20   Confederate Armed Forces should be treated.

21        The first question that came up, and it was actually

22   split, should we recognize them at all.  But also since

23   there were some who were private organizations rather than

24   members of the Confederate Army, or authorized to be part

25   of the Confederate Army, who should receive what type of

1  protection and status.  Professor Lieber wrote an essay in

2  1862 that was followed up by a request from the Union Army

3  to write rules for the law of war, and who should be

4  protected and how.

5  Q    How did that develop, and what type of core concepts

6  did he establish at that time?

7  A    Professor Lieber wrote what was -- what became known

8  as the Lieber Code.  And that's L-I-E-B-E-R.

9      It was also signed by President Lincoln as U.S. Army

10  General Order No. 100.  It established the simple

11  foundation for the law of war up to the day today as we

12  see it.  It was, in fact, the basis for the creation of

13  new laws of war in 1899 and 1907 and, in particular, the

14  1949 Geneva Convention, which is our primary reference.

15  Q    Okay.  If you would work forward from General Order

16  No. 100 that was issued in 1863 using your guide from

17  Exhibit 5.

18  A    There were a couple of informal developments prior to

19  1899.  There was a Brussels Final Protocol.  It stated the

20  same standards that were established by Professor Lieber

21  in his essay, and in General Order No. 100.  Basically

22  I'll read this.  *"The laws, rights, and duties by a person*

23  *responsible for his subordinates; that they have a fixed*

24  *distinctive insignia recognizable at a distance; that they*

25  *carry their arms openly; that they conduct their*

1   *operations in accordance with the laws and customs of*

2   *war."*

3       MR. MIKE GILL:  And just for the record to clarify,

4   Your Honor, Exhibit 5 has a typographical error in there

5   in the middle.  It's August 27, 1874, not 1974.

6       THE COURT:  All right.

7       COLONEL PARKS:  I never claimed to be a good clerk

8   typist.

9   BY MR. MIKE GILL:

10  Q    Those four criteria, is that when they first came on

11  the scene?  And what was the importance of those four

12  criteria?

13  A    The first time was established in the writings of

14  Lieber, and was followed thereafter.

15  Q    And why are those criteria important with respect to

16  regular armies and how they conduct themselves, as well as

17  militias and volunteer corps?

18  A    It's -- it's what I call a contract with society in

19  the civilian population.  We will provide prisoner of war

20  status for those who fight within those parameters.  In

21  order to discourage private citizens from engaging in this

22  type of combat, they are not entitled to prisoner of war

23  status.

24  Q    And in your experience over the years, does following

25  these core principles, do those actually save civilian

1  lives in practice in armed conflicts?

2  A    Certainly when we're looking at the types of

3  conflicts that involve insurgency encounters, insurgency

4  where you may have civilians who are taking direct part in

5  hostilities, thereby placing the civilian population at

6  risk.  Yes.

7  Q    All right.  So moving forward, tell us about after

8  the 1874 Brussels Final Protocol, working forward.

9  A    The -- there was a conference call in The Hague in

10  1899 to discuss any number of different types of treaties

11  that were proposed.  Some were disarmament, some dealt

12  with arbitration prior to conflict, and some dealt with

13  Naval warfare, and some dealt with specifically with the

14  law of war on land.

15       The first one was The Hague Convention II of 1899.

16  It was followed six years or seven years later by The

17  Hague Convention IV of 1907.  The United States was a

18  party to each of those, or is a party to this day.

19  Q    And do each of those include these four criteria that

20  we mentioned a moment ago?

21  A    That is correct.  I'm not repeating them each time

22  because they differ very little.

23  Q    Okay.  And continue on from that point.

24  A    There was a 1929 Geneva Convention for the protection

25  of prisoners of war based upon some of the experiences in

1  World War I.  And actually before that time, starting back

2  with the Franco-Prussian War where a number of civilians

3  were accused of being involved in hostilities, the Anglo

4  Boer War of 1899 to 1902, and some again in World War I,

5  the idea was to continue to look at these criteria and to

6  see what they could do to improve upon them.  And in fact,

7  there were very few changes to those.  Some changes

8  occurred thereafter based upon the experience in World War

9  II.

10  Q    And let me stop you right there.

11  A    Yes.

12  Q    And noticing your progression over time, would you

13  explain the significance of international experience with

14  armed conflict and how it results in these changes and how

15  the law of war just develops over time?

16  A    The first thing we were trying to do, or they were

17  trying to do, was of course to say we need universal

18  agreement on these types of things.  And in fact, in the

19  1949 Geneva Conventions with 195 state parties, is as

20  universal as you can make these things.  It's a very

21  important element.  So everybody is basically on the same

22  assumption.

23       The idea is to improve the treaties through lessons

24  learned from previous conflicts.  If there are places

25  where there are gaps, then this intention is to close

1  those gaps to, again, improve the law.  And once again,

2  first provide protection to captured military personnel,

3  but second also to maintain that contract that private

4  citizens should not be engaged in combatant-type

5  activities, and they would not be given prisoner of war

6  status for that purpose or for that reason.

7  Q    And before we talk about the 1949 Geneva Convention,

8  would you touch briefly on the law of war with respect to

9  the United States' recognition of the Confederacy.  I

10 believe I didn't hit on that earlier.  And the

11 significance of that under the concept of right authority,

12 and who has the ability to fight and who doesn't under

13 protection.

14 A    President Lincoln obviously had several choices of

15 several paths he could have taken.  He wanted to restore

16 the Union, and he felt that it was better to recognize the

17 government of the Confederacy rather than create a further

18 divide.  And so he -- that's when Professor Lieber was

19 called in and asked to do that.  And in fact, under the

20 Lieber Code, the Confederate States Army soldiers and

21 Confederate States Navy personnel were in fact recognized

22 as part of an existing government.

23      There was another division there that explains this.

24 There were a number of groups that would appear to have

25 been private armed groups.  Those, in fact, the way Lieber

1  described it, and the way it evolved was, well there are

2  some who are carrying out guerrilla operations.  But

3  guerrilla operations are attacking.  They are not a

4  different type of force.  And those types of operations

5  were conducted by units, organized units, like that of

6  Colonel John Mosby.

7       The idea was the governor of a state would duly issue

8  a warrant to those units that met the criteria, and the

9  same type of criteria set forth in the Lieber Code

10 eventually, and they would be authorized to continue to

11 operate as lawful combatants so long as they followed

12 those warrants.  And if they did not, the warrant was

13 withdrawn and they became a prisoner of belligerence.

14      The other group were those which were like Quantrill

15 fighting in Kansas, who were basically nothing more but

16 robbers who were taking advantage of an armed conflict to

17 go fight the war as they pleased, and where everything was

18 pillaged, and what have you.  So that was the idea for

19 that division.  We want to have the right authority issued

20 to those who were fighting on behalf of the Confederacy in

21 organized groups in uniforms, for the most part most of

22 the time, and award them prisoner of war status, which

23 they received as opposed to those like Quantrill who had

24 no regard for the law whatsoever, and conducted their

25 operations outside the law of war.

1  Q    And the law of war developed after that, up until the

2  international.  And with respect to international

3  application, the United States' common law does not apply

4  internationally?

5  A    That is correct.  Basically, it may -- you may call

6  it a compromise.  The common law provided a lot of the

7  basis for much of the thinking that evolved into

8  international treaties.  But since there are other nations

9  that have entirely different legal systems and entirely

10 different customs, the idea was to come up with something

11 that would have that universal acceptance.  So it has

12 primacy and interpretation of law.

13 Q    And as you sit here today, tell Judge Hudson what is

14 the body of law that has that international recognition

15 that is used to look at international conflicts?

16 A    We developed the law of war.  Some call it the law of

17 armed conflict.  The International Committee of the Red

18 Cross and some other governments call it International

19 Humanitarian Law, which personally is not something I like

20 because law does involve some very violent acts.  And we

21 can't make it any sweeter than it is.

22 Q    With respect to looking at conflicts and combatant

23 immunity or POW status, what is the proper area of the law

24 that governs that internationally?

25 A    Today it's the 1949 Geneva Convention relative to the

1  treatment of prisoners of war.

2  Q    And as far as you know based on your experience, is

3  it one of the most widely internationally accepted

4  treaties?

5  A    Before the 1949 Geneva Convention, all four of

6  them -- I should identify what they are.  The first is

7  wounded sick in the military on the battlefield, friendly

8  or enemy.

9      The second is for regulating the conduct and

10 treatment of the wounded sick and shipwrecked at sea.  And

11 that also includes the medical personnel and medical units

12 and medical transports that provide that treatment, both

13 on land and at sea.

14     The third is the 1949 Geneva Convention for the --

15 relative to the protection of prisoners of war, which I

16 referred.

17     The fourth one was new following World War II.  And

18 that dealt with protection of the civilians.  Civilians

19 that in occupied -- primarily in occupied territory.

20 Q    How many countries have ratified and accepted the

21 Geneva Conventions?

22 A    I believe the number is 195 out of, what I believe,

23 is either 198 or 200.  There are two or three small

24 Pacific island nations that are not parties.

25 Q    How many years have you been working under the law of

1  war under Geneva Conventions looking at the issues and

2  applying it?

3  A    My total federal service was -- military and civilian

4  and with the Pentagon was 43 years.  I worked in the

5  Pentagon on law of war issues for 34 years.

6  Q    Explain to us briefly the significance of the

7  International Committee for the Red Cross with respect to

8  the Geneva Convention.

9  A    The Conventions recognized the International

10 Committee of the Red Cross as an extremely important

11 portfolio they bring to implementation and respect for the

12 Conventions.

13     I've always said if we did not have the International

14 Committee of the Red Cross, we would have to start one.

15 They were created in the mid-1800s.  They were critical to

16 the establishment of the modern law of war.  They are very

17 persistent in going to nations around the world helping

18 them, assisting them, encouraging them to adhere to the

19 law of war.

20     They basically work on the basis of contributions

21 primarily from governments.  There are some governments

22 that do not contribute to them.  The United States is the

23 largest contributor.  I think our normal average

24 contribution annually is $250 million.  We do put a lot of

25 stock into them.  They have been very good.

1    We have -- they have had difficult times, as we know,

2 in the period right after 9/11.  I had the pleasure of

3 working with them on almost a weekly basis.  They always

4 pushed, and they always pushed to make things better.  And

5 that's their job.

6 Q    In your experience, and I understand that there's

7 disagreements between them and the United States

8 government, do they act in their capacity on behalf of a

9 neutral group charged with administering and protecting

10 the Geneva Convention?

11 A    They were doing their job.

12    COLONEL PARKS:  May I offer one example?

13    THE COURT:  Yes, sir.  Go ahead.

14 BY MR. MIKE GILL:

15 Q    Yes, sir.

16 A    There is a hard-core rule that the International

17 Committee of the Red Cross' correspondence with a

18 government are confidential.  They may not be subpoenaed.

19 No ICRC member may testify in any case.

20    When we had the disclosure of what was going on in

21 the Abu Ghraib prison in Iraq, we were summoned by

22 Congress to come and explain everything.  It turned out

23 that the warden of the Abu Ghraib prison was not sending

24 the reports we received -- they received from the ICRC to

25 us in Washington.  We were then asked for all of those by

1  four different Senate and House committees.  We went to

2  the ICRC and said please give us copies of them.  And they

3  said we can't do that because you're showing them outside

4  the Executive Branch.

5       We got a special exception from them.  We printed

6  them all out and made up notebooks and took them over to

7  the Senate and House committees for them to see.  We

8  thought it was important for them to see those and for all

9  of us to learn from that experience.

10      THE COURT:  Excellent.

11      Let's go.  Next question.

12  BY MR. MIKE GILL:

13  Q    And the significance of Jean Pictet, P-I-C-T-E-T, as

14  far as his relationship to the passage of the 1949 Geneva

15  Convention.

16  A    And Jean is spelled J-E-A-N.

17      Pictet was one of the true leaders in the ICRC

18  movement with a considerable amount of experience at the

19  time of the negotiations of the 1949 Geneva Conventions.

20  He wrote a four volume, what I would call, legislative

21  history of what was intended by the various provisions as

22  interpreted by the ICRC.  They are a foundation document

23  any time we delve into any detail on some of those

24  interpretations.

25  Q    And with respect to the Third Geneva Convention,

1  protection of the prisoner of war and those issues, can

2  you just tell us what are the general overall themes that

3  the Convention includes based on the law of war and the

4  things they seek to protect?

5  A    First, they establish the fact that when a soldier

6  captures an enemy soldier on the battlefield, that soldier

7  is entitled to humane treatment.

8       Second, the soldier does not own that prisoner.  That

9  soldier owns that prisoner from the standpoint of the

10 ownership of the nation -- of the government.  Any

11 prisoner of war in our hands is in the possession of the

12 United States government.

13      It establishes the criteria for who is entitled to

14 prisoner of war status.  It does make a distinction

15 between international armed conflict.  And in common

16 Article 3 non-international armed conflict, this was the

17 first time that appeared in any treaty -- any reference to

18 international armed conflicts.  It was a small article.

19 It was very brief.  It was also the establishment of what

20 we know today as human rights law.

21      The rest of it, after qualifying a person to be a

22 prisoner of war or, as some have said, if at any doubt to

23 run an administrative procedure to establish whether or

24 not they're entitled to that protection, then it gets into

25 very specific details of evacuating the prisoner from the

1    battlefield to avoid further risk or harm to that person.

2         The way in which they should be held in prisoner of

3    war camps, how the prisoner of war camps should function,

4    the right of the ICRC unlimited access to come into those.

5    Establishing that you cannot transfer your prisoners of

6    war to another nation and escape your responsibilities as

7    the original captive.

8         And in the first Gulf War, we actually took the

9    prisoners of war captured by some of our coalition allies,

10   the Canadians, for example, the French, the British.   And

11   we held all of those 250,000 men in prisoner of war camps

12   that were subject to the inspection, the daily inspection,

13   of the ICRC.   So it goes into that kind of detail of the

14   things that have to be done.

15   Q    All right.   And in fact we're going to get into this

16   in a few minutes, but is it fair to say that the United

17   States, in conducting its worldwide operations, provides

18   protection to any combatants that are captured across the

19   board, but that legally did not involve the determination

20   if they are entitled to the prisoner of war status that

21   gives them immunity down the road?

22        MR. KAMENS:  Can that question be restated?  I didn't

23   fully understand it.

24        MR. MIKE GILL:  I didn't fully understand it either.

25   BY MR. MIKE GILL:

1  Q      Explain to us the policy of the United States

2  military in treating enemy combatants, their capture.

3  A      It's strict adherence to the 1949 Geneva Conventions.

4  Now, that doesn't mean we always do it right.  Abu Ghraib

5  is a classic example.  But that's where we also stepped in

6  with the prosecutorial authority to correct that.

7  Q      Now, with respect to the common law from the 19th

8  Century, and the development of the body of law that

9  resulted in the 1949 Geneva Convention, tell Judge Hudson

10  in your expert opinion, as we sit here today, what is the

11  proper body of law to look at with respect to determining

12  whether the Taliban or soldier who claims to be an

13  associate of the Taliban is entitled to prisoner of war

14  protection or immunity from prosecution?

15  A      Again, the 1949 Geneva Convention relative to the

16  treatment of prisoners of war.

17  Q      Now, take a look at Government's Exhibit Number 6,

18  which is just a handful of provisions that we'll be

19  discussing today with Judge Hudson.

20      THE COURT:  Mr. Gill, hold on just one second.  Let

21  the interpreters change positions.

22      Ready to proceed?

23      INTERPRETER:  Yes.

24      THE COURT:  Go ahead, Mr. Gill.

25      MR. MIKE GILL:  And, Your Honor, we would move for

1    admission of Exhibit Number 6.

2         THE COURT:  Mr. Kamens, any objection to that?

3         MR. KAMENS:  No objection.

4         THE COURT:  Be received.

5              (Government's Exhibit 6 is received.)

6    BY MR. MIKE GILL:

7    Q    Now, tell us about Article 2 --

8         THE COURT:  What again is Exhibit 6?

9         MR. MIKE GILL:  It is a selection of some of the

10   provisions from the Geneva Convention that he'll be

11   discussing, Your Honor.

12        THE COURT:  The 1949 Geneva Convention?

13        MR. MIKE GILL:  Indeed, Your Honor.

14        THE COURT:  All right.  Go right ahead.

15        MR. KAMENS:  Just -- just so the Court knows, the

16   entire GPW provisions are Defendant's Exhibit 5.  And it

17   has everything.

18        THE COURT:  Thank you, Mr. Kamens.

19        MR. MIKE GILL:  And, Your Honor, we move for

20   admission of Defendant's Exhibit Number 5.

21        MR. KAMENS:  We can get to that later.

22        THE COURT:  All right.

23        I will assume that you will have no objection when it

24   is offered, Mr. Gill?

25        MR. MIKE GILL:  We definitely do not.

1       THE COURT:  All right.  Go ahead.

2  BY MR. MIKE GILL:

3  Q    Now, describe for Judge Hudson Article 2.  What does

4  it mean as far as who is covered, and its application or

5  non-application to a conflict.

6  A    This actually establishes the trip wire as to when

7  the treaty comes into force.  When it comes into effect.

8  It establishes --

9       THE COURT:  What was that paragraph number again,

10  Colonel?  I'm sorry.

11      COLONEL PARKS:  It's Article 2, Paragraph 1.

12      THE COURT:  Thank you, sir.

13  A    It says, *"In addition to the provisions which shall*

14  *be implemented in peace time,"* which is basically

15  requiring us --

16  Q    And slow down a little.

17  A    I've never, as a southerner, been told I talk too

18  fast.

19      That we have obligations in peace time to train our

20  soldiers, and airmen, Marines, sailors, and what have you.

21  And that's what that first sentence is referring to.

22  Q    Okay.  All right.  Go ahead.

23  A    Then it said, *"the present Convention shall apply to*

24  *all cases of declared war."*

25      I'm going to stop there because that has almost

1  become a moot point.  The United States has declared war

2  only five times in its entire history, and we've been in a

3  lot of conflicts other than those when we declared war.

4  The last time we did was December 7, 1941.

5      *"or of any other armed conflict which may arise*

6  *between two or more of the High Contracting Parties."*

7      *"High Contracting Parties"* are governments that have

8  ratified these treaties.  The four 1949 Conventions, you

9  know, and particularly this one.  And as I said, there are

10  195 out of some 198.  So that, again, if there's a war

11  between two nations, this treaty comes into force.

12  Q    Okay.

13  A    *"even if the state of war is not recognized by one of*

14  *them."*

15      A classic example here is the 1983 war between

16  Argentina and the United Kingdom over the Balkans

17  Malvinas.  Both sides keep saying at the leadership level,

18  *"We're not at war.  We're not at war."*  That was a

19  diplomatic step to say we don't want to be at war.  We'd

20  like to settle this.  As it turned out, they didn't settle

21  it, and there was an armed conflict.  Subsequently, it was

22  called the Balkan War.  So that's again more a political

23  issue.

24      But this says even if you don't accept it as a war,

25  if it looks like a war and quacks like a war, it's

1   triggered it.   That is for the protection of lawful

2   combatants who are captured, including medical personnel

3   who are not combatants, military medical personnel, in

4   order to provide them protection.   This is always going to

5   be the point of urgency by the Conventions and by the ICRC

6   and the implementation.

7   Q     All right.   And is that the requirement of an

8   international armed conflict that is commonly talked

9   about?

10  A     Of an international armed conflict, which is one --

11  actually, between two governments, two nations.

12  Q     And is that absolutely required before the Geneva

13  Convention is --

14  A     That is -- this is the trip wire to establish that.

15  Q     All right.   Now then, let's talk about Paragraph 2 of

16  Article 2.

17  A     It, again, defines the way in which the rights or

18  protections are triggered here, *"shall also apply to all*

19  *cases of partial or total occupation of the territory of a*

20  *High Contracting Party."*

21       This may be a situation in which there really may not

22  be a formal conflict.   You might have a temporary

23  incursion into the territory of another nation from the

24  standpoint of a skirmish between them at a border

25  crossing, or something like that.   There is no intent to

1   ever be the occupying power or occupy the territory.  But

2   nonetheless, if soldiers are captured during that time,

3   they are entitled to prisoner of war status until they are

4   repatriated.  That is the purpose there.

5   Q    And how about with respect to occupation where one

6   High Contracting Party goes into another country, but the

7   other country does not do anything to stop it?

8   A    That makes no difference.  It still -- it's already

9   triggered if you go in.

10       We went into Iraq in 1991 with the purpose of

11  defeating the Iraqi forces who were formally occupying

12  Kuwait.  We were trying to liberate Kuwait.  Our forces

13  were in there with only 24-hour notice that they would

14  stay in Iraq until, within that 24-hours, they were told

15  to pull back, they would pull back.  There was never any

16  intent to possess it permanently.  That's the type of

17  thing that is being looked at here, and how that's

18  triggered.

19  Q    Does that provision apply in situations such as 2009

20  in Afghanistan where the United States, and coalition

21  forces, are in the country assisting at the government's

22  request in Afghanistan?

23  A    Not entirely because we were there at the invitation

24  of the government of Afghanistan.  We had not invaded.  We

25  went in there in an incursion early on after

1  September 11th of 2001.  But in the case of 2009, we, and

2  our NATO coalition partners, were there at the request of

3  the government of Afghanistan to assist them in fighting

4  the insurgency that was ongoing in Afghanistan.

5  Q    So to be clear, in your opinion does that second

6  paragraph, the occupying power provision of Article 2,

7  does that have any application to Afghanistan?

8  A    We never regarded ourselves as the occupying power.

9  We never had any intent to be the occupying power in

10 Afghanistan at no time.

11 Q    And finally Paragraph 3 of Article 2.  Tell us what

12 that is, and what it covers.

13 A    That's why I just mentioned it.  It didn't apply in

14 Afghanistan in 2009 because we were -- we had gone into

15 Afghanistan.  At that point in time after the Karzai

16 government had been established, recognized by the

17 Security Council and by the United Nations, we were there

18 at President Karzai's request to assist him.  We have

19 assistance programs like this going on around the world.

20 We have been in a number of missions.

21       But in those cases, if we capture someone, we may

22 capture them, but we will then transfer them and turn them

23 over to the government of that nation.  So, slightly

24 different situation.

25 Q    Now, let's look at Paragraph 3 of Article 2.  And

1  tell us what that provision covers.  I'm sorry.  On Page 1

2  of Government's Exhibit 6, Article 2, Paragraph 3 with

3  respect to if there is a power that is in a conflict that

4  may not be a party to the Convention.

5  A    I've lost my place here.  You're talking about --

6  which page now?

7  Q    Article 2, the third paragraph there with respect to

8  if -- even if a party is not covered by the Convention, if

9  they accept -- if they agree though to accept provisions.

10 A    Sorry.  Yes.  In many ways, this one has become --

11 overcome by events as well since this was written in 1949

12 when there were no parties.  Eventually, as everybody has

13 signed on to it, you didn't have a nation who became part

14 of an armed conflict who had not -- that had not ratified

15 it, but would say we agree to abide by it.

16     And that's what you were referring to if you have a

17 government that's not a party and they sign up to it or

18 commit themselves to it.

19 Q    And as you sit here today, are you aware of the

20 Taliban or Haqqani Network at any time agreeing to abide

21 by the provision of the Geneva Convention?

22 A    We never received any such statement from the Taliban

23 or the Haqqani Network.

24 Q    In your experience with the International Committee

25 for the Red Cross, do they go out when conflicts start and

1  actually meet with different parties to offer that, and

2  encourage them to comply?

3  A    When any armed conflict starts, the ICRC not only

4  goes to capitols, it also sends out communiques to every

5  government reminding them of their law of war obligations,

6  and stipulating these are what they are.  That's a

7  standard practice for both actual visits to governments,

8  but also the messages sent to the governments.

9  Q    Now, tell us, can the character of a conflict change

10  over time and with events from an international armed

11  conflict to a non-international conflict?

12  A    Absolutely.  That is in -- this is probably the

13  Afghanistan conflict is the classic one.  We consider it

14  to be an international armed conflict as we entered it

15  following the 2001 terrorist attacks because we were going

16  into a foreign nation that was also a High Contracting

17  Party to the Geneva Conventions.

18       The memoranda that President Bush eventually signed

19  does make that statement this was an international armed

20  conflict.

21       That said, you had the transition then after the

22  Taliban was being defeated, fled Afghanistan in December

23  in 2001, and the Karzai -- President Karzai was brought

24  in, and then went through the elective process that's been

25  described earlier this morning, and was accepted and

1  recognized as the leader of Afghanistan by the United

2  Nations Security Council, and others.  At that point in

3  time, although the Taliban may have been a de facto,

4  recognized by some as the de facto government of

5  Afghanistan, subsequently all those events that

6  established that Karzai and the Karzai regime were in fact

7  the government of Afghanistan.  At that point in time, it

8  moved to being a non-international armed conflict covered

9  by common Article 3 of the 1949 Geneva Conventions.

10  Q    And in this, we are not maintaining, we are not

11  challenging de facto status.  In your personal opinion,

12  however, did you believe that the Taliban even lawfully

13  had control of the government in 2001 as de facto or de

14  jure?

15  A    I wrote an article on this several years ago.  And I

16  said based on my impression, the Taliban was not the de

17  facto government of Afghanistan.  I certainly know that

18  given that others, including our U.S. Government

19  officials, have said we believe they were at least a de

20  facto government, I defer to their expertise.

21  Q    Now, explain to us the significance of the Taliban

22  being moved out and the Karzai regime, and the

23  instillation of elected government, with respect to

24  whether this could change from an international armed

25  conflict to a non-international conflict?

1   A    There are no prisoners of war in non-international

2   armed conflicts.

3   Q    And in this particular situation with the institution

4   of the Karzai regime and the elections, did that occur, in

5   your opinion, even assuming that there was an

6   international armed conflict at the start where the

7   Taliban was the de facto government?  Did that change with

8   the installation of a new government?

9   A    Once you have an established government recognized by

10  the United Nations, recognized -- formally recognized by a

11  number of nations -- I lost the count.  Well over 50, if

12  I'm not mistaken.  In that case, it became a

13  non-international armed conflict.

14       Now, the important point there is because there is no

15  prisoner of war status in a non-international armed

16  conflict, nor is there a lawful combatant status for

17  non-state actors; nonetheless, there was a requirement in

18  common Article 3 for humanitarian treatment if captured.

19  Q    So even in the event that it's non-international, it

20  goes to Article 3?

21  A    That's correct.  Now, I will say that we continue to

22  run facilities that were built and constructed as prisoner

23  of war camps but were basically run as detainee, or

24  characterized as detainee facilities, which is exactly

25  what we had in Vietnam to some degree, but also in the

1    first Gulf War in 1991.

2    Q    Tell Judge Hudson in your expert opinion as of 2009,

3    certainly before November of 2009, are we dealing with an

4    international armed conflict or a non-international

5    conflict in Afghanistan?

6    A    Once the Karzai regime was established and recognized

7    internationally, it was a non-international armed

8    conflict.

9    Q    Now, you mentioned a moment ago a couple of different

10   documents, particularly the Bush Memorandum from February

11   of 2002.  And I want to talk to you about another one from

12   January of 2002 that was a memorandum from a Department of

13   State representative.

14        Before we look at those, can you give Judge Hudson an

15   idea of the political landscape that was going on in early

16   2002 just months after September 11th?

17   A    These are based on my personal observations during

18   that time.  There were, quite frankly, within the Bush

19   Administration, appointed officials, that did not believe

20   in the law of war or treaty war.  There was also the

21   reaction to the September 11th terrorist attacks.  And a

22   statement was made by one of the senior Department of

23   Defense appointees that the law does not apply to

24   terrorists.

25   Q    Continue.

1   A   Now, that's a very popular concept.  It's actually

2   correct in some ways because it's basically saying that a

3   terrorist is not entitled to combatant status.  But it was

4   cast wider than that.  There was a great deal of

5   controversy going on within the administration as to the

6   applicability of the law of war at all.

7       I will say that those of us who were subject matter

8   experts on the law of war were cut out of discussions

9   entirely.  I actually learned later on they were afraid we

10  might give them answers they didn't want, which would have

11  been the case.

12      There was a dispute arising between the Department of

13  Defense officials, White House officials, the Department

14  of Justice, at least some within the Department of

15  Justice, and the Department of State.  The Department of

16  State said you're throwing out the baby in the bath water,

17  basically.  And so the debate was trying to get the law of

18  war back into the picture.

19      So the memos that were written there, the first of

20  those we have, was a draft in reply to John Yoo at the

21  Department of Justice.  And it acknowledges it was a

22  draft.

23  Q   Okay.

24      MR. MIKE GILL:  And, Your Honor, at this time we move

25  for admission of Government's Exhibit 8, which is the

1  February 7th --

2       THE COURT:  Eight?

3       MR. MIKE GILL:  Yes, Your Honor.

4       The February 7, 2002, memorandum issued by then

5  President Bush.

6       MR. KAMENS:  No objection, Your Honor.

7       THE COURT:  That will be received.

8            (Government's Exhibit 8 is received.)

9       MR. MIKE GILL:  And also Government's Exhibit 9,

10  which is a January 11, 2002, memorandum drafted by William

11  Taft, IV, a legal adviser, with the Department of State.

12       MR. KAMENS:  No objection.

13       THE COURT:  They'll be received.

14            (Government's Exhibit 9 is received.)

15  BY MR. MIKE GILL:

16  Q    Taking Exhibit 9 --

17  A    January 11th?

18  Q    Yes, sir.  So is this right in the middle of this

19  situation you're describing for us?

20  A    Mr. Taft, and one of his senior attorneys, and Edward

21  Cummings, were the ones behind pushing the law of war back

22  into the picture.  They received the document referred to

23  in here that was drafted by John Yoo from the Department

24  of Justice, who offered some constitutional law arguments

25  as to whether or not the law of war applied, or whether or

1 not the President could renounce certain things in time of

2 war.  And you'll see with the document below the letter to

3 Mr. Yoo is a draft analysis done by Edward Cummings and

4 Mr. Taft -

5 Q     Okay.

6 A     - to counter those and explain why.  And it doesn't

7 say all the time clearly this is what you said is legally

8 wrong.  It is also done with something we do quite

9 frequently.  Be careful where you're going because you

10 also have to think about the effect this may have if U.S.

11 military personnel or allied personnel are captured by the

12 enemy.

13 Q     Now, with respect to Page 1 of this January 11, 2002

14 memo, if I could turn your attention to the second

15 paragraph.  And if you would please read the first

16 sentence of that paragraph, and then explain to us what

17 this memo is looking at.

18     THE COURT:  That's Page 1, second paragraph, is that

19 right?

20     MR. MIKE GILL:  That is, Your Honor.

21     THE COURT:  Go right ahead, Colonel.

22 BY MR. MIKE GILL:

23 A     *"Our concerns with your draft,"* that is John Yoo's

24 draft, *"are focused on its consideration of the status of*

25 *detainees"*, not referring to the Taliban as prisoners of

1  war, *"who were members of the Taliban Militia as a*

2  *practical matter."*

3  Q    Is this looking at future policy captures, or is this

4  looking back at the capture of individuals already in U.S.

5  custody?

6  A    I frankly don't know.  I do know that I don't believe

7  at that point in time we had actually captured many

8  Taliban.

9       THE COURT:  Could you pause one second, Colonel, to

10  let the interpreters change places.

11       Is the interpreter ready?

12       INTERPRETER:  Yes.

13       THE COURT:  Go right ahead, Colonel.

14  BY MR. MIKE GILL:

15  A    I don't know at that time that we had captured that

16  many Taliban.  Most of them had fled Afghanistan in

17  December of 2001.  And there may have been some in our

18  hands, but the idea that those who were detainees we had

19  not yet stated what we considered to be their status, as

20  the United States would.  But it was also looking towards

21  future operations.

22  Q    And does this memorandum ask you the different angles

23  to look at this situation in Afghanistan, and cautioning

24  the President to -- or his legal counsel, to consider, you

25  know, application of the Geneva Convention, and what it

 1   means in the situation facing them?

 2   A     We, at that time, were of course becoming ourselves

 3   somewhat of a person not wearing a white hat in some of

 4   the operations and statements being given by Washington

 5   officials.   And so this is another one of those political

 6   factors that has to be examined.   In making good policy

 7   determinations, it was making a clear statement of the law

 8   and our legal obligations.

 9   Q     Now then, Exhibit 8, February 7, 2002, memorandum

10   issued by President George Bush.   What did this relate to?

11   A     It was the, I think, response to this discussion, the

12   interagency discussion that had been going on during that

13   time.

14   Q     All right.   And turning your attention to the subject

15   matter.   What was the subject of the memorandum?

16   A     Sorry.   You said Exhibit 7?

17   Q     No.   Exhibit 8.

18   A     Eight.   I'm sorry.

19         *"Humane Treatment of al Qaeda and Taliban Detainees."*

20   Q     Now then, Paragraph 2.

21   A     Yes.

22   Q     Is that basically the statement that President Bush

23   as Commander in Chief makes the following determinations

24   as of February 7, 2002?

25   A     That's correct.

1  Q     All right.  What conclusion did he -- what decision

2  did he make with respect to 2a?

3  A     He determined in 2a, he accepted the legal conclusion

4  of the Department of Justice that none of the provisions

5  of the 1949 Geneva Convention relative to prisoners of war

6  apply to al-Qaeda either in Afghanistan or elsewhere

7  worldwide.

8       That statement basically meant they did not have

9  combatant status, and were not entitled to be prisoners of

10 war.  At the same time, you do have the safety net that

11 anyone you capture is entitled to humane treatment.

12 Q     And the policy of the United States is to provide

13 that treatment?

14 A     That's correct.

15 Q     Okay.  Now then, 2b.

16 A     *"I accept the legal conclusion of the Attorney*

17 *General and the Department of Justice that I have the*

18 *authority under the Constitution to suspend Geneva,"* that

19 is the Geneva Conventions, *"as between the United States*

20 *and Afghanistan, but I decline to exercise that authority*

21 *at this time."*

22 Q     Is that the issue you talked about earlier that was

23 going on, the tension?

24 A     Yes.  Yes.

25 Q     And what is the next determination that the President

1  made?

2  A    Well, he continued there and said, *"Accordingly, I*

3  *determine that the provisions of Geneva,"* again the 1949

4  Conventions, not just the Prisoner of War Convention,

5  *"will apply to our present conflict with the Taliban."*

6  Q    And in your experience with respect to that

7  presidential decree, are those decisions made in different

8  conflicts as a matter of United States policy?

9  A    We always -- it's a standard question when we start.

10  First, are we in an armed conflict?  What type of conflict

11  is it?  Is it international?  Is it non-international?

12  What treaties apply?

13  Q    And are there times even when legally protections may

14  not apply, but the United States decides as a matter of

15  policy in that current time they're going to apply?

16  A    Yes.

17  Q    Do you have any examples?

18  A    I think it's more a case of us always concluding the

19  law of war will apply, the treaties will apply, with the

20  exception being we're not going to apply them in this

21  case.  And I don't -- I, quite frankly, don't recall us

22  ever doing that.

23  Q    Now then, turn to Paragraph c.

24  A    *"I also accept the legal conclusion of the Department*

25  *of Justice and determine that common Article 3 of Geneva,"*

1  again, all four Geneva Conventions, *"does not apply to*

2  *either al Qaeda or Taliban detainees, because, among other*

3  *reasons, the relevant conflicts are international in scope*

4  *and common Article 3 applies only to 'armed conflict not*

5  *of an international character.'"*

6  Q    The President made that determination as of that

7  time, as.  We discussed earlier, putting aside whether

8  that's legally correct based on what's going on, but

9  political decisions are made.

10  A    As of 2002, based on the information -- I'm sorry.

11  2002.  Correct.  That was the status as was viewed in

12  Afghanistan.

13  Q    And did events after that, including the Karzai

14  election, change that character, change the application?

15  A    It did.  But to the best of my knowledge, there was

16  never a formal written determination like this that we're

17  now shifting to a non-international armed conflict.

18      And if I may explain part of the reason for that?

19  Q    Absolutely.

20  A    We train our soldiers, other servicemen, on how to

21  apply an international armed conflict and follow the

22  larger rules of international law contained in the entire

23  Geneva Conventions, rather than turn and focus on common

24  Article 3.  So the idea is we've already trained them at

25  that level, let's keep it there rather than getting into

1   confusing discussions as to are we today in an

2   international armed conflict as opposed to a

3   non-international armed conflict.

4        The international tribunal for Yugoslavia wrestled

5   with this tremendously over the years when they were

6   making -- rendering their decisions.  Because on any one

7   day, you can have an international armed conflict in one

8   small area that the next day would be a non-international

9   armed conflict.  So basically for a very long time, our

10  practice has been to follow the rules for an international

11  armed conflict without making a legal determination as to

12  whether they apply, vis-a-vis, a non-international armed

13  conflict.

14       This again is also a hope for reciprocity if our

15  personnel fall into enemy hands.

16  Q    And finally the next paragraph.  No need to read it,

17  but basically did President Bush determine that Taliban

18  detainees are unlawful combatants, and therefore do not

19  qualify as prisoners of war under Article 4?

20  A    This is Paragraph d?

21  Q    Paragraph d on Page 2.

22  A    Yes, he does.  He says, I do not -- Taliban *do not*

23  *qualify as prisoners of war under Article 4 of Geneva."*

24  And the same with respect to al-Qaeda.

25       If I may though continue to the next paragraph,

1   Paragraph 3, because this is the point I was making?

2       THE COURT:   Why don't you wait until he asks the

3   questions.

4       COLONEL PARKS:   Sorry.

5   BY MR. MIKE GILL:

6   Q   With respect to Paragraph 3 --

7   A   *"Our values as a Nation, values that we share with*

8   *many nations in the world, call for us to treat detainees*

9   *humanely, including those who are not legally entitled to*

10  *such treatment."*

11  Q   That's stating basically that we're going to follow

12  these protections?

13  A   That's correct.

14  Q   Are you familiar with the International Committee of

15  the Red Cross's position on the status of the Afghanistan

16  conflict in 2007 as well as 2011?

17  A   I don't recall ever being -- discussing that with the

18  ICRC myself.

19  Q   Take a look at Government's Exhibit Number 7.   And

20  read through those.

21      MR. MIKE GILL:   And, Your Honor, we offer these into

22  evidence.   These are the ICRC statements with respect to

23  the character of the conflict in Afghanistan.

24      THE COURT:   Any objection, Mr. Kamens?

25      MR. KAMENS:   No objection, Your Honor.

1          THE COURT:   They'll be received.

2               (Government's Exhibit 7 is received.)

3    BY MR. MIKE GILL:

4    Q     Do you agree with those statements?

5    A     Now after reading them, yes, I do.

6    Q     Are those a correct characterization, in your expert

7    opinion, of the nature of the conflict in Afghanistan as

8    of 2007, and continuing all the way forward?

9    A     I do.

10   Q     And rather than rehashing it, but they basically

11   restate the same thing you told us about a while ago

12   involving Afghanistan asking coalition forces to be in

13   their country to help them, and that the Taliban is not a

14   government, and this is a non-international conflict?

15   A     That's correct.

16   Q     In this instance, does the Geneva Convention, Article

17   4, prisoner of war apply?

18   A     It does not apply in a non-international armed

19   conflict.

20   Q     In the event it doesn't apply, it goes to Article 3?

21   A     That's correct.

22   Q     What about the common law?  In your expert opinion

23   for analysis of this issue in Afghanistan involving the

24   Taliban and circumstances in 2009, does the common law,

25   particularly from the 19th Century, have application

1  there?

2       MR. KAMENS:  Objection, Your Honor.  He's an

3  international law expert.  He's not an expert on domestic.

4       THE COURT:  He's an expert on the law of war.

5       MR. KAMENS:  The customary law of war.

6       THE COURT:  I think you need to lay some foundation

7  that your common law would be within that body or doctrine

8  of the law.

9       MR. KAMENS:  Thank you, Your Honor.

10       THE COURT:  Objection is partially sustained.

11  BY MR. MIKE GILL:

12  Q    Tell us, Colonel Parks, in your experience in

13  studying the law of war, do you have familiarity with

14  principles of the common law on the law of war, and do you

15  apply those, as well as know how they apply in an

16  international or they don't apply?

17  A    Our practice over the years has been the treaty law,

18  which has been accepted through our constitutional

19  process, consideration by the Senate vote on the

20  acceptance of the treaty, and the President as the

21  representative of the United States accepting that treaty

22  and placing that treaty -- depositing that treaty with the

23  treaty depository, which in this case is the nation of

24  Sweden that is the controlling law.

25  Q    In fact, with respect to the law of conflict and

1  prisoner of war status, is the Geneva Convention the most

2  comprehensive compilation of the principles to apply?

3  A    It is.  And as stated in the Constitution, is the law

4  of the land.

5  Q    Now, I want to put that aside.  So in your opinion,

6  this was a non-international armed conflict.  Geneva does

7  not apply in 2009 involving the Taliban?

8        MR. KAMENS:  Objection.  Leading.

9        THE COURT:  Objection is overruled.

10 BY MR. MIKE GILL:

11 A    Yes, I do accept that this was the controlling law,

12 and it was a non-international armed conflict at that

13 time.

14 Q    Put that aside.  I want you to assume with me, I know

15 you disagree with it, but I want you to assume with me,

16 that somehow it does apply and would go to Article 3.

17 A    All right.

18 Q    So if it's an international armed conflict, take a

19 look at Government's Exhibit 6 and turn to Page 2.  Is

20 Article 4 where the analysis turns as to whether a group

21 or individual is covered by prisoner of war status?

22 A    I'm sorry.  I wasn't following the question.

23 Q    Is Article 4 where we go, if we indeed have, if we

24 assume that there is an Article 2 international conflict,

25 we have a soldier who's been captured on the battlefield

1  who claims immunity, is Article 4 where we go next?

2  A    If it is an international armed conflict and we

3  capture someone, we make the determination as to whether

4  or not that person is entitled to prisoner of war status

5  or, I should point out, for captured medical military

6  personnel retained status.  Slightly different, same

7  treatment.

8  Q    All right.  Now then, using Page 2 of Exhibit 6 as

9  your guide, would you explain to Judge Hudson these

10  provisions at Article 4, beginning with Article 4(A), and

11  then each of the provisions under it.

12  A    The provision itself states the first category of

13  personnel who have fallen into the power of the enemy that

14  have been captured which are the *Members of the armed*

15  *forces of a Party to the conflict."*

16      *"Party"* there means a government.

17      *"as well as members of militias or volunteer corps*

18  *forming part of such armed forces."*

19      And the representative -- representing the way we do

20  things or categorize things here in the United States,

21  *"party to the conflict", "armed forces,"* are usually

22  active duty military personnel.

23      The militias are volunteer corps, would be referring

24  to those that are part of the Army reserves, the military

25  reserves, and not been activated or may have been

1  activated.

2      And also the National Guard.  But they're all still

3  part of the uniform structure of the United States

4  military.

5  Q    Okay.  And based on your expert opinion and your

6  belief about this provision, Article 4(A)(1), does that

7  require the application of a fourth criteria set forth at

8  4(A)(2) for a party to the Convention to be covered?

9  A    The negotiating history says that this is not stated

10  specifically because it's assumed the way regular military

11  forces operate.

12  Q    If a party to the conflict is seeking coverage under

13  the Geneva Convention, does it turn on the four factors,

14  or is it their being a party to the Convention that

15  applies?

16  A    In 4(A)(1)?

17  Q    Yes, sir.

18  A    In 4(A)(1), you have a member of the military who

19  carries out actions that are not consistent with the law

20  of war and that person is captured, they have an absolute

21  guarantee of being treated as a prisoner of war.  Their

22  status remains a lawful combatant, lawful prisoner of war.

23  They may be prosecuted for those offenses, but they do not

24  lose their prisoner of war status or combatant status.

25  Q    And when you talk about they may be prosecuted for

1  violations of the laws of war -

2  A    Yes.

3  Q    - now then, tell us about 4(A)(2), and how that

4  applies and what it refers to.

5  A    This was a lesson learned from World War II.  As the

6  Germans invaded western Europe, as the Japanese went

7  through the Pacific areas, there were eventually displaced

8  government leaderships in Belgium, Denmark, Norway,

9  France.  Just about most of western Europe.  Those

10 governments then moved to the United Kingdom.  They

11 continued to be recognized by other allied nations.

12      They began to organize resistance movements.  The

13 British Special Operations Executive was the first to

14 start doing this.  They found people to rejoin.  Some of

15 them had been discharged, military personnel, or military

16 personnel who had been fighting.  Others were those who

17 volunteered or enlisted by the special operations

18 executive.

19      They were trained as military personnel.  They were

20 armed.  They then went into the occupied territories and

21 worked with, and established, and trained and armed and

22 supplied resistance movements of citizens of those nations

23 who were under Nazi occupation or Japanese occupation.

24 The British OPS did the very same thing creating these.

25      The Russians had a huge resistance movement in the

1  Soviet Union that was quite successful against the Nazi

2  occupation.

3      This recognized -- and two of the criteria here.  And

4  what's important here is oftentimes people look at only

5  the number of criteria to follow, rather than the language

6  in this paragraph.  Members of other militias and members

7  of other volunteer corps, including those of organized

8  resistance movements.

9      Now, those words are extremely important because that

10 goes back to right authority.  That goes back to the idea

11 that a government is only the one who can organize such

12 movements and send them onto the battlefield, and entitle

13 them to combatant and prisoner of war status.  Belonging

14 to a party of the conflict and operating in or outside

15 their own territory, even if this territory is occupied,

16 provided that such militias are volunteer corps, including

17 such organized resistance movements, who fulfill the

18 following conditions.

19     This goes all the way back to Francis Lieber.  Same

20 criteria existed before - that of being commanded by a

21 person responsible for his subordinates.

22 Q   Why is that important?

23 A   That's, again, command responsibility.  You can't

24 have people running around the battlefield engaged in acts

25 of violence.  First, it will place the civilian population

1  at risk.  Oftentimes if they're not properly trained, they

2  will abuse the civilian population, or the persons they

3  may capture.  It also will, in someways, raise the

4  potential of them not meeting a uniformed requirement,

5  which then puts the civilian population at risk.  So it's

6  a way to discipline the military.

7      That is a fixed distinctive sign recognizable at a

8  distance that goes all the way back to Francis Lieber.

9  The idea was you must distinguish yourself from civilian

10 population.  And so this is uniform or a distinctive

11 design is not well defined.

12 Q   Stop it there.  Tell Judge Hudson about -- you've

13 written papers on this, your opinion with respect to that,

14 and the importance of the insignia versus uniform, and

15 particularly special forces operations.

16 A   It's an acknowledgment that oftentimes it would be

17 imprudent for someone to be wearing a full uniform on the

18 battlefield.  It has the words that are recognizable at a

19 distance.  When it was first written, that was around 200

20 meters because that was a range of a rifle.

21     Anything more than that, the idea is that many

22 special forces units may have to conduct operations like

23 this where at a distance the enemy may not be able to

24 determine whether they're friendly or foe.  It's a -- it

25 would be considered a lawful ruse.

1       It is different from what we call perfidy in that you

2  do something to mask your status so that you can approach,

3  and appearing to be a civilian, and carry out an attack

4  because that then places the civilian population at risk.

5  Because soldiers on the other side of the conflict, as to

6  anyone who approaches them, they're unsure if it's friend

7  or foe and may start shooting and kill innocent civilians.

8  Q    In your expert opinion, is it a violation of the law

9  of war to dress in civilian clothing, or for these

10  criteria, specifically with the design of blending in with

11  civilians?

12  A    That's a separate prohibition called perfidy.  And

13  that is the case.  And this is -- that's the distinction

14  that appears here.  And this is what Lieber was talking

15  about in the 1800s.  It was also the idea in all these

16  subsequent conflicts.

17       You cannot use the law of war requirement for

18  protection of civilians not taking direct part in

19  hostilities as a ruse, it's an unlawful ruse, for

20  approaching the enemy and attacking because it places

21  civilian population, the innocent civilian population, at

22  greater risk.

23  Q    The next criteria, *that of carrying arms openly.*

24  A    The same thing.  The idea of having some sort of an

25  appearance as a combatant, if you wish combatant status.

1    And, again, it's a matter of protecting the civilian

2    population from the potential harms and hostilities.

3    Q     And finally the final criteria, 2(d).

4    A     This is sort of a manifestation of the discipline

5    that it required.  A group that intends to claim combatant

6    status and prisoner of war status.  Now, the fact that

7    some may violate the law of war does not make them all

8    guilty for those offenses.  And of course the thing is in

9    regular militaries, if someone within a unit commits a

10   violation of the law of war, that person will be

11   prosecuted for that offense.

12   Q     So that provision is focused more on institutional

13   practices, and not isolated --

14   A     This is quite historical.

15   Q     Can you give us some examples of the types of

16   violations that would violate the laws and customs of war?

17   A     We had an incident in Vietnam with which I was

18   personally responsible, not as a bad guy, I should hasten

19   to say, in which we had a Marine patrol out.  What

20   appeared to be a fairly young child by the roadside in

21   semi-dark, semi-light, one of our Marines challenged that

22   person, and the person did something fiddling along the

23   road and then began to run away.  The point man opened

24   fire and killed what turned out to be a 13 year old girl.

25   As he approached the body, he set off the bobby trap that

1 she just set in.

2      We went back and found the enemy was holding the

3 entire family hostage with the threat of killing them if

4 the girl did not do what she was sent out to do.

5      This is the kind of thing that exacerbates and places

6 that civilian population at risk.  And that's the type of

7 thing this is intended to prevent from happening.

8 Q    Attacking civilians?

9 A    Yes.

10 Q    How about attacking imposing parties under a flag of

11 truce or an effort to reach peace?

12 A    These are all considered, and they're very expressly

13 prohibited.  You can't use the Red Cross, the Red

14 Crescent, Red Line and Sun, MogaDao Qigong.  But the new

15 version of that is actually recognized.  Those things

16 cannot be done.

17      You can't use the surrender flag.  You cannot wear

18 civilian attire with the intention of carrying out an

19 attack.  Again, posing as an innocent civilian.  These are

20 all prohibited acts that can be prosecuted because you

21 won't protect the civilian population.  And also keep your

22 own soldiers from stepping over the line and reacting and

23 saying shoot first and worry about it later.  That just

24 cannot be done.

25 Q    Does it also include destroying cultural property?

1   A     Yes.

2   Q     Now then, let's move on from 4(A)(2) to 4(A)(3).

3         THE COURT:  Hold off one second and let the

4   interpreters change positions.

5         Ready to proceed?

6         Go ahead, Mr. Gill.

7         MR. MIKE GILL:  Yes, sir.  Thank you.

8   BY MR. MIKE GILL:

9   Q     Please describe for us 4(A)(3), and what that covers.

10  A     The classic examples of this come from World War II,

11  following the German occupation of France.  The occupation

12  was not total throughout France.  It was heavier in

13  northern France and southern France.  There were some

14  French units that were left as French military units to

15  actually conduct some operations, that is, conduct some

16  types of work within France, but they were also resisting

17  the fact that Germany had defeated France and the

18  government had fled to the United Kingdom.

19        It also happened at a time later in the war when

20  Italy decided it was no longer going to be an ally of

21  Germany, and went over to the allied side.  The Germans

22  then said, in each case, these people will not be provided

23  prisoner of war status if they're now fighting against us.

24        The ICRC intervened and made the request to treat

25  them as if they were lawful combatants, even though they

1  had switched to the other side.  And the Germans, in fact,

2  for the most part, carried that out.

3       So the idea was, again, to try to maintain and

4  recognize your former friend is now your enemy, but they

5  were conducting their operations within the accordance of

6  the law of war, and should be provided prisoner of war

7  status and protection.

8  Q    Now, describe to us, in your opinion, do the

9  requirements set forth in 4(A)(2) apply in determining

10 whether regular armed forces is covered under 4(A)(3)?

11 A    Jean Pictet wrote that while it was not specified

12 here, that was the expectation.  Just as it is the

13 expectation in 4(A)(1).

14 Q    And with respect to Jean Pictet, is that the

15 commentary decided at Page 5 of Exhibit 5?

16 A    That's correct.

17 Q    Tell us about the significance of the term *regular*

18 *armed forces*" to you.  Is *regular*" a term of art that is

19 significant in the law of war?

20 A    Well, it makes the distinction between regular, that

21 is, the forces of the government and those that are

22 fighting called *sub-forces*" that have been organized and

23 activated.  As I said, the Army Reserve or the National

24 Guard is a militia force.  It is then, when activated,

25 becomes part of the overall Army to serve under that

1   Army -- under the Commander in Chief, and executing the

2   same type of operations.

3   Q    Now, aside from application of the four criteria at

4   4(A)(2) in determining whether a regular armed force is

5   covered by 4(A)(3), does Pictet point to other things in

6   the commentary that fit with your understanding, in your

7   expert opinion, what is required for that provision?

8   A    Pictet says that if you have a force that is fitting

9   the mold there, or as described in 4(A)(3), they must

10  state that they accept the obligations of following the

11  law of war in order for them to be regarded as lawful

12  combatants and entitled to prisoner of war status.

13  Q    Does he also state anything with respect to even

14  though a particular force, such as the United States may

15  not recognize a force, but whether other countries rather

16  than third-party states must recognize them?

17  A    That's the kind of thing that, to me, is an option of

18  each government.  I'm sure there would be some that would

19  recognize it, and there may be.  But at the same time, I

20  don't recall it being that exact on what it requires.

21  Q    All right.  Now, let's talk about application of

22  these factors to the Taliban related -- and related to the

23  Haqqani Network in 2009.  In your expert opinion, and

24  let's start at the top, 4(A)(1), were those groups covered

25  by 4(A)(1) in 2009?

1  A    It was not an international armed conflict, so

2  therefore it would not apply.

3  Q    Okay.  So that's Article 2?

4  A    Right.

5  Q    But assume with me that Article 2 applies, and we

6  have come to Article 4, would those groups receive

7  coverage under Article 4(A)(1) in your expert opinion?

8  A    I guess we have to go back and say was it -- and what

9  year was this?

10  Q    2009.

11  A    2009.  No, because they were not the regular armed

12  forces of the government of Afghanistan.

13  Q    So they're not a High Contracting Party to a

14  conflict?

15  A    Well, that's really the government -- Afghanistan as

16  a nation is the High Contracting Party.

17  Q    Now then, how about Article 4(A)(2)?

18  A    Same thing.  They would not be covered by that

19  because this is a -- this is a privilege given to the

20  members of organized armed forces of the government, not

21  these private armed groups, which is what the Taliban and

22  the Haqqani Network have become once you had the Karzai

23  government in power and recognized internationally.

24  Q    So they're not part of that government.  That's Step

25  1 under there.  How about with respect to application of

1  the four factors as a group?  Would they meet the four

2  factors?

3  A    Certainly from the testimony that was heard earlier

4  today, they did not.

5       MR. MIKE GILL:  And I believe that testimony speaks

6  for itself unless the Court -- if you'd like for us to go

7  through those factors, we can, but I believe the facts are

8  before the Court.

9       THE COURT:  I'll leave it up to you.  I don't think

10  it's required, but you can make the record that you feel

11  is appropriate, Mr. Gill.

12  BY MR. MIKE GILL:

13  Q    I tell you what.  I know that there's more detail

14  from the extensive testimony this morning, but if you

15  don't mind, if you would, just march through and just give

16  your observations, your expert observations about those

17  factors.

18  A    First, in the first testimony, of course, they were

19  not necessarily commanded by a person responsible for his

20  subordinates in that when an individual captors --

21  captives were being -- had been captured and were duly

22  executed on the spot, and nothing was done to those that

23  committed the acts of murder involved, certainly suggest

24  they were not responsible for the actions of their

25  subordinates.

1       With regard to B, I know that in the early days with

2   the conflict in Afghanistan, the Taliban was recognized to

3   some degree as wearing their black turbans as an indicia

4   of something like this.  But that was not the practice in

5   the 2009 time period that was described in the earlier

6   testimony this morning as well.

7       In fact, particularly with regard to the suicide

8   bombs, those are always -- not always, but for the most

9   part underneath the vest or the clothing for that very

10  purpose.

11      Carrying their arms openly.  If their primary weapon

12  in those days were the suicide vest, they were not

13  carrying their arms openly.  And even in other occasions,

14  certainly if they were carrying AK-47s, AKS, rifles, or

15  assault rifles, or what have you, oftentimes they would be

16  carrying and concealing those under their garb before the

17  attack began.

18  Q    Suicide vests also fall within that?

19  A    Yes.

20  Q    And finally, D.

21  A    And certainly they did not conduct their operations

22  in accordance with the law of war given it was a very long

23  list which were just examples of attacking civilian

24  objects, civilian populations, and such.  And, again,

25  you're going back earlier than the actual September 11th

1    attack, destruction of public property.

2    Q    Under Article 4(A)(3), the same analysis, would you

3    apply the same analysis on the four criteria here?

4    A    That's correct.

5    Q    So based on that analysis, would they qualify under

6    4(A)(3)?

7    A    They would not.

8    Q    Take it to the next step that you identified from

9    Pictet as far as the need to recognize Geneva Convention,

10   or coverage.

11   A    They didn't.  To the best of my knowledge, no such

12   statement was ever made by the Taliban.

13        MR. MIKE GILL:  May I have one moment, Your Honor?

14        THE COURT:  Yes, sir.

15        MR. MIKE GILL:  No further questions, Your Honor.

16        THE COURT:  Mr. Kamens, I assume your

17   cross-examination will take some time.  I'm trying to plan

18   our luncheon recess here.  Do you think your cross will

19   take more than half an hour?  I'm not going to hold you to

20   the time.  I'm just trying to plan.

21        MR. KAMENS:  I believe so.

22        THE COURT:  You think it will take more than half an

23   hour?

24        MR. KAMENS:  I believe so.

25        THE COURT:  At this point, we're going to recess for

1   one hour for lunch.  We're going to resume at 1:35.

2        Colonel Parks, you can step down.  You're free to go.

3   Come back, please, by 1:35.

4        The defendant is remanded to the custody of the

5   Marshal.

6        We'll stand in recess until 1:35.

7                      (Recess taken.)

8        THE COURT:  All right, Mr. Kamens, you may begin.

9        MR. KAMENS:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11   BY MR. KAMENS:

12   Q    Good afternoon, Colonel Parks.  My name is Geremy

13   Kamens.  I will be asking you a few questions.

14        On the first page of your CV, it's listed as

15   Government's Exhibit 4.  Do you see that?

16   A    Let me find it.

17   Q    Well, I can just tell it to you.

18   A    Okay.

19   Q    The first paragraph under career employment, it says

20   you were the "*Principal author and editor-in-chief,*

21   *Department of Defense Law of War Manual,*" is that right?

22   A    To the point until I retired.  That is not the one

23   that has just been published.

24   Q    I see.  Is the Department of Defense Law of War

25   Manual that was just published, does that use any of the

1  work that you contributed to as the principal author and

2  editor-in-chief?

3  A    I don't know.  I've not seen it.  It was sent to me

4  electronically.  And quite frankly, when I retired I

5  turned to other things, and I've not been involved with it

6  whatsoever.

7  Q    I see.  But as far as you know, the Department of

8  Defense Law of War Manual that was issued on Friday, that

9  expresses the opinion of the Department of Defense with

10  respect to the law of war?

11  A    I believe that's said in there.  Or it may have been

12  said in the press conference, but I can't say for sure.

13  Q    Before the Department of Defense Law of War Manual

14  was issued, sir, you gave a number of speeches where you

15  decried the fact that the manual hadn't been issued, you

16  felt, for political reasons, is that right?

17  A    That's correct.  Not a lot.  I gave two.

18  Q    All right.  And the political reasons you felt were

19  that certain lawyers in the government didn't agree with

20  parts of it, and that was holding up the issuance of the

21  manual?

22  A    Not exactly, because they held it up before they even

23  looked at it.  We had consensus of the four services,

24  D.O.D., General Counsel, Department of State, and the

25  members of the human rights activists and the National

1  Security Council.  And some people, I think, in some other

2  government agencies said, wait a minute.  We want to take

3  a look at this, which took five years and added 500 pages.

4  So I can't really tell you what's in there.

5  Q    But once it was issued, your conclusion would be that

6  consensus was reached, is that fair to say?

7  A    I'm not at liberty to discuss that because there's a

8  next step that's going to happen.  But it's not in my

9  realm to say what it's going to be.

10 Q    Well, I'm just asking your opinion, sir.

11 A    Without seeing it, I can't say.

12 Q    All right.  Well, let's look at it.  If you can

13 turn -- I think there's a notebook up there.  If you can

14 turn to Defendant's Exhibit 12.

15 A    Okay.

16 Q    And if you can, turn to the first page after the

17 opening page.

18 A    Right.

19 Q    Do you see that?

20 A    Yes.

21 Q    Page 10?

22 A    Uh-huh.

23 Q    Can you look at Section 1 --

24      THE COURT:  Defendant's Exhibit 12 being the new Law

25 of War Manual?

1          MR. KAMENS:   That's correct.   It is excerpts, Your

2    Honor.   The Law of War Manual is 1000 pages.

3          COLONEL PARKS:   It's 1100 pages.

4          MR. KAMENS:   I excerpted it to make a smaller

5    reflection of it.

6    BY MR. KAMENS:

7    Q     If you can look, sir, at Section 1.3.2.2.   Do you see

8    that?

9    A     I do.

10   Q     That is a section that discusses conflicts between

11   the law of war and other law.   Do you see that?

12   A     I do.

13   Q     Now, the next page, that would be Page 11.   In the

14   text there it says that international conventions are

15   generally construed not to constrain State's rights under

16   the law of war.   Do you agree with that?

17   A     This is on Page 11?

18   Q     That's right.

19   A     That's that very first sentence, is that correct?

20         *"In some cases, treaties explicitly clarify,"* is that

21   the one you're referring to?

22   Q     Well, there's that paragraph.   Let's see.   If you

23   keep going down it says -- let's see.   *"For example, the*

24   *LOS Convention has been interpreted not to impair a*

25   *State's rights during armed conflict, even though this*

1   *principle is not explicitly stated in the treaty."*

2       Do you see that?

3   A    I do.

4   Q    And then it also talks about *"the International*

5   *Convention for the Suppression of the Financing of*

6   *Terrorism."*

7   A    Okay.

8   Q    Do you see that?   That's also understood not to

9   prelude the rights of States under the laws of armed

10  conflict, is that right?

11  A    I've got to say, this was -- this was not in the

12  original manual that we worked on for 15 years.   And I

13  don't even know where they're going without reading more

14  of this.

15  Q    Okay.

16  A    You know, it's true but it's not true as a general

17  statement because, obviously, for many years, particularly

18  the Germans argued, that military necessity can negate any

19  law court's obligation, which they found to their regret

20  that that was wrong.

21  Q    Well, let's talk about something you may agree with.

22  A    Okay.

23  Q    Look at the top of Page 12.   It says, *"domestic*

24  *statutes have also been construed not to violate*

25  *international law, including the law of war, if any other*

1 *construction remains possible."* Do you agree with that?

2 A    I can't accept those statements without reading more

3 of that, and in reading the cases cited.  And quite

4 frankly, this is a lot more in depth than we anticipated

5 because this was supposed to be for the individual soldier

6 and his commander, not for academics.

7 Q    Well, I understand that.  I didn't review this with

8 you before?

9 A    No.  I'm just saying, I don't like general statements

10 like that without specific examples.

11 Q    Let me ask you about that statement.

12 A    Okay.

13 Q    It refers to a decision from 1804 authored by Chief

14 Justice Marshall -

15 A    Right.

16 Q    - called *The Charming Betsy.*

17 A    Right.

18 Q    Are you familiar with that case?

19 A    I am not.

20 Q    Okay.  The next sentence here says, *"Certain domestic*

21 *statues have been interpreted not to apply to situations*

22 *addressed by the law of war because such intention was not*

23 *made clear and unequivocal."*  Do you have any dispute with

24 that statement?

25 A    No.  Obviously, if there was some vagueness there,

1  that perhaps this is the way that they get to clarify it

2  through domestic law.  When we ratify treaties, we reserve

3  the right to either refuse to accept something, a

4  reservation, or to make a statement understanding to

5  clarify it.  So that may be the example you're looking

6  for.

7  Q    Well, here we're looking about domestic statutes.

8  A    Right.  No.

9  Q    Domestic statutes are often construed not to conflict

10 with the law of armed conflict.  Is that a fair statement?

11 A    That's a very general statement.  Again, I can't --

12 Q    You don't have an opinion one way or the other?

13 A    No.  Again, not having read this and not seen where

14 they're going with some of these arguments.

15 Q    Fair enough.

16 A    This is something that's been very unique to previous

17 manuals that we wrote.

18 Q    Okay.  Let's talk about something that you did

19 address in your direct testimony.  Take a look at Page 40.

20 Which it should be just one or two pages after that.

21      THE COURT:  Page 40 of your Exhibit 12, Mr. Kamens?

22      MR. KAMENS:  Well, 40 of the manual.  But it goes

23 from Page 13 to Page 40 in the manual.

24      THE COURT:  All right.

25 BY MR. KAMENS:

1  Q      Do you see that, sir?  If you can, look at Section

2  1.11.1.1.  Do you see that?  It's entitled, *"Competent*

3  *Authority (Right Authority) to Wage War for a Public*

4  *Purpose."*  Do you see that?

5  A      Yes.

6  Q      And this describes the right authority to engage in

7  hostilities, is that right?

8  A      That's correct.

9  Q      And this was what you talked about when you were

10  being asked questions by Mr. Gill about who, under

11  international law, is authorized to engage in hostilities,

12  is that right?

13  A      That's correct.

14  Q      And as a general matter, that right is limited to

15  state actors, correct?

16  A      That's what the next sentence says.

17  Q      So this states, *"that armed groups must belong to a*

18  *State to receive the privileges of combatant status."*

19  A      Correct.

20  Q      Do you agree?

21  A      Yes.

22  Q      Now, look at Page 81.  It should be two pages later.

23  Did you see that?

24  A      Right.

25  Q      Page 81 says under Section 3.4.1.2 -- do you see

1   that?

2   A    Yes.

3   Q    *"Non-state Armed Groups With the Intention of*

4   *Conducting Hostilities."*  Do you see that?

5   A    Yes.

6   Q    And it says, *"In contrast to States, non-State armed*

7   *groups lack competent authority."*  Do you agree with that?

8   A    Yes.  I think that's what I was testifying to.

9   Q    Exactly.  All right.

10       Now, let me ask you to look at Page 116, Section

11  4.5.3.  Do you see that?

12  A    Yes.

13       THE COURT:  What was that page number again,

14  Mr. Kamens?

15       MR. KAMENS:  It is Page 116, Your Honor.

16       THE COURT:  All right.  And the paragraph number was?

17       MR. KAMENS:  The Paragraph Number is 4.5.3.

18  BY MR. KAMENS:

19  Q    Do you see that?

20  A    Yes.

21  Q    Now, this section relates to *"Regular Armed Forces*

22  *Who Profess Allegiance to a Government or an Authority Not*

23  *Recognized by the Detaining Power."*  Do you see that?

24  A    Yes.

25  Q    Now, this section says that *"members of regular armed*

1   *forces who profess allegiance to a Government or authority*

2   *not recognized by the Detaining Power are treated as*

3   *members of the armed forces of a State."*  Do you see that?

4   A    Yes.

5   Q    And it says this section is designed to apply to

6   situations where members of armed forces *"continue to*

7   *fight after their State had been occupied."*  Do you see

8   that?

9   A    Yes.

10  Q    And it says if the armed forces are fighting *"for a*

11  *government-in-exile or"* even a government that ceased to

12  exist, the force would have the right authority to

13  participate in hostilities and receive POW status.  Do you

14  see that?

15  A    I do.

16  Q    Do you agree with it?

17  A    No.

18  Q    All right.  You disagree with the D.O.D. Law of War

19  Manual?

20  A    That's right.  Because they didn't take it far

21  enough.

22  Q    Okay.  Now, on Page 118 of this manual it says that

23  these forces will have the right authority to engage in

24  hostilities.  That this status continues as long as the

25  armed conflict continues.  It says, *"Persons belonging, or*

1   *having belonged, to the armed forces of an occupied State*

2   *would only be entitled to receive POW treatment while an*

3   *international armed conflict continues.  For example, this*

4   *provision would not apply to a situation like the*

5   *occupation of Japan after World War II because all*

6   *hostilities had ended."*  Do you see that?

7   A    Yes.

8   Q    And all of this is drawn -- oh, and if I can, just

9   point you quickly, it also cites to Levie's treatise on

10  POWs.  Do you see that?

11  A    I do.

12  Q    And it says that entitlement to POW status does not

13  extend beyond the termination of armed hostilities.  Do

14  you see that?

15  A    Yes.

16  Q    And all of this relates to 4(A)(3) of the Geneva

17  Convention, is that right?

18  A    That's correct.

19  Q    And this provision suggests that even for a

20  government that has been deposed, the armed forces of that

21  government continue to receive POW status until the

22  termination of hostilities, is that right?

23  A    That's what that says.

24  Q    Okay.

25  A    Are you asking me if I agree with it?

1  Q      Well, not right now.

2  A      Okay.

3  Q      None of these provisions, sir, state that entitlement

4  to POW status is removed once another government is

5  installed, is that right?

6  A      They don't say that.  No.

7  Q      All right.  Well, --

8  A      That's not the place to -- go ahead.

9  Q      Well, the Geneva Convention doesn't say that either,

10  does it?

11  A      The Geneva Convention defines what is an armed

12  conflict.  One armed conflict ended when the Karzai regime

13  was accepted by the government.  A new conflict began that

14  may have continued through the Taliban, but it began anew.

15  And based on that, looking at the criteria in Article 1

16  and 2 of the Prisoner of War Convention, we went to a

17  non-international armed conflict.

18  Q      We'll talk about Article 2 of the Geneva Convention

19  on Prisoner of War in just a moment.

20         If you would, look at Defendant's Exhibit 9, which is

21  the Taft Memo that you discussed.  It's also Government's

22  Exhibit 9, but let's stay with ours.

23  A      All right.  Go ahead.

24  Q      The Taft Memo at Page 16.  Do you see that?  At the

25  very top of Page 16.

1  A      Right.

2  Q      It says that 4(A)(3) of the Geneva Convention does

3  not require the forces to *be fighting in conjunction with*

4  *the State recognized as a regular belligerent."*  Do you

5  see that?

6  A      Not yet.  I do.  Second line.

7  Q      All right.  Do you agree with that?

8  A      I'm not sure if I do or not, quite frankly, at this

9  point.

10  Q      Okay.  Well, the provision, 4(A)(3), was drafted in

11  the wake of World War II.  You testified to that?

12  A      Right.

13  Q      In the experience of the German Army invading many

14  countries in Europe, deposing governments, and then not

15  treating the armed forces of that deposed government as

16  prisoners of war.  That was your testimony, is that right?

17  A      That's correct.

18  Q      And that's also contained in the commentary of the

19  Geneva Conventions?

20  A      Right.  With additional criteria.

21  Q      I'm sorry?

22  A      With additional criteria.

23  Q      And the Geneva Convention sought to avoid this

24  problem by detaching the status of combatants from the

25  recognition of the belligerent state by the detained

1  power.  Do you understand my question?

2  A     I understand.  Yes.

3  Q     Do you agree with that?

4  A     Again, it's situational.

5  Q     Well, the provision, 4(A)(3), says that it applies to

6  soldiers fighting on behalf of an authority or a

7  government not recognized by the detaining power.  That's

8  the language of the provision, is that right?

9  A     That's what the language says.

10 Q     And you agree, therefore, that it applies to armed

11 forces fighting on behalf of a government or authority who

12 are not recognized by the detaining power?

13 A     Again, I think you have to go into specific

14 situations because they were looking at the Free French.

15 That is not -- again, that's not a good analogy to what

16 happened in Afghanistan.

17 Q     All right.  Well, if you look back at Page 16 of the

18 Taft Memo, it says in the bottom of that first paragraph,

19 *"The precise situation of the Free French was a motivating*

20 *historical example but it was not the sole standard by*

21 *which Article 4(A)(3) is to be assessed."*

22 A     That's correct.

23 Q     Now, this Taft Memo, you mentioned that it was

24 actually written by Mr. Edward Cummings, is that right?

25 A     That's correct.

1  Q     And you have actually -- you knew Mr. Cummings?

2  A     Very well.

3  Q     And it's the late Mr. Cummings, is that right?

4  A     That's correct.

5  Q     And you actually mention Mr. Cummings in one of your

6  articles.  You said he was a senior and highly respected

7  Department of State lawyer with extensive law of war

8  experience.

9  A     Yes.

10  Q     So the author of this Department of State memo, you

11  would agree, was a well-respected authority on the law of

12  war?

13  A     I do.

14  Q     Now, this Taft Memo doesn't say that the Taliban

15  would lose the protection of prisoner of war status if

16  another government was installed in Afghanistan, does it?

17  A     No.  But in 2002, it didn't contemplate that.

18  Q     My question is does this memo contemplate the removal

19  of POW status if another government is install in

20  Afghanistan?

21  A     In 2002 it did not contemplate that.

22  Q     All right.

23  A     And it was unique to the circumstances in January and

24  February of 2002.

25  Q     Okay.  Just so we're clear, this document, the top

1  memo, doesn't contemplate the removal of POW status for

2  armed forces fighting on behalf of the Taliban, right?

3  A    This memo contemplated what happened to the Free

4  French when the Germans occupate -- occupied France, and

5  other territories.  But the rest of the world did not

6  recognize the Germans as anything other than an occupation

7  power, not the government of France.

8  Q    Well, we'll talk about recognition as well in a

9  moment.

10        The D.O.D. Law of War Manual that we just discussed

11  talks about the continuation of POW status for these

12  forces until the termination of hostilities, is that

13  right?

14  A    And arguably, the termination of hostilities occurred

15  when the Karzai regime was recognized by the U.N., the

16  Security Council, and other nations.

17  Q    Have you heard any fact testimony today, or ever

18  heard of any fact testimony, that the armed conflict in

19  Afghanistan has not proceeded unabated, sir, from 2001

20  until the present?

21  A    No.  But what I'm saying, the government of

22  Afghanistan lawfully changed.  What happened in France,

23  and the other occupied territories, was there was an

24  invasion.  There was the posing of the governments through

25  force; whereas, in the occasion with the coming of the

1  Karzai government, that was through a democratic process

2  that was given international supervision.

3      So I think what they contemplated in 4(A)(3) when it

4  was written, and when this memorandum was written, was far

5  different from what we saw occur within the next year or

6  two.

7  Q    What you're saying is, in effect, and I don't want to

8  put words in your mouth, but if a government is installed

9  by Germany, and we don't like that government, then POW

10 status would continue to apply to the government forces of

11 the deposed government, right?

12 A    That's -- well, it's not *we.*  It's what the

13 soldiers of France looked at in fighting the Germans.  The

14 whole purpose was if Germany occupies, the French resist

15 through their military that have not surrendered, they're

16 still entitled to prisoner of war status because they're

17 fighting in the same war.

18     The war that was then began with the Karzai regime

19 being elected, and approved by the Security Council, was a

20 cessation of the international armed conflict, and a

21 beginning of non-international armed conflict.

22 Q    That makes sense in theory, but on the ground, sir,

23 has there been any difference on the ground and the nature

24 of hostilities between 2001 and the present?

25 A    I think it was an increase in the NATO forces going

 1  in there because they supported a newly-democratically

 2  elected government.   I think there was a substantial

 3  change.

 4  Q    So there were more troops, international troops, that

 5  intervened with ISAF, is that right?

 6  A    At the behest of the Karzai government.

 7  Q    So the threshold of violence increased, is that your

 8  testimony?

 9  A    No.

10  Q    Well, the conflict --

11  A    The threshold of participating nations did.  And

12  actually, this is not exactly precise because the Taliban

13  had basically fled Afghanistan in December of 2001.   It

14  took them a long time to come back in the meantime.   So

15  this was really a break in the hostilities that became a

16  non-international armed conflict, whereas previously it

17  had been an international armed conflict because we went

18  in without permission or consent with whatever the

19  government might have been.

20  Q    Well, two questions for you.   They fled to Pakistan,

21  is that right?

22  A    Not entirely.

23  Q    Some remained in Afghanistan?

24  A    No.   They went -- they went elsewhere.  But most of

25  them, yes, they went -- they went in December of 2001,

1  they fled into Pakistan.

2  Q    All right.  Most Taliban, in your view, went to

3  Pakistan.  And the conflict continued, including into

4  Pakistan, is that fair to say?

5  A    We didn't go into Pakistan.  We didn't have ground

6  forces in Pakistan.

7  Q    Hasn't -- didn't President Bush give authorization to

8  go into Pakistan?

9  A    He may have.  But I don't recall us ever putting

10 ground forces in Pakistan.

11     MR. KAMENS:  This is not in our book, but I just want

12 to show the witness.

13 BY MR. KAMENS:

14 Q    If you can, take a look at this.  This, I'll

15 identify, as Defendant's 16.  This is an article from the

16 New York Times from September 11, 2008.  Do you see that?

17 It says, *"Bush Said to Give Orders Allowing Raids in*

18 *Pakistan."*

19 A    That's 2008.  That's well after the Karzai government

20 came into power.

21 Q    I understand.  But I'm just asking you, based on

22 this, it wouldn't surprise you that the United States

23 engaged in military operations in Pakistan against the

24 Taliban, would it?

25 A    Or al-Qaeda, or anybody else who was there.  We went

1  into Pakistan to kill Osama bin Laden.

2  Q    All right.  So you agree that --

3  A    But that didn't mean there was a continuation of the

4  original hostilities.

5  Q    I'm just asking whether you agree that the United

6  States forces went into Pakistan, sir?

7  A    I'm not agreeing with that because I don't think

8  that's been acknowledged.  I don't think the government,

9  that government, or the present administration, has ever

10  acknowledged us ever having people on the ground in

11  Pakistan.

12  Q    All right.

13  A    And if they did, it may have been with the consent of

14  the Pakistani government, which is different from doing it

15  without their consent.

16  Q    Sure.  Let's talk about what constitutes an

17  international armed conflict.  Government's Exhibit 6

18  contains an excerpt -- you can leave our book there.

19  A    Okay.

20  Q    Government's Exhibit 6 contains an excerpt from

21  Article 2 of the Geneva Convention.  If you would, I'm

22  going to refer to Defendant's Exhibit 5, which is in that

23  same book.  Okay.

24       Defendant's Exhibit 5, which contains all the

25  provision of the GPW.  Do you see that?

1    A    I'm back to 5.

2    Q    Do you recognize that document?

3    A    Yes.

4    Q    Is it the Third Geneva Convention?

5    A    Yes.

6    Q    Is it the Convention that we've been talking about

7    with respect to prisoners of war?

8    A    That's correct.

9    Q    All right.  You describe Article 2, which defines an

10   international armed conflict, as a *"trip wire"*?

11   A    Yes.

12   Q    In your direct testimony, is that right?

13   A    That's correct.

14   Q    That is, once the provisions of Article 2 are met,

15   then all of the provisions related to international armed

16   conflict apply to that conflict.  Is that fair to say?

17   A    That's correct.

18   Q    Sorry, sir?

19   A    That's correct.

20   Q    Now, this language says that it applies to *"declared*

21   *war,"* -

22        Is that right?

23   A    Yes.

24   Q    - *"or of any other armed conflict which may arise*

25   *between two or more High Contracting Parties."*  Do you see

1  that?

2  A      I do.

3  Q      So if a conflict arises, for example, by one state

4  invading another, then any other armed conflict that

5  arises out of that conflict is covered by this Article, is

6  that right?

7  A      That's a pretty interesting question because arising

8  and spreading are two different -- several different

9  things.  The fact that you may have one and it concluded,

10 it may spread someplace else.  But I don't see what

11 happened in 2001 where we went in without the

12 government's -- assuming the fact of the government of

13 Taliban, would it have been an international armed

14 conflict from the stand that we were invading another

15 nation's sovereign territory.

16 Q      I just want to focus on the language.

17 A      Okay.  I've given you an explanation for the question

18 you asked.

19 Q      I appreciate it.

20 A      If then we stayed in Afghanistan at the request of

21 the democratically elected government, obviously the

22 international armed conflict stopped.

23 Q      Now, this language says that it applies to any other

24 armed conflict which may arise between two or more parties

25 to the Convention, is that right?

1  A    That's correct.

2  Q    It doesn't say any armed conflict that may be

3  conducted by two or more parties, is that right?

4  A    No.  The language is very specific in what it says.

5  But the word *"arise"* can have multiple meanings.

6  Q    All right.  And you refer to this provision as a

7  *"trip wire"*?

8  A    That's correct.

9  Q    Okay.  You also stated that the Bush administration

10  characterized this conflict in Afghanistan as an

11  international armed conflict in 2002, is that right?

12  A    Yes.

13  Q    And you testified that this characterization has

14  never been changed by the U.S. Government, is that right?

15  A    The characterization in that memorandum.  It's never

16  been officially changed.  You're correct.

17  Q    Okay.  Now, you also mentioned the U.S. position with

18  respect to the definition of armed conflict in a case in

19  the ICJ called *Tadic*.  Do you remember that?

20  A    Yes.

21  Q    And you refer to the U.S. position in that case,

22  which was about whether the conflict in the former

23  Yugoslavia constituted an international armed conflict.

24  Do you remember that?

25  A    Yes.

1  Q    I'd ask you to look at Defendant's Exhibit 10.  Do

2  you see that?

3  A    I do.

4  Q    I'll represent to you that this is the Amicus brief

5  submitted by the United States in that litigation.  And

6  I'd ask you to look at Pages 27 and 28 of this submission.

7        THE COURT:  Mr. Kamens, what case was that of?

8        MR. KAMENS:  It is called *The Prosecutor of the*

9  *Tribunal v. Dusan*, D-U-S-A-N, *Tadic*.

10       THE COURT:  D-U-S-A-N?

11       MR. KAMENS:  And the last name is Tadic.  T-A-D-I-C.

12       THE COURT:  Okay.  Thank you.

13       MR. KAMENS:  I'm sure I butchered that.

14 BY MR. KAMENS:

15 Q    Do you see Pages 27 and 28, sir?

16 A    Yes, sir.  I'm reading them now.

17 Q    I direct your attention to the footnote there.

18 Footnote 43.  Did you see that?

19 A    Yes.

20 Q    And it discusses the characterization of this

21 conflict.  It says, *"that once the provisions of the*

22 *Geneva Convention relating to international armed conflict*

23 *are triggered, the Conventions apply in their entirety."*

24 Do you see that?

25 A    I do.

1  Q     And the citation is to the commentary?

2  A     Yes.

3  Q     By Jean Pictet.

4  A     Jean Pictet.  Yes.

5  Q     Okay.  Jean Pictet.

6        The footnote goes on to say that, *"The commentary

7  states that Article 2 is triggered any time a difference*

8  *arises between States 'leading to the intervention of*

9  *members of the armed forces.'"*  Do you see that?

10  A     I'm going back through it now.

11        All right.  Would you ask your question again,

12  please.

13  Q     Well, it says here that, *"Since the intervention of*

14  *outside armed forces into Croatia and Bosnia has crossed*

15  *the 'international armed conflict' threshold, the Geneva*

16  *Conventions are applicable in their entirety to the*

17  *conflict.  Attempting to identify elements of that*

18  *conflict as 'internal' is the kind of pretext for avoiding*

19  *full application of the Conventions that is not*

20  *permissible.  Given the inextricable link of particular*

21  *incidents to the broader conflict, the Tribunal should*

22  *endorse the strictest rules governing treatment to be*

23  *afforded to persons protected by international*

24  *humanitarian law."*

25        And in the text it says, *"We believe it is artificial*

1    *and improper to attempt to divide it into isolated*

2    *segments, either geographically or chronologically, in an*

3    *attempt to exclude the application of those rules."*  Do

4    you see that?

5    A     I do.

6    Q     Do you agree with that?

7    A     Well, again, I don't mean to be parsing words, but

8    when it says in its entirety, it means the entire treaty

9    applies.

10          Now, the problem that the ICTY had was that you had

11   different conflicts on different days in different parts

12   of the Balkans, but --

13   Q     Can I direct your attention --

14          THE COURT:  Let him finish his answer.

15          Go ahead, Colonel.

16   BY MR. KAMENS:

17   A     But, the point is, you did have different things

18   happening.  What the State Department in part was arguing,

19   don't start parsing portions --

20          THE COURT:  Colonel, can you slow down for the

21   interpreter.

22          COLONEL PARKS:  I'm sorry.

23   A     Do not start parsing portions of that overall area.

24   And to this country has a non-international armed conflict

25   today, and tomorrow it has an international armed

1  conflict, whereas the nextdoor neighbor, it may have it.

2  So the State Department was applying it maybe not

3  necessarily as a legal issue, but as a pragmatic issue

4  that once you have an international armed conflict, you

5  should apply it, and continue to apply it under the

6  circumstances in Yugoslavia, which were different than

7  those in Afghanistan.

8  Q    And the first thing you said is that -- what this

9  suggests is that the entire Conventions apply?

10 A    The four Geneva Conventions.

11 Q    Right.  And not necessarily the provisions with

12 respect to international armed conflict, is that your

13 point?

14 A    Yes -- no.  I'm talking about the Conventions.  The

15 portions of those four treaties as applied to

16 international armed conflict.

17 Q    Okay.

18 A    You can't pick and choose the Articles you want to

19 enforce.

20 Q    Okay.  But you would agree with the footnote that

21 once a conflict triggers that international armed conflict

22 threshold, then the provisions related to international

23 armed conflict would apply to that conflict, is that

24 right?

25 A    But there was no defined break as there was in

1   Yugoslavia.

2   Q    Okay.  But you would agree that once the trigger

3   occurs, the provisions related to international armed

4   conflict applied to that conflict until some conclusion?

5   A    So long as there is no longer an international armed

6   conflict.  Which my point is once Karzai was elected and

7   approved globally, then the international armed conflict

8   had ceased.

9   Q    I understand.  Your point is that international

10  recognition of the Karzai government transformed the

11  character of the conflict from an international armed

12  conflict to a non-international armed conflict?

13  A    That's correct.

14  Q    That's your point.  And because there are no POWs in

15  a non-international armed conflict, that means the

16  Taliban, United States soldiers, ISAF forces, Afghan

17  forces, none of them are entitled to POW status?

18  A    That's correct.  But we continue to apply, as a

19  practical or policy purposes, we continue to apply them

20  because there was no sense in transitioning away from the

21  way we've conducted our detainee facilities.

22  Q    You're saying it's the policy of the United States

23  government or the United States military to apply the

24  rules applicable to an international armed conflict to

25  Afghanistan?

1  A    That they were -- well, they were doing it from the

2  standpoint of we know how to fight an international armed

3  conflict, we know how to build prisoner of war camps.  We

4  may have stopped calling them prisoner of war camps, if we

5  ever did call them that.  We can run a detainee facility

6  with the name "*detainee facility*" on it instead of

7  prisoner of war camp because we don't feel we're obligated

8  to provide prisoner of war status in a non-international

9  armed conflict.  But we still want to provide the

10 humanitarian protection that's required in common Article

11 3.

12 Q    Okay.  And I'm not sure I fully understand your

13 answer.  Are you saying we apply -- the rules apply --

14 that are applicable to a non-international armed conflict

15 under common Article 3 to the conflict, but not the rules

16 applicable to an international armed conflict?

17 A    Not all the rules would apply, no.  In an

18 international armed conflict, we apply the four Geneva

19 Conventions in their entirety except for common Article 3.

20 Once the transition was made from the Karzai elected --

21 being democratically elected, and so recognized by the

22 world community, we would then be in a non-international

23 armed conflict.  But at the same time, we would continue

24 business as usual the way we were before from the

25 standpoint of how to run a detainee facility.

1      We're still going to give them the same humanitarian

2    protections.  We do get into the issue of who is in fact a

3    prisoner of war now and who is in fact a detainee.

4    Q    All right.  And maybe I'm confused.  You said we're

5    not going to switch the rules mid-game, is that right?

6    A    For practical purposes.  Yes.

7    Q    For practical purposes, the U.S. military isn't going

8    to change the rules that it applies mid-conflict?

9    A    For treatment.  Not for qualification.

10   Q    I see.  So it would, and did, change the rules it

11   applied with respect to treatment of prisoners of war?

12   A    We continued to treat them as -- the detainees as if

13   they were prisoners of war because we know how to run a

14   POW camp.

15       I will tell you, I use to get a call from some young

16   JAG somewhere in Afghanistan, and in some cases in Iraq,

17   about on average every week.  Okay, it's Thursday, is this

18   an international armed conflicted today, or a

19   non-international armed conflict?

20       It's to avoid that confusion.  Continue to do your

21   business as you're doing.

22       Now, how we then determine who is -- if someone might

23   be a prisoner of war as opposed to a detainee or a

24   belligerent, if you want to use that term, is a decision

25   that had to be made at that time.  But once the Karzai

1  regime had come in and been approved and been accepted,

2  then we were saying that they were not -- the Taliban was

3  not qualified to be prisoners of war and unlawful

4  combatants.

5  Q    And wouldn't you agree, sir, that this submission by

6  the United States in the *Tadic* litigation suggests that we

7  wouldn't even change the rules that we apply with respect

8  to the status of detainees that once the provisions of the

9  Geneva Convention relating to international armed conflict

10 are triggered, the Conventions apply in their entirety?

11 A    When this memorandum was written, no one ever

12 contemplated 9/11.  That was a sea change in how some of

13 these things were looked at.  So this was good history for

14 the Balkans, but might not necessarily be for other

15 conflicts.

16 Q    So your testimony is that the law changed because of

17 9/11?

18 A    No.  The law did not change.

19 Q    Okay.

20 A    The way it would be applied might be because we

21 certainly, or had to be, a lot more specific as to whether

22 or not we were in an international armed conflict or

23 non-international armed conflict.  Whether we were dealing

24 with people who were unprivileged belligerents, or whether

25 they were in a situation where they were entitled to

 1  prisoner of war status.

 2  Q    Now, I think you said on direct that you previously

 3  argued in an essay that -- it's entitled "*Combatants*."

 4  And you argued that the Taliban was unable to exercise

 5  effective control in Afghanistan from '94 to 2001, and for

 6  that reason the U.S. attack on Afghanistan did not

 7  initiate an international armed conflict, is that right?

 8  A    From 2004 on.

 9  Q    Well, you argue in this book, I think, --

10  A    The Naval War College?

11  Q    The Naval War College.  That's right.

12       You argue that it was never an international armed

13  conflict, don't you?

14  A    I argued that because I didn't think -- I didn't

15  believe the Taliban, as a fighting body, really met the

16  criteria in its own operations.  You had tribes, or

17  members of tribes, who would depart one day to go to the

18  other side.  They would constantly switch from the Taliban

19  to the Northern Alliance.  They would go off and go

20  farming for three or four months.  They would do a number

21  of things.  They were not acting like a regular military.

22  That was my point more so than any type of calendar,

23  chronological calendar.

24  Q    Now, that conclusion in your essay is inconsistent

25  with the testimony we heard today from Mr. Dempsey and

1  from Mr. Adams, is that right, that the Taliban had

2  effective control as the de facto government of

3  Afghanistan in 2001?

4  A    I don't remember them testifying to that.

5  Q    You don't recall them saying that the Taliban were

6  the de facto government and --

7  A    I think they said at one point they were de facto.

8  But de facto can be changed.  That is something that is

9  conceded by Pictet, and others.

10 Q    I'm sorry.  Let me just complete my question.

11 A    Sorry.

12 Q    You don't recall Mr. Dempsey and Mr. Adams saying

13 that the Taliban were the de facto government of

14 Afghanistan, and controlled the majority of the country,

15 sir, between 1994 and 2001?

16 A    I did hear that.  Yes.  But that was -- that's the

17 basis for the original memo by Will Taft in 2002.  What

18 we're talking about now is 2005 and beyond.  Totally

19 different era and totally different battlefield.

20 Q    Now, this was issued in 2009, is that right, this

21 book?

22 A    I don't know which year it was.  I'm not so sure I

23 can find it in my papers.  I know the one you're talking

24 about.

25 Q    I'll represent to you, sir, it was published in 2009.

1   A     That's good.

2   Q     Did you read any of the other essays in this book?

3   A     I did not.

4   Q     So you're unaware that Yoram Dinstein on Page 51 says

5   that an interstate war exists between the United States

6   and its allies versus the Taliban fled Afghanistan, and

7   that this interstate war continues unabated to this very

8   day.

9   A     It wouldn't be the first time I've disagreed with

10  Yoram Dinstein.  He's a good friend, but that doesn't mean

11  that we always agree.

12        And now the question is when did he write that?

13  Because that might have been earlier than the time it was

14  published.

15  Q     Well, let me ask you this.  Would you agree that

16  Mr. Dinstein is a recognized authority on the laws of war?

17  A     Absolutely.

18  Q     Would you agree that Mr. Dinstein continues to say

19  that the law of armed conflict, and the armed conflict in

20  Afghanistan today, constitutes an international armed

21  conflict?

22  A     Are you asking me if he did say that?

23  Q     That he continues to say that.

24  A     That's his prerogative.  He does not represent the

25  United States' view.

1  Q    Well, you said the United States has never changed

2  its view.

3  A    We have never publically changed it.

4  Q    All right.

5  A    There was no requirement for President Bush.  We have

6  never had a president write a memorandum like the one that

7  President Bush wrote in 2002.  But that one had to be

8  written to reconcile what was being said by some Bush

9  political appointees, and the views of others, including

10 the State Department.

11 Q    All right.  We talked a little bit about recognition.

12 A    Yes, sir.

13 Q    Just to go back in terms of history, the CSA,

14 Confederate States of America, they were recognized as a

15 belligerent by certain countries, is that right?

16 A    I'm not that good of a historian.

17 Q    Well, it certainly is true that at the conclusion of

18 the Civil War, the citizens of the southern states didn't

19 lose their citizenship in the United States, is that

20 right?

21 A    That's correct.

22 Q    And that's because they were never -- they never

23 achieved the status of an independent state, is that

24 right?

25 A    That could be one argument.  Another argument could

1  be it was a desire for reconciliation.

2  Q    All right.   They were given the benefits -- or they

3  were recognized as a belligerent in the conflict with the

4  northern states, is that right?

5  A    That's correct.

6  Q    And that's why Professor Lieber wrote that they

7  should be given the status of the combatant privilege, is

8  that right?

9  A    That's correct.

10  Q    Now, Professor Lieber doesn't talk about wearing

11  uniforms as a condition of receiving combatant privilege,

12  does he?

13  A    I think the criteria ends there because they were

14  also in his original act.   I will have to go to my papers

15  to find them.

16  Q    You know what, you can just go to Defense Exhibit 2

17  and look at Articles 49 and 57.

18      THE COURT:   What is Defense Exhibit 2, Mr. Kamens?

19      MR. KAMENS:   That is the Lieber Code, Your Honor.

20      THE COURT:   The Lieber Code.   Okay.

21      Mr. Kamens, you haven't been asking for any of the

22  exhibits to be admitted into evidence.

23      MR. KAMENS:   Thank you for reminding me, Your Honor.

24  If I can, I'll do it at the end?

25      THE COURT:   That's okay.   I just want to make a

1   complete record.

2          MR. KAMENS:   Thank you.

3   BY MR. KAMENS:

4   A    If you're talking about -- are you talking about the

5   four criteria that are now in Article 4?

6   Q    That's right.

7   A    All right.   I know they are in there because this is

8   one of the first times that it was so listed.

9   Q    Well, take a look at --

10  A    What Article did you cite?

11  Q    I suggested Article 49, sir.   You can also look at

12  Article 57.

13  A    Forty-nine?

14  Q    Forty-nine and 57.

15         So Article 49 says, "*A prisoner of war is a public

16  *enemy armed or attached to the hostile army for active*

17  *aid, who has fallen into the hands of the captor, either*

18  *fighting or wounded, on the field or in the hospital, by*

19  *individual surrender or by capitulation.*

20         *All soldiers, of whatever species of arms, all men*

21  *who belong to the rising en masse of the hostile country;*

22  *all those who are attached to the army for its efficiency*

23  *and promote directly the object of the war, except such as*

24  *are hereinafter provided for; all disabled men or officers*

25  *on the field or elsewhere, if captured; all enemies who*

1  *have thrown away their arms and ask for quarter, are*

2  *prisoners of war, and as such exposed to the*

3  *inconveniences as well as entitled to the privileges of a*

4  *prisoner of war."*

5       THE COURT:  Mr. Kamens, at that pace, there is no way

6  any interpreter can possibly interpret what you're saying.

7       MR. KAMENS:  I'm sorry.  I can read that slowly.

8  Thank you, Your Honor.

9  BY MR. KAMENS:

10  Q    Do you see that, that provision?

11  A    I do.  And I'm trying to find still the point because

12  I know I had it in here.  Lieber was one of the first ones

13  who laid out those criteria.

14  Q    Well, I'll read this slowly, if I can.

15  A    Sure.

16  Q    Article 49 says, *"A prisoner of war is a public enemy*

17  *armed or attached to the hostile army for active aid, who*

18  *has fallen into the hands of the captor, either fighting*

19  *or wounded, on the field or in the hospital, by individual*

20  *surrender or by capitulation.*

21       *All soldiers, of whatever species of arms, all men*

22  *who belong to the rising en masse of the hostile country;*

23  *all those who are attached to the army for its efficiency*

24  *and promote directly the object of the war, except such as*

25  *are hereinafter provided for; all disabled men or officers*

1  *on the field or elsewhere, if captured; all enemies who*

2  *have thrown away their arms and ask for quarter, are*

3  *prisoners of war, and as such exposed to the*

4  *inconveniences as well as entitled to the privileges of a*

5  *prisoner of war."*

6       Now that does not contain the four conditions from

7  4(A)(2), does it?

8  A   It does not.

9       THE COURT:  Hold on for the interpreter.

10       Follow-up with your question, Mr. Kamens.  Go right

11  ahead.

12  BY MR. KAMENS:

13  Q   That article does not contain the conditions you

14  referenced from Article 4(A)(2) of the Geneva Convention,

15  is that right?

16  A   It does not.

17  Q   Article 57.  Do you see that Article?

18  A   All right.

19  Q   Article 57 says nothing about those conditions, does

20  it?

21  A   It does not.

22  Q   It says, *"So soon as a man is armed by a sovereign*

23  *government and takes the soldier's oath of fidelity, he is*

24  *a belligerent; his killing, wounding, or other warlike*

25  *acts are not individual crimes or offenses."*  Do you see

1   that?

2   A      That's correct.

3   Q      That also doesn't contain those conditions?

4   A      Does not.   No.

5   Q      You mentioned the 1873 Brussels Conference.

6   A      1874.

7   Q      1874.   The Brussels Conference.

8   A      Yes.

9   Q      That is not a treaty, is it?

10  A      That was not a treaty, nor was the 1880 Oxford

11  Manual.   But that was the basis for that language going

12  into the 1899 Hague Convention II.

13  Q      All right.   We'll talk about the Oxford Manual is

14  just a moment.

15  A      All right.

16  Q      The 1873 Brussels Conference, they did not submit

17  anything that was adopted by any of the participants?

18  A      That's correct.

19  Q      Now, the Oxford Law of War Manual, if you would, take

20  a look at Defendant's Exhibit 3.

21  A      Article on *GENERAL PRINCIPLES*?

22  Q      Yes.   *"PART I: GENERAL PRINCIPLES."*   Do you see that?

23  A      I do.

24  Q      And it's Article 2, defined *"The armed force of a*

25  *State."*   Do you see that?

1  A      I do.

2  Q      *"The armed force of a State includes:  1. The army*

3  *properly so called, including the militia:"*  Is that

4  right?

5  A      That's correct.

6  Q      And then it has a semicolon.  And then it says, *"2.*

7  *the national guards, landsturm, free corps, and other*

8  *bodies which fulfil the three following conditions:"*

9  A      That's correct.

10 Q      And the conditions are command, fixed emblem.

11 A      Right.

12 Q      Carrying arms openly.

13 A      Right.

14 Q      Those conditions apply solely to *"The national*

15 *guards, landsturm, free corps, and other bodies"*?

16 A      Right.

17 Q      In this document, is that right?

18 A      Yes.

19 Q      They are not explicitly tied to *"The army properly so*

20 *called, including the militia;"* described in Paragraph 1

21 of Article 2, is that right?

22 A      That's correct.

23 Q      The Hague Convention.  Take a look at Defendant's

24 Exhibit 4.

25 A      I have the language here.  Go ahead.

1   Q      All right.  This is the annex on Page 2.  Do you see

2   that?

3   A      Yes.

4   Q      Now, just to be clear, you testified about the 1899

5   Hague Convention, and that's Hague II; and the 1907 Hague

6   Convention, that's Hague IV; is that right?

7   A      That's correct.

8   Q      And there's no real distinction between the language?

9   A      No.

10  Q      Of those Conventions?

11  A      No.

12  Q      All right.  The annex to the Convention provides

13  definition in Chapter 1, Article 1.  Do you see that?

14  A      Go ahead.

15  Q      And it says, *"The laws, rights, and duties of war*

16  *apply not only to armies, but also to militia and*

17  *volunteer corps fulfilling the following conditions:"*  Do

18  you see that?

19  A      I do.

20  Q      And then it lists the conditions of command, fixed

21  emblem, carrying arms openly, conducting operations in

22  accordance with the laws and customs of war?

23  A      That's correct.

24  Q      Now, those conditions are specifically referenced to

25  militia and volunteer corps, which fulfilled those

1  following conditions, is that right?

2  A    That's correct.

3  Q    They're not specifically tied to armies in this

4  document?

5  A    They're not in this document.  But it depends on how

6  you read it.  Again, this is the case where in the Civil

7  War, warrants were given to forces like Mosby's soldiers

8  that were militia, or these other private groups, giving

9  them that right authority.  So the language, as it was

10  being used in 1899 or 1907, is entirely different.  It may

11  be different from the Civil War, or 1949 Geneva

12  Conventions.  That's the dilemma of running -- these are

13  all precedents in trying to establish who should be a

14  combatant and a prisoner of war.  They may be differences

15  without distinction.  That's the problem you have.

16  Q    I understand.  But we'll talk about the Geneva

17  Conventions in just a moment.

18  A    Right.

19  Q    But your testimony was that the reason that the

20  Taliban armed forces are not entitled to prisoner of war

21  status, if you assume, as Mr. Gill asked you to assume,

22  that this is an international armed conflict, the reason

23  that you provided for why they are not entitled to POW

24  status is because they did not fulfill the four conditions

25  in 4(A)(2) of the Geneva Convention, the Third Geneva

1  Convention?

2  A    No.  My basic argument was that once the Karzai

3  regime came into power, they did not have any governing

4  authority to be engaged in hostilities.  They were

5  private.

6  Q    But the premise of Mr. Gill's question to you was to

7  assume that it was an international armed conflict.

8  A    All right.  Okay.

9  Q    And once he gave you that premise, you agree it's an

10  international armed conflict, it has not ceased, then your

11  rationale for why the Taliban soldiers would not be

12  entitled to POW status is because they did not meet those

13  conditions in 4(A)(2), is that right?

14  A    Those in 4(A)(2), yes.

15  Q    Of the Third Geneva Convention?

16  A    Yes.

17  Q    Briefly, you also mentioned that the Taliban were not

18  recognized, is that right?

19  A    That's correct.

20  Q    Now, the State Department memo that we discussed

21  written by your late friend, Mr. Cummings, it acknowledges

22  that only three states accorded the Taliban formal

23  recognition, is that right?

24  A    He did.  He wrote that in January or February of

25  2002, by which time all three of them had withdrawn their

1  recognition.

2  Q    And what he says is that *"Pictet and other sources do*

3  *not suggest a numerical minima for purposes of*

4  *recognition."*  Is that right?

5  A    I don't have that in front of me, but I'll take that

6  for granted.

7  Q    He also says, *"The international community acted as*

8  *if the Taliban controlled Afghanistan and had a*

9  *responsibility to adhere to Afghanistan's international*

10 *obligations.  This form of 'recognition' should satisfy*

11 *the concern described by Pictet."*

12 A    And that has two good points.  First, remember, the

13 State Department was trying to push the administration to

14 acknowledging the law or its system.  So there was some

15 reasons for saying that.

16     But at the same time, he was writing something about

17 something that was, by then, historical because each of

18 those three states had withdrawn their recognition.

19 Q    He was talking about the forces that were fighting at

20 that time, and whether the United States should give POW

21 status to the forces that were fighting at that time.

22 Under 4(A)(3), forces fighting for a government that has

23 been deposed.

24 A    But he was also talking about they had received three

25 recognitions of their -- of their being the government of

1  Afghanistan prior to 9/11, and withdrawn no later than

2  November 22nd of 2001.

3  Q     That's right.

4  A     So he was simply noting this happened.  But since

5  then, circumstances have changed.

6  Q     But the State Department memo concluded that Geneva

7  Convention 4(A)(3) should apply to the Taliban, did it

8  not?

9  A     That could be a legal argument they made for policy

10  purposes.  Again, we were trying to get people to pay

11  attention to the Geneva Convention and apply the law of

12  war, which many within the Bush administration did not

13  want to do.

14  Q     Your friend, Mr. Cummings, also said that 4(A)(3)

15  *"provides for standards far less restrictive than one*

16  *might identify for purposes of the formal recognition of*

17  *statehood of governments, and it provides clear textual*

18  *support for the application of the GPW in the situation of*

19  *armed conflict between U.S. forces"* --

20       THE COURT:  Slow down, Mr. Kamens.

21       COLONEL PARKS:  He's taking my bad habits.

22       MR. KAMENS:  I apologize.

23  BY MR. KAMENS:

24  Q     *"Provides clear textual support for the application*

25  *of the GPW in the situation of armed conflict between U.S.*

1  *forces and Taliban forces in Afghanistan."*  That sounds

2  like --

3  A    It applies.  Now, after applies, you then look at the

4  criteria to see if in fact captured Taliban meet those

5  criteria.

6  Q    Okay.  So let's talk about the GPW.

7  A    Right.

8  Q    Let's talk about 4(A)(1) and 4(A)(3).  Those

9  provisions of the Geneva Convention.  And they're in

10 Defendant's Exhibit 5 on the second page, Article 4(A)(1)

11 (A)(3).  Do you see that?

12 A    All right.  Go ahead.

13 Q    Now, those sections which describe the prisoners of

14 war, or people who should be entitled to the status as

15 prisoners of war, do not expressly incorporate the

16 conditions set forth in 4(A)(2), is that right?

17 A    They do not expressly include that.

18 Q    That is, the text of the Convention doesn't say

19 anything about 4(A)(2) conditions applying to 4(A)(1) or

20 4(A)(3), is that right?

21 A    Actually, they don't.  But Pictet does.

22 Q    Pictet, in the commentary, says that it's assumed, is

23 that right?

24 A    It is not only assumed, it also says it is also

25 necessary that "*this authority, which is not recognized by*

1   *the adversary, should either consider itself as*

2   *representing one of the High Contracting Parties, or*

3   *declare that it accepts the obligations stipulated in the*

4   *Convention and wishes to apply them."*

5        THE COURT:  Colonel, you need to slow down a little

6   bit.  They can't translate it.

7        TRANSLATOR:  Can you repeat it please slower.

8        COLONEL PARKS:  It was his fault.

9   BY MR. KAMENS:

10  A    It is also necessary that "*this authority, which is*

11  *not recognized by the adversary, should either consider*

12  *itself as representing one of the High Contracting*

13  *Parties, or declare that it accepts the obligations*

14  *stipulated in the Convention and wishes to apply them."*

15  Which the Taliban never did.

16  Q    Is it fair to say, sir, that the Taliban consider

17  themselves the lawful government of Afghanistan?

18  A    They could dream, too.  But at that point in time,

19  the time we're talking about, we're not talking about 2001

20  or 2002, which is discussed in this memoranda.  We're

21  talking about the post-Karzai regime.

22  Q    Sure.  Even today?

23  A    Even today.

24  Q    The first condition that Mr. Pictet talks about is

25  the armed forces and the government exile believing

1   themselves to be the legitimate government of the High

2   Contracting Party, is that right?

3   A    That's again what he may be talking about.  But

4   there's a certain level of immediacy or connection there.

5   We've had -- this is 2015, and that was 2004.  That's the

6   big difference from what was being contemplated in these

7   provisions.

8   Q    Well, do you know whether the Taliban considered the

9   Afghan government forces to be traitors?

10  A    I really don't know that.

11  Q    So you have no idea, sir, whether the Taliban

12  actually consider themselves to represent the legitimate

13  government of Afghanistan, but if they do, that would

14  affect your opinion as to whether they qualify under

15  4(A)(3)?

16        THE COURT:  That's a compound question.  Let's take

17  them one at a time.  Take them one at a time.

18  BY MR. KAMENS:

19  Q    Sir, you don't know whether the Taliban consider

20  themselves to be the legitimate government of Afghanistan

21  and consider Afghanistan forces to be traitors?

22  A    I have never heard that stated by the Taliban since

23  they were defeated and Karzai was brought into power.

24  Q    But if they do, if they consider themselves to be the

25  legitimate government of Afghanistan, that would affect

1  your opinion as to the application of 4(A)(3) to the

2  Taliban?

3  A    It would affect the interpretation and

4  considerations, things that might be considered, with

5  respect to 4(A)(3).  There are many people in the United

6  States who still believe the Confederate states will win

7  the war.  That's been a long time.

8  Q    Well, those hostilities have ended, sir.

9  A    So did the ones in Afghanistan.

10 Q    Well, the definition of armed forces relates to the

11 practical determination of whether hostilities continue on

12 the ground, is that right?

13 A    They do.  But there was some gaps in time when the

14 Taliban recovered while -- after they retreated.

15 Q    Did you hear anything this morning about gaps in time

16 where the armed forces --

17 A    I don't think they were asked about that.

18 Q    Let me finish.

19      Did you hear anything this morning about gaps in time

20 in which the armed conflict in Afghanistan concluded?

21 A    No.  But I don't think that was necessarily the point

22 being briefed.

23 Q    Do you know if anyone has argued that the armed

24 conflict in Afghanistan concluded because the hostilities

25 in Afghanistan have ended, other than lawyers on behalf of

1  the Guantanamo Bay detainees who say that the conflict

2  ended because the U.S. had pulled out in 2014?

3  A     I'm not sure where you're going with this.

4  Q     Do you know what the government's position is today,

5  sir, about whether hostilities continue in Afghanistan?

6  A     I don't.

7  Q     Okay.  You've testified that if regular forces don't

8  wear uniforms, they may be prosecuted for a war crime

9  potentially?

10  A     Potentially.

11  Q     If they have the intent to deceive?

12  A     That's correct.

13  Q     By appearing without their uniform, is that right?

14  A     That's correct.

15  Q     That's the war crime called perfidy?

16  A     Perfidy.

17  Q     But you also testified that they don't lose their

18  combatant immunity?

19  A     People in 4(A)(1) did not lose combatant immunity.

20  Q     4(A)(1) or 4(A)(3)?

21  A     They may be prosecuted if they in fact engaged in

22  perfidy.  But they did not lose their POW status.

23  Q     And there's no distinction between the armed forces

24  described in 4(A)(1) and the armed forces described in

25  4(A)(3), is that right?

1  A     There is a distinction there, but that's never been

2  clearly pursued.  The Free French stayed in uniforms.  The

3  resistance was not in uniform, which is why this provision

4  was put in there.  Or if you had the Italian forces after

5  they switched over to the allied side fighting the

6  Germans, they were fighting in uniform.  So basically they

7  were adhering to the four criteria, which is not in

8  4(A)(1), but those of the general practices as opposed to

9  the legal requirements.

10 Q     So your interpretation of 4(A)(1) is that the

11 requirements in 4(A)(2) don't apply to 4(A)(1)?

12 A     I didn't say that.  I said they're not specified

13 there, but it is recognized as the general practice that

14 those are the things that the active military forces of

15 the government must do.  Those are the things that we, in

16 the United States military, adhere to in all of our

17 practices.  We do every single one of those.  We can argue

18 that we're not obligated to do that under 4(A)(1), but

19 certainly as a practical matter, that's been the practice

20 of nations.

21 Q     But your testimony is that if a member of the regular

22 armed forces doesn't wear a uniform, they don't lose their

23 combatant immunity?

24 A     They don't.  And if they commit a war crime, they

25 don't lose their combatant immunity but they can be

1   prosecuted.

2   Q     They can be prosecuted for a war crime.  They don't

3   lose their combatant immunity?

4   A     Right.

5   Q     They can't be brought into a court and charged with

6   domestic crimes?

7   A     That's up to the individual domestic law of the state

8   where that person is being held.

9   Q     Well, just to be clear, you agree that combatant

10  immunity is a defense to prosecution under domestic law?

11  A     Combatant immunity is basically an authority you

12  engage in the use of deadly force against legitimate

13  targets.

14  Q     So POW status is a defense to prosecution under

15  domestic law?

16  A     Combatant status.  Not POW status.

17  Q     Combatant status often aligns with POW status?

18  A     They do.

19  Q     And so someone can have POW status, but could have

20  committed some crime unrelated to the armed conflicts?

21  A     Yes.

22  Q     So, for example, a soldier could rape a civilian and

23  they could be prosecuted for that?

24  A     That's correct.

25  Q     But they don't lose their combatant immunity for

1  fighting in the armed conflict?

2  A    That's correct.

3  Q    So combatant immunity relates to the protection from

4  being prosecuted for fighting in an armed conflict?

5  A    That's correct.

6  Q    You have written with respect to the conflict in

7  Afghanistan that both sides readily identified opposing

8  forces?

9  A    That was in 2001, 2002.  And that issue brought about

10 that article.  The -- since that time, as was testified

11 today, the Taliban has fought differently in using

12 civilian clothing, and carrying out attacks in civilian

13 clothing.

14     The information I received from the special forces

15 who were in Afghanistan starting in October of 2001 said

16 that them wearing their turbans, they could be

17 distinguished from al-Qaeda and other forces.  The

18 Northern Alliance had a unique system in their scarf,

19 headdress.  That type of thing.

20     Many of our -- initially, some of our special forces

21 dressed the same way for the purposes of blending into the

22 Northern Alliance because there was a bounty on their

23 heads by the al-Qaeda and the Taliban.  Within two weeks

24 they had gone out of that back into their standing

25 uniforms because they knew where the pockets were, and if

1  they had to get to magazines, and what have you, very

2  quickly.

3      Since that time, as the testimony today pointed out,

4  the Taliban increasingly have carried out attacks in

5  civilian clothing rather than having any distinct uniform.

6  Q    You've also written that the Bush administration's

7  focus on uniforms was "*not only factually incorrect, but*

8  *ignored the fact that U.S. forces fought alongside*

9  *anti-Taliban forces who also did not wear a uniform in the*

10 *western European tradition.*"

11 A    That's correct.

12 Q    You also wrote that the Bush administration's

13 arguments in support of the February 7, 2002, decision

14 were flawed and "*politically based rather than based on*

15 *law.*"

16 A    That's correct.  Because they failed to look at the

17 first part of Article 4 and 4(A)(2), which talks about the

18 very things that we learned in the use of resistance

19 groups in World War II.  It has to come from government

20 authority.  It's not merely the four criteria that people

21 instantly jump to every time this issue comes up.

22 Q    You believe that President Bush "*erred in accepting*

23 *the advice of individuals who lacked military experience*

24 *and in depth knowledge of the law of war, but possessed*

25 *skepticism, if not destain for the law of war, over that*

1  *of individuals with military combat and substantial law of*

2  *war expertise and experience."*

3  A     I do.  I did.  I did say that.

4  Q     You would agree, sir, that if the conflict in

5  Afghanistan is characterized as an international armed

6  conflict, and the provisions of 4(A)(2) do not apply to

7  4(A)(1) or 4(A)(3), then the armed forces of the Taliban

8  should be entitled to POW status?

9  A     Again, we may be talking in circles here.  It is

10  generally accepted those criteria do exist in 4(A)(1) as a

11  duty, if not a specific legal premise set forth.  And

12  that's also true in 4(A)(3) that there is -- and this is

13  what Jean Pictet is citing behind this, refer to that.  It

14  was said in Pictet it was not deemed necessary to put that

15  into 4(A)(3) because it was presumed in 4(A)(1).

16  Q     You would agree that there are many scholars who say

17  the opposite.  That the conditions of 4(A)(2) do not apply

18  to 4(A)(1) and 4(A)(3), are you not?

19  A     It is common for people to automatically go to the

20  four conditions without looking at the rest of Article 4

21  and its history.  So some of that could be.  And there may

22  be scholars, and lay people, who are just sloppy and

23  saying they weren't wearing uniforms is not the

24  disqualifier necessarily in all circumstances.  They may

25  have been wearing a distinguishing device.  I think that

1   same article that you're quoting also says there is no

2   international definition of uniform.

3   Q     My question, sir, is you are aware that many scholars

4   agree that 4(A)(2) conditions do not apply to forces

5   described in 4(A)(1) or 4(A)(3)?

6   A     Actually, I have got to say I've never seen that.

7   Q     You should read the briefs in this case.

8         MR. KAMENS:  I would move for the admission, Your

9   Honor, of Defendant's Exhibit 2, which is the Lieber Code.

10  Three, --

11        THE COURT:  Hold on one second.

12        All right.  What exhibits, Mr. Kamens?

13        MR. KAMENS:  Defendant's Exhibit 2, which is the full

14  Lieber Code.

15        Exhibit 3, which is an excerpt from the Oxford Law of

16  War Manual.

17        Four, which is the 1899 Hague II Convention.

18        Five, which is the full provisions of the Geneva

19  Convention.

20        Nine, although it's already been admitted, is the

21  Taft Memo.

22        Ten, which is the *Tadic* amicus submitted by the

23  United States.

24        THE COURT:  What's the number on that?

25        MR. KAMENS:  That is 10.

1          THE COURT:  Ten.  Okay.

2          MR. KAMENS:  Twelve, which are excerpts from the

3   D.O.D. Law of War Manual.  And that is all.

4          THE COURT:  You also referred to 16.

5          MR. KAMENS:  Sixteen, I'm happy to submit it.  It's a

6   news article from the New York Times.

7          THE COURT:  I'm not suggesting you should.

8          MR. KAMENS:  I'll be happy to submit it if the

9   government has no objection.

10          THE COURT:  Okay.  I assume there's no objection,

11   Mr. Gill?

12          MR. MIKE GILL:  No objection, Your Honor.

13          THE COURT:  Those items will be admitted without

14   objection.

15               (Defendant's Exhibits 2, 3, 4, 5, 9, 10, 12 & 16

16               are received.)

17          THE COURT:  Redirect examination of the Colonel.

18                    **REDIRECT EXAMINATION**

19   BY MR. MIKE GILL:

20   Q   Colonel, just a few more questions.  First, I want to

21   turn your attention to Exhibit 12.  The Department of

22   Defense Law of War Manual.  Now, in your experience or

23   knowledge about this manual, is it directed at getting

24   down to nitty gritty details that occur in combatant

25   immunity proceedings before a federal court, or is it more

1  concerned with POW treatment of prisoners that's followed

2  by the Department of Defense in our worldwide operations?

3  A    It's more concerned with how we handle prisoners of

4  war once the determination has been made as to their

5  status, which is also done in doctrine for the soldiers

6  who are guarding prisoner of war facilities.

7  Q    And if you would turn to Page 116 through 117.

8  Specifically 4.5.3.

9        THE COURT:  What was that number again, Mr. Gill?

10        MR. MIKE GILL:  That is on Page -- I'm sorry.  It's

11  provision 4.5.3 on Page 116 of Exhibit 12.

12        THE COURT:  All right.  Go right ahead.

13  BY MR. MIKE GILL:

14  Q    Mr. Kamens was asking you about that provision.  And

15  you said that it didn't go far enough.  Tell us what you

16  meant by that.

17  A    Well, it's basically a problem we identified before

18  we started rewriting this manual, that many of the manuals

19  simply repeat the text of the treaty provision without

20  further explanation.  And that was the problem.  This

21  requires, as we've seen from the discussions and the

22  questions today, that's the essence of having a better

23  manual.

24        This is what it says, but we needed to do things like

25  read Pictet, look at the experience we've learned over the

1  various wars we've had in the last 50 years, and offer a

2  better explanation for those trying to interpret those

3  treaty provisions.  This book is going to end up as a CD

4  for every young JAG captain who at 2:00 a.m. have to

5  answer a question like this that we spent two or three

6  hours on.  So simply providing them the treaty language

7  does no good.  And that was what I was expressing.

8  Q    Now, turning to Yugoslavia.  Are you aware -- I mean,

9  that time period around 1995 when you were being asked

10 about the brief in Exhibit 10, are you aware of at that

11 time of those events in Yugoslavia that -- whether they

12 have had -- they had had a democratic election that

13 installed a recognized government in that country?

14 A    To my -- to my recollection they had not.

15 Q    Was it also -- did it involve a situation where the

16 United States, and coalition forces, were on the ground

17 helping a recognized government that asked for assistance?

18 A    To my recollection it did not.  The only people we

19 ever had on the ground were the people -- prisoners

20 indicted for war crimes.  We had special operations teams.

21 We, the Brits, and the French, we went in to capture these

22 individuals.  But we otherwise did not have people on the

23 ground for these operations.

24 Q    Bottom line is, different circumstances than

25 Afghanistan?

1   A      That's correct.

2   Q      Also, you don't need to pull it up, but if you recall

3   looking at the International Committee of the Red Cross,

4   those two provisions that they had in 2007 and 2011, it's

5   in the government's exhibits, and I don't know if it's up

6   there, but provisions where they interpreted the

7   characterization of what's going on in Afghanistan as

8   something that turned into a non-international conflict.

9   Do you recall that?

10  A      I do.

11  Q      In your opinion as a law of war expert, does it

12  appear that even the International Committee of the Red

13  Cross recognizes that conflicts can change over time and

14  with specific events?

15  A      They can.  And it actually was a fairly marked step

16  because the ICRC will tend to push the greatest amount of

17  detail, such as saying -- they could have said from a

18  policy standpoint we think this is still an international

19  armed conflict so the entire Prisoner of War Convention

20  applies.  That would be their preferred option in many

21  cases.

22      But what they're saying here is, is it is no longer

23  an international armed conflict, so at a minimum you must

24  be applying common Article 3.  But the *at a minimum* type

25  is continue to apply all parts of the Second Convention --

1  the Third Convention because it might work better.   But

2  that was -- yes, it was a very strong statement from them

3  that is probably stronger than what they would normally

4  say.   But they were quite honest.

5  Q    Mr. Kamens was also asking you about the Lieber Code

6  of 1863, the Oxford Manual that contains laws of war from

7  1880, and The Hague Convention of 1899.   In the 19th

8  Century, since that time, did the world gain, and

9  international leaders gain, extensive experience in wars,

10 and how to refine the law of war into what we have today

11 under the Geneva Conventions?

12 A    That's correct.   And this is -- all that was good

13 precedent, but the law today is the 1949 Geneva

14 Convention.   And this -- I've seen this battle fought,

15 intellectual battle fought, over and over and over again

16 every time we stepped into an insurgency.   Often times

17 people take something and then don't really study it as

18 closely as they should, which can cause this type of

19 confusion.   Our politicians are reluctant to say they're

20 in certain types of conflicts for political purposes.

21 Q    And finally, if you would, take a look at Exhibit 9,

22 which is the Taft Memo.

23      THE COURT:   Your Exhibit 9?

24      MR. MIKE GILL:   It's actually either one, Judge.   But

25 if you would look at the defendant's right in front of

1   you.

2        MR. KAMENS:  Can I say something with respect to the

3   exhibit?  There's a page missing.  I was not able to find

4   it.  It's Page 15.  I don't know if government's -- if

5   theirs has Page 15.  I'm happy to use theirs.

6        MR. MIKE GILL:  Good question.  I didn't check.

7        THE COURT:  You can work that out in a few minutes.

8   Let's move on here.

9        Ask the Colonel the next question, please.

10  BY MR. MIKE GILL:

11  Q    Colonel, Number 1, on Page 16 of Defense Exhibit 9 -

12  A    Page 16?

13  Q    Yes, sir.

14       - that very memo there at the bottom where it cites

15  to Pictet, *"this authority, which is not recognized by the*

16  *adversary, should either consider itself as representing*

17  *one of the High Contracting Parties, or declare that it*

18  *accepts the obligations stipulated in the Convention and*

19  *wishes to apply them."*

20  A    You're on Page 16.  So which of these paragraphs?

21  Q    It's indented.  I'm sorry.  Page 16 right here.

22  A    *"Pictet suggests several points"* or *"Pictet makes two*

23  *other points"*?

24  Q    He suggests two other points with respect to what you

25  were telling us earlier.  They recognize the same thing?

1  A    This is at the second full paragraph?

2  Q    The indented paragraph that quotes Pictet at the

3  bottom.

4  A    All right.  Go ahead.

5  Q    That recognizes the same thing you were telling us

6  earlier about the need that if you're going to rely upon

7  4(A)(3), they've got to agree with the Geneva Conventions?

8  A    That's correct.  *"it accepts the obligations*

9  *stipulated in the Convention and wishes to apply them."*

10 Q    And then it continues at the bottom.  It says -- if

11 you'll turn actually to Page 20.  Do you see Paragraph D 1

12 on Page 20?

13 A    Yes.

14 Q    And if you would go to the second paragraph.  And

15 does that second paragraph include the same thing you were

16 telling us earlier about the application of the 4(A)(2)

17 requirements on 4(A)(3), according to Pictet?

18 A    That's correct.

19 Q    All right.  And then finally turn with me to Page 21.

20 And it's fair to say this memo was written in 2002?

21 A    That's correct.

22 Q    And they sure didn't have the information that we

23 have today about things that happened in 2009?

24 A    That's right.  Or 2004.

25 Q    And there on Page 21, make sure I get this right.

1   *"Moreover, the GPW requirement is not for a 'distinctive*

2   *uniform' but for a 'distinctive sign.'"*   That's something

3   you agree with?

4   A     Yes.

5   Q     And our information indicates that the Taliban

6   soldiers did wear distinctive black turbans based on

7   information from 2002?

8   A     That's correct.

9   Q     *"In any event, the available information does not*

10  *enable us to reach a conclusion that such a requirement*

11  *was not met."*   So they're saying they don't have the

12  information, is that correct?

13  A     That's correct.

14  Q     *"Finally, we agree that Taliban forces likely*

15  *committed serious violations of the laws of armed conflict*

16  *during the recent conflict, including the use of civilians*

17  *to shield military objectives from attack.   However, the*

18  *commission of crimes by some members of the force is not*

19  *sufficient to demonstrate that the Taliban forces*

20  *generally may not be covered under Article 4(A)(3).*

21  *Rather, the question in this respect is whether the*

22  *Taliban forces were unable to implement the laws of war.*

23  *Further, there is no evidence to suggest that the Taliban*

24  *provided central command level direction and guidance for*

25  *forces to violate the laws of war.   If there is factual*

 1   *evidence to support certain leaders providing instructions*

 2   *that would violate the laws of war."*  Do you agree with

 3   that?

 4   A    I do.  And in fact, that's what you come from

 5   seeing -- witnessing the testimony this morning.  It was a

 6   systematic method of attack using individuals who are in

 7   civil attire and attacking civilians, and what have you.

 8          MR. MIKE GILL:  No further questions, Your Honor.

 9          THE COURT:  All right.

10          MR. KAMENS:  Just briefly, Your Honor, with respect

11   to --

12          THE COURT:  Wait a minute.  We don't normally allow

13   recross.  What areas are you going to recross on,

14   Mr. Kamens?

15          MR. KAMENS:  Just on the Taft Memo.  The indented

16   paragraph on Pictet that Mr. Gill just asked about.

17          THE COURT:  All right.  Go ahead.  You may cross on

18   that paragraph.  Go ahead.  I mean recross.

19          MR. KAMENS:  And the violation of laws of war that he

20   just mentioned, if I could?

21          THE COURT:  Okay.  Go ahead.

22                       **RECROSS-EXAMINATION**

23   BY MR. KAMENS:

24   Q    Take a look at Page 16, again, of the Taft Memo.

25   A    And by the way, there is no 15 in ours either.

1   Q     Maybe your friend at State will give us a full copy.

2         It says, *"This form of 'recognition' should satisfy*

3   *the concern describe by Pictet."*

4         And then it says, *"Second, Pictet notes that 'this*

5   *authority, which is not recognized by the adversary,*

6   *should either consider itself as representing one of the*

7   *High Contracting Parties, or declare that it accepts the*

8   *obligations stipulated in the Convention.'"*  Do you see

9   that?

10  A     Yes.  That's what we were just reading.

11  Q     Right.  And then the next sentence that Mr. Gill

12  didn't read was, *"We have no information concerning any*

13  *Taliban declarations concerning application of the*

14  *Convention.  However, the Taliban did consider itself the*

15  *representative government of Afghanistan, as indicated by*

16  *its attempts to gain broader recognition from the*

17  *international community (such as seeking the Afghanistan*

18  *seat at the United Nations)."*

19        So, according to this document, Afghanistan -- I'm

20  sorry, the Taliban would consider itself the government

21  representing one of the High Contracting Parties?

22  A     Well, actually, that last part that you refer to was

23  talking about things the Taliban did in the last part of

24  the 1990s in which it approached the Clinton

25  administration, which declined to give them that status or

1  support their -- accepting the seat in the United Nations.

2  And in fact, had the Taliban -- Afghan embassy closed in

3  Washington.

4  Q    And, sir, this question is about what they consider

5  themselves.  Not whether anybody else accepts that they

6  were the legitimate government, by simply whether the

7  Taliban consider themselves as the legitimate government

8  of Afghanistan.  According to this report, they have, and

9  do, consider themselves as the legitimate government of

10 Afghanistan.

11 A    They were seeking that.  And the best way to seek

12 that is to claim that they do that.  It could be described

13 as wishful thinking.

14 Q    Mr. Gill also asked you about violations of the laws

15 of war.  If you would, take a look at Page 20, footnote

16 33.

17       THE COURT:  Page 20 of what?

18       MR. KAMENS:  I'm sorry.  Of Defendant's 9, the Taft

19 Memo, Page 20, Footnote 33.

20 BY MR. KAMENS:

21 Q    It says, "It is well understood in the law of war

22 that the commission of violations of the law of war by

23 one, some or many members of an armed force do not thereby

24 implicate the status of all the members of such armed

25 forces."

1  A     I agree completely.  If I may give you an example to

2  support that.  One of the most tragic things that happened

3  during the Vietnam War was the March 16, 1968 massacre of

4  hundreds of civilians in the village of My Lai.  That

5  tainted the entire United States military, and the United

6  States itself, who is not representative of the status of

7  people as combatants.  It was a black eye on us, but

8  certainly did not change the fact that if our personnel

9  were captured -- this is what I was suggesting at the end.

10  If you have a government, or commanders, who carry out

11  persistent acts like that, committing a My Lai every

12  single day, then you reach that threshold where they have

13  lost their entitlement if you fail to meet the four

14  criteria.  A single incident or a few incidents are bad,

15  but it's not the criteria in that part of 4(A)(3).

16  Q     Do you agree, sir, that if there is a practice of

17  denying POW status based on belligerent -- identifying law

18  of war violations on behalf of the enemy, if that is

19  something that denies the status of POW to detainees, that

20  that is something that could be applied to the United

21  States by our enemies?

22  A     I would be interested in the argument for that.  I

23  mean, the North Vietnamese denied POW status to all of our

24  POWs during the entire Vietnam War without giving a

25  credible, or accepted, argument for them doing it.

1        For us to say we do not believe the Taliban and

2   al-Qaeda meet the standards for prisoner of war status and

3   combatant status, obviously, that's something people, I

4   would see is far more credible then simply doing a

5   wholesale saying you're not combatants.

6        MR. KAMENS:  Thank you.

7        THE COURT:  All right.

8        Mr. Gill, anything further?

9        MR. MIKE GILL:  No, Your Honor.

10        THE COURT:  May the Colonel be excused?

11        MR. MIKE GILL:  Yes, Your Honor.

12        THE COURT:  Mr. Kamens, may the Colonel be excused?

13        MR. KAMENS:  No objection, Your Honor.

14        THE COURT:  Colonel, you're excused and free to go.

15   Thank you, sir, for coming in today.  We appreciate your

16   testimony.

17                    **WITNESS STOOD ASIDE**

18        MR. MIKE GILL:  And with that, Your Honor, we have no

19   further witnesses.

20        THE COURT:  All right.

21        I assume you'll have witness, Mr. Kamens?

22        MR. KAMENS:  We have one witness, Your Honor.  Would

23   you like me to start now, or if the Court wanted to take a

24   break?

25        THE COURT:  Okay.  We'll take about a 10 minute

 1   recess and we'll come back and take your witness, okay?

 2        MR. KAMENS:  Thank you, Your Honor.

 3        THE COURT:  We'll stand in recess for 10 minutes.

 4                      (Recess taken.)

 5        THE COURT:  All right, Mr. Kamens, call your first

 6   witness.

 7        MR. KAMENS:  Your Honor, at this time we would call

 8   Professor Jordan Paust.  P-A-U-S-T.

 9        All right.

10        Mr. Paust, if you would come forward, sir.

11        Professor, if you would raise your right hand, place

12   your left hand on the Bible, and face the Clerk of the

13   Court.

14        THE CLERK:  You do solemnly swear that the testimony

15   which you are about to give, in this case, before this

16   Court, shall be the truth, the whole truth, and nothing

17   but the truth, so help you God?

18        PROFESSOR PAUST:  I do.

19        THE COURT:  Have a seat on the witness stand,

20   professor.

21        Whereupon, **Prof. Jordan Paust**, having been

22   duly sworn in, testifies as follows:

23                   **DIRECT EXAMINATION**

24   BY MR. KAMENS:

25   Q    Professor Paust, could you state your full name for

1    the record, and spell your first and last name.

2    A    Jordan.  J-O-R-D-A-N.  But I'm not a basketball

3    player.  Jeffry.  J-E-F-F-R-Y.  Paust.  P, as in pappa,

4    A-U-S-T.

5    Q    Professor Paust, could you describe your current

6    position and your background and experience with respect

7    to teaching and writing about international law and the

8    law on conflict, briefly.

9    A    I am currently the Mike and Teresa Baker Law Center

10   Professor at the University of Houston, which is a chaired

11   position.  I was previously -- I assume you want me to

12   mention I was at the JAG school, Faculty at Law.  I went

13   to UCLA undergrad and UCLA Law School.  I was ROTC, and

14   stayed with the program undergraduate.  I was a lieutenant

15   in the infantry when I graduated in 1965 from the

16   University of California at Los Angeles, and deferred to

17   go to law school.  I went to law school at UCLA.

18   Graduated in 1968.

19        And I chose to join the Army JAG Corps, and I was

20   assigned to attend the 50th Basic Class.  We ran four

21   classes a year for the 2,000 lawyers in the Army during

22   the Vietnam era that the JAG school conducted training

23   for.  And I was in the 50th Basic Class assigned to the

24   airborne unit in South Carolina after the class, but I was

25   fortunate, in my opinion, looking back in history, to be a

1    member of the faculty of the JAG school in the

2    international law division upon graduation.

3         And I served --

4    Q    Let me stop you right there.  Did you have occasion

5    to meet Colonel Hays Parks at that time?

6    A    Yes.  I started on the faculty of the JAG school in

7    1969.  Hays Parks was later a student in the advanced

8    class.  I believe I was one of his thesis advisers when he

9    was a student there.  And later he joined the faculty, I

10   believe, after I left.  I left in January of 1973 and went

11   to Yale Law School for further studies in jurisprudence.

12        I received a master's in law from the University of

13   Virginia in 1972 part-time, while I was teaching full-time

14   at the JAG school.  And I started writing on the law of

15   war, and going to conferences, international law

16   conferences, as a JAG officer since the 1970s.

17        So, you know, it's 45 years later.

18   Q    How many articles have you written on international

19   law of war?

20   A    That's actually difficult for me to identify right

21   now.  I have over 194 articles and book chapters, and

22   several books.  And a lot of them are on aspects of the

23   laws of war, or use of force, which is a different area.

24   But it would be difficult to identify.  Maybe a third.

25   I'm not sure.  But I've been writing on the law of war up

1  until today.

2  Q     Do you have the witness notebook of exhibits?

3  A     I do -- I do not.

4        THE COURT:  I assume you're offering him as an expert

5  on the law of war?

6        MR. KAMENS:  I am.

7        THE COURT:  I assume, Mr. Gill, you have no

8  objection?

9        MR. MIKE GILL:  No objection.

10       THE COURT:  He'll be received.

11       MR. KAMENS:  Thank you.  And I was going to submit

12  his CV, which is Defense Exhibit 1.

13       I'm not sure if that notebook --

14       The witness has walked away with it.

15  BY MR. KAMENS:

16  Q     Briefly, can you look at Defense Exhibit 1.  Do you

17  recognize that document?

18  A     Yes.  It is my resume.

19       THE COURT:  It will be received without objection.

20       Mr. Gill, you don't have an objection, do you?

21       MR. MIKE GILL:  No objection.

22       THE COURT:  Be received.

23       MR. KAMENS:  Thank you, Your Honor.

24            (Defendant's Exhibit 1 is received.)

25  BY MR. KAMENS:

1  Q     To start, what has been the role, briefly, of the

2  United States in the development of the law of armed

3  conflict with respect to combatants?

4  A     Well, that's a very long story.  I will go back to

5  George Washington as the President.  He demanded that we

6  treat prisoners of war humanely, and we protested the

7  British violations of the laws of war with respect to our

8  soldiers.  We were involved in the war of 1812,

9  Mexican/American War.  General Scott issued orders

10 concerning the laws of war, treatment of prisoners.

11     But as Hays Parks testified, the Lieber Code was a

12 significant development in our history.  It was an effort

13 by Francis Lieber, Major General Halleck, and others

14 serving President Lincoln to try to codify what was then

15 the customary laws of war, international laws of war, and

16 to apply them to the U.S. Civil War.

17     Combatant immunity is mentioned, in my opinion, in

18 Article 57.  And combatant status, prisoner of war status,

19 is mentioned in Articles 47, 49 and 57 as well.  And it's

20 a significant document.

21     For example, a Swiss scholar, who is a professor at

22 Heidelberg at the time, knew or communicated with Francis

23 Lieber, and he came up with his own convocation.  And it

24 was well-received in Europe, and undoubtedly had an impact

25 with respect to the 1880 Oxford Manual that was referred

1  to previously that was adopted by an international law

2  group.

3  Q    Was the Lieber Code also adopted by the Confederate

4  States of America?

5  A    No.  We adopted -- the United States adopted that as

6  a codification of the customary laws of war.  And it was

7  recognized in a digest of opinions of the Judge Advocate

8  General of the United States, but it did codify the

9  customary laws of war.

10      It was used for some prosecutions, for example, of

11  U.S. soldiers, but also former soldiers from the

12  Confederate States of America for belligerency.  And it

13  was well-received as a precursor for some of the Hague

14  Conventions of 1899 and 1907 that were referred to earlier

15  today.

16  Q    You just mentioned *"the customary laws of war."*  Can

17  you distinguish between the common law and customary

18  international law in the context of the Lieber Code?

19  A    Well, first, I'm an international law professor.  And

20  I'd like to say there are two types, basic types, of

21  international law.  One are international agreements.

22  They can be treaties, charters, protocols, et cetera.

23  They are technically binding between the parties, and

24  they're nationals.  All nationals of the treaty are bound

25  by the treaty once it's ratified.  That's when insurgents

1  are bound, that's why ordinary civilians are bound, under

2  laws of war treatise as well.

3      And then there's customary international law that's

4  created by the convergence of two elements generally.

5  It's well-recognized that general patterns of practice is

6  one element.  And that general patterns of a opinio *juris*,

7  or *juristic* opinion, expectations that something is

8  legally appropriate or required, this is the second

9  element of the custom.

10     And the Lieber Code was primarily focusing on a

11 opinio *juris*.  Manuals, books that he had available in his

12 library.  I looked at the Lieber library, for example.  It

13 was in the Office of the International Law Division of the

14 JAG school.  And I saw some of his handwritten notes, et

15 cetera.  He was looking at practice as well, and trying to

16 codify customary laws of war.

17 Q    Is that the --

18 A    Now, once you have customary laws of war, they're

19 universally applicable.  But international agreements

20 technically apply only to the parties and internationals.

21 Q    Is that a --

22 A    Only if you --

23     THE COURT:  Professor, why don't you hold off until

24 the next question is asked, okay?

25     PROFESSOR PAUST:  Yes.

1  BY MR. KAMENS:

2  Q     I'm sorry, Professor.

3        Is that distinct from the common law?

4  A     Yes.   Most civil -- most systems in the world are

5  what we call civil law systems.   They didn't apply common

6  law.   The United States and Great Britain apply common

7  law.   Former British colonies, some of them, retained

8  common law.   But it's rather a rarity.   And it has nothing

9  to do with international law.   Common law, as such, is

10 merely common law.

11       Going back to Bonham's case in the 1600s in Europe.

12 Of course, the common law was an act of Parliament then.

13 It's a different history.

14 Q     Keep talking slowly.

15 A     Yes.

16 Q     Talking about the Lieber Code.   Let's look at Article

17 49.   That's Defendant's Exhibit 2.

18 A     Two.

19 Q     And can you explain to the Court how the Lieber Code

20 defined prisoners of war.   It should be Defendant's

21 Exhibit 2, Article 49.

22 A     Well, *"A prisoner of war is a public enemy armed or*

23 *attached to the hostile army for active aid, who has*

24 *fallen into the hands of the captor, either fighting or*

25 *wounded, on the field."*

1          And it goes on.

2          *"All soldiers, of whatever species of arms."*

3          If you note, the criterion is membership.  If you're

4    a part of the army, you're covered.  You're a prisoner of

5    war.  There are no other criteria in this document, such

6    as carrying arms openly, which would be rather stupid in a

7    war not to do, during combat.

8          Wearing of a distinctive insignia recognizable at a

9    distance, as opposed to camouflage, for example.  There

10   are no such criteria here, nor in Article 57.

11   Q    So all of the conditions that we talked about from

12   the Geneva Convention, Article 4(A)(2), none of those are

13   contained in the Lieber Code?

14   A    Absolutely not.  In fact, if I can refer to Article

15   57.  *"So soon as a man is armed by a sovereign government*

16   *and takes the soldier's oath,"* that's a status

17   determination, he's a member of the armed forces, then

18   he's entitled to the privilege of combatancy.  He cannot

19   be prosecuted for lawful acts of war.  He is what we would

20   call a combatant, and he is entitled to prisoner of war

21   status as well.  And that comes straight out of the Lieber

22   Code.  Combatant immunity is recognized in Article 57.

23   Q    Professor Paust, why should the Court care about what

24   these relatively aged documents say about the laws of war?

25   A    Because customary international law is a necessary

1  background for interpretation of the treaty.  If there's

2  any ambiguity, if there's a gap in the Court's mind.

3      Customary international law is also the supreme law

4  of the land.  In fact, it's recognized famously,

5  Kenfield's case, by four justices of the Supreme Court in

6  1793, when we prosecuted treaty violations and customary

7  law violations directly without a federal statute.

8      As the Court recognized in 1942 in the *ex parte*

9  *Quirin*, this Court, the Supreme Court, has recognized, and

10 applied the laws of war, concerning rights and duties and

11 the status of nations and individuals since the beginning

12 of its history.  We didn't have a statute until 1916, and

13 we prosecuted all war violations under the customary laws.

14     So customary law in its own right is part of

15 international law.  And it can be different than a treaty.

16 And it still operates as customary law.  And it operates

17 universally.

18     The treaty that's the primary one before us today is

19 the 1949 Convention.  But we also know that the Geneva

20 Protocols of 1977 reflect the -- Protocol I reflects

21 customary law in its major portions, its major parts.  And

22 custom is an interpretative aid.  The necessary background

23 of interpretation of treaties.

24     And we've adopted the same approach, as you

25 mentioned, in the U.S. Supreme Court cases like *Charming*

1  *Betsy*.   Customary international law is necessary as the

2  background for interpretation of the treaty.  And that's

3  just the first line of inquiry with respect to federal

4  statute versus a treaty.   There are other steps you might

5  want to entertain.

6  Q    Let's stick to the Lieber Code for a moment.

7  A    Yes.

8  Q    Can you explain how the Lieber Code treated acts of

9  violence against soldiers in an armed conflict?  Was that

10 a crime?

11 A    No.  In fact, -- well, if you have a detained

12 soldier, a prisoner of war, yes, you can't engage in

13 torture of a prisoner of war.  But while the fighting is

14 occurring if you're targeting an enemy soldier during the

15 U.S. Civil War, if a United States soldier is targeting a

16 Confederate States of America soldier on the battlefield,

17 which happened too often really, one of the bloodiest wars

18 in the history, there was the combatant's privilege for

19 lawful acts of war.

20 Q    So in the Civil War, did that apply to, say, a

21 soldier who didn't have the money to buy a uniform?

22 A    Some members of the Confederate States of America, I

23 believe, engaged in combat in civilian clothing.  Uniforms

24 were rather scarce in some respects.  I wouldn't be

25 surprised if some members of the Union Army didn't have

 1  uniforms.  But there is no requirement that you have a

 2  uniform in the code.  So as soon as you take the soldier's

 3  oath, you're a soldier, you're a combatant.  And you have

 4  this immunity for lawful acts of war.

 5       I've seen no change since the Lieber Code through all

 6  the documents that we'll be looking at up to 4(A)(1) and

 7  4(A)(3) of the GPW.

 8  Q    Let's talk about the next document on the list, the

 9  Oxford Manual and the law of war, which is Defendant's

10  Exhibit 3.  Do you see that?

11  A    Yes.

12  Q    Can you identify and explain the significance of this

13  document to the laws of war?

14  A    This document was a document adopted at Oxford called

15  the Oxford Manual.  And it was adopted by the Institute of

16  International Law, September 9, 1880.  And you have an

17  extract from that document.

18       It's relevant as a further indicia of patterns of

19  opinio *juris*.  Patterns of expectation that something's

20  legally appropriate or required or relevant to the content

21  of identification and clarification of law, customary law,

22  for relevant treaty.

23       It's on -- it's on the road from the Lieber Code, and

24  on the way towards -- or for some major documents, the

25  1899, 1907 Hague Convention.

1   Q    With respect to the definition of armed forces, does

2   the Oxford Manual distinguish between combatants who are a

3   part of an army -- and I'm sorry.  I used the word

4   *"combatants."*  Armed forces or belligerents who are part

5   of an army and other forces, national guards, who must

6   fulfill conditions of command, fixed distinction, and

7   carrying arms openly?

8   A    Yes.  Unlike the Lieber Code, Article 2, Paragraph 1,

9   has a semicolon at the end.  And then there's a Paragraph

10  2.  And there is a separate set of categories, unlike the

11  Lieber Code in this respect.

12       The first category is *"The army properly so called,*

13  *including the militia;"* semi-colon.

14       So there are no criteria that otherwise must be

15  complied with like carrying arms openly during combat or

16  wearing a fixed distinctive sign recognized at a distance.

17  That only pertains with respect to Article 2, Paragraph 2

18  only with respect to certain types of persons, not the

19  members of the armed forces that are identified in

20  Paragraph 1.

21  Q    Let's also look at Defendant's Exhibit 4, which is

22  the first -- it's Hague II, the 1899 Hague Convention.

23       With respect to the definition of armed forces in

24  this Convention, does the annex distinguish between

25  combatants who are part of the army and combatants who

1   must fulfill conditions of command, fixed distinction,

2   carrying arms openly, and observing the laws of war?

3   A     Yes.   Article I of the annex to this Convention is

4   the same as Article I to the annex of the 1907 Hague

5   Convention IV, which was found to be at Nuremberg to

6   reflect customary international laws of war, and defining

7   universally, not merely upon parties to this treaty.

8   Q     Now, these conditions that are listed, do those apply

9   to armies?

10  A     The first -- no, they did not.   The -- there's a

11  famous comma, like the famous semi-colon in the Oxford

12  Manual.   There's a famous comma in the Hague manual.   And

13  you can see that Article I talks about, first, *armies*

14  comma.   And that's that first category.

15       That's like the Lieber Code.   As soon as you become a

16  soldier, you become a combatant.   You don't lose the

17  combatant status because you fail to wear -- you wear

18  camouflage and you don't -- and you're not recognized from

19  a distance.

20  Q     You say the *famous comma.*   Are you suggesting that

21  the comma is well-known to international law scholars?

22  A     Most scholars know that this comma sets off two types

23  of persons.   One, the armies, as such, without those

24  conditions.   And, secondly, another group, militia and

25  volunteer corps, they must follow these conditions.   And

1  that was intentional.

2      And, by the way, we interpret treaties with reference

3  to the text in light of the object and purpose of the

4  treaty.  This is the Vienna Convention and the law of

5  treaties, Article 31.  And we use international law as a

6  background.  That's Article 31, Paragraph 3, Subparagraph

7  C of the Vienna Convention and the law of treatises.

8      And so we would use the Lieber Code as background of

9  an interpretation of this treaty if we had any doubt or

10  ambiguity about that comma.

11  Q    So are you saying that the interpretation of treaties

12  and conventions is just like the interpretation of the

13  statute; the text is the primary indication of meaning?

14  A    Yes.  And more so.  At the international level, we do

15  not look at the legislative history unless the text --

16  considered in context with the object and purpose, and

17  customary international laws of background would lead to

18  an absurd result.  That's in Article 31 and 32 of the

19  Vienna Convention.  Some courts look at the legislative

20  history, but you're not supposed to.

21  Q    Let's talk about the Third Geneva Convention, which

22  is Defendant's Exhibit 5.  Can you briefly describe the

23  subject matter -- I'm going to skip that question.

24      Look at common Article 2.

25  A    Yes.

1   Q      And I called it *common Article 2.*  Can you explain

2   to the Court what that means?

3   A      Because there are four 1949 Conventions and the

4   Articles 1, 2, and 3 are common to each, as Hays Parks

5   testified to.  GWS, Geneva Wounded and Sick, that's the

6   short term title.  And GWS at sea, the short term title.

7   GPW, Geneva Prisoner of War Convention that you're looking

8   at here.  And GC, Geneva Convention.  They have the same

9   1, 2 and 3.

10  Q      I see.  So common Article 2, what are the

11  requirements to constitute an international armed conflict

12  for purposes of this Article?

13  A      For purposes of this treaty only.  Not customary

14  international law as such.  It's not determinative over

15  custom.  There are three circumstances identified in the

16  three paragraphs.

17  Q      Can you describe them?

18  A      The first one is conflict that arises, for example,

19  between parties, contracting parties.  And that's going to

20  typically be states with respect to this treaty.

21         International law is broader.  The customary laws of

22  war we've defined.

23         We still have treaties with Indian nations.  There's

24  a difference between a nation and a state.  The Navajo

25  Nation, for example, that's a part of the state of the

1  United States.  We have treaties with Indian tribes.  We

2  have treaties with people.  And there are other non-state

3  actors with formal participatory roles that can engage in

4  agreements, for example, other than states, including

5  belligerents.

6      And part of our history is well-known in Europe.  The

7  history of the U.S. Civil War.  The Confederate States of

8  America never gained statehood status.  The British

9  refused.  And a few other European countries recognized,

10  like the British, that the CSA was a belligerent so that

11  they could have certain trade rights, not a state.  The

12  United States never recognized the CSA as a state.

13  Ultimately recognized them as a belligerent.  They fell

14  into the belligerent criteria.

15      And that was a war to which we applied all of the

16  customary laws of war.  It was an international armed

17  conflict, even though it took place only within the United

18  States.

19  Q    Can you explain to the --

20  A    The *Prize* case is the famous U.S. Supreme Court case

21  that recognized these facts that the criteria were met.

22  That Great Britain, and a couple of other states,

23  recognized the CSA not as a state, but as a belligerent.

24  And they weren't even a nation.  I don't know if they were

25  a tribe.

1   Q      Can you explain the --

2   A      The laws of war can apply to international armed

3   conflicts in the 19th Century to various entities other

4   than states.   This treaty, however, to be a party to this

5   treaty, you're more likely to have to be a state.

6          The Palestinian Authority ratified this treaty, for

7   example, at The Hague Convention.   There's some concern

8   still whether or not the Palestinian  -- that Palestine is

9   a state, although the majority of states have recognized

10  Palestine as a state.   The United States and France do

11  not, for example.

12  Q      This is just sort of a separate side question.   But

13  the parties in the Middle East, Israel, Palestinian

14  Authority, often do not recognize each other?

15  A      Yes.

16  Q      Does international law identify conflicts between the

17  identities regardless of whether Middle Eastern countries

18  recognize Israel, or Israel recognizes the Palestinian

19  Authority?

20  A      Well, that brings us to Paragraph 3, if not also to

21  Paragraph 2.   The International Court of Justice has ruled

22  in the case of the Wall advisory opinion that the Geneva

23  Conventions apply in toto because of Article 2, and the

24  customary law concerning occupied territories.   It's

25  possible to be an occupying power, especially in the

1  customary law, even though you're not occupying the

2  territory and a state.

3       But Paragraph 3 speaks to a power.  And we have a

4  question - what is a power within the meaning of Paragraph

5  3?  And it's not merely what Pictet focused on.  You have

6  to look at the rich history here of wars between the

7  United States and nations, United States and tribes, and

8  the United States and belligerents.  That's Civil War,

9  especially.  And that customary law didn't go away.  It

10 was retained as a background for interpretive purposes.

11      A power, in my opinion, includes a belligerent

12 because most all texts recognizes that a belligerency

13 triggers the application of all of the customary laws of

14 war.  Just like our Lieber Code did.  And there's been --

15 there's rarely a dissent with respect to that.

16      And a power doesn't have to be a state.  It may not

17 be a party.  But a customary law is an interpretative aid.

18 And it helps us.  We could have a party to an

19 international armed conflict that is not a state.  And

20 then there's a question of whether they are covered under

21 Article 2.

22 Q   Can you explain to the Court the difference between a

23 state and a belligerent?

24 A   Yes.  A state has to be recognized by some states.

25 No magic number.  That Taft Memo was entirely correct with

1  respect to POW status on that point, the three states that

2  recognized the Taliban, for example, at that time as the

3  de jure, the lawful, government of Afghanistan.

4      And by the way, Afghanistan is, has been, is, and

5  still is, a state.  But it was a question also of

6  recognition de jure of that government.

7      Not all states -- not even a majority of states

8  recognize a state as a state to be a state under

9  international law.  But a state has to fulfill certain

10  common criteria.

11      And a belligerent has to fulfill certain criteria,

12  some of which are different.  A belligerent doesn't have

13  to have recognition as a state, or a nation, or a people.

14  "*People*" is the magic word in internationalists.  In the

15  U.N. Charter, certain "*people*" have a right to

16  self-determination, not states.  So it's a separate

17  category.

18      We've had treaties with people, with the British,

19  we've had treaties with nations and tribes in Africa in

20  the 1900s.

21      A belligerent then doesn't have to be a state,

22  represent a nation, or a people.  Sometimes they have

23  claimed such status, and they must fulfill the types of

24  criteria that the Supreme Court recognized in the *Prize*

25  case.  That, for example, -- and you have my declaration

1  on that point anyway.

2  Q    We'll get to that.

3  A    A belligerent will have the semblance of the

4  government.  We're very tolerant when it's the natural

5  government.  They don't have to have parliamentary

6  elections, and things like that.  A belligerent will,

7  importantly, control territory as its own like the Taliban

8  did, in my opinion, unlike al-Qaeda.  In my opinion,

9  al-Qaeda --

10  Q    One moment.

11       In your opinion, al-Qaeda?

12  A    In my opinion, al-Qaeda never controlled territory as

13  its own.  It would have been politically incorrect.  And

14  Hugo Thain (phonetic) in Afghanistan even tried to do

15  that.  But the Taliban did.

16       Do you have military units, and do you field them in

17  sustained or protracted hostilities?  Are you engaged in

18  combat missions, operations?  As a belligerent, you must

19  do that.  And that's basically it.

20       I don't believe that al-Qaeda ever had a military

21  like the Taliban or fielded military units and sustained

22  hostilities.  So I disagree with the Obama administration

23  that we're at war with al-Qaeda.  I don't know what that

24  means under international law.  It doesn't mean anything

25  as far as I'm concerned.

 1          But I do accept the government's position in *Hamdan*

 2   that there's a difference between the so-called war with

 3   al-Qaeda, as the government recognized in *Hamdan*, in the

 4   majority opinion in *Hamdan*, and the war with the Taliban.

 5   And the majority opinion in *Hamdan* said we don't have to

 6   decide about what the status of this war with al-Qaeda is.

 7   That, at a minimum, common Article 3 applies.  And so the

 8   government didn't, I guess -- I guess has not changed its

 9   mind subsequently.

10          The Taft Memo, in other words, backs up my

11   recognition that we have an international armed conflict

12   occurring at the time the Taft Memo was created.

13   Q    Let's talk about common Article 3.  That provides a

14   definition of non-international armed conflicts?

15   A    It's specifically an armed conflict not of an

16   international character.  And we look for the character of

17   the conflict in terms of context.

18          As Hays Parks intimated, this is brand new in 1949.

19   This is actually quite radical that laws of war would

20   apply below a belligerency of any sort, any kind of level.

21   Below a belligerency through an insurgence.  And the

22   difference is that an insurgent basically has no outside

23   recognition as a belligerent by anyone.

24          As the Supreme Court recognized in the *Prize* case,

25   that maybe three governments recognized the CSA as a

1   belligerent.  And besides, at that time we didn't have

2   anything like insurgency.  The laws of war wouldn't apply

3   to insurgency.  Importantly, this text, and this is the

4   text of the treaty, this is decisive.  It talks about

5   occurring in the territory of one of the High Contracting

6   Parties.

7        And Pictet famously added to that recognition in the

8   territory of one that the insurgency occurs in a single --

9   I'm nearly quoting if you don't have Pictet with you, but

10  quote, it's nearly a quote, *in a single country."*

11  Q    I do.  It's Defense Exhibit 6.  If you can take a

12  look at that.  Page 37.

13  A    Exhibit 6?

14  Q    Exhibit 6.  It's the last page of 37, the first full

15  paragraph on that page.

16  A    Yes.

17  Q    Do you see that?

18  A    *"in short, which are in many respects similar to an*

19  *international war, but take place within the confines of a*

20  *single country."*

21       The war in Afghanistan has never taken place merely

22  within the confines of a single country.  And I can

23  explain about the regular army of Pakistan when we went in

24  in October 7th of 2001.  Pakistan military, thousands were

25  fighting with the Taliban against the Northern Alliance.

1  So that conflict was already an international armed

2  conflict.  It was a belligerency, actually.  The Northern

3  Alliance was a belligerent by the de jure, and at least de

4  facto government of Afghanistan at the time when we went

5  in.

6      It was internationalized already because the Pakistan

7  military were there.  And now Iran is supplying weapons to

8  the Taliban, and they're supplying the logistics, and

9  other material to the Taliban, if not helping them in

10 other ways.

11     But the United States is not engaged in a war with

12 the Taliban that has lasted nearly 14 years merely in

13 Afghanistan.  It's well known -- as you cited from the *New*

14 *York Times*, it's well known that we've had drone strikes

15 before the Bush authorization, and after the Bush

16 authorization in Pakistan.  And U.S. military are

17 constructively there if they're running those drones from

18 Pakistan, for example -- from Afghanistan, or from north

19 of Las Vegas, and flying missions into Pakistan and

20 targeting, for example, the top Taliban leader who was

21 killed.

22     Jane Mayer's article demonstrates that the top

23 Taliban leader was killed by a drone strike in Pakistan.

24 There were many targets that occurred in Pakistan against

25 the Taliban.

1    And then we have indications from many media sources

2  from 2008 and 2009 that this Bush operation was -- was

3  effectuated.   That we had some special ops forces on the

4  ground, as we say.

5    Some of this may be classified.   I'm not able to look

6  at classified material, but I suppose you can do that.

7  Q    Well, we'll get back to the Taliban.   Let's stay with

8  the Geneva Convention.

9  A    So the point is, an international -- an armed

10 conflict of an international character --

11    THE COURT:   Mr. Kamens, I think it would be easier if

12 you proceed by question and answer here.

13    PROFESSOR PAUST:   All right.

14    THE COURT:   I think it would be much easier for the

15 court reporter, and for everybody to understand,

16 Mr. Kamens.   So let's use that format, all right?

17    MR. KAMENS:   Thank you, Your Honor.

18    THE COURT:   All right.   Let's go.

19 BY MR. KAMENS:

20 Q    How does the Geneva Convention, the Third Geneva

21 Convention, define prisoners of war in Article 4?

22 A    There are six categories.

23 Q    Let's talk about three.   The first three.

24 A    And in the first three there are differences.

25 Q    All right.   Does the text of the Geneva Convention

1   apply the requirements that we have talked about in

2   4(A)(2) to the members of the armed forces described in

3   4(A)(1)?

4   A      No.

5   Q      Does the text of 4(A)(3) apply the requirements of

6   4(A)(2) to the members of regular armed forces described

7   in 4(A)(3)?

8   A      No.  And not in 4(A)(4), 4(A)(5), or 4(A)(6).

9   They're only in one of six categories, which is

10  determinative, as a matter of treaty interpretation.  They

11  knew how to use those words and condition POW status for

12  all six categories.  They chose not to do so.  And we have

13  stuck with this text, and we read this text as the treaty.

14          THE COURT:  Which categories does it apply to,

15  Professor?

16          PROFESSOR PAUST:  It only applies to 4(A)(2), Your

17  Honor.

18  BY MR. KAMENS:

19  Q      What is 4(A)(2)?

20  A      4(A)(2) only concerns certain persons.

21          If I can go back to 4(A)(1).  You can see there's

22  some militia and volunteer corps that are attached or

23  connected, forming a part of, the army and members of the

24  armed forces.

25          But 4(A)(2) applies specifically only to *other*

1   *militia and members of other volunteer corps."*   And

2   4(A)(3) applies to the armed forces of the power, et

3   cetera.

4   Q    Was 4(A)(2) designed to apply to partisans in the

5   wake of World War II?

6   A    I would say that there's a richer history than that.

7   And it's -- I would say also that I -- I would be hesitant

8   to say definitively that it was even meant to apply to

9   partisans as such.   Pictet, I know, mentioned that the

10  French resistance, and we've heard testimony about that,

11  was what some people had in mind, but there's a richer

12  history here.   But what we have though is the text

13  consistent with the Lieber Code, the Hague Convention, the

14  Oxford Manual, 4(A)(1), 4(A)(3).   Membership is the only

15  criterion for 4(A)(1) and 4(A)(3).

16  Q    Is that interpretation consistent with the Lieber

17  Code, the Hague Conventions, and the Oxford Manual?

18  A    They're all consistent up to 4(A)(1) and 4(A)(3).

19  And I am especially -- I recognize especially that the

20  Taft Memo on those points is absolutely correct on Pages

21  5, 10, and 15 through 19, in terms of the nature of the

22  conflict, as well as Article 4(A)(3).

23  Q    That's Defendant's Exhibit 9, the Taft Memo.   We

24  don't have to look at it.   We'll get to it.   Just to be

25  clear, what happens if there is doubt about whether a

1  detained person falls into one of the categories of

2  prisoners of war defined in Article 4?

3  A     Then you go to Article 5.  And in the case of doubt,

4  the person has POW status.  And there must be a

5  determination by what we call now a combatant status, some

6  executive determination by an actual tribunal, that a

7  person does not have prisoner of war status.

8        As Article 5 states: *"The present Convention shall*

9  *apply to persons referred to in Article 4 from the time*

10 *they fall into the power of the enemy and until their*

11 *final release and repatriation.*

12 *Should any doubt arise as to whether persons, having*

13 *committed a belligerent act and having fallen into the*

14 *hands of the enemy, belong to any of the categories*

15 *enumerated."*

16       So any of these six categories.

17       *"Such persons shall enjoy the protection of the*

18 *present Convention until such time as their status has*

19 *been determined by a competent tribunal."*

20 Q     We heard testimony -- thank you.

21       We heard testimony this morning about agreements and

22 recognition of states of the Karzai government after the

23 Loya Jirga in Afghanistan in approximately 2005.  Under

24 Article 6 of the Third Geneva Convention, is it possible

25 for a party to make an agreement that affects the status

1   of a detained person with respect to whether they are

2   considered a POW?

3   A     No.  Article 6, the second paragraph, *"Prisoners of*

4   *war shall continue to have the benefits of such"* -- I'm

5   sorry.  Special agreements for them, even if there is such

6   an agreement.

7         And by the way, this is one of the examples in

8   Article 7 of expressed recognition that prisoners of war,

9   or persons protected by this treaty, have rights under the

10  treaty.  They have direct rights as treaty law of the

11  United States.

12  Q     And I'm referring specifically to the language in

13  Article 6 that says, *"No special agreement shall adversely*

14  *affect"* --

15  A     Yes.  I jumped over that.  Exactly.

16        *"No special agreement shall adversely affect the*

17  *situation of prisoners of war, as defined by the present*

18  *Conventions."*

19        So the treaty controls.  Continuous control.

20  Certainly a bilateral treaty cannot change this multilevel

21  treaty.  And Article 1 of the Convention, which is very

22  important, it requires all parties to this treaty *"to*

23  *respect and to ensure respect for the present Convention*

24  *in all circumstances."*

25        So you can recognize that an agreement attempting to

1   deviate from what's required in this treaty would be

2   trumped by this treaty if you didn't have Article 6 and 7.

3   Q    Are POWs subject to prosecution for ordinary acts of

4   armed conflict against military targets under the GPW?

5   A    No combatant or prisoner of war is subject to

6   prosecution for a lawful act of war.  Killing a civilian

7   on the battlefield, for example, who is DDH, Director of

8   Discipline and Hostilities; or has a CCF function, a

9   Continuous Combat Function; or killing a soldier in a

10  combat situation who is not detained, you can't kill any

11  person once they're detained; that would be a war crime.

12       But a lawful act of war does not -- cannot be subject

13  to prosecution.  You have this combatant privilege that is

14  recognized since the Lieber Code in Article 57 that lawful

15  acts of war are not subject to prosecution.  And that's

16  the same case with respect to the Geneva Conventions, the

17  customary laws of war more generally.

18  Q    What signifies the end of an armed conflict

19  encompassed by common Article 2?

20  A    By common Article 2?

21  Q    Well, how do we know when an international armed

22  conflict has ended?

23  A    It's partly addressed in Article 2 if you're an

24  occupying power.  The laws of war concerning the

25  occupation under the Convention, and in addition to

1  customary international law, continue to apply as long as

2  you're the occupying power.

3  Q     What about hostilities?

4  A     And the hostilities, it doesn't say when your

5  hostilities end.   The U.S. Army Field Manual indicates

6  when the laws of war don't apply.   For example, if the

7  enemy is subject to complete subjugation, the conquering

8  of --

9  Q     What if somebody won?

10  A     If somebody won, the fighting's over.

11        Number two.   If there's a peace treaty, then the

12  fighting is over.

13        By the way, the war is not over in Korea.   There's

14  just an armistice.   And the war technically still applies.

15  Q     Can you look briefly at Defendant's Exhibit 11.   It's

16  a section of a case book on international criminal law.

17  A     That's our case book in the Fourth Edition.   Those

18  are my five co-editors.

19  Q     And this -- this section, is this the Army Field

20  Manual that you were discussing?

21  A     Yes.   This is -- you can see on Page 677 and 678

22  we've extracted from the U.S. Army Field Manual 27-10,

23  which has had only one change.   It was a -- Major Baxter,

24  at the time, was a primary drafter of this.   And he became

25  a professor at Harvard later on the International Court of

1  Justice.  It was widely received as an indication of laws

2  of war and content.  For example, the International Red

3  Cross and the salient custom, international law, looks at

4  various field manuals.

5  Q    So what does this say about when armed conflicts end?

6  A    If you look at Page 678, Paragraph 10, there's a

7  subtitle there that's right on point.  And you can see

8  *"The termination of a war by agreement, normally in the*

9  *form of a treaty of peace."*

10      *"The termination of a war by unilateral declaration*

11 *of one of the parties, provided the other party does not*

12 *continue hostilities."*  The fighting still continues.  The

13 war still continues.

14      *"The complete subjugation of an enemy."*  And there

15 will be no fighting then.

16      Or *"termination of a declared war or armed conflict*

17 *by simple cessation of hostilities."*

18      That is actually wrong.  We have an armistice

19 agreement with respect to Korea, and it's been broken in

20 the past.  But we're still at war in Korea because there's

21 no peace treaty, or complete subjection of the enemy.

22 Q    Is there any provision of the Third Geneva Convention

23 that suggests that a conflict that began between two state

24 actors could become a non-international armed conflict

25 other than following the cessation of hostilities?

1   A    No.  And I would say that you can't have a shift to a

2   NIAC if -- in terms of common Article 3.

3   Q    I'm sorry.  Can --

4   A    The fighting occurs outside the territory.

5   Q    Let me stop you there.  NIAC?

6   A    Oh.  Non-international armed conflict, or an armed

7   conflict not of an international character, and insurgency

8   covered by Article 3.

9   Q    NIAC is a short term, N-I-A-C, for non-international

10  armed conflict?

11  A    Yes.  It's a short term.  It may not be precise.  In

12  common Article 3 is the treaty.  And it says it has to

13  occur in the territory of one of the parties.  Again, as

14  Pictet points out, it has to occur in a single state.  And

15  the conflict in Afghanistan has intensified outside the

16  boundaries of Afghanistan, and could never have really

17  become a NIAC in terms of Article 3.

18  Q    You would agree --

19  A    In terms of this treaty.

20  Q    Would you agree that in a non-international armed

21  conflict under international law, combatants do not have

22  combatant immunity?

23  A    Yes.  Nor POW status in an insurgency, as opposed to

24  a belligerency like the U.S. Civil War.

25  Q    So if the Court were to determine that the conflict

1  in Afghanistan were a non-international armed conflict

2  with the Taliban, U.S. soldiers would not be entitled to

3  combatant immunity under the Geneva Convention for acts of

4  war against military targets in Afghanistan or Pakistan?

5  A    U.S. soldiers would be placed in harms way.  We're

6  talking about tens of thousands of soldiers in a war

7  that's lasted nearly 14 years.  And we have to have in

8  mind future wars that we're involved with when the United

9  States goes in and starts engaging in combat.  In my

10 opinion, that's an international character precisely

11 because U.S. soldiers need combatant status and combatant

12 immunity for lawful acts.  Anyone can be prosecuted for a

13 war crime.

14 Q    Can you look at Defendant's Exhibits 7 and 8.  Those

15 are your declaration and supplemented declaration.

16 A    Yes.  Seven -- I'm sorry.  I'm looking at 7.

17 Q    All right.  And 8 as well?

18 A    I've got 8.

19 Q    Eight's not signed, is that right?

20 A    Eight is not a formal supplemental declaration.  I

21 prepared this and sent it to you in case you wanted to use

22 it.

23 Q    Do you accept and adopt the conclusion in both --

24     THE COURT:  Pause for a second to allow the

25 interpreters to trade places.

1        All right.  Mr. Kamens, go right ahead.

2   BY MR. KAMENS:

3   Q    Do you accept and adopt the conclusions in those

4   declarations as your testimony?

5   A    Yes, I do.

6   Q    And Pages 2 and 3 of Exhibit 7, you characterize the

7   conflict between the United States and the Taliban as an

8   international armed conflict.  Can you explain for the

9   Court your reasons for concluding that it is an

10  international armed conflict?

11  A    Yes.  First, it was an international armed conflict

12  before we went in.  It was a belligerency and war because

13  the Pakistan regular army were fighting with the Taliban.

14  As we go in on October 7th with a massive use of force,

15  it's internationalized doubly.  Since then, we've had

16  military personnel from some 43 countries, I believe,

17  participating in the war in Afghanistan up until today --

18  or up until a year ago or so.

19       The United States has also used -- has fought the

20  Taliban in parts of Pakistan.  So it's an international

21  armed conflict because of that alone.  Not only are we

22  there fighting in Afghanistan, but also fighting outside

23  its borders, the Taliban in Pakistan.  As the testimony

24  was today, some of the Taliban leaders went to hide in

25  Afghanistan.

1          President Bush issued that order because we're having

2    trouble still fighting.  We're still fighting them in

3    Afghanistan.  So --

4    Q     In Pakistan?

5    A     I mean in Pakistan.  And we were using drones for

6    targeting members of the Taliban in Pakistan.  That's part

7    of the internationalization conflict.  And it's definitely

8    not occurring in the territory of a single country.

9    Q     Does the --

10   A     And then we used ground troops apparently from the

11   Bush order, and the media responses that we had.  Special

12   ops units also on the ground, which wouldn't be necessary

13   since the drone target was already occurring.

14   Q     Does the fact that the government of Hamid Karzai,

15   and subsequent to the present government of Afghanistan

16   was installed, does that change the nature of the conflict

17   on the ground?

18   A     No.  That alone did not.  The United States was

19   engaged in a belligerency, and it was the recognized

20   government all the time.  It doesn't matter.  What's

21   critical is, you know, these questions of belligerent

22   status and other internationalizing elements of the armed

23   conflict.

24   Q     You talk about belligerent status.  And in the

25   exhibit, your declaration, Exhibit 7 on Page 3, you

1 describe the Taliban as a belligerent party for purposes

2 of customary international law.

3 A    Yes, they met the criteria, as I have already gone

4 through, of having the semblance of the government.  And

5 you've indicated with other experts that they even claim

6 to represent the State of Afghanistan subsequently.  They

7 had military units.  I understand that this accused was a

8 leader of a military unit.

9 Q    Alleged.

10 A    That they have fielded military units in fighting

11 that U.S. soldiers engage in.  Merely everything that's

12 charged here is what a U.S. soldier does.  They control

13 territory.  Certainly, 90% as we went in.  And I'm not an

14 expert, but I understand that they controlled back and

15 forth 60%, 70%.  And they may still end up winning this

16 war with outside intervention with Iran.  Who knows.  The

17 war is still occurring.

18 Q    What rights does a belligerent have in an armed

19 conflict under international law?

20 A    Back to the Lieber Code.  You are a member of an

21 armed force of a belligerent.  You are entitled to POW

22 status.  And as Article 57 says, you are privileged.  And

23 you have immunity from lawful acts of war.

24 Q    Are you familiar with the January 11, 2002,

25 memorandum by the then State Department Legal Adviser,

1    William Taft?

2    A    Yes.  Especially now.

3    Q    Does that memorandum support the conclusion that the

4    conflict began as an international armed conflict --

5    A    Very much so.

6         Do you want to ask me questions about it?

7    Q    I will in just a moment.  Does the application of the

8    Geneva Convention, the Third Geneva Convention, to the

9    Taliban depend upon whether the United States recognized

10   the Taliban as the lawful government of Afghanistan?

11   A    No.  But it was recognition by the United States

12   necessarily that Article 2 applied because you don't get

13   to 4(A)(3) until Article 2 applies.  And they did

14   recognize that there was a de facto government.  And the

15   three countries recognized it was a de jure government.

16   Q    And so are you saying that that triggered the

17   application of common Article 2, and the provisions

18   related to prisoner of war status under Article 4?

19   A    Yes.  And it requires a conclusion that it's not a

20   Article 3 conflict.

21   Q    Do you agree that the Taliban meet the criteria as an

22   authority or government for purposes of Geneva -- Third

23   Geneva Convention, Article 4(A)(3)?

24   A    Yes.

25   Q    Why?

1  A    I address 4(A)(3) in my declaration as an alternative

2  to 4(A)(1).  And they had a government in exile.  And they

3  are a government or authority.  They don't have to be a

4  recognized state or nation.  They were a belligerent, and

5  still fighting as a belligerent in parts of Pakistan and

6  parts of Afghanistan, if not with Iran.

7  Q    Do they have to fight in connection with some other

8  state in order for the conflict to remain an international

9  armed conflict?

10  A    No.  For example, the U.S. Civil War, the Confederate

11  States of America had no other state supporting them as a

12  state, and they weren't fighting units from other states

13  supporting the CSA, and they nevertheless were a

14  belligerent.

15  Q    The Taft Memo states on Pages 20 and 21 that the

16  Taliban armed forces met the requirements to constitute

17  the armed forces of an unrecognized authority.  Do you

18  agree?

19  A    The Taft Memo expressly refers on Page 20 to Article

20  4(A)(3), which is this category of a power.  And they

21  quote Article 4(A)(3).  And in the middle of the page, I

22  agree with that conclusion.  *"We have already explained*

23  *why the Taliban should be considered a 'government or an*

24  *authority' for purposes of 4(A)(3).  The Taliban military*

25  *forces should also be considered 'regular armed forces'*

1  *for purposes of 4(A)(3)."*

2      I agree with this memo, again, on Pages 15 through

3  20.

4  Q    The Taft Memo states that the commission of

5  violations of the laws of war *"by some members of the*

6  *force is not sufficient to demonstrate that the Taliban*

7  *forces generally may not be covered under Article*

8  *4(A)(3)."*  Do you agree?

9  A    Yes.  In any war where you have a substantial number

10  of fighters there will, unfortunately, be war crimes.  And

11  people can be prosecuted for their war crime activity.

12  But POW status and combatant status are completely

13  unhinged from that.  In 4(A)(1), there's no criterion as

14  in 4(A)(2) with respect to following, generally, the laws

15  of war.

16      In 4(A)(3), as this memo's addressing, there's no

17  criterion as in 4(A)(2) for certain - certain - militia

18  and volunteer corps about following the laws of war more

19  generally.

20  Q    So --

21  A    You can't lose POW status and combatant status merely

22  because you commit a war crime.

23  Q    So in World War II, for example, did Japanese foot

24  soldiers lose POW status because members of the leadership

25  engaged in war crimes?

1  A    No.  And moreover, it would be a violation of another

2  Geneva provision concerning collective penalties to punish

3  a person not for what they have done, but because of the

4  conduct of others.

5  Q    In World War II, did German foot soldiers lose POW

6  status because leaders who were prosecuted at the

7  Nuremberg Tribunals engaged in war crimes?

8  A    No.  And during the Civil War, there were war crimes

9  on both sides.  And people were entitled to prisoner of

10  war status.

11  Q    What would be the consequence for U.S. forces if POW

12  status could be stripped based on a violation of the laws

13  of war by members of that force?

14  A    It would be horrendous potentially.  And it would be

15  wrong legally.

16  Q    Are you familiar with the United States' Amicus

17  submission in the ICJ prosecution of Dusan Tadic?

18  A    Yes.

19  Q    That's Defendant's Exhibit 10.  Have you reviewed the

20  discussion?

21  A    One second.  Yes.

22  Q    Have you reviewed the discussion of the application

23  of the Third Geneva Convention -- I'm sorry, the common

24  Article 2 discussion of the definition of international

25  armed conflict on Pages 27 and 28, and Footnote 43?

1   A     One second please.   Yes.

2   Q     Does this discussion and submission by the United

3   States support the application of the Third Geneva

4   Convention to the Taliban, specifically the provisions

5   related to international armed conflict?

6   A     Yes, it does.  And by the way, this is from the

7   government of the United States.  Not merely the State

8   Department.  And it's not a D.O.D. position, either.  It's

9   the government of the United States.

10  Q     What is your conclusion with respect to members of

11  the armed forces of the Taliban as to whether they are

12  subject to criminal prosecution for ordinary acts of armed

13  conflict against military targets?

14  A     If -- I don't know what you mean by *ordinary.*  But

15  I assume you mean lawful.

16  Q     I mean acts of armed conflict that are not violations

17  of the laws of war that is targeting civilians --

18  A     As I pointed out in my declarations as statements,

19  under the customary laws of war reflected in the 1863

20  Lieber Code, the Oxford Manual, The Hague Convention, and

21  the '49 Conventions, the customary international law

22  generally, they're entitled to combatant status and

23  prisoner of war status.  And in my declaration, I've cited

24  about 10 of us that have recognized that the Taliban

25  should be given POW status.  It was a mistake to try to

1   deny POW status for other purposes.

2        MR. KAMENS:  One moment, Your Honor.

3        Pass the witness, Your Honor.

4        THE COURT:  All right.

5        Mr. Gill.

6        MR. MIKE GILL:  Do you mind if I pass up some

7   exhibits?

8        MR. KAMENS:  I'm sorry.

9        Your Honor, can I move in Defendant's 1, 6, 7, 8 and

10  11?

11       THE COURT:  Exhibits 1, 6, 7, 8 and 11.

12       Any objection?

13       MR. MIKE GILL:  No objection, Your Honor.

14       THE COURT:  They'll be received.

15            (Defendant's Exhibits 1, 6, 7, 8 & 11 are

16            received.)

17                     **CROSS-EXAMINATION**

18  BY MR. MIKE GILL:

19  Q    Professor Paust, we met earlier?

20  A    Yes.

21  Q    And I just have a few questions for you today.  If I

22  ask you anything you don't understand, let me know to make

23  sure we're on the same page.

24       Now, let's talk about what's not in dispute.  Would

25  you agree that the Taliban in 2001, prior to the United

1  States entering the country, was only recognized by three

2  governments in the entire world?

3  A    No.  I would say, again, as the Taft Memo does, and

4  importantly international as the de jure, the lawful

5  government, as the Taft Memo points out explicitly, they

6  had recognition implicitly from U.N. Security Council

7  Resolutions - you better follow the laws of war - which

8  you referred to.  They've had outside recognition as a de

9  facto government by many enemies, even though they're not

10 a de jure government.

11 Q    To be clear, I'm asking you de jure.  Actual legal

12 recognition.  Diplomatic ties.  Now, you recognize, as a

13 law of war expert, the distinction, right?

14 A    Yes.

15 Q    And they're only recognized by Pakistan, the UAE, and

16 the other one has escaped me right now.  Remind me.

17 A    Saudi Arabia.

18 Q    Okay.  And within two months of 9/11, all of those

19 countries had remove their recognition, am I right about

20 that?

21 A    I think I heard today that two of them did.

22 Q    And I'll tell you the third removed their recognition

23 in November of 2011.

24      Just so we're clear for the court reporter, is that a

25 yes?

1    A    Yes.

2    Q    Now, am I also correct that from that day forward,

3    there's not a single country in the entire world that has

4    recognized the Taliban as a government for diplomatic

5    relations?

6    A    Not necessarily.  I hate to be too precise, but --

7    Q    Well, tell me what government --

8         THE COURT:  Let him respond.

9    A    I will say that to my knowledge no government has

10   subsequently recognized the Taliban government as a de

11   jure government of Pakistan -- of Afghanistan.

12   Q    Okay.  So basically, to the best of your knowledge,

13   you're saying that I'm correct about this?

14   A    I'm being very specific.

15   Q    Okay.

16   A    There's a difference between recognition of the

17   government as the de facto government and recognition of

18   the government of the de jure government.  And by the way,

19   belligerents don't have to be a state.

20   Q    I understand.  But I'm asking you to be clear, de

21   jure recognition, is there any country that you're aware

22   of in the entire world that has recognized them since

23   2001?

24   A    I'm unaware of any country that recognized them as

25   the de jure government.

1  Q     Okay.  Now also would you agree with me that since --

2  let's just make it easy, 2004, 2006, the Karzai regime has

3  been elected.  You don't disagree with that?

4  A     That's correct.

5  Q     And that the United States of America, and other

6  coalition forces, were in Afghanistan at that government's

7  request?

8  A     That is correct.

9  Q     And would you also agree with me that as a matter of

10  policy, that the United States of America, that we treat

11  people, and we don't recognize them unless they're

12  entitled to it legally for POW protection, but that we

13  treat enemy combatants as POWs, and that we apply the

14  Convention?

15  A     Well, that's -- I hate to be so precise.  An enemy

16  combatant is a lawful combatant under the POW status.

17  There's such a thing as an unprivileged fighter who is not

18  a combatant, and is not entitled to combatant's privilege.

19  So we have to be careful.

20       Could you repeat your question?

21  Q     I will just ask you that as a matter of policy, the

22  United States treats enemy combatants humanely, and in

23  accordance with POW protections without -- I'm not saying

24  recognizing POW combatant immunity, I'm just saying as

25  prisoners of war we treat them humanely?

1  A    I hope I can answer your question.  An enemy

2  combatant is treated by the United States as entitled to

3  prisoner of war status in combatant immunity.  An

4  unprivileged fighter may, as a matter of policy, be

5  treated like a prisoner of war in some circumstances where

6  they are -- they've have a tribunal hearing and they are

7  recognizably not a prisoner of war.  As a matter of

8  policy, that has happened.

9  Q    Okay.  I think we're in agreement.

10     As a law of war expert, are you aware of the Taliban

11 treating anybody with prisoner of war protection?

12 A    No.

13 Q    Are you aware of the Taliban -- and you were here

14 earlier.  You saw the testimony --

15 A    Except the -- what's his name?  The U.S. soldier who

16 wandered off.

17 Q    Bergdahl?

18 A    Bergdahl.

19 Q    Different situation there.

20 A    Yes.  And -- and in Pakistan, I believe.

21 Q    And you heard the testimony this morning from the

22 senior analyst, Barclay Adams, talking about that it's a

23 practice of the Taliban to actually kill Afghan National

24 Police Officers that they capture?

25 A    No person who's captured, of any status, can be

1  killed during the armed conflict.  It's a war crime.

2  Police are not necessarily not lawful military targets.

3  Depends on their function.  They could be even militia.

4  Depends on their quasi military character.  Or they could

5  be civilians who are participating directly.  We look for

6  direct participation in hostilities.  There are such

7  civilians.  They are targetable.  So they can be killed

8  before capture.

9      Some of the testimony I heard today was about bombs

10 and bombing of civilians.  And a law of war expert would

11 have to try to identify what civilian, what context, were

12 they DPH, were they CCF.  They can be killed.  We kill

13 civilians who are DPH and CCF.

14     And I'm sorry, but Geneva Protocol 1, Article 51,

15 civilians are not immune from targeting if they are

16 participating directly in hostilities.  And there's a

17 difference between direct and indirect.

18 Q   Okay.  And we're going to get into more detail in a

19 moment.  But you would agree that if there's a fight in

20 force, the Taliban, that is giving directives as a matter

21 of practice, directives that would blatently violate the

22 law of war, that it is their practice; is it your

23 testimony that they're entitled to the immunity under

24 Geneva and the common law that you're talking about

25 despite those directives?

1   A     Yes.  And so you can have a Taliban military leader

2   give an order to kill all prisoners.  I don't think this

3   accused did anything like that.  So this accused is the

4   question; is this person entitled to combatant status for

5   fighting and not killing prisoners?  And the answer is,

6   yes, under 4(A)(1) or 4(A)(3).

7   Q     Okay.  And --

8   A     And you can prosecute that Taliban leader who commits

9   that war crime.

10  Q     But do you see a distinction where world leaders,

11  countries that are helping Afghanistan -- and you would

12  agree with that our military, our soldiers, are putting

13  their lives on the line every day they're out there in

14  Afghanistan?  There's no dispute about that, is there?

15  A     Absolutely.  And so are the -- have, at relevant

16  times, some soldiers from 43 countries.  That's why it's

17  an international armed conflict.

18  Q     And under your application, the Taliban is entitled

19  to Geneva protection, lawful combatant status, from this

20  point until all fighting stops?  Until they decide to

21  stop, or the other world authorities give up; am I right

22  about that?

23  A     Until the hostilities end.  Yes.

24  Q     Okay.  That could continue for decades, couldn't it?

25  A     Especially if Iran gets involved.

1  Q      Meanwhile, the United States military, and other

2  coalition forces, are there trying to help a

3  lawfully-elected government to maintain control and

4  establish its position.  Do you disagree with that?

5  A      No.   That's apparently one of our objectives.

6  Q      And irrespective, and there's no dispute, there's no

7  evidence that the defendant himself engaged in some of

8  these atrocities that we're talking about that the Taliban

9  supported, like suicide bombs, right?

10 A      Yes.   And some of that evidence, I assume, is after

11 he was captured, in any event.

12 Q      Right.   But for fighters such as the defendant that

13 choose to fight with the Taliban, and they go to battle

14 and they shoot military targets, they kill United States

15 Army, or any other world authority, they're entitled to

16 protection under your theory even though they know the

17 organization they're fighting for doesn't uphold these law

18 of war principles?

19 A      We have to apply the treaty.  Yes.  4(A)(1) and

20 4(A)(3).

21 Q      It doesn't end, does it, until all hostilities stop

22 under your reading?

23 A      You're correct.  To be precise, there's no shift in

24 international law from an IAC to a NIAC.

25         THE COURT:  Professor, hold up just one second.  Let

1   the interpreters switch places.

2   BY MR. MIKE GILL:

3   Q    Now, you would agree with me that level of knowledge

4   is important on testifying about law of war, and what's

5   going on with the Taliban and application of Geneva?  Do

6   you agree with me on that?

7   A    Yes.

8   Q    You personally, have you been to Afghanistan?

9   A    No.

10  Q    And you're not tuned in to the information sources

11  that say, for instance, Senior Analyst --

12  A    No.  I'm not CIA.  I don't have top secret clearance.

13  Q    And I'll tell you, Senior Analyst Barclay Adams is

14  not CIA.

15       But you would agree that you don't have that kind of

16  information?

17  A    I do not.

18  Q    And in fact, the things you heard from Senior Analyst

19  Barclay Adams this morning, was that the first time you've

20  heard about some of those things?

21  A    No.  Some of it is public knowledge.

22  Q    Some of it.  Well, were you aware of the directives

23  as far as suicide bombing, and their 2009 code of conduct?

24  A    No, I was not.

25  Q    Their directives about that that they're instructing

1  their fighters to wear civilian clothes so they blend in

2  with the civilian population, did you know that they had

3  that directive out there?

4  A     No, I didn't.  I forgot even the date.

5  Q     I'm sorry?

6  A     I forgot the date of that.  But I do not.

7  Q     Well, I'll represent to you that it's Government's

8  Exhibit 6.  Or actually, I'm sorry, Government's Exhibit

9  3, I believe.

10      And those directives were put in place in May of

11 2009, several months before the defendant was captured.

12 So, those directives are in place.

13      As a law of war expert, does it concern you that

14 there is a insurgency out there that is instructing its

15 fighters to wear civilian clothing so they blend in with

16 the population?

17 A     It concerns me that there was a belligerency in the

18 international armed conflict and there was such a

19 directive.  Because if you're wearing civilian clothing

20 not just to go through enemy lines, but during combat,

21 that is a war crime.

22 Q     Okay.

23 A     As Hays Parks testified.

24 Q     But putting war crimes aside, do you also see the

25 problem I pointed to earlier that fighters such as the

1  defendant who may not engage in war crimes, but they'll

2  continue fighting under this immunity that you would

3  provide for the organization which causes more military

4  deaths and causes the hostilities to continue?

5  A    Well, in all wars there are war crimes.  And it's

6  important to retain combatant status for those who have

7  combatant status.  As U.S. soldiers will be fighting in

8  the future, as they are fighting now in several countries,

9  and that's important that they not lose that combatant

10  status or combatant immunity.

11  Q    How many times have you represented the United States

12  in summits and conferences to discuss treaties and

13  application of laws of war?

14  A    It's in my resume the formal conferences that I

15  attended.  But it would be during the four years I was a

16  JAG officer representing the United States.

17  Q    At those conference, and I'm just -- I don't know,

18  were you the sole United States representative authorized

19  to negotiate on behalf of the United States?

20  A    Oh, negotiate?  I did not negotiate treaties on

21  behalf of the United States if you mean a conference where

22  a treaty is being created.  I'm talking about a conference

23  where people are discussing laws of war, debating laws of

24  war.

25  Q    Now, let's talk about development of a law of war.

1  And if I understand you correctly, you are telling us that

2  the Lieber Code applies in this case and provides the

3  defendant with immunity?

4  A    To be a little more precise -

5  Q    Sure.

6  A    - the Lieber Code attempted to identify customary

7  international law.  There are some things in the Lieber

8  Code that are now war crimes, like destroying types of

9  food, and firing on civilians if you can see such a

10  situation.

11  Q    How many --

12  A    But the articles that we've been talking about are

13  part of customary law and the conforming of the

14  development of custom.  And in that respect, the customary

15  law of war is applicable in the war in Afghanistan.

16  Q    How many countries have adopted the Lieber Code?

17  A    Only one.  The United States.  It was formally

18  adopted by the United States.  But it had -- it has had a

19  significant impact on the development of the laws of war,

20  as Hays Parks testified to.

21  Q    And in fact, would you agree with me that the Lieber

22  Code is 150 years old?

23  A    Yes.

24  Q    And would you also agree with me that the way wars

25  were fought at the time the Lieber code was instituted,

1   it's very different from what we're dealing with in the

2   20th Century?

3   A     In some respects, yes.   I remember Hays Parks talked

4   about persons who were not members of the armed forces.

5   And if they were like Merrill's Marauders, they could

6   be -- they would not have the combatant's privilege.

7         That actually still happens today in certain

8   international armed conflicts.   That you have certain

9   persons fighting that do not have the combatant privilege.

10  Q     Under your view, or interpretation, even if the

11  Geneva Convention does not provide coverage for the

12  defendant, is it your testimony that the Lieber Code does?

13  A     The customary law reflected first in the Lieber Code,

14  subsequently in the Oxford Manual, and The Hague

15  Convention, which is treaty law, yes.   We're a party to

16  The Hague Convention also.

17        And at Nuremberg, the IMT at Nuremberg, ruled that

18  the German-accused said that that treaty is non-binding

19  because of a general participation clause, and not all the

20  parties to World War II were parties to the treaty.   The

21  IMT at Nuremberg ruled that the 1907 Hague Convention IV

22  reflected customary and international law, and was

23  universally applicable in its basis for the prosecution of

24  war crimes.

25  Q     Now, moving forward from the Lieber Code to the

1   Oxford Manual, 1880, and then The Hague, 1899, and beyond,

2   would you agree with me that the law of war is developing?

3   A    Has developed, and is still developing.   The

4   protocols are somewhat different than the Geneva

5   Convention.   For example, in terms of Article 51 and 52,

6   target selections and who's entitled to freedom from being

7   targeted and what precautions you have to take, et cetera.

8   So, yes.

9   Q    And that --

10  A    And the developments don't necessarily obviate the

11  basic rules that are still customary.

12  Q    But the rules, they develop over time with

13  experience, would you agree with me on that?

14  A    No.   Actually, technically they develop as customary

15  law over time with respect to general patterns of

16  practice, which experience can be related to that element

17  of custom, and general patterns of expectation.   And the

18  Court, the Supreme Court, famously ruled that law of war,

19  for example, in 1900, prohibited the seizure of enemy

20  fishing vessels that were just applying their trade,

21  contrary to the executive view of the content of

22  international law.

23       And the court famously -- it goes on for maybe 100

24  pages looking at texts of insurgency in military manuals.

25  And the text would -- the decrees of different states

1  and -- that are relevant as an indicia of a opinio *juris*.

2  What's expected as a matter of a law.  And it's the

3  general pattern of practice that you do look at, and the

4  general patterns of expectation, what is legally

5  appropriately required that you look at.

6  Q    Okay.

7  A    Not only to develop custom, but as an aid for

8  interpretation of the treaty, because custom is an aid for

9  interpretation of treaties as well.

10 Q    And under your reading, the law of war, and the

11 customary law of war, has developed to the point that you

12 say the Taliban is entitled to immunity until all

13 hostilities stop, no matter how long that takes?

14 A    Yes.  I see nothing in the '49 Conventions otherwise.

15 And as I testified, the U.S. Army Field Manual sets forth

16 specific circumstances where the laws of war would cease

17 to apply.  And certainly not because a government is

18 recognized by one of the parties to international

19 conflict.

20 Q    You see nothing in the Geneva Convention that

21 actually would provide a stopping point for such violence

22 and no longer allow coverage for prisoners of war?

23 A    I do not see a requirement that the laws of war cease

24 at time X.  Yes.

25 Q    Does the international armed conflict requirement in

1    Article 2 have any place in your mind?

2    A    It has no notation like that.   No.

3    Q    Okay.  So your testimony is if there is an

4    international armed conflict, there's no way it can back

5    out until all violence stops?

6    A    Until that war ends.

7    Q    Even when you're dealing with insurgent groups living

8    in mountains that willfully hide and continue fighting as

9    long as they possibly can; it doesn't stop?

10   A    Well, theoretically if you got down in the

11   Confederate States of America circumstance, we had a

12   belligerency.  And if -- there were only three Confederate

13   soldiers still fighting in Texas.  By the way, they were

14   fighting in Texas as well even after the end of the war at

15   Appomattox.  But if you had three soldiers fighting, yes,

16   at a certain point, theoretically, it would not be an

17   armed conflict.

18   Q    Okay.  So there is a line, but you're saying it's

19   that far down the line?

20   A    Theoretically it would be that far down the line.

21   Yes.

22   Q    Okay.  Now, you would agree with me that the Civil

23   War, the times have certainly changed and the way people

24   do battle has changed?

25   A    Well, partly, yes.  But, I mean, in terms of POW

1  status, no.  In terms of the membership as the sole

2  criterion for combatant status, no, that has not changed.

3  In fact, it's very striking.

4       So, as soon as you take the soldier's oath, you're

5  entitled to this status and this immunity.  And it's so

6  important that we retain this, despite the push

7  politically from the Bush administration to take away POW

8  status.  It's so important for U.S. military.  All of the

9  U.S. military who fought in Afghanistan and in Pakistan.

10  Imagine if U.S. soldiers were subject to laws like these

11  and were prosecuted in Pakistan or Iran for just doing

12  what a soldier does.

13  Q    Now, in the Civil War, are you aware of whether they

14  had suicide bombing?

15  A    I am not aware of suicide bombing.

16  Q    Are you aware --

17  A    As we understand suicide bombing today.

18  Q    Are you aware of in the Civil War people going into

19  places such as civilian restaurants or banks and shooting

20  them up and killing several civilians just to get one or

21  two military targets?

22  A    That's a very interesting scenario.  But I'm aware of

23  Sherman's March in Georgia, for example, and some other

24  incidents.

25       But if I can focus on your question about two people

1  are targetable, and there's some civilians present, we do

2  this all the time with drone targeting.  For example, when

3  we targeted the top Taliban leader of Pakistan, we took

4  out him, seven Taliban guards, and one of them was a

5  lieutenant in the Taliban, and his wife, who is a

6  non-targetable civilian possibly, his wife's uncle and

7  aunt, and some medical person.

8       And there's a Professor Mary Ellen O'Connell at Notre

9  Dame that says that was an unlawful target.  And I went on

10 the record that, no, that was a lawful target.  You have

11 to look at the value of the target - top Taliban leader.

12 You look at the circumstances - he doesn't drive a car.

13 You can't wait.

14      So you can kill civilians in war, and foresee that

15 you're killing civilians.  If the target is a significant

16 target, for example, you apply the rules of necessity and

17 proportionality and rules of distinction.  You otherwise

18 do not target civilians as such.  You don't kill civilians

19 as such who are not DPH.

20 Q   And how about on the lawful elections in Afghanistan,

21 cutting people's fingers off and threating them not to

22 vote?

23 A   If somebody did that and they're in the military,

24 they would be combatants, let's say.  But they could be

25 prosecuted for a war crime.

1   Q    And meanwhile, others who are fighting --

2   A    Because you -- because the person is detained,

3   presumably.  You can't cut someone's finger off with a

4   robot, I assume.  You're talking about somebody who's in

5   your control.  Once a person is in your control,

6   regardless of their prior status, you can -- and your

7   status, you can -- a civilian can commit a war crime.  You

8   cannot engage in killing or torture, cruel treatment, et

9   cetera, to a person.

10  Q    But, again, you recognize the problem though that if

11  the organization has a practice engaging in that, and they

12  have fighters that may not do it, but they know about it

13  and they continue to engage in foreign countries and cause

14  death and more battles until it stops, all the time, under

15  your theory, they'll by shielded by combatant immunity,

16  correct?

17  A    Yes.  And I admit that there is some policy

18  preferences at stake here.  But the law, in my opinion,

19  requires that we continue in combatant status, combatant

20  privilege, for those who were initially entitled to the

21  combatant status and combatant privilege especially if

22  we're talking about the conduct of others because we

23  cannot engage in collective punishment of individuals.

24  Q    Now, you will agree with me that under Article 2 of

25  the Geneva Convention, that a fighting group can receive

1   coverage if they agree to abide by the Geneva Convention?

2   A      That's one of the circumstances.

3   Q      Okay.  Are you aware of the Taliban ever doing that?

4   A      I'm not aware that they did that.  That's not the

5   only circumstance in the third paragraph.

6   Q      Let me ask you, under your theory with ISIS in

7   control of significant areas, is ISIS entitled to coverage

8   under the Geneva Convention?

9   A      I've already written that they are at best an

10  insurgent.  But they are participating in an international

11  armed conflict because we're there.  Several other

12  countries are bombing not only in Iraq but also in Syria.

13  It's internationalized in that respect.

14         But, to my knowledge, no one has recognized ISIS,

15  despite their claim to be a state, as a government, as a

16  de facto or a de jure government, or a belligerent.

17  Technically, as a belligerent, I don't know of any state

18  that has so recognized them.  And I put that in an article

19  recently.

20  Q      Under your --

21  A      That they would not be initially entitled to

22  combatant privilege.

23  Q      Under you --

24  A      -- in an international armed conflict.  Sorry.

25  Q      That's okay.

1          Under your de facto theory, if ISIS takes over an

2    entire country, and assumes governing even though they're

3    not recognized by a single nation in the world, are they

4    covered by Geneva?

5    A    That's an interesting point.  It is, as Pictet points

6    out several times, it is the fact of war that triggers the

7    laws of war, not the recognition by any party.

8          Obviously, somebody has got to recognize there's a

9    war in the factual sense.  But there is no de jure

10   recognition that's required.  And that may be curious for

11   those who don't understand the laws of war, but that's the

12   case.

13         I would assume that if they get to that -- if they

14   get to that kind of power.  They have that exercised

15   power, and they claim to have the government, but if they

16   get to that kind of circumstance that others will start to

17   recognize them, but it hasn't happened yet.  It hasn't

18   happened.

19   Q    Even if --

20   A    I will maintain that ISIS is not entitled to

21   combatant privilege.

22   Q    Even with --

23   A    They've never been a government.  They've never had

24   de jure status of any sort by anyone.

25         THE COURT:  Professor, hold off for the next

1  question.

2       Go right ahead, Mr. Gill.

3  BY MR. MIKE GILL:

4  Q    With your testimony, so I understand, the

5  international armed conflict has not ended in Afghanistan

6  since 2001?

7  A    It's actually intensified.

8  Q    And you saw the -- if you can take a look at

9  Government's Exhibit 7 there in front of you.  Now, these

10 are the interpretations of the International Committee of

11 the Red Cross.  I would like you to read those.

12 A    I see the first paragraph.  Ready to answer questions

13 for the first paragraph.

14 Q    You would agree with me that the International

15 Committee of the Red Cross has determined that the ongoing

16 hostilities directly quoted are governed by the rules

17 applicable from this point forward to non-international

18 armed conflicts?  That they recognize that an

19 international armed conflict can indeed turn into a

20 non-international armed conflict?

21 A    I agree that this extract from a book so states that

22 they had, albeit it with an international component, which

23 is quite problematic.  And they've changed their minds

24 several times, actually.  But I agree that this paragraph,

25 if it represents the ICRC's view, is to that effect.

1        THE COURT:   To the effect that it represents their

2   view or it's factually correct?

3        PROFESSOR PAUST:   To the -- it is a statement that

4   the war on terror currently being waged in 2007 is a

5   non -- conflict of a non-international, dot, dot, dot.

6   That's what they say.   Is non-international.   And I

7   disagree with their conclusion, but that's what they say.

8   That's what this book says.   I agree that that's what this

9   book says.

10  Q    And also 2011.   And I'll tell you, these are from the

11  International Community of the Red Cross Website.   These

12  are their official positions.   But you disagree with their

13  position that it is a non-international armed conflict?

14  A    Yes.   And I go back to the treaty, which is

15  determinative.   The language of the treaty states that it

16  really can't be a NIAC if it's not occurring in a single

17  country.

18  Q    Now, --

19  A    And I know they've changed their tune several times.

20  They first criticized the United States for not applying

21  prisoner of war status.

22  Q    Let's turn to Article 4.

23  A    Of GPW?

24  Q    Yes.   Now, do you contend in any way --

25  A    Is that in your --

CROSS-EXAMINATION OF PROFESSOR PAUST       281

1   Q      It's not.   Just look at Government's Exhibit -- I

2   mean, Defense Exhibit 5, or you can look at -- I can't

3   remember my exhibit number that's up there.   I think it's

4   Exhibit 6.   But at Exhibit 5, and take a look at Article

5   4.

6   A      Yes.

7          THE COURT:   Hold off for the interpreter.

8          Go right ahead.

9   BY MR. MIKE GILL:

10  Q      You've got Article 4 there in front of you.   And

11  let's go ahead and get straight on Article 4(A)(2).   Do

12  you contend that the Taliban satisfies those four

13  criteria?

14  A      I contend that they're -- that the criteria are

15  irrelevant to the Taliban.

16         THE COURT:   That's not the question.

17  A      No.   I do not.

18  Q      To make sure I didn't -- you're saying I'm not

19  contending?   You're saying I do not contend that they meet

20  those criteria?

21  A      I do not argue that they meet these criteria.

22  Q      Okay.   With respect to 4(A)(1), your position is what

23  with respect to the Taliban?   That they are covered by

24  that?

25  A      Yes.   As noted in my declaration, and the Taft Memo,

 1  when the conflicts started, of course, they were members

 2  of the armed forces of a party to a conflict.  And that's

 3  the language of 4(A)(1).  And it still is today.  They are

 4  a party to the conflict.

 5  Q    And you say that continues from here?

 6  A    Until that conflict is over.  Yes.  Until it

 7  terminates according to recognized criteria in the field

 8  manual.

 9  Q    Even though there's been an election in Afghanistan

10  and --

11  A    Absolutely.  Absolutely.  Because you can have a

12  government in exile and a government that's recognized by

13  a lot of states, and --

14  Q    But that's not in --

15       THE COURT:  Let him finish his answer.

16       MR. MIKE GILL:  Sorry, Judge.

17  BY MR. MIKE GILL:

18  A    Absolutely.  You can have the de jure government and

19  still the armed conflict of an international character

20  continues.  And that's what we have in Afghanistan.

21  Q    So under your reading, it makes no difference that

22  Afghanistan has an elected official?

23  A    That's correct.

24  Q    Elected government?

25  A    In the United States Civil War we had an elected

 1  government, the United States, still the laws of war

 2  applied even though the United States was that de jure

 3  government of the state of the United States.  And no

 4  other state recognized the CSA as the de jure government

 5  of a state.  Absolutely.

 6  Q    But as you testified, the United States, under

 7  President Lincoln, recognized the Confederate States.

 8  A    As a belligerent only.

 9  Q    But with respect to the application of law of war of

10  hopes of bringing them back in, they gave recognition to

11  their status for the Civil War.

12  A    I don't know what the political motive was.  It's

13  irrelevant.  The status was correct, as the Lieber Code

14  recognizes.  The status is correct as soon as you are

15  sworn in as a member of the armed forces of a party to the

16  conflict.

17  Q    Now, Article 4(A)(3), your position is that the

18  4(A)(2) factors do not apply?

19  A    They expressly do not apply to 4(A)(1), 4(A)(3), nor

20  to the historic documents with respect to members of the

21  armed forces of an army.

22  Q    Now, you'd agree with me that unlike 4(A)(1), 4(A)(3)

23  does not reference militias or volunteer corps?

24  A    Absolutely.  It was referring to a power.  And it's

25  referring expressly to armed forces that profess

1   allegiance to a government or authority.  And the Taft

2   Memo is absolutely correct as a matter of law what that

3   means.

4   Q    Let me ask you again.  Article 4(A)(3) does not

5   reference militia or volunteer corps like 4(A)(1)?

6   A    That is correct.  Or 4(A)(2).  And certain types of

7   militia volunteer corps in 4(A)(1) and 4(A)(2).

8   Q    In fact, 4(A)(3) applies to, under your reading,

9   *"regular armed forces,"* correct?

10  A    Yes.

11  Q    So if you have a government like the Taliban who

12  decides to call their fighters militia, they don't fall

13  under the terms of your reading?

14  A    It's not what they call them.  It's what they are.

15  And it's constantly -- it's the de facto existence of

16  hostilities.  It's the de facto of circumstances of war.

17  Who is a fighter, what is their unit, organization, et

18  cetera.

19       Besides that, this is the treaty Article 4(A)(3), and

20  the customary international laws are broader, as I've

21  testified, going back to the Civil War.

22  Q    So under your reading, 4(A)(3) includes volunteer

23  groups and militias, even though it's not referenced in

24  4(A)(3)?

25  A    It would include the kind of militia and volunteer

CROSS-EXAMINATION OF PROFESSOR PAUST

1  groups that are addressed in 4(A)(1).

2  Q    Well, but you test --

3  A    They are part of a power that has a military -- that

4  professes allegiance to a government authority.

5  Q    You testified earlier that words matter.  And you'd

6  agree with me that the drafters did not include militias

7  or volunteer forces in 4(A)(3)?

8  A    I agree.

9  Q    And under your reading then, terms would matter if

10  somebody wanted to call their group a regular armed force,

11  then they receive protection and they don't have to worry

12  about the 4(A)(2) factors?

13  A    But it's not what "*they*" say.  It's what is de facto

14  of the case.

15  Q    De facto status?

16  A    Are they a member of armed forces of a party.  And if

17  they call themselves irregular, some irregular, some

18  special ops units, that doesn't matter what they call it.

19  It's the community's view of the contents.

20  Q    So regardless of how bad the particular group --

21  let's take the Taliban, for example, how they operate, and

22  they don't abide by the laws of war, and they're not

23  following the four factors.  But under your reading, they

24  receive coverage just as long as they profess allegiance

25  to a government or authority not recognized by the --

1   A     As long as those hostilities pertain, especially

2   those individuals who don't commit war crimes and have had

3   combatant status and that immunity.  They can't lose that

4   because of the conduct of another.  There's nothing in

5   here about the loss of combatant status or combatant

6   immunity or POW status.

7   Q     Now, you would have to -- you'd agree you'd have to

8   meet these Article 4 criteria?

9   A     If you meet that initially, yes.  For the treaty,

10  yes.

11  Q     All right.  And you'd agree with me there are several

12  authorities, including Colonel Parks, who disagree with

13  your reading in 4(A)(3)?

14  A     I'm aware of his disagreement today.  But I've

15  researched -- in my declaration I think I have 10

16  citations of people who say the Taliban should have had

17  POW status.  I'm very impressed with the Taft Memo saying

18  basically the same thing with respect to -- especially to

19  4(A)(3).  I agree with the Taft Memo.  And nothing has

20  changed in that regard.

21        THE COURT:  But didn't Taft say in his memo that not

22  every Taliban is entitled to combatant immunity, and only

23  certain types that meet certain qualifications?

24        PROFESSOR PAUST:  Your Honor, I didn't see that.

25  What I saw in the Taft Memo if you're a member.  I saw

1   membership as the criterion.  But we'd want to look at

2   that again.

3   BY MR. MIKE GILL:

4   Q     Absolutely.  If you would turn to -

5   A     It is possible that you can be an American and not a

6   member of our armed forces.

7         THE COURT:  All right.

8   BY MR. MIKE GILL:

9   Q     - 9.  Defense Exhibit 9.  If you would turn to that.

10  That's the Taft Memo.  And turn to Page 20.

11  A     Yes.

12  Q     And there at the middle of the page.  Read to

13  yourself.

14  A     That *"We have already"*?

15  Q     Yes.  *"We have already."*

16  A     Do you want me to read this out loud?

17  Q     No.  You can read it to yourself.  We referred to it

18  earlier.  It includes reference to Pictet.

19  A     Yes.

20  Q     Okay.  And you would agree with me that they're

21  talking about for 4(A)(3) that regular armed forces

22  implies *"a certain amount of organization and discipline"*?

23  Did I get that right?

24  A     Well, they're referring to Rosas and then they refer

25  to Pictet.

1  Q    And Pictet is next.  And he -- Pictet said that they

2  have all the material characteristics and all the

3  attributes of armed forces in the sense of Subparagraph 1.

4  They wear uniforms.  They have an organized hierarchy.

5  And they know and respect the laws and customs of war.

6  A    Yes.  And they're referring to 4(A)(1), not 4(A)(3)

7  there.

8        THE COURT:  But isn't that the criteria that Will

9  Taft used in drafting that opinion?

10       PROFESSOR PAUST:  Excuse me?

11       THE COURT:  Isn't that the criteria that he used in

12  giving the advice to the Department of Justice

13  interpreting whether or not the Taliban should be treated

14  as prisoners of war?  Isn't that the star he was steering

15  by at the time?

16       PROFESSOR PAUST:  He quotes this, but still says,

17  *"The Taliban military forces should also be considered*

18  *'regular armed forces' for the purposes of 4(A)(3)."*  I

19  agree with that.

20       THE COURT:  But didn't he say if they meet that

21  criteria of having the uniforms, having the structure,

22  having a command type structure; isn't that what he's

23  saying there?

24       PROFESSOR PAUST:  Well, it's curious.  He's quoting

25  Pictet 4(A)(1), and the conclusion relates to 4(A)(3).  So

 1  I don't know why he's referring to Pictet here.

 2      THE COURT:  All right, sir.  Just wanted to clarify

 3  that.

 4      PROFESSOR PAUST:  And besides, the treaty is

 5  determinative.  Not Pictet.

 6      THE COURT:  All right.

 7  BY MR. MIKE GILL:

 8  Q   And take a look at the next paragraph.  And, again,

 9  you don't need to read this out loud, but I want you to

10  read that and continue on to Page 21.  And when you're

11  done, let me know.

12  A   Do you want me to read all of 21?

13  Q   Please read over 21.  Just that paragraph.  But it's

14  important.

15  A   Yes.

16  Q   Okay.  Would you agree with me that in that paragraph

17  that the memo goes through and it analyzes for 4(A)(3) the

18  Taliban under each of the factors in 4(A)(2)?

19  A   Well, I see that they're disagreeing with the Yoo

20  opinion, and they're applying 4(A)(3).  And they're saying

21  *"that the Taliban command structure"* - I'm quoting from 20

22  - *"differed from the kinds of structure we might find in*

23  *our own armed forces, but we do not think the structure*

24  *was such as to fall outside the bounds of Article 4(A)(3).*

25  *Similarly, our experts report that Taliban soldiers did*

1  *wear uniforms and sought additional uniforms regularly,*

2  *recognizing that resources were often not available."*

3      They -- they are looking at some 4(A)(2) criteria,

4  but their conclusion is about 4(A)(3).  And I see this as

5  a sort of, even if, 4(A)(2) was relevant, Taliban meets

6  that test.

7  Q    Don't they say in here that they just don't have the

8  information at that time in 2002 to make a determination,

9  but they are not determining that they meet the criteria

10 that 4(A)(3) should apply; rather, they're just cautioning

11 the President to take a good look at this?

12 A    I don't see this memo as cautioning the President.

13 Q    Okay.

14 A    I see this as a exposition of the law.  That's what

15 the State Department legal adviser's office does.  That's

16 the job of the legal adviser, Howard Taft, IV.  And this

17 is addressing 4(A)(3), the law.  I don't see that it's for

18 any political purpose.

19 Q    Finally, sir, under your interpretation, am I correct

20 that even if the international community, every country in

21 the world, wants a particular insurgent group to stop

22 fighting, that under your interpretation if they had

23 coverage years before as a de facto government that was

24 quickly taken out, that they're covered regardless of what

25 the international community thinks?

1  A      The Taliban were never -- never lost power.  They're

2  still in power in parts of Pakistan and parts of

3  Afghanistan.  They come and go as they please.  They kill

4  U.S. soldiers still.

5  Q      Yes.

6  A      They lost Kabul, but I don't know what you're talking

7  about, actually.

8  Q      Do you maintain they --

9  A      Could you reask that question in view of the fact

10 that the Taliban were still fighting?

11 Q      Are you maintaining that the Taliban maintained a

12 government, a state authority?

13 A      No.  I'm maintaining that they had -- they were the

14 lawful government, and de facto government, when we went

15 in.  And they had combatant status and POW status from

16 4(A)(1).  They also comply with 4(A)(3), as the Taft Memo

17 conclusions support that conclusion.  And they never lost

18 that status.

19       And I think part of your question was what if every

20 country in the world wanted the fight to end.  They still

21 don't lose that status if the fighting is still

22 continuing.  They have that status.

23 Q      All right.

24 A      There's nothing in the Geneva Convention that

25 indicates that they lose their status.

1      MR. MIKE GILL:  No further questions, Your Honor.

2      THE COURT:  All right.  Very well.

3      Mr. Kamens, redirect.

4      MR. KAMENS:  Very briefly.

5      THE COURT:  I'm not going to argue with you on that.

6                    **REDIRECT EXAMINATION**

7  BY MR. KAMENS:

8  Q    Professor Paust, I have two areas of questions.  One,

9  about recognition that Mr. Gill asked you about.  And the

10  second, the duration of the international armed conflict.

11      With respect to recognition, the <u>D.O.D. Law of War</u>

12  <u>Manual</u> that was just issued states that 4(A)(3) applies

13  when military forces *"continue to fight for a*

14  *government-in-exile or for a government that has ceased to*

15  *exist."*  Do you agree with that?

16  A    Yes, as long as the fighting -- as long as they had

17  belligerent status, or above, it was a belligerency or

18  above, it's an international armed conflict.  And the

19  particular fighters at one point had combatant status and

20  combatant immunity, yes.

21  Q    It is possible to recognize a government that ceased

22  to exist?

23  A    You could subsequently recognize a government that

24  you no longer recognized at one point.  Can a government

25  exist that is not recognized as the de jure government by

1  any state?  Yes.

2  Q    My question is, 4(A)(3) can apply to -

3  A    A power.

4  Q    - a power.  And armed forces who continue to fight on

5  behalf of a government that no longer exists?

6  A    The word is *"power."*  But they do talk about a

7  government or authority.

8  Q    Government or authority.

9  A    And so the government is not required if you're an

10  authority or power under 4(A)(3).

11  Q    Is it more difficult to recognize a government that

12  has ceased to exist, even if they still have armed forces

13  fighting on the battle?

14  A    I'm sorry, again, as with the other counsel, do you

15  mean de jure recognition?

16  Q    Sure.

17  A    Because there are -- I mean, it is possible to not

18  have de jure recognition as the government of the state,

19  and so the fighting continues.  Yes.

20  Q    But it's certainly difficult from the perspective of

21  de jure recognition to recognize a government that no

22  longer exists, is that right?

23  A    Well, yes.  As a matter of --

24  Q    And so the fact that 4(A)(3) can apply even when it's

25  impossible to give de jure recognition, doesn't that

1   suggest that the recognition of the fighting force as a de

2   jure matter doesn't determine whether 4(A)(3) applies?

3   A     The de jure recognition certainly doesn't.   It's

4   the -- again, what drives the application of laws of war

5   is the de facto existence of the conflict.   And what

6   drives as belligerency is these de facto criteria.

7   Q     When you say *de facto,* you mean facts on the

8   ground?

9   A     Yes.

10  Q     The fighting continues?

11  A     Yes.

12  Q     Still an armed conflict?

13  A     Yes.   It has the nature that it started with.

14  Q     All right.   The second thing --

15  A     Unless we're down to three soldiers.

16  Q     Unless you're down to three soldiers.

17  A     Yes.

18  Q     So, for example, in World War II there were still

19  some Japanese soldiers fighting even after the conclusion

20  of peace.   There was no armed conflict in that

21  circumstance, correct?

22  A     You're correct.

23  Q     That's not the case in Afghanistan?

24  A     That's certainly not the case in Afghanistan.

25  Q     Everybody agrees there's still an armed conflict?

1  A    I think everyone knows there's a war that still

2  continues.

3  Q    Let me ask you about duration of armed conflict.

4  This is the last area of my questioning.

5       Under Article 2, duration of an international armed

6  conflict under Article 2, the fact that 4(A)(3) of the

7  Geneva Convention III applies even when fighting on behalf

8  of a government that doesn't exist, does that suggest that

9  the change in government doesn't affect the determination

10 of whether the international armed conflict still exists?

11 A    Yes.  In fact, you interpret a treaty in view of like

12 Article 4(A)(3) speaks to a power and an authority, for

13 example.  That's quite important to read that in

14 connection with common Article 2 as opposed to common

15 Article 3 that talks about an insurgency in one country,

16 for example.

17      Yes.  You read these provisions together.  Yes.

18      THE COURT:  Which two provisions, Professor?

19      PROFESSOR PAUST:  He's talking, Your Honor, about

20 common Article 2.  If we have an interpretive question.

21      THE COURT:  That's 4(A)(2), right?

22      PROFESSOR PAUST:  No.  I'm sorry.  Common Article 2,

23 which is the trigger for the type of conflict from its

24 Conventions.

25      THE COURT:  Okay.  I understand.

1          PROFESSOR PAUST:  And his question is does 4(A)(3),

2   when it refers to a power or an authority, is that

3   relevant as an interpretative set of textual materials, or

4   interpretation of another part of the treaty.

5          Yes, as a matter of international law, you look at

6   the various provisions in light of the object and purpose

7   of the treaty, et cetera.

8   BY MR. KAMENS:

9   Q    And so for purposes of common Article 2, Article 2 of

10  the Geneva Convention of 1949, it applies or it's

11  triggered or there's a *"trip wire,"* as Colonel Parks says,

12  when there's conflict between two state actors, is that

13  right, that arises?

14  A    Between two state -- the armed forces of two state

15  parties, yes, that's the first trigger.  The second is

16  occupation.  The third is this power.

17  Q    And that conflict that has arisen remains an

18  international conflict until when?

19  A    The fighting stops.

20  Q    The fighting stops?

21  A    Until then.  Yes.

22         MR. KAMENS:  Nothing further.

23         THE COURT:  All right.  May the Professor be excused?

24         MR. MIKE GILL:  Yes, Your Honor.

25         THE COURT:  Mr. Kamens?

REDIRECT EXAMINATION OF PROFESSOR PAUST   297

1        MR. KAMENS:  Absolutely, Your Honor.

2        THE COURT:  Professor, you're excused and free to go,

3  sir.  Thank you very much for coming in.  We appreciate

4  your testimony.

5        PROFESSOR PAUST:  Thank you.

6                      **WITNESS STOOD ASIDE**

7        THE COURT:  Gentlemen, if your yellow pad has as many

8  notes as mine, I'm sure you want to collect your thoughts

9  before you wish to argue this.  So my plans are to conduct

10  argument of this at 9:00 a.m. tomorrow morning.

11       Mr. Kamens?

12       MR. KAMENS:  That's fine, Your honor.

13       MR. MIKE GILL:  That would be great, Judge.  Thank

14  you.

15       THE COURT:  Okay.  That's fine.

16       And then we'll proceed with the other motions.  With

17  respect to the other motions, will there be any additional

18  evidence put on by either side?

19       MR. WAGNER:  No, Your Honor.

20       MR. MIKE GILL:  No, Your Honor.

21       MR. PAUL GILL:  Judge, I may have literally one

22  document.  It's declassified notes on someone's statement

23  with respect to the --

24       THE COURT:  But no live witnesses?

25       MR. PAUL GILL:  No live witnesses.

1    THE COURT:  Okay.

2    Mr. Gillis?

3    MR. GILLIS:  As we discussed, Your Honor, we do have

4    some exhibits to introduce.  But, no, we have no live

5    witnesses.

6    THE COURT:  All right.  So things should move much

7    more quickly, I believe, than today.  We should easily

8    finish tomorrow.

9    MR. GILLIS:  Yes, Your Honor.

10    MR. PAUL GILL:  Yes, sir.

11    THE COURT:  All right.  Very well, then.

12    The Court will stand in recess until tomorrow morning

13    at 9:00.  I'll hear final arguments on these two motions,

14    and then proceed into the others.

15    We'll stand in recess until then.

16    (The proceeding concluded at 5:24 p.m.)

17    REPORTER'S CERTIFICATE

18    I, Krista Liscio Harding, OCR, RMR,
Notary Public in and for the Commonwealth of
19    Virginia at large, and whose commission expires
March 31, 2016, Notary Registration Number 149462,
20    do hereby certify that the pages contained herein
accurately reflect the notes taken by me, to the
21    best of my ability, in the above-styled action.
Given under my hand this 10th day of July, 2015.

22

23    _____
Krista Liscio Harding, RMR
Official Court Reporter

24

25