1             UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2                Richmond Division

3  UNITED STATES OF AMERICA    }
                         }
4  v.                  }   Criminal Action No.
                         }   3:14 CR 140
5  IREK ILGIZ HAMIDULLIN      }
  a/k/a IREK ILGIZ KHAMIDULLAH  }

6

                        June 18, 2015
7

8        **COMPLETE TRANSCRIPT OF MOTIONS**
     **BEFORE THE HONORABLE HENRY E. HUDSON**
      **UNITED STATES DISTRICT COURT JUDGE**

9
  APPEARANCES:
10
  Michael R. Gill, Esquire
11 James P. Gillis, Esquire
  Jennifer E. Levy, Esquire
12 OFFICE OF THE UNITED STATES ATTORNEY
  600 East Main Street, Suite 1800
13 Richmond, Virginia  23219

14     Counsel on behalf of the United States

15
  Robert J. Wagner, Esquire
16 Geremy C. Kamens, Esquire
  Paul G. Gill, Esquire
17 OFFICE OF THE FEDERAL PUBLIC DEFENDER
  701 East Broad Street, Suite 3600
18 Richmond, Virginia  23219

19 and

20 Claire G. Cardwell, Esquire
  STONE CARDWELL & DINKIN PLC
21 101 Shockoe Slip, Suite K
  Richmond, Virginia  23219
22
     Counsel on behalf of the Defendant
23

24        KRISTA L. HARDING, RMR
       OFFICIAL COURT REPORTER
25      UNITED STATES DISTRICT COURT

1      (The proceeding commenced at 9:03 a.m.)

2      THE COURT:  Good morning.

3      MR. MIKE GILL:  Good morning.

4      MR. WAGNER:  Good morning.

5      MS. CARDWELL:  Good morning.

6      THE COURT:  When we recessed yesterday, we had heard

7  all the evidence concerning the motion to dismiss, and I

8  deferred until this morning for final argument on that

9  motion.  And then we'll proceed to the other issues in the

10 case.

11     In the course of your argument, I would like for

12 you-all to try to focus on what exactly is the standard

13 this Court should employ in determining whether or not

14 this defendant is a lawful or unlawful enemy combatant

15 entitled to immunity.  We've heard a great deal of

16 testimony from many many scholars and folks who have read

17 a great deal in this field, but an awful lot of the

18 debate, as well as the treatises that have been published

19 and offered, are rather heavily infected by public policy,

20 political and academic arguments.  This Court has got to

21 decide whether or not -- or what body of law actually

22 controls the decision in this case.

23     My review of almost every published case I can find

24 confirmed that this is somewhat of a clouded area.  Murky

25 at best.  So I'm anxious to hear from counsel.

1      Mr. Kamens, I believe you're the movant, so you go

2 right ahead, sir.

3      MR. KAMENS:  Thank you, Your Honor.

4      Your Honor, I'd like to start by talking about the

5 issues that are before the Court on our motion to dismiss.

6 And I'll discuss specifically what I believe are the

7 standards by which I believe the Court can evaluate these

8 issues.

9      THE COURT:  All right.

10      MR. KAMENS:  There are three sets of arguments that

11 we make in our motion, this first motion to dismiss.  The

12 first is statutory.  That is with respect to Counts 3 and

13 4, which charge violations of 18 U.S.C. 32.  And Counts 11

14 and 12, charging violations of 18 U.S.C. 2332(c), whether

15 they were intended to apply in the context of armed

16 conflict.  We suggest that the remaining counts

17 incorporate the common law justification defense, but we

18 have moved to dismiss 3, 4, and 11 and 12 on the basis

19 that those statutes were not intended by Congress to apply

20 to armed conflict.  That is simply a question of statutory

21 interpretation.

22      The second issue to be raised is with respect to the

23 common law public authority defense, and whether that

24 common law defense precludes criminal liability in this

25 case.  That issue depends upon this Court's evaluation of

1  whether undisputed facts, and the allegations in the

2  indictment, are sufficient to find that the defense

3  applies.  If the Court believes that there are material

4  facts in dispute, then the Court cannot rule on that issue

5  and must reserve it for trial.

6      The third issue, which is the issue that much of the

7  testimony --

8      THE COURT:  And the material fact, which I'm sure

9  you're going to argue is in dispute, is whether or not

10  there is any body that is a lawful authority that can

11  provide him with the justification for the actions he

12  took, is that correct?

13     MR. KAMENS:  We believe that --

14     THE COURT:  You've got to have lawful authority in

15  order to invoke that defense.  And you're going to argue

16  that the evidence that you presented provides a basis for

17  me to find there was a lawful authority, is that right?

18     MR. KAMENS:  It is.  But let my say that lawful

19  authority, for purposes of the public authority defense,

20  is different than lawful authority under international

21  law.  And I'll discuss that in terms of the law below.

22     THE COURT:  Okay.

23     MR. KAMENS:  But they are not the same standard.

24     THE COURT:  All right.  Go ahead.

25     MR. KAMENS:  The third issue, which is the issue that

1  the experts testified about, is whether the defendant in
2  this case is entitled to combatant privilege pursuant to
3  the Third Geneva Convention.  I believe that that is --
4  the question of the application of the Geneva Convention
5  is an issue of law that is decided by the Court *de novo*.
6  There is no particular standard other than that the Court
7  has to evaluate the facts of the circumstances in
8  Afghanistan.  So it is slightly different than the
9  standard that the Court applies in terms of common law
10  public authority defense.
11      THE COURT:  And you don't think that's a political
12  question?
13      MR. KAMENS:  I do not.  It has not been held to be a
14  political question.  It is an issue, I will say this, that
15  came up in the case of *Hamdi v. Rumsfeld*, which is an
16  individual who was detained in this district, and held as
17  an enemy combatant.  And the government's -- one of the
18  government's principal arguments was that Article II of
19  the Constitution gives the President the power to
20  determine who is an enemy combatant.
21      The Supreme Court, and I'm trying to count, I think
22  seven -- eight of the justices determined that it is not a
23  political question.  That it would violate the separation
24  of powers to give that determination solely to the
25  President that the legality of detention is something that

1  must be determined not simply by one branch of government,

2  but is certainly province for the courts.  We are here in

3  a slightly even more --

4      THE COURT:  That was a 2255, was it not?  A habeas?

5      MR. KAMENS:  It was.  And it was a habeas challenging

6  military detention.  We are in an even more aggressive

7  posture with respect to the authority of this Court to

8  evaluate the application of the defense.  And that's

9  because this is a criminal case.

10     So in the case of Mr. Hamdi, he was being held by the

11  military outside the confines of an Article III Court,

12  outside the confines, according to the government's view,

13  of any court system.  And they argued that in that

14  context, Article II precluded judicial review.  And the

15  Court rejected it, even in the extreme context of the

16  seizure of a so-called enemy combatant on the field of

17  battle.

18     Here the government has itself brought the defendant

19  into this courtroom, an Article III courtroom, brought his

20  case before this Court, and therefore there should be no

21  question about this Court's authority to address the

22  defenses that we have raised.

23     One issue that is in the papers is whether the Geneva

24  Convention is judicially enforceable.  It has been --

25     THE COURT:  I noted in the *Noriega* case there was a

1   dissent by Thomas and Scalia on that point.  Not that they

2   took a position, but merely to say that the Court should

3   reach the issue.

4        MR. KAMENS:  And we have cited a number of

5   authorities which we believe are persuasive that suggest

6   that this Court can apply international law as a rule of

7   decision in this case.  And, actually, I don't think it's

8   been of much dispute.  The government has one footnote, in

9   which we've distinguished in our reply.  But everybody has

10  been operating, at least in the course of this courtroom,

11  on the assumption that the Geneva Convention is judicially

12  enforceable, and that it can be applied as a rule of

13  decision.

14       Let me address first the statutory issues briefly.

15  These are relatively simple issues.  18 U.S.C. 32

16  prohibits efforts to destroy aircraft.  And 18 U.S.C.

17  2332c prohibits assault.  Both describe conduct that is

18  commonplace in war.  Neither statute expressly recognizes

19  any justification in the text.  And so the question arises

20  whether they were intended by Congress to apply it all in

21  the context of armed conflict.

22       With respect to 18 U.S.C. 32, the clear answer is no.

23  The legislative history reveals that the expansion in 1984

24  to encompass military planes had nothing to do with

25  describing attacks in wartime.  The office of the legal --

1  the Office of Legal Counsel has determined in a memorandum

2  that 18 U.S.C. 32(b) was not meant to apply in armed

3  conflict.  And there's no reason to believe that that

4  reasoning shouldn't apply to 32(a) as well.

5      2332(c) prohibits physical violence to U.S.

6  nationals.  It likewise should not be construed to be

7  applied in armed conflict, because it makes no sense to do

8  so.

9      The United States Criminal Code cannot outlaw war.

10 There's been no particular testimony on these issues, but

11 Defendant's Exhibit 12 on Page 12, this is the excerpt

12 from the <u>Department of Defense's Law of War Manual</u>, which

13 was just issued on Friday.  The excerpts specifically

14 note, and I'm quoting from Page 12, *"Certain domestic*

15 *statutes have been interpreted not to apply to situations*

16 *addressed by the law of war because such intention was not*

17 *made clear and unequivocal."*

18     INTERPRETER:  When you read something, please read

19 slowly.  Thank you.

20     THE COURT:  Yes, ma'am.

21     Go ahead.

22     MR. KAMENS:  I'm sorry.  I'll read that again.

23     The quote is, *"Certain domestic statutes have been*

24 *interpreted not to apply to situations addressed by the*

25 *law of war because such intention was not made clear and*

1  *unequivocal."*

2  The footnote cites to the OLC's memorandum discussing

3  18 U.S.C. 32(b).

4  We suggest that these statutes --

5  THE COURT:  Is that 32(b) or 32(d)?

6  MR. KAMENS:  It's 32(b), as in boy.

7  THE COURT:  Okay.

8  MR. KAMENS:  We suggest that these statutes were

9  never meant to apply to armed conflict.

10  The second issue with respect to this first motion is

11  the common law public authority defense.  As we've noted

12  in the papers, criminal law treatises, case law, and the

13  model penal code, recognize a common law defense for

14  conduct on behalf of a party in an armed conflict.  As

15  we've noted, Wharton's criminal treatise, *"In time of war,*

16  *acts done under the authority of the enemy or insurgent*

17  *government do not support criminal liability, except that*

18  *the actor may be captured and treated as a prisoner of*

19  *war, and may also in an appropriate case be convicted of*

20  *espionage or treason."*

21  This is not the same as the issue of the application

22  of combatant immunity under the Geneva Conventions.  The

23  OLC memo regarding drone strikes discussing this defense

24  addresses its application not just for the military, but

25  in the context of a non-international armed conflict

1  against al-Qaeda by persons who don't belong to the

2  military.

3      In other words, the defense does not depend upon

4  international law.  The protection from criminal and civil

5  liability under U.S. common law that is derived from the

6  Supreme Court case in *Dow v. Johnson*, extends even to

7  civilians who act at the direction of an insurgent

8  government, even though the international law would give

9  no immunity to such persons.  The Dow Immunity Doctrine

10  that the laws of the enemy do not apply to the acts of

11  soldiers in an armed conflict applies to both sides.  We

12  have listed on Pages 14 and 15 of our motion a number of

13  cases that rely on *Dow* in holding that foreign laws do not

14  apply to U.S. soldiers in armed conflict overseas.

15      These cases demonstrate that Dow Immunity remains a

16  viable defense.  It's not simply a 19th Century antiquated

17  doctrine.  But *Dow* itself said that its principle of

18  non-liability to the tribunals of the invaded country for

19  acts of warfare, was as applicable to Confederate soldiers

20  as it was to Union soldiers.  In other words, this is not

21  a one-way doctrine that only benefits one side of a

22  conflict.

23      THE COURT:  Do I understand your argument,

24  Mr. Kamens, that under the holding in *Dow*, and the cases

25  it interpreted, that the common law authority that you're

 1  citing would include civilians as well as military

 2  personnel that are acting under directions from a military

 3  authority, is that correct?

 4      MR. KAMENS:  That's right.  There are two conditions.

 5      THE COURT:  Well, see, under your argument, every

 6  terrorist in the United States that detonates a bomb, and

 7  says they've become a member of the Taliban, can't be

 8  prosecuted.  Is that your argument?

 9      MR. KAMENS:  No, sir.  And that would not be a viable

10  act under the law of war.  That would be an attack on

11  civilians, and would violate the law of war.

12      THE COURT:  All right.

13      MR. KAMENS:  There are two conditions.

14      THE COURT:  So if your client attacks civilians in

15  Afghanistan, as some of this evidence shows, that would

16  not be a lawful act of war, is that correct?

17      MR. KAMENS:  Absolutely not.  That's correct.

18      THE COURT:  Okay.

19      MR. KAMENS:  He would be subject to prosecution for a

20  violation of the law of war for attacking civilians.  And

21  secondly, he would not be entitled to this defense, public

22  authority.

23      THE COURT:  Okay.

24      MR. KAMENS:  It applies under two conditions.  The

25  conditions are, one, there is a belligerency - that is, an

1   armed conflict.

2        And two, the defendant must be acting on behalf of an

3   insurgent government, or the other side, fighting against

4   the insurgent government.   Those are the two conditions.

5        However, the conduct, and it is focused on the

6   conduct itself, must be consistent with the law of war.

7   That is, it must be against a military target.   It cannot

8   be a violation of the law of war.

9        And the discussion in the OLC's drone memo is very

10  clear on this.   Even though the civilian employees of the

11  United States government that exercise drone strikes are

12  not entitled to POW status because they are not part of

13  the military, their conduct, the actual conduct, that

14  they've engaged in is not in violation of the law of war.

15  And for that reason, they are entitled to this defense.

16       Colonel Parks said that the Third Geneva Convention

17  is the governing law with respect to prisoners of war.

18  And that is true as a matter of international law.   But he

19  was not admitted, and could not be admitted, as an expert

20  on domestic law.   There is nothing in the Geneva

21  Conventions that says our domestic common law cannot give

22  greater civil and criminal protections to those that act

23  on behalf of an insurgent government, particularly given

24  our history, than does international law.

25       In this case, the testimony is undisputed that in

2009 the Taliban were the deposed government of

Afghanistan.   It continued to engage in government and

military operations.

    Barclay Adams, the government's first witness,

testified that in 2009, Mullah Omar was the undisputed

leader of the Taliban.   There was a senior governing

committee, called a Shura, with various subcommittees.

There were provincial and district commanders.   And he

testified that the Taliban affected cohesive command and

control in southern Afghanistan, while their control in

the west and northeast of the country was less well

defined.

    Mr. Dempsey agreed that the Taliban continue to

exist.   That they continue to engage in armed conflict in

Afghanistan.   It is also clear that the Taliban have not

been designated as a foreign terrorist organization.

    I think, just as an aside, it may be possible for the

government to foreclose the application of this common law

defense if the government were to say this organization is

a terrorist organization.   That has not been done with

respect to the Taliban.   And I think it has not been done

for a particular reason, that is, because in the 14 years

that we have been engaged in conflict, we have never

prosecuted any non-American Taliban soldier in an Article

III Court because they are the former government of

1  Afghanistan, and the U.S. government wants to preserve the

2  ability to negotiate with the Taliban a peace in that

3  country.

4       They are a party to a belligerency, and because the

5  allegations are that Mr. Khamidullah acted on their behalf

6  against military targets, the public authority defense

7  precludes criminal liability.  Again, this is not summary

8  judgment.  If the Court disagrees that the undisputed

9  facts support this defense, then the application of the

10 defense must be decided by the jury.

11      The last issue raised in this motion is the

12 application of the Third Geneva Convention of 1949.  As I

13 mentioned in the history of our conflict with Afghanistan,

14 we have never prosecuted a non-American in an Article III

15 Court for --

16      THE COURT:  Let me back you up a bit here.  The issue

17 of whether or not common law authority applies, I have not

18 seen in my reading, and perhaps you have, any cases in

19 which this issue has ever been presented to a jury.  Did I

20 miss something?

21      I mean, I understand where you're coming from.  But I

22 don't know that in application it has ever been left to a

23 jury to make that decision.

24      MR. KAMENS:  There is one case, and I will certainly

25 try to research this issue, but there is one case that

1   comes to mind, and that is the case that is cited in

2   William Winthrop's military precedence and treatise.  And

3   he talks about a case, and it is from the 1800s, but

4   against a Indian Chieftain.  And in that case, the

5   Chieftain, who was accused of murder, was found not

6   guilty.  And it was presented to a jury.  It is clear, in

7   that case, that in a federal court that the issue of

8   immunity from prosecution was submitted to the jury.

9        THE COURT:  All right.

10       MR. KAMENS:  And that --

11       THE COURT:  You know of nothing more -- I mean, we

12  can brush the dust off of that case and have a look at it,

13  but I don't know anything in the more contemporary context

14  of the law where that issue has been presented to a jury.

15  If you can find a case, please let me know.

16       MR. KAMENS:  Well, let me say this, the public

17  authority defense is a run-of-the-mill common law defense.

18  It is something that is submitted --

19       THE COURT:  Well, if it's run-of-the-mill, how come

20  it's never been presented to a jury?

21       MR. KAMENS:  It has been submitted to a jury, I'm

22  sure, many many times in the ordinary context of a

23  defendant who says I am not guilty because I acted at the

24  behest of law enforcement.  That is the typical context in

25  which the public authority defense arises in federal

1  cases.  And so just like any other common law defense,

2  self-defense, or any other, it is an issue to be decided

3  by the jury.

4      Now, this undeniably is a unique context.  But the

5  question of whether this common law defense is a jury

6  question or a legal question, should be no different than

7  the way the Court ordinarily determines any other common

8  law defense, such as self-defense.  Those are issues that

9  are presented to a jury in the ordinary course of a

10  criminal trial.  We have raised it as a motion to dismiss

11  on the basis that in a very narrow set of circumstances,

12  the Court has the power to rule and dismiss an indictment

13  if the facts are undisputed on the material issues.

14      And the government doesn't take any issue with that.

15  I think what they argue is that the defense doesn't apply.

16  But the question for the Court is, are there material

17  issues of fact that are undisputed that support that the

18  defendant is alleged in the indictment to fight on behalf

19  of an insurgent government in an armed conflict, and

20  against military targets in ordinary armed conflict.

21      If those facts are undisputed, then the Court has the

22  power to dismiss the indictment.  If they are not, the

23  Court must reserve the issue and have the jury decide.

24      The last issue is with respect to the application of

25  the Geneva Conventions.  As Professor Parks testified, one

1  reason for affording -- I'm sorry.  Paust.  As Professor

2  Paust testified, one reason for affording the Geneva

3  Conventions and POW status to our enemies is for the

4  protection of our own troops in this conflict, and in

5  conflicts to come.  The application of POW status under --

6      THE COURT:  But I think the testimonials -- or the

7  testimony also revealed that the methodology employed by

8  the U.S. troops is a little more orthodox than the Taliban

9  do.

10      MR. KAMENS:  I would certainly agree with that.

11      THE COURT:  And much more consistent with 4(A)(2) in

12  their operations, their presentation, et cetera.

13      MR. KAMENS:  I'll address that.

14      THE COURT:  Go ahead.

15      MR. KAMENS:  And I understand that that is a

16  significant issue in the Court's mind.

17      THE COURT:  It is.

18      MR. KAMENS:  The application of POW status under what

19  I'll call is the GPW, the Third Geneva Convention, turns

20  on two questions.  First, did the conflict remain an

21  international armed conflict in 2009?

22      And two, do the conditions listed under Article

23  4(A)(2) of the GPW apply to 4(A)(1) or 4(A)(3)?

24      The government argues that the international conflict

25  ended with the installation of the Karzai government.  The

1 premise of that argument is that the Karzai government was

2 legitimate, it expressed the will of the people, and that

3 ended the international armed conflict between the United

4 States and the Taliban.

5       The problem with this argument is that there is no

6 *"will of the people"* exception to demonstrate the end of

7 an international armed conflict.  There is no language in

8 the GPW to support the argument.

9       The testimony from the experts in response to the

10 question where -- and I'm referring specifically to

11 Professor Paust.  Where in the GPW does it say that an

12 international armed conflict ends once a government, the

13 international community recognizes, is installed?  He said

14 there is no provision.  There is no provision of the GPW

15 that says that the election of a new government ends the

16 international armed conflict between an invading power and

17 the old government as long as hostilities continue.

18       Article 2 says an international armed conflict, that

19 those rules apply to any conflict that arises between two

20 states.  It did not use the word any conflict that is

21 conducted between two states.  The armed conflict must

22 arise at the beginning between two states.  And the rules

23 apply to any conflict thereafter that is related to that

24 initiation of conflict.

25       THE COURT:  And you believe that the Taliban qualify

1  as a State because they were recognized by three

2  countries, even though that was revoked in 2001?

3       MR. KAMENS:   The question for purposes of Article 2

4  is not about recognition.   It is about de facto government

5  status.   And so while it is true that Professor Paust and

6  the Taft Memo say that they are effectively a government

7  in part because they were recognized by three countries as

8  the de jour government.   The real question here is were

9  they the de facto government?   And there should be no

10  dispute about that.

11       Mr. Adams testified that they had rapidly seized

12  control of Afghanistan in 1994.   That they effectively

13  control the -- up to 90% of the territory of Afghanistan

14  between 1994 and 2001.   Mr. Adams testified, as I recall,

15  that they were the de facto government of Afghanistan.

16  And that is the operative question.

17       Article 2, as I mentioned, applies the rules of

18  international armed conflict to a conflict that arises

19  between two states.   Colonel Parks describes this

20  provision as a *"trip wire."*   Those are his words.   The

21  U.S. amicus brief submitted in the *Tadic* litigation said

22  the same thing.   That once the provision is triggered, it

23  applies to the entirety of the conflict.

24       Article 4(A)(3) applies to armed forces --

25       THE COURT:   Back up one frame here.   You were just

1    speaking of 4(A)(2), correct?

2        MR. KAMENS:  I was speaking of Article 2.  Common

3    Article 2.

4        THE COURT:  Common Article 2.  Okay.

5        MR. KAMENS:  Common Article 2 defines when an

6    international armed conflict has arisen.

7        4(A)(2) is one of the provisions that defines who is

8    entitled to prisoner of war status.

9        4(A)(3) applies POW status to armed forces fighting

10   on behalf of a government that no longer exists, or a

11   government in exile.

12       THE COURT:  I don't want to interrupt you, but the

13   Colonel indicated that that is only applicable in a

14   situation - I believe it was the Colonel that testified to

15   this - when they agreed to embrace all the rules of war

16   promulgated by the Geneva Convention.  Is that correct?

17       MR. KAMENS:  No.

18       THE COURT:  Do you disagree with that?

19       MR. KAMENS:  I do.  There are two conditions under

20   4(A)(3) by which the deposed government can be entitled to

21   be considered an authority for purposes of 4(A)(3).  One

22   is if they say we will accept and adopt all the rules of

23   international law.  But the other is whether they purport

24   to represent the interests of the High Contracting Party.

25       And so I believe it is on Page 20 of the Taft

1  Memorandum where the memo concludes that the Taliban

2  consider themselves to represent the legitimate government

3  of Afghanistan.  And that is the only condition that needs

4  to be applied.

5       THE COURT:  Has any court ever set a standard for

6  what would be necessary in order for a court to find that

7  they legitimately purport to represent the governing

8  authority?  In other words, any one individual can kind of

9  take the view that I'm the king.  What is the standard

10 there?  How do you measure that?

11      MR. KAMENS:  I think it is a question of fact that

12 the Court decides based on the testimony that we have

13 heard.  The testimony that we have heard is that this is

14 not a fly-by-night situation.  This is a deposed

15 government that continues to operate in exile that has

16 ministries, that has shadow governors, that has military

17 force.  And so it -- it should not be a question of great

18 dispute with respect to this entity.

19      And let me say this, the Court should have no fear

20 that this determination with respect to Taliban would

21 somehow legitimate armed forces around the world.  We are

22 dealing with a very unique circumstance of a deposed

23 government that has continued to engage in armed conflict

24 for the last 14 years with a military with government

25 institutions.

1    But the fact that it has continued for this long

2  should not distract the Court.  It does not matter for

3  purposes of 4(A)(3) whether we are making this

4  determination in 2003 or 2009 or 2011.  The question is

5  has the armed conflict that began between the state

6  actors, has that continued, or have hostilities ceased?

7    So the rule is that POW status is afforded to the

8  armed forces of a deposed government as long as

9  hostilities continue.

10    THE COURT:  And you contend that that applies

11  irrespective of whether or not they agree to be bound by

12  the other provision of the Geneva treaty governing laws of

13  war?  In other words, if they want to go out and massively

14  slaughter citizens, they're still going to be treated as

15  combatants entitled to all the privileges appertain?

16    MR. KAMENS:  Let me say this, they would be subject

17  to prosecution for violations of the laws of war.  But the

18  application of 4(A)(3) and Geneva Conventions is not

19  designed to simply apply to governments that we like, or

20  to governments that -- and not apply to governments that

21  we don't like.  There were many things that occurred by

22  the German government, by the Japanese government, that

23  are abhorrent to everyone in the courtroom.  That does not

24  mean that in the aftermath of that conflict that the 1949

25  Convention wouldn't have continued to apply to the

1 soldiers of those governments.  It is not a matter of

2 moral determination about whether the law of armed

3 conflict authorizes a particular combatant to receive POW

4 status.

5     That is, we do not have a moral litmus test with

6 respect to the question of whether the Taliban constitute

7 an authority for purposes of 4(A)(3).  There is absolutely

8 no doubt that --

9     THE COURT:  In that context though, Mr. Kamens, you

10 had soldiers who were much more regimented.  They were in

11 uniform.  They were under command.  And to apply that

12 theory to a band of insurgents, so to speak, who profess

13 some affiliation with the Taliban; does that model fit as

14 well here?

15     MR. KAMENS:  The question is whether the armed forces

16 of the Taliban are entitled to GPW status.  It is a fact

17 question of whether a particular combatant is actually a

18 member or the armed forces of the Taliban.  It hasn't

19 particularly come up as an issue here.  It hasn't been

20 raised as a factual question, I think, because the

21 indictment itself alleges that Mr. Khamidullah was a

22 follower of Mullah Omar.  That he was affiliated with

23 Taliban forces.  That he received the authorization of the

24 regional Taliban commander and post to engage in the

25 alleged attack.

1        So there hasn't been much of a question of whether

2   Mr. Khamidullah, based on the undisputed facts, is

3   actually eligible to be considered as a member of the

4   armed forces of the Taliban.  In another case, it is

5   certainly true that an individual who engages in freelance

6   violence without --

7        INTERPRETER:  Please slow down.

8        MR. KAMENS:  It is certainly true in other contexts

9   that a person who is unaffiliated, or only loosely

10  affiliated with an authority, that they would not be

11  entitled to POW status.  Or if they were -- and I'll leave

12  it there.

13       The second issue that the Court is alluding to is

14  whether the Taliban are precluded from POW status because

15  many don't wear uniforms, and because of the examples of

16  law of war violations committed by the Taliban.

17       THE COURT:  And the lack of typical regimentation and

18  command structure you would normally affiliate with a

19  military body.

20       MR. KAMENS:  Well, I think the testimony on command

21  structure has been less robust than the other testimony.

22  The information that we have is that this government --

23  this government in exile has successfully engaged in armed

24  conflict with the most powerful country in the world for

25  the last 14 years.  The Taft Memo describes a very

1  effective fighting force.   It is certainly much more

2  decentralized than our own U.S. military.   But that is not

3  the test for purposes of the 4(A)(2) command structure

4  element.

5      We have heard testimony from Mr. Adams about the code

6  of conduct issued by the Taliban.   But Mr. Adams said

7  there's no evidence that parts of the code were designed

8  to ensure respect for civilians and combatants was

9  actually being followed on the ground.

10      If that's true, then the government can't point to

11  other portions of that code about blending in with

12  civilians or about suicide bombings, to say that those

13  provisions reflect how the Taliban actually act.   That is,

14  the government can't pick and choose the elements of this

15  code and say the Taliban aren't really following it in

16  some respects, but other respects show that they

17  absolutely are not entitled to any benefit of the Geneva

18  Conventions.

19      It is important to point out that, as the government

20  admitted, there is no evidence that Mr. Khamidullah

21  himself was involved in violations of the laws of war.

22  This is not a military tribunal in which the government is

23  seeking to prosecute him for violations of law of war.

24  And you cannot decide that he is not entitled to POW

25  status because of the actions of others.

1    As noted in Footnote 33 of the Taft Memo, *"It is well*
2  *understood in the law of war that the commission of*
3  *violations of the law of war by one, some or many members*
4  *of an armed force do not thereby implicate the status of*
5  *all of the members of such armed forces."*

6    He is presumed to be a POW under Article 5 of the
7  GPW, and is entitled to protections until a competent
8  tribunal decides otherwise.  So the question before the
9  Court is whether the criteria of 4(A)(2) apply to the
10 regular forces covered by 4(A)(3).  The text itself does
11 not apply those criteria.

12   Let me also read from what Colonel Parks says in his
13 article on Page 509 in the Chicago Journal of
14 International Law entitled "Special Forces' Wear of
15 Non-standard Uniforms."  It is contained in Tab 14 of the
16 defendant's exhibits.  *"While history, the negotiating*
17 *history of article 4 and predecessor treaties, other*
18 *provisions in the GPW, and recognized experts strongly*
19 *suggest that regular force combatants are entitled to*
20 *prisoner of war status once they are identified as members*
21 *of the regular forces (however attired when captured),*
22 *other experts argue that the 4(A)(2) criteria are*
23 *prerequisites for prisoner of war status for regular force*
24 *personnel as well as militia members."*

25   And Colonel Parks has a footnote.  It is to an

1   article.  It says, *"In International Law and the War on*

2   *Terrorism, Professor Yoo and Professor Ho argue that the*

3   *four criteria contained in Article 4(A)(2), GPW are*

4   *prerequisites to prisoner of war status for regular force*

5   *combatants.  That view is not consistent with Articles 5,*

6   *85 and 93 of the GPW or the negotiating history of the*

7   *four criteria."*

8        So Colonel Parks has not been consistent on this

9   issue.

10        THE COURT:  But isn't there a significant difference,

11  Mr. Kamens, between a military that as a matter of policy

12  does not wear an emblem or a uniform and a special

13  operator on specific assignment that may have his or her

14  identity camouflaged for the purpose of that assignment;

15  isn't there a material difference there?

16        MR. KAMENS:  Potentially there could be.  However,

17  the only policy that we've heard is the code that the

18  government submitted.

19        THE COURT:  But we've got to use some common sense

20  too, do we not?

21        MR. KAMENS:  Absolutely.

22        THE COURT:  Okay.

23        MR. KAMENS:  And one of the common sense principles I

24  would suggest that the Court apply is the one that was

25  applied to Confederate soldiers in the Civil War.  And

1  that if there are not resources by which a combatant has

2  the funds to purchase a uniform, that will not preclude

3  the application of prisoner of war status.

4       And in the Taft Memo, one of the questions is, is

5  this for purposes of the person who's being accused with a

6  crime?  Is this a question of policy or a question of

7  resources?  The Taft Memo suggests that certainly with

8  respect to individual members --

9       THE COURT:  Well, Mr. Kamens, having served myself in

10 the Executive Branch of government many times, I have --

11 there's a lot of policy infected in Mr. Taft's opinion in

12 that memo.  I think you would agree with that.

13      MR. KAMENS:  I believe -- I agree with Professor

14 Paust that it is a legal memo.  That it addresses legal

15 issues.  I think the politics are reflected in the OLC's

16 memo that the government also submitted by Judge Bybee,

17 and written by Mr. Yoo.

18      And the quotation that I read to Colonel Parks was

19 with respect to the President's February 7, 2002, order.

20 And he agreed that the argument submitted by OLC in

21 support of those determinations were political and not

22 legal.  I don't think the same can be said of the Taft

23 Memo, which, as Colonel Parks said, was written by his

24 late friend who was a well-recognized expert in the area

25 of international law, and had extensive experience in the

1  law of war.

2       THE COURT:  Okay.

3       MR. KAMENS:  Professor Paust is absolutely clear on

4  this issue.  The criteria in 4(A)(2) do not apply to

5  regular armed forces for a state actor, or for a

6  government or authority not recognized by the detaining

7  power.

8       The Court should also look to Page 19 of the reply

9  brief which cites the ICRC, the International Committee

10  for the Red Cross, and in ICRC's publication, which firmly

11  support that 4(A)(2) criteria do not apply to the other

12  provisions in Article 4.

13      In the article that we've cited in the International

14  Review of the Red Cross, it says, *"Neither the 1907 Hague*

15  *Regulations nor the Third Geneva Convention explicitly*

16  *stipulate that a member of regular armed forces has to*

17  *fulfil the four criteria in order to be a prisoner of war*

18  *in the event of capture."*

19      THE COURT:  Give me that page reference again,

20  Mr. Kamens.  I'm sorry.

21      MR. KAMENS:  This is Page 19 of our reply brief.

22      THE COURT:  Okay.

23      MR. KAMENS:  Which is citing an article -- citing a

24  rule book issued by the ICRC and a publication in the

25  International Review of the Red Cross which says, *"On the*

1  *contrary, the four criteria, including wearing a uniform*

2  *or at least a distinctive sign, are mentioned only for*

3  *irregular forces and not for regular ones.   The 1949*

4  *Geneva Conventions endorse this literal reading by*

5  *separating the two categories into two subparagraphs."*

6      In sum, armed forces that fail to satisfy these

7  criteria risk being charged with violations of the laws of

8  war, but they did not lose --

9      THE COURT:  How do I conclude on the record that he

10 was a member of the regular as opposed to the irregular

11 armed forces?

12     MR. KAMENS:  I think that on the record before the

13 Court, the only evidence the Court has is the allegations

14 in the indictment.   There hasn't been any particular

15 evidence submitted with respect to this defendant other

16 than those allegations which are that he was a follower of

17 Mullah Omar, that he was affiliated with Taliban forces,

18 and that he received the authorization of the Taliban

19 commander to engage in the conduct alleged.

20     And so there is also the statement in the Taft Memo

21 that the application of 4(A)(3) is something that should

22 be considered less restrictive then the conditions for

23 armed forces that are otherwise defined in 4(A)(1), then

24 when you have a deposed government.   And it was defined in

25 the context of the Free French in the context of World War

1   II, they were considered the armed forces of the deposed

2   government.  But they certainly would not have the same

3   organization and control if they were the armed forces of

4   a government that actually was in power.

5        Colonel Parks wouldn't answer my question about

6   whether the Taliban would be entitled to POW status if the

7   conflict, A, remained an international armed conflict in

8   2009; and, B, if the conditions of 4(A)(2) did not apply

9   to the other provisions of Article 4.

10       But the answer is clear - Taliban armed forces are

11  entitled to POW status.  And based on the allegations in

12  the indictment, the Court should find that Mr. Khamidullah

13  is entitled to combatant immunity under the Geneva

14  Convention.

15       THE COURT:  Thank you, Mr. Kamens.  I appreciate your

16  arguments this morning.

17       MR. KAMENS:  Thank you.

18       THE COURT:  Mr. Gill on behalf of the United States.

19       MR. MIKE GILL:  Thank you, Your Honor.

20       May it please the Court.

21       THE COURT:  Yes, sir.

22       MR. MIKE GILL:  Your Honor, you've heard a lot of

23  testimony over the past day, and we went through a lot and

24  you've seen the briefing.  The issues before this Court

25  are whether the defendant can lawfully claim combatant

1   immunity under the Taliban under international and United

2   States law.   The question the Court is focused on is what

3   law do we look to for this inquiry.

4         The United States' position is firm.   It's supported,

5   and it makes sense in the application of the common law

6   that developed over the years that gave us the body of law

7   that governs your decision today, and that's the Geneva

8   Convention.   Let's talk first, Your Honor, about the law

9   of war.   And the history is important because it gives us

10  the common themes that have developed over the years.

11  They make sense.   And they guide the determination of who

12  gets combatant immunity based on the strategies and world

13  events being faced by the decision-makers at the time.

14        Now, one of the most important themes is the right of

15  authority.   And Colonel Parks talked about that.   That

16  goes back to even before the Lieber Code.   Three to four

17  centuries.

18        And for a lawful force to be able to take up arms,

19  they have to have some type of state authority.   That is

20  what is important.   That is what prevents insurgent

21  groups, such as the Taliban, from coming in and holding a

22  country hostage and holding all the other world powers

23  hostage that don't want to recognize it.   A line has to be

24  drawn.   And that is a very important concept that goes

25  back to the common law, and it's captured in the Geneva

1  Convention.

2      THE COURT:  Now, they say that in this case the

3  Taliban authorities derived from the fact that they were

4  recognized by three countries at one point as a de jure

5  government, and the fact that they have in fact exercised

6  control over certain provinces and territories in

7  Afghanistan on a continuing basis.

8      MR. MIKE GILL:  They're key on that, Your Honor.

9  With respect to recognition by three countries, that was

10  withdrawn immediately.  The United States believes, and

11  this is firm, we believe it's apparent through Article 2

12  of the Geneva Convention, and common sense that the Court

13  recognized a while ago.  We are not bound to sit there and

14  look strictly at the rules by ignoring world events and

15  what's going on.

16      With respect to the Taliban, they were only

17  recognized in three countries.  It was pulled.  If the

18  defense's position, and I wrote this down a while ago,

19  Mr. Kamens said under Article 2 it doesn't even matter.

20  Their position is it doesn't matter if there's any world

21  recognition.  It's only de facto control.  If they are

22  correct about that, then ISIS receives Geneva Convention

23  protection if they take over an entire country.

24      CNN, in May of 2015, said that ISIS controls over 50%

25  of the landmass in Syria.  And they hold most of Al-Raqqah

1  province within the city.  And under the defense's theory,

2  ISIS will get coverage under this de facto control.

3      But Article 2, and I'll discuss it more in a moment,

4  is much narrower and it provides the tools that this Court

5  can apply within the law to find what is the correct

6  result - that the Taliban's not covered.  And it has

7  implications for the future.

8      As I mentioned yesterday during Mr. Paust's

9  cross-examination, if the defense's theory is accepted,

10 than an organization such as the Taliban that has policies

11 that blatantly violate the law of war, that is blatantly

12 resulting in the murder of civilians day in and day out in

13 Afghanistan, that would -- then combatant immunity would

14 provide to soldiers who didn't take part in those actions,

15 but they know they're part of an organization that does

16 that.  And it takes world powers to come in and fight them

17 and die on the field of battle.

18     And if the defendant pulls the trigger and kills a

19 soldier knowing full well that he fights with the bloody

20 Taliban, that he's entitled to combatant immunity and

21 can't be prosecuted under domestic law, that doesn't make

22 sense.  That also ties the hands of not only the United

23 States, but Afghanistan to enforce their own domestic laws

24 against bands of marauders, such as the Taliban who are

25 taking up arms and holding the country hostage against the

1  international will of all countries.

2      No nation recognizes the Taliban.  In 14 years,

3  they've had no recognition whatsoever from any country in

4  the world, yet the defense wants this Court to hold that

5  they are entitled to protection under the Geneva

6  Convention, and that they're combatants who are out there

7  marauding back and forth and attacking Afghans, United

8  States military, British, and civilians within

9  Afghanistan, that they should receive POW protection.  We

10 believe the law does not allow that.

11     Now, getting back to some of those concepts.  You

12 mentioned the right authority.  The --

13     THE COURT:  One of the concerns the Court has

14 expressed is that under the theory advanced by the

15 professor, there is a strong argument - and I may be

16 totally wrong on this and I know Mr. Kamens disagrees, and

17 that's fine because that's part of the debate here - that

18 a terrorist anywhere in the world who contended that they

19 were affiliated with the Taliban and carries out a

20 destructive mission contending that they were asked to do

21 that by the military commander, by Mullah Omar, cannot be

22 prosecuted criminally.  He can only be prosecuted for

23 violations of the law of war and receives POW treatment.

24     MR. MIKE GILL:  That is exactly --

25     THE COURT:  That's hard to square.

1          MR. MIKE GILL:  That is, Your Honor.  And that is

2   exactly -- and when the Court brought that question up, we

3   turned to each other and we were like, we didn't even

4   think about that extra step beyond.  That it actually

5   would apply under their theory to that type of operation.

6          So if you have a Taliban operator who in the United

7   States attacks what they believe to be a military target,

8   they would claim they are protected by combatant immunity

9   from prosecution within the United States for that act,

10  even though they are operating under an organization that

11  willfully -- and there's just no doubt in the code of

12  conduct I'll discuss in a moment.  They evade every aspect

13  of the law of war that applies to lawful fighting

14  authorities.  They are all about sneaking around and

15  murdering and breaking the rules.  And yet, the defense,

16  under their reading of Geneva and the common laws, would

17  provide them with protections.  The law does not provide

18  that.  It's not right.  And the Geneva Convention is where

19  we look for the answer on those questions.

20         Now, a couple other things to bring up about the

21  history of the law of war:  Right authority.  Protection

22  of civilians.  Incredibly important.  And that is the

23  rubric that a lot of the Geneva Convention and the common

24  law focuses on.

25         And then finally, the way war armies conduct

1   themselves.  And this goes to the four factors that we'll

2   discuss in a moment that's developed back in the late

3   1800s, early 1900s, and has evolved over the years.

4       Now, what the defense wants the Court to do is rely

5   upon a patchwork of common law dating back to the 19th

6   Century, and pick a piece here and pick a piece here, and

7   say that somehow combatant immunity applies here in 2015

8   for events that occurred in 2009 involving military acts

9   that our forefathers in the 19th Century could not even

10  foresee.

11      And with respect to the Lieber Code, part of their

12  patchwork, they want to go with the provision that says if

13  you're armed by a sovereign government, you are a

14  belligerent.  They go with other provisions.  And if

15  you're going to pick out provisions, I provided a copy of

16  just a couple of excerpts.  These are cited in the United

17  States' brief.  But I believe that they have application

18  here.

19      If you're going to pick and choose the common law,

20  and try to apply things that they were doing back in the

21  19th Century, even though they were not dealing with

22  anything as bloody, deadly, and with complete disregard as

23  the Taliban shows for the laws of war, they recognized

24  that there's problems with groups that don't play by the

25  rules.  That they're deadly.  And they put citizens at

1  risk.  And they're not operating under the right

2  authority.

3      If you look at Colonel Winthrop, he distinguished

4  between military forces of a sovereign state that is with

5  the right authority and, quote, this is his words,

6  "'irregular armed bodies' or 'guerrillas.'"

7      And he observed that "it is a general rule that the

8  operations of war on land can legally be carried out only

9  through the recognized armies or soldiery of the State as

10  duly enlisted or employed in its service."  These very

11  concepts about right authority and an army employed by a

12  recognized state were throughout the background of what

13  they're dealing with back then.

14      And with respect to regular armed bodies, Colonel

15  Winthrop, recognized as The Blackstone of Military Law,

16  said that "Irregular armed bodies or persons not forming

17  part of the organized forces of a belligerent, or

18  operating under the orders of its established commanders."

19      "Established commanders."  They knew back then it's

20  important to have a command structure that enforces

21  discipline, following rules.  And that they are not, in

22  general, recognized as legitimate troops or entitled when

23  taken to be treated as prisoners of war, but may upon

24  capture be summarily punished.

25      Francis Lieber recognized the same thing.  If you

1  want to pick from portions from the Lieber Code, you can

2  look at Article 82 in which Francis Lieber said that,

3  *"Men, or squads of men, who commit hostilities, whether by*

4  *fighting, or inroads for destruction or plunder, or by*

5  *raids of any kind, without commission, without being part*

6  *and portion of the organized hostile army, and without*

7  *sharing continuously in the war, but who do so with*

8  *intermitting returns to their homes and advocations, or*

9  *with the occasional assumption of the semblance of*

10  *peaceful pursuits."*

11      And I bring to the Court's attention when the Taliban

12  lured former President Rabbani in for peace talks and they

13  killed him with a suicide bomb, were one of their

14  representatives.

15      *"Divesting themselves of the character or appearance*

16  *of soldiers - such men, or squads of men, are not public*

17  *enemies, and, therefore, if captured, are not entitled to*

18  *the privileges of prisoners of war, but shall be treated*

19  *summarily as highway robbers or pirates."*  So back then,

20  even the authorities recognize the problems that are

21  before this Court today.

22      Your Honor, I can guarantee the Court that if Francis

23  Lieber could see what was going on in the world today, and

24  the situations being dealt with by the world powers, and

25  these insurgent groups that are deadly and spreading like

1  cancer, and they are not following the lawful war

2  engagement rules, and they're murdering civilians as they

3  go, populations are at risk because of what they are

4  doing, Francis Lieber would look at this and say, this is

5  not the situation that we were dealing with in the Civil

6  War of the United States.  This is not even what we dealt

7  with in World War I.  This is a whole different paradigm.

8  It has evolved.

9      We were not dealing with suicide bombers back in the

10  19th Century.  International coalitions that have joined

11  together to go to a country at that country's request to

12  try to dispel and get rid of an insurgent group that is

13  holding the civilians hostage.  A group that is so

14  ruthless that during the presidential elections, that they

15  would cut the fingers off of citizens who exercised their

16  right to vote for their leader in their country.  That's

17  unbelievable terror.

18      And that is something that Francis Lieber would look

19  at and he would say, my code and my concepts recognize the

20  importance of having the right authority, of protecting

21  the citizens, and the way that armies need to conduct

22  themselves, and when they don't act like armies as they

23  should conduct themselves to protect the citizens and with

24  the right authority, they should not receive prisoner of

25  war protections.

1    And I feel confident, Your Honor, that Francis Lieber

2 would look at the Geneva Convention that was developed

3 over one of the -- and definitely, one of the most

4 unbelievable world engagements ever engaged in against an

5 evil that was so terrible out of Germany that brought the

6 world together for 195 countries.  There's only a couple

7 of islands that haven't signed on, and that's probably

8 because they weren't able to get there and be represented.

9 Everybody has signed off on the Geneva Conventions.

10    And the Geneva Conventions take this experience from

11 the deadly, deadly engagements that occurred since the

12 Lieber Code was created, all the way up to World War II,

13 took these concepts we're telling the Court about and

14 fused it together into a set of rules that can be applied

15 to effectively determine whether a group such as the

16 Taliban is entitled to protection in this situation before

17 this Court.

18    Now, one other thing I want to mention, briefly, is

19 that in light of this common law, and it is the United

20 States' position formally that the Geneva Convention is

21 the proper law to look to for this, that the common law

22 provides useful background, and it explains what's going

23 on, but that the Geneva Convention is the encapsulation of

24 what's going on that --

25    THE COURT:  Mr. Gill, my research has indicated that

1  with the exception of Judge Ellis' decision in *Lindh*, no

2  other court has identified GPW, or its various articles,

3  as applying -- or how they specifically apply in the

4  context of the Taliban.  Am I correct?

5      MR. MIKE GILL:  That is correct, Your Honor.  I

6  believe that is the only case.  It's truly a unique

7  situation.  And Judge Ellis did a wonderful job of laying

8  out the Geneva Convention, and the various reasons for

9  application of its sections, and the common law history.

10 He identified that and how it developed into the Geneva

11 Convention.

12      One thing that Judge Ellis didn't have, that this

13 Court has before it, is the body of evidence that we

14 presented on the factors, and the situation before this

15 Court.  Judge Ellis approached the Taliban problem in

16 2002.  Things were still evolving.  They had been out of

17 power for just a little while.  But all of the other

18 things that have happened since then that apply in this

19 case, including the election of the Karzai regime, it

20 makes it much clearer in the United States' opinion, and

21 makes it an easier decision for this Court, firmly

22 grounded in the law.

23      On the public authority defense, two things on that.

24 Number one, the common law foundation for their argument,

25 we believe, is not there.  That is the Geneva Convention

1  that applies.  That the common law does not provide the

2  foundation for giving Irek Hamidullin combatant immunity

3  status.

4       THE COURT:  Well, doesn't the Fourth Circuit say with

5  respect to public immunity -- public authority defense,

6  that it's very, very narrowly applied, and rarely applies

7  in criminal cases?

8       MR. MIKE GILL:  Absolutely.  And that was the second

9  point on that, Your Honor.

10      THE COURT:  Go ahead.  I'm sorry.

11      MR. MIKE GILL:  Oh, no.  I was just going to point

12 out secondly that it only applies when there's actual

13 governmental authority.  And the Fourth Circuit Court of

14 Appeals is very clear about that.

15      THE COURT:  Yes, sir.

16      MR. MIKE GILL:  And here there is not a recognized

17 government behind the defendant's conduct in this case.

18 There's not a recognized government behind the Taliban's

19 bloody campaign that they have engaged in.  And we believe

20 they cannot rely upon the public authority defense as a

21 matter of law.  It should not even go to a jury in this

22 case.  We believe the Court can determine it, as a matter

23 of law, under the Fourth Circuit.

24      And there's also a case, and I'll pull it for the

25 Court, out of Chicago, I believe, Illinois.  And that case

1    talks about from 2011.   There was a defendant who tried to

2    claim that he was entitled to some type of public

3    authority defense for an act of terrorism.   And the Court

4    recognized, listen, he was actually pointing to, I

5    believe, Pakistan for somehow authorizing his conduct.

6    And the Court said, I'm sorry.   They cannot authorize your

7    conduct for violation of United States law as a matter of

8    law.   It's a District Court case.   And I'll give a copy to

9    the Court afterwards.

10         THE COURT:   And make sure Mr. Kamens gets a copy as

11   well.

12         MR. MIKE GILL:   Absolutely.

13         THE COURT:   All right.

14         MR. MIKE GILL:   Now, applying the Geneva Convention.

15   Now, here's the status of the insurgency that the

16   defendant has hitched his wagon to leading up to his

17   criminal acts in November of 2009.   They've been out of

18   power for eight years.   Not recognized by a single

19   government since 2001.   And there were only three, and

20   they withdrew immediately after the events of 9/11.

21         And that government that he has tied himself to, that

22   insurgency, that he has tied himself to is running around

23   and brutalizing citizens in Afghanistan with a goal of

24   terrorizing them to run away from the lawful elected

25   government of their country.

1     Jordan Paust says that we have to accept what the

2 Taliban is doing.  He says that under Article 2 of the

3 Geneva Convention, or any of the common law little patch

4 worked pieces he chooses to pull out, that the world

5 powers, and the United States of America, have to accept

6 that the Taliban fighters have prisoner of war immunity

7 until all hostilities stop.  Meaning that it will

8 continue, and there are fighters such as the defendant,

9 who will continue to fight on the battlefield.

10     Now, putting aside the awful suicide bombings and

11 terrible violations engaged in as a matter of practice by

12 the Taliban.  I want to point out, and this is important

13 Judge, the defense's position allows fighters that choose

14 not to engage in that type of conduct and, hey, let's just

15 assume perhaps the defendant himself, that they can fight

16 on the battlefield knowing that they're fighting for a

17 power that engages in such atrocities and killing soldiers

18 from the international community that have to come in to

19 stop them, and if they recede they can't be prosecuted for

20 doing that.

21     And we believe as a matter of law under the Geneva

22 Convention, they do not get prisoner of war status.  And

23 they can be prosecuted not only for war crimes, but

24 violations of domestic law.  If you're going to shoot at

25 Americans out there on the battlefield putting their lives

1  on the line, or persons assisting them, in these

2  circumstances you can be prosecuted in the court of the

3  United States.

4     Now, Geneva Convention, Article 2.  That is very

5  important of the 2-step process that Colonel Hays Parks

6  testified about.  This is one of the most important parts,

7  because this is where we look to determine does the Geneva

8  Convention even get triggered.

9     Now, according to Jordan Paust, once it's triggered,

10  you can never back up until all hostilities stop.  But

11  that doesn't even make sense in the common sense analysis

12  the Court pointed to a moment ago.  And it also doesn't

13  make sense in light of the International Committee of the

14  Red Cross in their official -- not just a law review type

15  thing.  This is their official reasoning and position that

16  they put out to the world on their Website.  It's marked

17  as Government's Exhibit 7.  And they are very clear in

18  2007, and again in 2011, that this is a non-international

19  armed conflict.

20     THE COURT:  Well, now, in trying to apply the

21  Professor's theory, as I understood his testimony, even if

22  the United States' forces and the Afghan forces decide to

23  stop aggressive military combat, that if the Taliban

24  considered the killing of civilians to be an act of

25  military strategy, Article 2 still applies.

1    MR. MIKE GILL:  I don't believe it applies at all,

2  Your Honor, with respect to that.  And let me make sure I

3  understand the Court's question.

4    THE COURT:  Even if in a combat theater of war - and

5  I want to make sure I'm applying the Professor's teachings

6  correctly here - that even if the United States military

7  forces ceased participation in combat, and the Afghans

8  cease participation in combat, if the Taliban believed

9  that they could continue to take more control by

10  aggressively preying on the citizens, under the

11  Professor's theory, applied to the extreme, I agree, it

12  would still be covered under Article 2.

13    MR. MIKE GILL:  It would be under his reading.

14    THE COURT:  Okay.

15    MR. MIKE GILL:  I believe that's right, Your Honor.

16    And, that again, shows what I believe is against the

17  history leading up to the Geneva Convention, and the

18  Geneva Convention itself.  That an insurgent group, such

19  as the Taliban, should not be able to hold the world

20  hostage and receive privileges under this international

21  treaty when they are the ones that are determining to

22  continue the hostilities.  They refuse to recognize the

23  lawfully-elected government.  And every nation in the

24  world has refused to recognize them.

25    And there is a coalition force, multiple countries,

1  in Afghanistan trying to help them with their government,

2  and to establish law and order for a country so that they

3  can get past this horrible pattern of bloodshed that

4  they've had for so many years.

5       So, under Article 2 --

6       THE COURT:  Hold of a second.  I think the

7  interpreters want to change positions.

8       MR. MIKE GILL:  Yes, sir.

9       THE COURT:  Is the interpreter ready?

10      INTERPRETER:  Yes.

11      THE COURT:  All right.

12      Go ahead, Mr. Gill.

13      MR. MIKE GILL:  So under Article 2, Your Honor, the

14  terms are clear.  And under Colonel Hays Parks' testimony,

15  and also the interpretation of the International Red

16  Cross -- International Committee of the Red Cross, we

17  believe its application is clear.

18      Provision 1 or Paragraph 1, of Article 2, only

19  applies when there are an armed conflict between two or

20  more High Contracting Parties.  Now, even if we assume,

21  and we will for the purposes of this, that in the

22  beginning of 2001 when the United States went in that that

23  provision applied, it changed after the Taliban was

24  removed.  And certainly changed after the Karzai regime

25  was elected in.  And it certainly, certainly changed after

1  so many years of Afghanistan having its own elected

2  government in place and the Taliban refuses to recognize

3  it.  They are not a High Contracting Party.  They are not

4  covered by the Geneva Convention, Paragraph 1.

5      Paragraph 2.  That's the occupying power provision

6  that Colonel Hays Parks testified about.  And that --

7      THE COURT:  What article are you referring to?  I'm

8  sorry.

9      MR. MIKE GILL:  It's Paragraph 2 of Article 2, Your

10  Honor.

11      THE COURT:  Okay.  Go ahead.

12      MR. MIKE GILL:  And that is the -- involves

13  situations where there's a *partial or total occupation of*

14  *the territory of a High Contracting Party, even if the*

15  *said occupation meets with no armed resistance."*  That one

16  applies in situations where a world power to the Geneva

17  Convention would go into another contracting party and

18  take them over, and that country decides not to fight due

19  to the sheer futility of what it would mean to try to

20  stand up to such a violent attack.

21      And that is not the situation here.  The United

22  States, and the coalition forces, are in Afghanistan as of

23  2009 for several years.  And all the exhibits that we

24  introduced during John Dempsey's testimony make it very

25  clear.  Recognized by the United Nations Security Council

1  that we are authorized forces there at the country's

2  invitation.   Their President is asking us to be there to

3  help them to establish order, and deal with the insurgency

4  from the Taliban.

5      And then the third paragraph also does not provide

6  the Taliban with any cover.   That one provides, *"Although*

7  *one of the Powers in conflict may not be a party to the*

8  *present Convention, the Powers who are parties thereto*

9  *shall remain bound by it in their mutual relations."*

10      That's no mystery that other countries in the United

11  States, our allies, will continue to apply the Geneva

12  Convention between ourselves in whatever we do.   That's

13  the Contracting Parties.   We've signed on.

14      It continues.   *"They shall furthermore be bound by*

15  *the Convention in relation to the said Power,"* that being

16  one of the powers that is not bound, *"if the latter*

17  *accepts and applies the provisions thereof."*

18      That's the key.   The Taliban has never ever accepted

19  the Geneva Convention.   In fact, they do the opposite of

20  what the Geneva Convention stands for.   They have no

21  prisoner of war camps.   They summarily execute any Afghan

22  police, military forces that they actually capture.

23      And on that interpretation, I mentioned it before,

24  and I've mentioned it again, Your Honor, Government's

25  Exhibit 7.   Don't just take Colonel Parks's word for this,

1  take the International Committee of the Red Cross.  They

2  are very clear about this characterization.  And that the

3  Geneva Convention prisoner of war, it doesn't even get

4  kicked in.  It not an international armed conflict.

5      Now, even if we assume, and it took a while to even

6  get Colonel Parks to get comfortable enough to assume this

7  to answer these questions because he's so firm in his

8  expert opinion with his years of experience, that this is

9  not an Article 2 international armed conflict.  But when

10  we do just assume that Article 4 applies, the Taliban does

11  not receive coverage or protection under the Geneva

12  Convention.  The law of war is captured in Article 4.  And

13  if we think about it, Your Honor, that makes sense.

14      Now, the *Lindh* opinion is very clear, and Judge

15  Ellis' reasoning is also -- it makes sense that the four

16  factors should apply across the board to 4(A)(1), (2), and

17  (3).  And that is just simply recognition.

18      And 4(A)(1), we'll put that aside for a minute, but

19  that lawful armies, fighting forces, operating in the

20  world, should abide by those characteristics.  And as a

21  practice, the parties to the conflict, the High

22  Contracting Parties, their armies are trained in those

23  rules.  The Taliban has never ever, ever, ever done that

24  with their forces.

25      Under the concepts of, you know, common law dating

1  back to the 19th Century, and moving forward to the

2  provisions that are captured in Article 4, there's just no

3  realistic way to even consider for a moment that the

4  Taliban, and what they -- how they conduct themselves

5  could be covered as a regular armed force under the Geneva

6  Convention, or a militia or a member of other volunteer

7  corps that meets the four provisions of 4(A)(2).

8      Now, they're applying 4(A)(1).  And Colonel Parks

9  made it clear in his opinion, parties, that being the High

10 Contracting Parties, by virtue of them being a part of the

11 signatories of the Geneva Convention, they get coverage.

12 They are covered.  But it is presumed that they will abide

13 by the four criteria.  And we stand beside it that they do

14 abide by them, Your Honor.

15     Article 4(A)(2).  *"Organized resistance movements,"*

16 militias, members of other volunteer corps, and others

17 *"belonging to a Party to the conflict and operating in or*

18 *outside their own territory"* have to meet the conditions

19 outlined there.  We presented a lot of evidence yesterday

20 from Senior Intelligence Officer Barclay Adams.  And, Your

21 Honor, it makes it clear, the Taliban fails under each of

22 the criteria.

23     I can't imagine, frankly, or the United States cannot

24 imagine, a more knowledgeable resource being presented.

25 The government is proud we're able to present that depth

1   of information for this Court's decision because he

2   explained, you know, with respect to 2(A) they have a

3   command structure in place.  We don't dispute that.  He

4   testified about that they have structure in place.  They

5   don't always fill the positions.

6       But where it's important, and where it makes sense

7   with respect to Colonel Parks and what he said, is that

8   they have to be commanded by a person responsible for

9   subordinates.  And we believe that the testimony from

10  Intelligence Officer Adams makes it clear that they do not

11  enforce the rules as an organization.  From the top to the

12  bottom, they do not enforce the rules and hold people

13  accountable for their acts that are in violation of the

14  laws of war.

15      That's why it creates a dangerous situation.  That's

16  why the law of war prohibits such a group that, as a

17  matter of practice, ignores that type of stuff.  And they

18  don't have a structure in place that can even reasonably

19  enforce the laws of war.

20      Second, "*that of having a fixed distinctive sign*

21  *recognizable at a distance.*"  Your Honor, that -- we turn

22  the Court to Exhibit 3, which is the rules that the

23  Taliban put in.  I believe that they're put in around

24  May 2009.  The United States recovered them in July of

25  2009 on the battlefield.

 1    These were in place before the defendant carried out

 2   his attack in November.  And the defense says, well, the

 3   government can't pick and choose which provision they want

 4   to apply.  But the fact is, these provisions, they really

 5   reflect the organization and their pattern of practice and

 6   what they're about.

 7    And any organization that puts in a provision that

 8   says that their fighters in the mujahideen should always

 9   have the same uniform as the locals because it will be

10   difficult for the enemy to recognize them, and also it is

11   easy for the mujahideen to go from one location to

12   another, through that, that illustrates this.  And I can

13   guarantee that the Taliban is abiding by that rule in

14   their operations.  And Senior Intelligence Officer Adams

15   made it very clear that's how they're working in the late

16   2000s and leading up to 2009, and beyond.  They are not

17   following that rule as a matter of practice.

18    Next 4(A)(2)(c), *"that of carrying arms openly."*  You

19   know, in general with respect to their fighting on the

20   battlefield or the attack the defendant was involved in,

21   they have their arms displayed in the traditional way.

22   The problem with the Taliban, as a matter of practice, is

23   their suicide operations that they're carrying out day in

24   and day out.  And Rule 41 in Exhibit 3 talks about the

25   four conditions in conducting suicide attacks.

1    So as a matter of practice and policy, the Taliban is

2  instructing its soldiers on how to do suicide attacks.

3  And those attacks are carried out with concealed

4  explosives and traps that when the violator is able to

5  infiltrate a nation, such as when President Rabbani was

6  going to meet with the Taliban official to negotiate

7  peace, you can't see the problem until it's too late.

8  Hidden in his turban.  Takes him out.  And they use these

9  operations at all times in Afghanistan.  This is how the

10  people of Afghanistan are having to live with the Taliban

11  and their chosen tactics.

12    And finally 4(A)(2)(d), *"that of conducting their*

13  *operations in accordance with the laws and customs of*

14  *war."*  They -- there are so many violations before the

15  Court as a matter of practice.  We believe the record is

16  sound for you to make findings that as a matter of policy,

17  the Taliban -- this is not an instance of the United

18  States may have a military member making a mistake and

19  doing something that is a violation of the law.  These

20  things happen.  But as a matter of practice and policy,

21  the United States of America, and other recognized

22  military forces in the world, do not condone those.  And

23  when problems happen, we deal with them.

24    The Taliban, as a matter of practice, takes the

25  opposite approach.  They pursued these types of practices.

1   That's how they operate.  So it is a pattern that applies

2   cross the board, and precludes them from having coverage.

3       And when you think about what to rely upon for those

4   types of violations, you can look at Government's Exhibit

5   2, which has the list of certain incidents, just a

6   representative as Senior Intelligence Officer Adams

7   testified, of the types of things that are going on as a

8   result, and the senseless murder of civilians and

9   foreigners.  And as recently as May 14, 2015, an attack at

10  the Kabul Park Palace where a lone gunman killed 14

11  civilians, including 10 foreigners.

12      And then the Taliban claimed responsibility saying

13  that they attacked that hotel due to the presence of

14  foreigners, including Americans.  This is what they do.

15  And they gladly tell the world that we did it.

16      If that's the way you practice, you're not going to

17  receive protection under international law.  You're not

18  going to shield it from violating the domestic laws of

19  Afghanistan, the United States, or any other world figure

20  or national that falls in the path of this insurgent

21  group.

22      Now, turning to 4(A)(3).  *Members of regular armed

23  forces who profess allegiance.*"  Your Honor, with respect

24  to the terminology used in that compared to 4(A)(1), terms

25  matter.  And certainly they don't mention the militias or

1  volunteering corps falling into that category.  4(A)(3) is

2  unique.

3       THE COURT:  Your view of that is limited only to

4  members of the regular armed forces?

5       MR. MIKE GILL:  It is indeed, Your Honor, by its

6  expressed terms.  And that is a term that has meaning, as

7  Colonel Parks testified.  And that brings into play

8  4(A)(2).  And the Court can rely upon Colonel Parks'

9  expert analysis on that.  It can rely upon Pictet, which

10  is an authority on that.  Talks about the factors

11  applying.

12       Now, there's two additional things that we'd like to

13  point out on that, Your Honor, and that is Defense Exhibit

14  15, which is just the easiest way to refer to it right

15  now.  And that is Hays Parks' Combatants article that he

16  wrote.  And you can look at Page 19, Your Honor.  It has a

17  quotation from Pictet's analysis on 4(A)(3).  And it makes

18  sense.  And it actually provides a guide to avoid the

19  situation the defense claims that 4(A)(3) allows, which it

20  does not.

21       THE COURT:  Refresh my recollection what's discussed

22  in that paragraph, Mr. Gill.

23       MR. MIKE GILL:  That is the one, Your Honor, that not

24  only talks about the expectation that these "regular armed

25  forces," it uses that quotation, will abide by the four

1  criteria, but it continues by saying that this provision,

2  which was meant for the Free French, that was the whole

3  thing.  They're associated with the government.  They're

4  taken out by a adversary who takes over their county.

5  They pull back and fight in connection with others in

6  their recognized authority.

7      And Pictet said with respect to that, and this is

8  from him, *It must be expressly stated that this*

9  *Government or authority,*" that being the government or

10  authority that is claiming protection under 4(A)(3), "*must*

11  *as a minimum requirement, be recognized by third States,*

12  *but this condition is consistent with the spirit of the*

13  *provision, which was founded on the specific case of the*

14  *forces of General de Gaulle.*"  That's the French

15  revolutionary group -- or the French armed group that was

16  moved out by the Nazi's, but continued to fight alongside

17  the English and other allied forces.

18      THE COURT:  Now, as I recall the Professor's

19  testimony, he believed that because they had been

20  recognized by three states at some point, they arguably

21  qualify in perpetuity.

22      MR. MIKE GILL:  That was his testimony.  We believe

23  the focus is 2009.  And there is not a single world power

24  that recognizes the Taliban.  They haven't been recognized

25  since 2001.  And they can't claim protection.

1   Putting aside that they can't meet the four criteria.

2   They can't claim protection under 4(A)(3) without

3   recognition by a third party, or there is another

4   alternative recognized by Pictet, and that is if they

5   declare that they accept the obligations under the Geneva

6   Convention.

7   So they either have to be recognized by third

8   parties, or they have to say we accept the Geneva

9   Convention.   Neither of which apply to the Taliban.

10   THE COURT:   All right.

11   MR. MIKE GILL:   And just to touch on, and wrapping

12   up, Your Honor, hitting on just a couple of points raised

13   by the defense in their argument as well, first,

14   Article -- with respect to their motion to dismiss the

15   counts associated with 18 U.S.C. Section 32(a), the United

16   States' position we've got in our brief, we believe that

17   their arguments reply upon the wrong section of 18 U.S.C.

18   32(b), which deals with civilian aircraft.

19   And the really compelling thing is, Judge, that 18

20   U.S.C. 32(a) is extremely broad.   It is broader than the

21   attempted murder charges before this Court.   And 32(a)

22   covers --

23   THE COURT:   Now, as I understand it, in order for

24   there to be extraterritorial jurisdiction, there's got to

25   be specific expression by Congress of that.   Where is that

1  in that statute?

2      MR. MIKE GILL:  That statute covers special aircraft

3  jurisdiction of the United States, which includes an

4  aircraft of the armed forces of the United States that is

5  in flight.  That is the jurisdiction we have in this case.

6      Furthermore, 32(a) covers -- it covers anyone who

7  *"willfully...damages, destroys, disables, or wrecks any*

8  *aircraft in the special aircraft jurisdiction."*  So it

9  covers the United States military in the air wherever

10  those flights may be.

11      THE COURT:  Refresh my recollection where the term

12  *"special aircraft jurisdiction"* is defined.

13      MR. MIKE GILL:  It's defined at 49 U.S.C. Section

14  46501.

15      THE COURT:  46501?

16      MR. MIKE GILL:  Yes.  (2)(B).

17      THE COURT:  All right.

18      MR. MIKE GILL:  And I believe that we have it

19  expressly cited for that within the indictment itself.

20      And also we have a Second Circuit case of *United*

21  *States v. Yousef* where the Second Circuit said, *"The text*

22  *of the applicable Federal Statutes makes it clear that*

23  *Congress intended 32(a) to apply extraterritorially."*

24      THE COURT:  And my recollection is in *Yousef* they

25  were talking about this specific statute, were they not?

1          MR. MIKE GILL:  They were.  About 32(a).

2          THE COURT:  All right.

3          MR. MIKE GILL:  And then also on 18 U.S.C. 2332(c),

4   the defense claims that doesn't apply.  We believe, Your

5   Honor, that is very clear.  That one's included in

6   Chapter 113B of the United States Code which applies to

7   terrorists.  And the statute covers *Whoever outside the*

8   *United States engages in physical violence with intent to*

9   *cause serious bodily injury to a national of the United*

10  *States.*"  It's intended to protect nationals of the United

11  States in the current world that we're dealing with where

12  terrorists are targeting not only civilians abroad, but

13  military abroad.

14          *"Prosecution shall not be instituted."*  This is in

15  that same statute.  It can't even be instituted without

16  approval of the Attorney General of the United States or

17  his designee.  This is a heavy duty statute.  Congress

18  knew exactly what they were doing with this one.  And we

19  believe it applies squarely to this case.

20          And then finally, I believe, Your Honor, that's

21  wrapping up.

22          We believe that the common law has marched forward

23  over the years.  The proper focus for this Court is the

24  Geneva Convention.  And we're absolutely confident that

25  under the law, and evidence presented before this Court,

1  that the Taliban is not covered.  It was not an

2  international armed conflict.

3      And even if Article 4 somehow applied, they do not

4  meet the regular armies.  They are brutal.  They are

5  murdering Afghan civilians.  Trying to hold a country

6  hostage against the will of the people and elected

7  government.  They need to be stopped.  And people who take

8  part in that should not be shielded from prosecution by

9  domestic authorities.

10     THE COURT:  All right, sir.  Thank you very much.

11     MR. MIKE GILL:  Thank you.

12     THE COURT:  Mr. Kamens, your rejoinder.

13     MR. KAMENS:  Your Honor, I would like to reply to

14  eight arguments made by the government.

15     The first is with the hypothetical suggested by the

16  Court that if the defense were correct, anyone in the

17  world could attack within the United States, civilians,

18  and claim to be immune from prosecution by virtue of

19  prisoner of war status, that is absolutely not true.  The

20  reason is that the rules that we are discussing apply

21  solely in the context of armed conflict.  There is no

22  armed conflict in the United States.

23     And our entire argument has been predicated on the

24  fact that it makes no sense to apply our domestic criminal

25  laws to conduct that occurred on the battlefield in

1  Afghanistan by an ordinary foot soldier who has not

2  alleged to have committed a violation of the law of war.

3  And so the hypothetical that this could be a defense for

4  anybody is not correct.  We are only talking about conduct

5  within the context of armed conflict.

6      The second argument that I would like to respond to

7  is the government's choice of law argument.  Essentially

8  they say common law provides a background for

9  international law, but the Court only need look at the

10  Geneva Convention to determine whether the defendant has

11  the benefit of prisoner of war status.

12      Essentially what that argument comes down to is the

13  government making the surprising claim that an

14  international convention displaces domestic law of the

15  United States that is not in conflict with it.  What we

16  have argued is that the domestic common law protection,

17  which is broader than that provided under international

18  law, is not in conflict.  There is nothing in the Geneva

19  Convention, there is nothing in international law

20  generally, that precludes states from providing heightened

21  protections for defendants in this context.

22      THE COURT:  And you're arguing that in relationship

23  with your public authority defense, is that correct?

24      MR. KAMENS:  Correct.

25      THE COURT:  Okay.

1          MR. KAMENS:   And what is indicative of this is my

2    question to Colonel Parks.   And I asked him, Do you think

3    that prisoner of war status is a defense to criminal

4    prosecution in the United States?   Essentially asking him

5    could the Geneva Conventions be a rule of decision in this

6    criminal case.   His response was, Well, that's an issue of

7    domestic law.

8          And it is.   It is a question of domestic law, one,

9    whether the Geneva Conventions can serve as a rule of

10   decision.   And, two, whether there is some other part of

11   domestic law that provides different protection.

12   Heightened protection.

13         The third argument that I would like to respond to is

14   Mr. Gill's reference to right authority.   This is an issue

15   with respect to the Geneva Conventions.   But what he says

16   is is that we have an insurgent group that has come in and

17   is holding a country hostage.   I would like to remind

18   Mr. Gill that this conflict was initiated by the United

19   States.

20         The government that we deposed has continued to fight

21   since 2001.   Now, we may not like that government.   But as

22   a matter of fact, we initiated this armed conflict, and

23   the government that was in power de facto continues to

24   fight, and they continue to have armies, and they continue

25   to have government institutions.

1        4(A)(3) under the Geneva Convention provides

2  protection for forces that are fighting on behalf of that

3  deposed government.  Independently, the common law

4  protects soldiers who fight on behalf of an insurgent

5  government.  Now, what the government says is look at

6  Winthrop and Lieber, and their discussion of guerrillas.

7  The common law wouldn't provide protection, the argument

8  goes, because essentially these are guerrillas.

9        But if you look at those texts, what Colonel Winthrop

10 and what Professor Lieber are referring to, is individuals

11 who are not acting on behalf of a party.  It is on Page 7

12 of a reply brief where we see the language from the

13 Winthrop treatise.  And it is talking about persons who

14 are acting independently who engage in the killing,

15 disabling and robbing of peaceful citizens not on behalf

16 of a party, but by personal motives.  That is the

17 definition of the guerrillas that is referred to by

18 Professor Lieber and Colonel Winthrop.

19       The last point I'd like to make here is with respect

20 to ISIS.  The government trots out the parade of

21 horribles, and the example is the ISIS regime.  Professor

22 Paust responds to this.  He said that this is an insurgent

23 group.  They have never exercised government power.  They

24 are not an entity that would be determined to be a

25 belligerent such that they would receive any customary

1  international law protection.

2      Now, the question is if a government that we find

3  abhorrent takes powers in a state, and engages in

4  horrendous atrocities as the German government did during

5  World War II, would that mean because we find their

6  conduct so abhorrent that the foot soldiers of that regime

7  would not be entitled to the benefits of the Geneva

8  Convention?  And the answer is this:  International law is

9  not a moral litmus test.  We can absolutely condemn the

10  actions of the Taliban, but we must apply the law as it

11  is.  The law is the law.

12      The government next argues with respect to public

13  authority, and rightly says that the defendant must have

14  acted based upon actual authority.  And the question is

15  whether, under the common law, a defendant can ever

16  receive authorization, actual authority to act, in time of

17  war from an insurgent government.  And the answer is

18  absolutely yes.  And we have cited a criminal law

19  treatise.  We did that intentionally because this is a

20  question of domestic criminal law.  It is not a question

21  of international law.

22      And what we are presenting to the Court is criminal

23  authorities, criminal law, domestic law, that says that an

24  insurgent government can authorize its forces to act in an

25  armed conflict.

1    The government also cites to a case out of Chicago.

2  I'm familiar with that case.  I've read it.  And what the

3  District Court said in that case where the defendant

4  claimed authorization from the intelligence services in

5  Pakistan, what the Court said is this is a defendant who

6  resides in the United States, and who acted in this

7  conspiracy with connections to the United States.  And

8  whatever the government of Afghanistan did, whether they

9  had any authority in the case, or had given the defendant

10 any communications at all, that cannot displace the

11 domestic law of the United States.  And that is absolutely

12 true.

13    The conduct of the defendant and the context of the

14 defendant to the United States were absolutely clear.

15 Here the defendant's conduct occurred in Afghanistan.  And

16 the question is in the context of an armed conflict in

17 Afghanistan, can a party to that armed conflict give

18 authorization to a foot soldier to engage in combat?  And

19 the answer is absolutely yes.

20    If Mr. Khamidullah came to the United States and

21 began fighting in the United States, he would have no such

22 authority.  The authorization of the Taliban cannot exceed

23 the bounds of the armed conflict.  That is, they do not

24 have free rein to authorize violence around the world

25 outside of the confines of an armed conflict.

1        The fifth point I would like to make is with respect

2   to international armed conflict, and the definition of

3   Article 2.  We ask the Court to look to the text, and to

4   the U.S. Army Field Manual, which is Defendant's Exhibit

5   11.  The Court questioned the government and said, well,

6   Professor Paust said that this conflict can continue even

7   if the United States ceased in its combat operations.

8   Even if Afghanistan stopped fighting, but the Taliban

9   still continued to fight, then the war would continue.

10       Those words are not simply from Professor Paust.

11   Those come from the U.S. Army Field Manual which defines

12   when the law of war ceases to be applicable.  It ceases

13   when there is a peace treaty, when there is *"The*

14   *termination of a war by unilateral declaration of one of*

15   *the parties, provided the other party does not continue*

16   *hostilities."*

17       *"The complete subjugation of an enemy State."*  Or by

18   "The termination of a declared war or armed conflict by

19   simple cessation of hostilities."  That's the definition

20   in the Army Field Manual.

21       It happens to be the same definition that is adopted

22   by the Department of Defense Law of War Manual released on

23   Friday in Section 3.8.1 on Page 94 of our exhibit, Defense

24   Exhibit 12.  The exact same definition.  That is not

25   Professor Paust coming from left field.  It is the

1   international legal definition of when the law of war no

2   longer applies.

3        There is no text in the Geneva Convention that says

4   that an international armed conflict ends upon the

5   installation of another government, regardless of how much

6   we might like the new government.  If hostilities

7   continue, the war is not over.

8        And the International Committee of the Red Cross

9   cannot change that fact.  And the government cannot point

10  to any text in the Geneva Conventions is what decides this

11  issue that suggests that the installation of a government,

12  no matter how much we like it, ends the hostilities.

13       With respect to 4(A)(2) is the sixth issue.  The

14  ICRC, Colonel Parks in his article, Professor Paust, the

15  history and text of conventions and treatises that we have

16  gone through, the Lieber Code and the Oxford Law War

17  Manual, The Hague Conventions, all suggest and demonstrate

18  that the 4(A)(2) conditions are not prerequisites for POW

19  status.  The government has no answer to this other than

20  what Colonel Parks said on the stand, which is

21  inconsistent with what he has said in writing.

22       Judge Ellis did not even consider 4(A)(1) or 4(A)(3).

23  He simply looked at 4(A)(2).  Judge Ellis also didn't have

24  the benefit of the Taft Memo.  I think that would have

25  certainly helped his decision-making in applying the law

1   of war.

2        But it is very clear that the vast majority of

3   sources hold that 4(A)(1) and 4(A)(3), as a matter of

4   text, as a matter of history, as a matter of law, do not

5   require armed forces, regular armed forces, to comply with

6   the conditions of 4(A)(2).

7        The seventh issue is with respect to whether the

8   defendant constituted part of the regular armed forces.

9   The issue here is two.  The government says first, the

10  Taliban were recognized only briefly, and then the

11  recognition was withdrawn.  That suggests they are in --

12  that they are not eligible to be found as a government or

13  authority for purposes of 4(A)(3).  That is addressed in

14  the Taft Memo.  It's on Page 16.

15       And it says that, *"In this situation, only three*

16  *states accorded the Taliban formal recognition, but Pictet*

17  *and other sources do not suggest a numerical minima for*

18  *purposes of recognition.  Moreover, the international*

19  *community acted as if the Taliban controlled Afghanistan."*

20       *"This form of 'recognition' should satisfy the*

21  *concern described by Pictet."*

22       In other words, it is not something where they

23  receive recognition in perpetuity.  It is simply for

24  purposes of 4(A)(3) are they in authority.  And they are

25  in authority in this conflict until the war ends.

1    The second issue is whether they are entitled to --

2  being determined to be an authority under 4(A)(3).   And

3  the Court has mentioned, well, have they ever stipulated

4  or agreed to apply the Conventions?   This is the language

5  from Pictet that is at issue.   It is quoted on Page 16 of

6  the Taft Memo.   It says, *"this authority, which is not*

7  *recognized by the adversary, should either consider itself*

8  *as representing one of the High Contracting Parties, or*

9  *declare that it accepts the obligations stipulated in the*

10  *Convention and wishes to apply them."*   Either of these

11  conditions means that they can qualify as an authority.

12    What the State Department says is they have no

13  information determining -- relating to whether the Taliban

14  have agreed to abide by the Geneva Convention.   And we can

15  all agree, based on the testimony, that they have not.

16  But it is also true, as the State Department recognized,

17  that the Taliban considered itself the representative

18  government of Afghanistan.   And that is certainly true in

19  2009 by their continued exercise of authority in

20  Afghanistan, and their view of Afghanistan's soldiers as

21  traitors.   Traitors, because they, the Taliban, under

22  their view, are the legitimate government of Afghanistan.

23    The last issue I'll address is with respect to the

24  statutory construction.   The government says 18 U.S.C. 32,

25  in the memo by the OLC, refers to a different section,

1  32(b).  Not 32(a), which is at issue in the indictment in

2  this case.

3       The rationale in the OLC memo is this:  32(b) applies

4  to damage or efforts to destroy civil aircraft.  What the

5  OLC says in the memo is, however, when those civil

6  aircraft in the unusual circumstances that they are used

7  for military purposes in an armed conflict, under that

8  unique circumstances it would be absurd to say that this

9  statute prohibits efforts to damage that civil aircraft.

10      Well, if that's true with respect to the unique

11  circumstance in which civil aircraft are used for military

12  purposes, that rationale applies even greater, and even

13  with more force, to military aircraft generally.  That is,

14  military aircraft are designed to be used in military

15  combatant.  And the OLC's memo --

16      THE COURT:  Do you think the Second Circuit was wrong

17  in *Yousef*?

18      MR. KAMENS:  No.  As I understand it, that's a

19  decision relating to terrorism and relating to the

20  extraterritorial application to terrorist acts.

21      The OLC memo -- and our statutory argument has

22  nothing to do with the application of the statute to

23  terrorism.  We agree it applies with full force to

24  terrorism.  But terrorism is distinct from the law of

25  armed conflict.  Conduct that occurs, and may be

1  incredibly instructive, and may be incredibly harmful to
2  life and property, but that occurs in the context of armed
3  conflict.
4      The trigger for the international law of war is the
5  existence of an armed conflict.  Terrorism, although it
6  certainly can occur in the context of an armed conflict,
7  as a general matter occurs in peace time.  It occurs in
8  places that are not suffering from the harms of armed
9  conflict.
10      There is a unique set of laws that apply in armed
11  conflict.  That is what we have been discussing.  And we
12  have no difference or objection to the application of this
13  statute extraterritorially, or to conduct that occurs
14  in -- with respect to terrorism.  But with respect to --
15      THE COURT:  It doesn't apply to the theater of war,
16  right?
17      MR. KAMENS:  We argue that in the context of military
18  operations in an armed conflict it does not apply.
19      THE COURT:  All right.
20      MR. KAMENS:  2332(c) outlaws efforts to harm
21  individuals generally.  And our argument is this:  If this
22  argument applied in the context of armed conflict, we
23  would essentially be outlawing war.  It is absurd to say
24  that the U.S. Congress can prohibit efforts to harm our
25  soldiers in an armed conflict.  That is simply not

1  something that this statute was designed to do.

2      It is designed to protect our individuals and

3  employees of the government in every circumstance that is

4  not armed conflict.  Individuals around the world have --

5  must suffer the threat of potential prosecution in this

6  country if they harm our people and individuals outside of

7  the realm of conflict.  But in an armed conflict, --

8      THE COURT:  Doesn't your argument though assume that

9  the perpetrator of the alleged crime is a member of the

10  regular armed forces, or otherwise qualifies for combatant

11  immunity?

12      MR. KAMENS:  No.  And the reason is this.

13      THE COURT:  Any civilian that shoots down an aircraft

14  could not be prosecuted?

15      MR. KAMENS:  It is not a violation of the law but

16  for -- well, let me say this, it is not a violation of the

17  law of war for a civilian to directly participate in

18  hostilities in an armed conflict.  They may not receive

19  the protections of POW status.

20      But this is my point.  There are justifications,

21  relatively explicit justifications, in every other statute

22  that is listed in the indictment.  Those say essentially

23  that if the defendant acts with lawful authority, or if

24  the defendant's actions, they must be unlawful.  Those

25  statutes have a textual congressional intent that the

1  defendant must prove or show or be demonstrated to act

2  lawfully.  This statute has nothing of the sort.  And we

3  suggest that that absence of any --

4       THE COURT:  But that would be a defense to the crime,

5  and not necessarily a bar to prosecution.

6       MR. KAMENS:  That's right.  But it suggests that

7  there is a congressional intent for application of the

8  statute in circumstances where even in armed conflict the

9  defendant doesn't act lawfully or with authority they can

10  be prosecuted.  This statute has no such language.  It

11  simply applies around the world generally if its applied

12  extraterritorially, and would purport to outlaw armed

13  conflict because it covers conduct that is of -- that

14  prohibits efforts to harm individuals - the United States

15  employees.

16       THE COURT:  But under your theory, though, it

17  wouldn't affect armed combat by regular military forces

18  because they have combatant immunity.

19       MR. KAMENS:  This statute says nothing about that.

20       THE COURT:  But isn't that an overlay, though?  Isn't

21  that a concept that bars prosecution itself?  It wouldn't

22  be specifically a defense under the statute, would it?

23       MR. KAMENS:  Potentially, but what we're talking

24  about is did Congress intend this statute to apply in the

25  context of armed conflict.  And what we suggest is that by

1  virtue of its global application, Congress wasn't

2  intending this statute to apply to armed conflict.  You

3  may be right that separately this is a defense.  And I

4  think you are right, actually, if the defenses that we're

5  talking about separately, they would apply to this statute

6  as to any other.  But our argument here is simply about

7  what Congress intended.

8       So did Congress intend for these statutes to apply in

9  armed conflict initially, and then we get to the question

10 of are there defenses.  Here, we suggest, Congress didn't

11 intend for this statute, just like 18 U.S.C. 32, to apply

12 in the context of armed conflict at all.

13      THE COURT:  But no court has ever adopted your

14 position, have they?

15      MR. KAMENS:  Not with respect to that statute;

16 however, the D.O.D. Law of War Manual, which we've --

17      THE COURT:  But these are just people's opinion they

18 put in the manual.  These people aren't Article 3 judges.

19      MR. KAMENS:  That's certainly true.

20      THE COURT:  These are what we call a *policy wonk.*"

21      MR. KAMENS:  Well, I mean, the OLC opinions are the

22 advice given to the Attorney General.  It presumably is

23 the D.O.J.'s policy.  And of course it isn't an Article 3

24 judge, but it --

25      THE COURT:  Assuming the Attorney General adopts it?

1          MR. KAMENS:   Certainly.

2          THE COURT:   And enforces it?

3          MR. KAMENS:   Sure.   But they are legal opinions that

4   the Court can look to as persuasive authority.   And so, of

5   course, they are not a precedent like the Fourth Circuit,

6   but they are persuasive that these statutes never

7   contemplated application in an armed conflict.   And there

8   has been no case in which these statutes have been applied

9   in armed conflict.

10          THE COURT:   All right.

11          MR. KAMENS:   Thank you, Your Honor.

12          THE COURT:   Yes, sir.

13          I will hand my opinion down hopefully in two or three

14   weeks.   It will take a while to sort through this record.

15   And obviously I'm blazing a new frontier here, so it's

16   going to take a bit of time for me to express my views.

17   But I should have an opinion out in about three weeks.

18          Both of you did an outstanding job in presenting your

19   arguments.   I'm very impressed by both of you today.   I

20   appreciate it very much.

21          I'm going to take a 10 minute recess.   We'll come

22   back and try to wrap up the rest of these motions as

23   quickly as we can.

24          We'll stand in recess.

25                        (Recess taken.)

1      THE COURT:  All right.  The next motion is the one

2  that is based upon due process notice and jurisdictional

3  defects.

4      Who'll be arguing that on behalf of the defense?

5      MR. WAGNER:  That will be me, Your Honor.

6      THE COURT:  All right.  Thank you, Mr. Wagner.  Go

7  right ahead, sir.

8      MR. WAGNER:  Thank you, Judge.  And good morning.

9      THE COURT:  Good morning, sir.

10      MR. WAGNER:  Judge, our motion to dismiss for due

11  process reasons, under that motion we request that the

12  Court look at the evidence that was presented yesterday,

13  consider the government's arguments they presented today,

14  and through that evidence and through those arguments, the

15  government has highlighted the validity and importance of

16  this motion.

17      Now, although we will be principally relying on the

18  briefs that we filed for this motion, the evidence that

19  you've heard from Mr. Barclay Adams, the arguments that

20  you heard from Mr. Gill demonstrated the fundamental

21  unfairness and arbitrariness of this prosecution.

22      Mr. Adams testified about the many atrocities of the

23  Haqqani Network and of the Taliban.  He spoke of suicide

24  bombings, of kidnappings, of mutilations, of threats

25  against citizens, of bombings and burnings of citizens'

1   homes.   Tens of thousands of acts, of terrorist acts,

2   against citizens.

3        Judge, that is not Mr. Khamidullah.   And that is not

4   the case that has been presented against Mr. Khamidullah.

5   No Americans were killed or injured in this situation.   No

6   civilians were targeted or injured.   No Afghan citizens or

7   Afghan Border Police were killed or injured.   No American

8   property was damaged or destroyed.   No planes or

9   helicopters of the United States, or any coalition forces

10  were shot down.

11       THE COURT:   But I think you have to add a footnote to

12  that.   That was because the guns malfunctioned.

13       MR. WAGNER:   That is true that there were guns that

14  malfunctioned.   But whether or not those guns could have

15  actually taken down an American aircraft is another

16  question.   This was a --

17       THE COURT:   But is it a question of the intent to do

18  so or the capability of the gun?

19       MR. WAGNER:   Well, it's both, Judge.

20       THE COURT:   I don't want to get into an argument with

21  you on this because really it's irrelevant, but you raised

22  it.

23       MR. WAGNER:   No, I did, Judge.   But, again, that was

24  also part of a contingency plan.

25       THE COURT:   Okay.

1    MR. WAGNER:  It wasn't the essential plan that at

2  least has been outlined in the defendant's statements, and

3  I think also by the government's accusations against

4  Mr. Khamidullah, if American aircraft responded to this

5  operation then perhaps the issue of whether the guns

6  malfunctioned becomes a part of this case.

7    But, again, Mr. Khamidullah did not engage in the

8  activities, the many activities with the many atrocities,

9  that the government has pointed to through their evidence

10  and through their argument in the previous motion.

11    Now, Judge, in 2012 the Fourth Circuit in *Brehm* made

12  clear that when prosecuting a foreign national, the

13  government must comport with notions of fundamental

14  fairness, and cannot prosecute foreign nationals

15  arbitrarily.  The Court also, without specifically ruling

16  on the point, addressed the concept that there must be a

17  sufficient nexus between the conduct prosecuted and the

18  United States.

19    Finally, the Fourth Circuit made clear that a foreign

20  national must have notice, have fair warning, that he will

21  be haled into a U.S. Court for prosecution to comply when

22  due process dictates.

23    THE COURT:  But didn't the Fourth Circuit say in that

24  case, or in a similar one, that as long as the person

25  realized they would be haled into court somewhere to be

1  prosecuted, that was sufficient for the notice

2  requirement?

3       MR. WAGNER:  Right.  And the facts of the *Brehm* case,

4  Your Honor, involved a foreign national who had actually

5  signed a contract with the United States to work with the

6  United States, and to be subject to the jurisdiction of

7  the United States, should some act arise that would allow

8  that person to be brought into court.

9       THE COURT:  But no where in the Court's ruling did I

10  see that as being a significant consideration.  They held

11  there that it was clear American interests involved in

12  that particular -- that was in Kandahar, was it not?

13       MR. WAGNER:  That's correct, Judge.

14       THE COURT:  Yes.

15       MR. WAGNER:  And in that case, though, Judge, I think

16  that being an employee of the United States, or at least a

17  contractor of the United States, there was a very

18  significant expectation that he could be haled into court.

19  Here you have a foreign national in a very unique case.

20  The first prosecution of its kind.

21       You have a foreign national who is being brought off

22  the battlefield of Afghanistan into a court of the United

23  States.  And that's far, far different, from the factual

24  scenario that you had in the *Brehm* case.

25       Also, Your Honor, but for the efforts for the United

1   States Military, Mr. Khamidullah would have been summarily

2   executed by the Afghan Border Police.  Our troops stopped

3   the Afghan Border Police from killing Mr. Khamidullah when

4   he was found.  Mr. Khamidullah's cohort, who was captured

5   at the same time outside the presence of the United

6   States' troops, faced a very different fate.  He was

7   killed.

8        The Afghan Border Police have not been prosecuted for

9   their criminal actions there.  And you can compare them,

10  at least under the government's theory, to the situation

11  in the *Brehm* case.  The government suggests that the

12  Afghan Border Police were assisting the United States

13  almost to the extent of a contract with the United States,

14  yet those Afghan Border Police were not brought to the

15  United States for purposes of being prosecuted when

16  someone was killed because of their actions.

17       So the issue raised in this motion should be

18  considered in conjunction with several of the other

19  motions filed by the defendant here in deciding whether or

20  not the due process rights of Mr. Khamidullah have been

21  violated.

22       First, the failure to preserve critical evidence,

23  Judge.  There was a firearm in this case that the

24  defendant was very adamant was never fired.  And so the

25  failure to preserve that firearm should be considered in

1  conjunction with other issues that we've raised here in

2  regard to fundamental fairness.

3       THE COURT:  Do you intend to argue that motion

4  separately?

5       MR. WAGNER:  Absolutely, Judge.

6       THE COURT:  Okay.

7       MR. WAGNER:  Yes.  But I was just mentioning that as

8  a --

9       THE COURT:  I'll hold off on my questions until then.

10      MR. WAGNER:  Very well.

11      Also, Judge, there's a failure to preserve or present

12 to the defense any aerial videos of the attack by the

13 United States on the insurgents in this case.  Generally

14 speaking, there should be video of helicopter response to

15 a situation such as this.  F-16s that were bombing.  We

16 haven't seen any of those videos, Judge.

17      THE COURT:  Are there videos that weren't shown to

18 you?

19      MR. WAGNER:  I don't know.  And I would actually ask

20 that the government, for purposes of the record, indicate

21 whether or not any such videos exist because --

22      THE COURT:  Yes, sir.

23      MR. GILLIS:  Are you saying you want that at this

24 point, Your Honor?

25      THE COURT:  No, I'm not necessarily suggesting that.

1          MR. GILLIS:  Okay.

2          MR. WAGNER:  I would.  If they would put it on the

3   record, I would appreciate that, Judge.

4          THE COURT:  I'll let them do that before the hearing

5   is over.  You go ahead.  I'll let Mr. Gillis do his

6   presentation.

7          MR. WAGNER:  But, again, there is no -- we have not

8   received any evidence of that kind, Judge.

9          THE COURT:  All right.

10          MR. WAGNER:  Problems with Mr. Khamidullah's

11   interrogation, Judge.  We have a motion pending regarding

12   the suppression of some of those statements that he made,

13   his requests for a practitioner that was construed as a

14   request for a lawyer.

15          Language barriers that were present.  And the

16   government is relying so heavily on these statements of

17   Mr. Khamidullah in their prosecution of him.  He was

18   fasting at times during his interrogation.  Wounded.  He

19   had demands that he was making for privileges, for food

20   and for books in exchange for information that he was

21   communicating to his interrogators.

22          THE COURT:  He was primarily concerned about

23   correspondence with his family, was he not?

24          MR. WAGNER:  There was that, Judge.

25          THE COURT:  All right.

1      MR. WAGNER:  The very novel theory that the

2   government has presented about the Afghan Border Police

3   assisting the United States government.  All of these

4   issues, all of these matters that have been raised with

5   the Court, should be considered in conjunction in

6   determining whether or not this prosecution was

7   fundamentally unfair, whether or not there was a

8   sufficient nexus between the defendant's conduct and the

9   United States, and whether or not there was proper notice

10  that the defendant could be expected to be haled into

11  court in the United States.

12      Under all of these circumstances, Judge, we believe

13  that the government has failed to demonstrate that this

14  prosecution comports with due process, and we ask that all

15  the charges be dismissed.

16      Thank you.

17      THE COURT:  Thank you, Mr. Wagner.

18      Ms. Levy.

19      MS. LEVY:  Good morning, Your Honor.

20      THE COURT:  Good morning.

21      MS. LEVY:  May it please the Court.

22      The government submits that there's no dispute that

23  the statutes with which the defendant's been charged have

24  extraterritorial application, either explicitly in the

25  terms of the statutes, or through the protective principle

1    of international law, *United States v. Boman*, the Supreme

2    Court case.  But I'd like to take this first opportunity

3    to address the specific references to Section 18 U.S. Code

4    Section 32(a), and 18 U.S. Code Section 2332.

5        The provisions of Section 32(a) were enacted by

6    Congress in 1954, I believe.  They are broad.  They are

7    domestic law of the United States.

8        THE COURT:  They argue that one of the lawyers with

9    the Department of Justice contends that this particular

10   section does not apply to acts that occur in the theater

11   of war.  So I'm anxious to hear you on that.  And how much

12   weight should be given to that lawyer's viewpoint.

13       MS. LEVY:  With all due respect, it's a legal

14   memorandum from an attorney in the Office of Legal

15   Counsel.  It is not the decision of any court, first of

16   all.  Second, --

17       THE COURT:  Also, is there any record whatsoever that

18   the Attorney General of the United States adopted that

19   memo and promulgated policy based upon it?

20       MS. LEVY:  None whatsoever, Your Honor.  And that

21   was, as I understand it, in the context of a specific

22   provision or a specific circumstance of the authority for

23   drone strikes.

24       But particularly interesting is that 18 United States

25   Code Section 32(b) was enacted in October of 1984

1  precisely to implement the United States' international

2  legal obligations under a Convention, a Convention against

3  aircraft sabotage.  It was to extend particularly,

4  extraterritorially, in certain circumstances that were

5  implemented under this Convention.  That is all that 18

6  United States Code Section 32(b) was enacted to do.

7       So in this case, the defendant is not charged under

8  18 U.S.C. 32(b).  He's charged under 18 U.S.C. 32(a).  So

9  it is apples and oranges regardless of what the defense

10  would like to pull from the analysis under 18 U.S.C.

11  32(b).

12       As far as 18 United States Code Section 2332 is

13  concerned, that is an extremely broad statute.  It was

14  enacted in 1986 in response to some terrible international

15  terrorist attacks in December of 1985 against United

16  States citizens at Rome and Vienna airports.  Congress was

17  concerned that there was not sufficient extraterritorial

18  reach to criminalize the conduct of murder, and attempted

19  murder, of United States nationals outside of the United

20  States under existing law.

21       So that is why 18 United States Code Section 2332 was

22  enacted.  It was enacted very broadly.  It is based -- or

23  it is supported by the passive personality principle of

24  United States law which allows -- not of United States

25  law.  Forgive me.  Under international law, which allows

1  for implementation of laws that would protect the identity

2  of the victim.  If a United States victim is at stake, the

3  passive personality principle of international law could

4  support enactment.

5      But regardless of that, there is this provision under

6  2332d which requires Attorney General certification.

7  That, we submit, is the limitation on proceeding with

8  otherwise very broad prosecutorial jurisdiction under 18

9  U.S.C. 2332.  And there's no dispute that that

10 certification has been given by the Attorney General in

11 this case.  It's not an element of the offense, but it had

12 in fact occurred.

13     So, in fact, both of those statutes are clearly

14 extraterritorial.  They were always intended to be

15 extraterritorial.

16     THE COURT:  Is there language in 18 U.S.C. 2332 that

17 specifically speaks to extraterritorial jurisdiction?

18     MS. LEVY:  Yes, Your Honor.  At the very nature of

19 the offense, 2332(a) talks about killing a national of the

20 United States while such national is outside the United

21 States.

22     2332(b), also, whoever outside the United States

23 attempts to kill, engage in conspiracy to kill a national

24 of the United States can be punished.

25     Similarly, 2332, Subsection C, whoever outside the

1    United States engages in physical violence against a

2    national of the United States shall be punished.

3        THE COURT:   Okay.

4        MS. LEVY:   Turning our attention to the Court's

5    inquiry about whether these -- any of these statutes

6    should be applied in active combat situations, we would

7    turn the Court's attention to the Second Circuit opinion

8    in *United States v. Siddiqui*, S-I-D-D-I-Q-U-I, which was

9    determined and it was decided November 15, 2012.  There's

10   interesting language.  The defendant in that case had

11   argued that the statutes with which she was charged -- she

12   assaulted, and attempted to assault, U.S. military

13   personnel at Bagram Air Force Base.

14       And there's interesting language when the Court

15   rejected her argument.  It says Siddiqui's argument that

16   the statutes, even if generally extraterritorial do not

17   apply "*in an active theater of war*" is unpersuasive.  As

18   the government points out, it would be incongruous to

19   conclude that statutes aimed at protecting United States

20   officers and employees do not apply in areas of conflict

21   where large numbers of officers and employees operate.

22       THE COURT:   What was the page number on that in

23   *Siddiqui*?

24       MS. LEVY:   I have it --

25       THE COURT:   I can find it.

1        MS. LEVY:  It's under Headnote 5, Your Honor.

2   Because it's unpublished -- I think it's an unpublished

3   opinion.  I will --

4        THE COURT:  I can find it.  That's fine.

5        MS. LEVY:  Thank you, Your Honor.

6        So turning back to the main issues of the defendant's

7   motion to dismiss here.  The test is the Fourth Circuit's

8   test in *United States v. Brehm*.  The *Brehm* court

9   specifically did not endorse the idea that there has to be

10  a nexus established.  The two parts of this test, and the

11  test we submit the Court should apply --

12       THE COURT:  Well, I thought in that case the Fourth

13  Circuit said that the interest of the United States alone

14  created a nexus.  Not that there was no nexus that needed

15  to be proven.  They held that the facts of that case were

16  sufficient.

17       MS. LEVY:  You're correct, of course, Your Honor.

18  Because the two prongs of that test, as *Brehm* had

19  established was, does the offense affect significant

20  United States' interests.

21       THE COURT:  Yes, ma'am.

22       MS. LEVY:  And would the offense subject the

23  defendant to prosecution somewhere.

24       And of course that 2-prong test has been adopted and

25  used subsequently in at least three other Fourth Circuit

1  cases in *United States v. Ayesha*; in *United States v.*

2  *Sepulveda*, S-E-P-U-L-V-E-D-A; and *United States v.*

3  *Bocachica*, B-O-C-A-C-H-I-C-A.

4  Interestingly, in *the Ayesha* case, again, it was a

5  foreign national who defrauded people outside the United

6  States in two different countries.  This defendant was a

7  foreigner.  He was working for the United States Embassy,

8  but his activities were certainly not connected to his

9  work at the United States Embassy.

10  The other two cases that the government cited had

11  nothing to do, essentially, with employment.  It was the

12  kidnap and murder of a DEA agent in South America by two

13  defendants who were also foreign nationals.  Again, the

14  United States -- the significant interests of the United

15  States is key here.

16  So in this case, the criminal conduct that the

17  defendant is charged with actually puts him on notice that

18  he could be haled into a court somewhere.  As far as the

19  evidence and the charges have demonstrated, the defendant

20  purchased weapons for an attack.  He led an attack.  He

21  anticipated that the United States' forces would arrive.

22  And as the Court will hear in the motion to suppress

23  statements and the motion *in limine*, there is evidence

24  that he knew that this was going to happen.  And as the

25  defendant claims that this attack was a contingency plan,

1  if and when the United States arrived, it was very clear

2  that this was part of the broader plan.  And that's why

3  the second superseding indictment charges him with

4  separate attacks, accordingly.

5      He was acting as an insurgent in support of a

6  terrorist organization that's been condemned by the world

7  community.  He must have assumed to know that these

8  activities, as an insurgent, could subject him to

9  prosecution.  The conspiracy charges, although the defense

10  has stated no Americans were injured, no harm, no foul,

11  well, under the Second Circuit's decision in *United States*

12  *v. Al Kassar*, the Second Circuit noted that the active --

13  or the most important thing is to look at the aims of the

14  conspiracy, not whether they were successful in their

15  completion.

16      THE COURT:  Well, am I correct that during the battle

17  damage assessment phase there were shots fired at U.S.

18  troops?

19      MS. LEVY:  Yes.  Yes, Your Honor.  There are multiple

20  eyewitnesses who already have -- we've provided the

21  defense with their statements.  And they will be prepared

22  to testify at trial to the same.

23      Finally, the United States assumes, and maintains,

24  that the prosecution is not arbitrary, nor is it unfair.

25  And the defendant knew of Camp Leyza's connection to

1  coalition forces.  He's a trained military officer from

2  the Russian authorities.  He knows what is required and

3  what the strategic plan would be for an attack on a camp

4  that is so strategically important to the border of

5  Pakistan and Afghanistan.

6       He anticipated the United States' response so much so

7  that he positioned his men and his heavy weaponry to shoot

8  down the U.S. aircraft when they arrived.  And he ordered

9  his men to shoot.  Whether the heavy weapons, and I think

10 one of them is a DShk, which is significant heavy

11 weaponry, he ordered that to be shot.  And whether or not

12 those weapons actually malfunctioned, fortunately for

13 American troops, it did not succeed.

14      But anyway, inviting the Court, as the defense has,

15 to look at all the circumstances of the case, the

16 testimony and the arguments, the government submits that

17 there would be no due process violation here under *United*

18 *States v. Brehm*, and under the applicable law.

19      THE COURT:  Thank you, Ms. Levy.  I appreciate it.

20      Mr. Wagner, I'll give you the final word.

21      MR. WAGNER:  Thank you, Judge.

22      The government points to the conspiracy and attempt

23 to shoot down American aircraft as part of the nexus

24 between the defendant's conduct and being haled into court

25 here in Richmond, Virginia.  However, there is no evidence

1    that any shots were ever taken at any aircraft.  And the

2    absence of any video from helicopters or F-16s --

3        THE COURT:  I've seen no evidence of that.  So I

4    don't know that -- I don't think the government's taking

5    that position.  The only shots that appear to be fired

6    were during the battle damage assessment phase.

7        MR. WAGNER:  And that's hotly contested as well.

8        THE COURT:  Understood.  But there is evidence of

9    that.

10       MR. WAGNER:  There is evidence that I'm sure the

11   government will introduce, and we'll be prepared to

12   address that.

13       Judge, we would ask that this Court apply the nexus

14   test as outlined in the *Brehm* case.  Not necessarily

15   applied, but outlined there because these facts and

16   circumstances in this case are so different.

17       THE COURT:  Don't -- didn't the Court there reject

18   the nexus test that's traditionally applied in choice of

19   law questions in civil cases?  And the Fourth Circuit

20   formulated its own test, did it not?

21       MR. WAGNER:  It did just apply the fundamental

22   fairness and arbitrariness test of due process.  But I

23   don't believe it rejected the nexus test at all.  In fact,

24   it looked to several other circumstances.  The Second

25   Circuit, for instance.  And it applied the nexus test, and

1   simply said it was inappropriate under these

2   circumstances.  And whether it's a choice of law

3   situation, or this situation, I believe the nexus test is

4   appropriate in this case.

5       Judge, the government has referenced certification by

6   the Attorney General authorizing this prosecution.  That

7   may be so, Judge, but we haven't received that specific

8   authorization from the government, and we would ask that

9   they produce it to the defendant.

10      Judge, the government in their response --

11      THE COURT:  I don't know that that's any requirement

12  of proof.  I don't know quite what legal dignity that

13  should be accorded.  It just indicates that the U.S.

14  Attorney can't sign the indictment without the Attorney

15  General's authority.  And I've been there.  And I

16  understand how that happens.

17      MR. WAGNER:  Very well.  But if there is such

18  authorization, if there is such certification, we would

19  request that they produce it to us, Judge.

20      THE COURT:  I'm sure they will accommodate you with

21  that.

22      MR. WAGNER:  And the government also raised the

23  question over the issue, and which we can't argue with,

24  that if the defendant could be prosecuted somewhere, then

25  this particular prosecution may be appropriate.  I don't

1　know where else Mr. Khamidullah could have been

2　prosecuted.  If he were taken into custody by Afghan

3　authorities, he would have been shot, and so there was no

4　prosecution there.  And so to expect him to be brought

5　into court for prosecution anywhere else, I think, is

6　unreasonable and impractical and would not have happened.

7　　　　So he could not reasonably be expected to have -- he

8　could not have reasonably expected to be brought into

9　court anywhere, Judge.

10　　　　THE COURT:  All right.  Thank you, Mr. Wagner.

11　　　　I believe the next argument is the motion to suppress

12　the statements?

13　　　　MR. PAUL GILL:  Yes, Judge.

14　　　　THE COURT:  Mr. Gill.  Mr. Paul Gill, will you be

15　handling that, sir?

16　　　　MR. PAUL GILL:  Yes.

17　　　　THE COURT:  Come on up.  You've got the podium.

18　　　　MR. PAUL GILL:  Judge, I'd like to address --

19　basically identify what I think are the four critical

20　factual points, and focus on the law.  And in doing so,

21　I'll make reference to something that I understand

22　Mr. Gillis is going to make reference to later, basically

23　sort of raising a best evidence rule, and suggesting that

24　the actual audio portion of the statements on April 17th

25　control.

1   THE COURT:  Well, unless there has been a change in

2   the polarity of the law, the best evidence rule only

3   applies to written documents.

4   MR. PAUL GILL:  Again, in any event, Judge, all I

5   want to say is I'm happy to have the Court rely rather

6   than on submissions from the parties as to transcripts, or

7   otherwise, upon its own listening to the audio.  I think

8   the Court will hear the same things I am hearing in

9   relevant part.  And the four things I would --

10   THE COURT:  I have looked at the tapes in preparation

11   for today's hearing.

12   MR. PAUL GILL:  All right.  And, Judge, I would say

13   that the four things that you -- that one hears on the

14   recording are the following:  First, at 25 minutes into

15   the first session of the April 17, 2010, interrogation,

16   Mr. Khamidullah is asked after viewing some videotape

17   whether he can talk about this.  And he really does

18   immediately say, and he moves his hand in the negative

19   fashion, and he immediately says, *"No."*

20   And what I hear, and what I think the Court will hear

21   is, *"first I have to talk with my practitioner"* before I

22   talk with you.  He makes very clear of that.  I think it

23   would be a perfectly reasonable assumption that, one, from

24   a European nation or from Russia saying I have to speak

25   with my practitioner is asking for counsel.

1        THE COURT:  Hold that point just one second.  I don't

2   mean to interrupt you, but it's irresistible in this case.

3        Is he referring to conferring with his practitioner

4   because he doesn't want to talk about the contents of the

5   tape that's being played, or because he is upset because

6   his six demands -- five demands have not been fulfilled,

7   and he's upset that he has not had a chance to talk to his

8   family, and it doesn't have anything to do with the

9   interrogation or the tape?

10       MR. PAUL GILL:  Well, Judge, two things.  I think

11  once one asks -- I do not divine in the law a litmus test

12  that says that there has to be a particular motivation for

13  you're saying I want my practitioner.  I want my lawyer.

14  If it can be construed as I want my lawyer, then it's

15  treated as a certain way regardless of what your

16  motivations are.  Maybe you're being truculent.  Maybe

17  you're trying to assert your rights.  Maybe you are just

18  trying to be troublesome.  Or you want to interrupt the

19  flow of the interrogation.

20       I've seen no case law authority, and really no, I

21  think, rationale for the proposition that you should

22  construe one's request for a practitioner or counsel

23  through some lens of a motivation factor.  I don't think

24  that's the case.

25       Again, over the next really just about four or five

1  minutes, the following things occur.  Later, about a

2  minute and a half later, Mr. Khamidullah clearly says,

3  *"you said if I don't want to talk with you I don't have*

4  *to."*

5       And it is true, as I think the government says in its

6  briefing, they respond with, yep.  That's right.  You

7  don't have to talk with us.

8       But again, after that, about another minute and a

9  half or two later, he says I gave you my explanations for

10 this video, and then he demands -- this is how I would

11 quote, *"now you send me away."*  Meaning back to his cell.

12 I believe, as I submitted in the briefing, you can hear

13 him saying words to that effect later.

14      He, of course, never gets returned to his cell in

15 that first session, or the ensuing sessions that follow.

16 He never gets a counsel brought to him.  He never has

17 anybody who are his interrogators say, okay, you don't

18 want to talk about this.  We're done.  We're sending you

19 back.  None of that occurs.

20      Now, the significance -- and, again, as I indicated

21 in my briefing, if you look through or listen through the

22 second session, he again repeatedly says I don't want to

23 talk about this.  I want to go.  I don't want to do this.

24      Now, the legal points, I would say, is this.  First,

25 --

1      THE COURT:  But in the context of the discussion, is

2   he saying that he doesn't want to talk because he wants to

3   confer with his attorney as in invocation of his rights,

4   or is he saying that he's tired of discussing that?  I've

5   already been over this.

6      He says, you already have enough to convict me of all

7   the charges, I believe, or something like that.  I forget

8   what it is.  But he just decided he doesn't want to talk

9   with him anymore.

10      MR. PAUL GILL:  Well, Judge, again, I think in

11   context, the way the Supreme Court, the way the cases look

12   at it, seems to me to be, are you saying I want a lawyer?

13   Are you saying I don't want to talk?  It doesn't examine

14   why is the person saying I'm done talking about this, or I

15   don't want to talk about this anymore, or why I want a

16   lawyer.

17      And, again, that gets me to, I think, part of the

18   government's response on the papers is that in context

19   this is a defendant who knows his rights, asserts them

20   when he wants to, or says I don't want to talk, and does

21   those kinds of things.  All the case law, really, or a lot

22   of it concerning invocation of rights, often will involve

23   a person who, much like this defendant, was interrogated

24   and did in fact waive his rights repeatedly over even the

25   course of days.  But one doesn't look at a defendant and

1  say, well, he waived a lot, he waived often, and say,

2  well, that should be -- that should inform the decision or

3  the lens through which you look at his invocation of the

4  right to remain silent.

5       THE COURT:  Do you think you can selectively invoke

6  your right to remain silent and say I'll talk about A and

7  B, but not C and D?

8       MR. PAUL GILL:  I think -- I think that may be

9  correct.  Having said that, the way the cases work out,

10 for example, I believe *Mosley*, the 1975 Supreme Court

11 case, one of the seminole cases on invocation, makes clear

12 one doesn't have to use formalistic language.  And what --

13 as I recall, is that person, what the Court said, was he

14 said he did not want to discuss the robberies.

15      I cannot recall -- my recollection is there were some

16 other things involved.  But basically at that point, the

17 Supreme Court says once he says that, questioning must

18 stop.  His invocation must be scrupulously honored.

19      The *Tice* case is probably a leading case --

20      THE COURT:  Which case?

21      MR. PAUL GILL:  Tice, T-I-C-E, out of the Fourth

22 Circuit from 2011.

23      THE COURT:  All right.

24      MR. PAUL GILL:  That case has a couple of quotations

25 that are, I think, worth emphasizing here.  In discussing

1  how one needs to invoke, *Tice* says if the defendant

2  indicates in any manner during questioning that he wishes

3  to remain silent, that triggers the obligation to

4  scrupulously honor the request and cease all

5  interrogation.

6      Other quotes from that. *"I'm not gonna say anything*

7  *after that."* And this is again *Tice* citing through a

8  litany of cases out of the Fourth Circuit, and others, to

9  go over some examples. *"I have nothing else to say."* The

10 defendant *"did not want to discuss the case any further."*

11 Or, *"I'm not saying nothing."*

12     Judge, I understand there's certainly cases that say

13 if you are being equivocal or ambiguous in your assertion

14 of your rights, if, for example, you are saying, the

15 classic is, maybe I should talk to a lawyer, we don't have

16 the argument if that's what's going on here. Do you think

17 I should consult with my attorney? I don't know. Maybe I

18 should stop talking.

19     Those are not the phrases that come out of the

20 audiotape, that come out of Mr. Khamidullah's mouth.

21 Those are not what he is saying. This is not equivocal.

22 This is not ambiguous. And those created the obligation

23 of his interrogators to stop.

24     What happens instead by they're not stopping at all,

25 or even taking any motion, they don't even say, so do you

1    really want to stop?  They don't inquire further.  They

2    just keep going.  They keep showing the videotape they

3    want him to look at.  They keep asking him questions.

4        THE COURT:  Well, refresh my recollection, Mr. Gill,

5    did they ask him questions, or did they merely continue to

6    have the tape playing and he began on his own making

7    comments?

8        MR. PAUL GILL:  Judge, I'd say there's a little bit

9    of both there.  Clearly they do ask him some questions.

10   They ask him a number of questions, especially in the

11   second session.  Clearly, they're continuing to show him

12   the tape.

13       But my proposition would be one of the reasons for

14   the rule of once someone has asserted rights, you've got

15   to scrupulously honor them immediately to avoid exactly

16   what happens here.  From the perspective of the defendant,

17   he's sitting in a room and says I can't talk to you before

18   I talk to my practitioner.  He saying I don't want to talk

19   about this anymore.  He saying I've talked to you all I'm

20   going to talk.  Send me back to my cell.

21       And what he says is essentially that resistance is

22   futile.  I say I want my practitioner.  I don't get one.

23       I say I am done talking.  They keep wanting me to

24   talk.  I say send me back to my cell.  I don't get sent

25   back to my cell.

1    This is not scrupulously honoring his request for

2  counsel, and his request to stop, and his request to cease

3  the interview and get him back to his cell.  This is the

4  opposite of scrupulously honoring, and it is for that

5  reason that we would ask that the motion be granted.

6    THE COURT:  Thank you, Mr. Gill.  I appreciate your

7  comments this morning.

8    Who'll be arguing on behalf of the United States?

9    MR. GILLIS:  Your Honor, I'm sorry to say that after

10  the excellent advocacy that you've heard so far, I'm left

11  to argue this motion.

12    Your Honor, if I may, my mouth tends to get dry not

13  only because I'm a little nervous, but also because some

14  of the medication I take.

15    THE COURT:  That's okay.  Mr. Paul Gill is a very

16  intimidating arguer.  We know that.

17    MR. GILLIS:  I do.  I do, Your Honor.  In fact, I've

18  been trying to establish a kinship between me and Mr. Gill

19  since my great grandmother was named Catherine Gill.  And

20  so I'm sure that there's one there somewhere, but I

21  haven't yet found it.

22    THE COURT:  Okay.

23    MR. PAUL GILL:  Just to clarify.  I'm the first Gill

24  in this division.  And Gill and Gill and Gillis is piling

25  on.

1        THE COURT:  Mr. Gill, there's so many issues in this

2  case, we don't want anymore to resolve, all right?

3        Go right ahead, Mr. Gillis.

4        MR. GILLIS:  Your Honor, the events on April 17th

5  must be examined in the context of the entire history that

6  took place between these agents and this defendant.  It

7  was a rapport-building exercise that carried on for nearly

8  three weeks.  And by the time we got to the statements

9  that are at issue here, the defendant had been *Mirandized*

10 at least 13 separate times.

11       And as I point out in the brief, he even was able to

12 recite them from memory on his own.  They joked that he

13 could be hired into the FBI.

14       So against that background of selective invocation of

15 rights, which the courts make clear can be done, a

16 defendant can certainly say, for example, I'll talk to

17 you -- I'm willing to talk to you, but I'm not going to

18 give you a written statement without my lawyer.

19       The Supreme Court has found that that did not violate

20 a right to counsel when the agents continue to interrogate

21 him.  So he can selectively invoke his rights.  And

22 exactly that happened here, Your Honor.

23       Over the course of three weeks, as I cataloged in the

24 brief on Pages 4 through 6, there were myriad times when

25 the defendant refused to answer some questions, agreed to

1  answer other questions, then he was coy about some

2  subjects, and then he was willing to completely answer

3  others.   And indeed, they have the laughing exchange on

4  April 10th about this Bolshoi Ballet that I put in the

5  brief.

6       THE COURT:  But my real question here, and kind of

7  focusing on the central events, is whether or not on

8  April 17th he was invoking his right to counsel, or

9  whether or not he was upset because his demands had not

10 been satisfied and he wasn't going to cooperate any

11 further until they used their influence to make sure that

12 he had a new cellmate, had food, communicated with his

13 family, had access to the Red Cross?

14      MR. GILLIS:  And his luggage, Your Honor.

15      THE COURT:  Yes.  All that.  Right.  That is

16 important, I think, in the analysis.

17      MR. GILLIS:  I couldn't agree more, Your Honor.  And

18 it's important for two reasons.  Because it is -- it is

19 fundamentally in *Miranda*, and all the cases that proceed

20 from it, the protection of the Fifth Amendment right to be

21 free from giving compelled testimony against oneself.  It

22 is that privilege against self-incrimination that is at

23 the root of *Miranda*.  It is the same -- it is that root

24 that then gives the right to counsel under the Fifth

25 Amendment.  And it is from that that all of the cases

1    proceed.

2         It is fundamental then so that when it is plain from

3    the context that that is not the right that is being

4    asserted, and it could not be more plain than it is in

5    these recordings, when it is plain that --

6         THE COURT:  What other circumstance do you rely upon

7    in concluding that it was plain and clear under these

8    facts?

9         MR. GILLIS:  Your Honor, from the -- from the

10   beginning, the defendant had said something about books.

11   That was one of his complaints back in perhaps the first

12   or second encounter.  He was saying that he wanted his

13   books.  He had been treated much better.

14        As the Court is aware, he had been in the custody of

15   the D.O.D. beforehand.  He had been questioned, and they

16   had provided him with books and other comforts, and he was

17   not enjoying the same comforts at the facility where he

18   was when the FBI talked to him.  So that was one of his

19   complaints at the very beginning.

20        On the 13th of April, however, Your Honor, he listed

21   these five conditions that he wanted met.  Not a single

22   one of them dealt, in the least, with a right to counsel

23   or a right against self-incrimination.  That was nowhere

24   in that mix at all.

25        And it is -- it is clear that he never felt -- the

1 touchstone of these cases is that the defendant expresses

2 a desire to deal with the police only through his counsel.

3 That language pervades the cases.  And it is so that that

4 is the right that is protected and so --

5      THE COURT:  But does the invocation have to be solely

6 because they don't want to incriminate themselves, or

7 simply because they don't want to deal with the agents

8 because their demands weren't fulfilled?

9      MR. GILLIS:  Well, Your Honor, for purposes of

10 argument, I would say that the defendant has a right not

11 to answer questions generally.  But if we're talking about

12 applying the bright-line rules, or the other rules that

13 grow out of *Miranda*, those rules are based fundamentally

14 on the right against self-incrimination.  And unless that

15 right is what's at issue here, it is not -- it is not

16 those cases that come into play.  They're simply

17 inapplicable in this context.

18      THE COURT:  Is that the constitutional linchpin that

19 you -- that you invoke it because you don't want to

20 incriminate yourself?

21      MR. GILLIS:  Well, Your Honor, before I -- if I may,

22 I'll answer that question in one moment.

23      THE COURT:  All right.

24      MR. GILLIS:  Before I neglect it, I want to make the

25 point that if the request for counsel, or the request

1  to -- the desire to remain silent, if either of those

2  things is ambiguous, then the assertion is ineffective.

3  That could not be clearer.  The agents have no obligation

4  to clarify.  And if it is ambiguous, it is not sufficient

5  to raise the *Edwards* and *Mosley* consequences.

6       So in saying, for example, that he wanted a

7  practitioner, that -- on the 17th, following on the heels

8  of these five demands that he made on the 13th which was,

9  to be clear, the interrogation that immediately proceeded

10 the 17th.  So there was a break at the defendant's request

11 at the conclusion of the 13th, and then the resumption of

12 questioning on the 17th.

13      And so it is -- and indeed, at the very beginning you

14 hear -- at the very beginning when he's presented with his

15 *Miranda* form on the 17th, the defendant says you didn't

16 talk to my five.

17      THE COURT:  Talk to who?

18      MR. GILLIS:  Talk to my five.

19      THE COURT:  Oh.

20      MR. GILLIS:  That's the first words out of his mouth

21 when he's presented with the *Miranda* waiver.  And so it's

22 against that backdrop then you have to examine the

23 question of what the practitioner meant.

24      So in the context of his five requests, it's the ICRC

25 visit, the Red Cross visit, the -- some sort of thing

1   having to do with his family through the ICRC, and among

2   them also is a request to see a dentist.  And so when he

3   says *"first I have to talk with my practitioner,"* first,

4   that's not lawyer.  And he's recited from his own mouth

5   the *Miranda* requirements that he be advised of his right

6   to counsel.  He knows the word for lawyer or attorney.

7   He's used it.  In this context he's saying *"practitioner."*

8        Now, whether he may have meant subjectively to say

9   attorney or lawyer, that subjective intent is irrelevant

10  because it is the objective test that applies.  What would

11  the agent --

12       THE COURT:  I don't know of any case that requires a

13  formalistic incantation here.

14       MR. GILLIS:  No, Your Honor.

15       THE COURT:  Don't you think you can reasonably

16  construe *"practitioner"* to be a lawyer?

17       MR. GILLIS:  Well, it might, Your Honor.  In fact,

18  even if it was likely that that's what he meant, that is

19  not the test.  And that, Your Honor, is from the Supreme

20  Court's mouth.  Not mine.

21       Even if there is a likelihood that the defendant

22  wishes to have counsel, the assistance of counsel, that

23  does not invoke the privilege.  So in a sense, it is an

24  incantation.  But what's important here is that you look

25  at the totality of the circumstances, including the nearly

1   three weeks that preceded it, and in particular the one

2   day immediately before where he says I want to talk to the

3   ICRC, and I want to see a dentist.

4       And so it's possible, or at least it creates an

5   ambiguity, about what he wanted to do was first talk to

6   the ICRC, a practitioner from the ICRC, before he talked

7   to them.

8       Nowhere, Your Honor, is there anywhere else, anywhere

9   that they've pointed to or that you would be able to find

10  in any of the transcripts or the videos, anything that

11  comes remotely close to a request for counsel, apart from

12  this single reference to a practitioner.  And in that

13  context, Your Honor, it is ambiguous on its own.  Standing

14  alone, I submit, it's ambiguous.  But in this context,

15  what these agents knew, what these agents had discussed

16  with this defendant, and knowing what they knew about this

17  defendant, that request was ambiguous, Your Honor.

18      THE COURT:  Let's move forward a moment or two.  As I

19  recall the tape, Mr. Gillis, shortly after that brief

20  dialogue, the tape was still playing and he began

21  commenting on some of the contents of the tape.  What's

22  the legal significance of that in your mind?

23      MR. GILLIS:  Well, Your Honor, the legal significance

24  of that is that the defendant reinitiated contact with the

25  agents.  And as the cases from the Supreme Court make

1  clear, even after the invocation of the right to counsel,

2  that does not mean that forever and all time he may not --

3  he may not waive that right without a lawyer being

4  present.

5      The question is whether under the totality of the

6  circumstances he knowingly and voluntarily waived his

7  right to counsel assuming that he clearly, unambiguously,

8  unequivocally asserted a right to counsel.  So assuming

9  that, then he can waive it.

10     And I think what is clear from the record, and from

11 the transcript and from the recording itself, he did

12 exactly that.  He continued to converse to comment upon

13 the videotape, and that affects both the question of his

14 right to counsel and his claim to right to silence.  For

15 the same reason, Your Honor, we submit that the right to

16 silence was never invoked here either.

17     And it's interwoven, in my mind, that on the one hand

18 it is not the right that *Miranda* and other cases protects.

19 A right, for example, to say -- if the defendant, for

20 example, had said I want to talk to a lawyer to write a

21 will before I answer any questions, I'm willing to

22 incriminate myself all day long, but first I want to talk

23 to a lawyer to write a will, that could not possibly

24 invoke all of the prophylactic measures that the Supreme

25 Court has put in place to protect the right to counsel,

1  which grows only out of the right against

2  self-incrimination.

3      And similarly, if the defendant had said I will talk

4  to you and incriminate myself, perfectly happy to do so,

5  but first I want a slice of cherry pie.  And if you don't

6  give me that slice, I'm not going to say a word.  No

7  talking until I get my pie.  That too would certainly not

8  be covered by *Miranda*.  Certainly not by some bright-line

9  rule that would require the exclusion of the evidence.

10      But, Your Honor, we don't need to get to that point

11 because it is that -- the way in which the right was --

12 the right -- the way in which the mention of the

13 practitioner, and the mention that he did not want to

14 answer questions, the way in which it was done, the

15 context in which it was couched, related directly to the

16 five conditions that he had made that had nothing to do

17 with his right to counsel or his right to remain silent.

18 It is that that makes it ambiguous.

19      So it's completely within the rubric of the existing

20 case law that would make the assertion ambiguous and

21 therefore ineffective.

22      THE COURT:  Okay.

23      MR. GILLIS:  So -- I beg your pardon?

24      THE COURT:  Go ahead.

25      MR. GILLIS:  So to be clear, there is absolutely no

1   evidence whatsoever of any coercion in this case, nor any

2   claim that could be seriously -- that could be seriously

3   advanced.

4        Your Honor, it's clear that the defendant knew from

5   having been in ISI custody, in FSB custody, in the custody

6   of other unsavory characters representing governments, he

7   had mentioned himself on several occasions how surprised

8   he was by the treatment that he was receiving.

9        THE COURT:  I don't think the defense has suggested

10  that.

11       MR. GILLIS:  So, Your Honor, then I think that's

12  important for the record because it does obviously have

13  different consequences if this is -- if this is a coerced

14  statement that obviously has different consequences.

15       THE COURT:  Hold off one second.  My court reporter

16  is having some sort of difficulty.

17       Go ahead, Mr. Gillis.

18       MR. GILLIS:  Thank you, Your Honor.

19       So the Supreme Court cases, *Barrett*, and others,

20  McClain, and *Edwards*, and *Roberson* make clear that there

21  is indeed a motive element to this.

22       McClain speaks of the defendant's wish to -- *McNeil*.

23  Pardon me.  Not McClain.  But *McNeil* mentions that the

24  purpose of the *Miranda*, *Edwards* guarantee, and hence the

25  purpose of invoking it, is to protect the quite different

1  interest, the suspect's desire to deal with the police

2  only through counsel.  And going on --

3       THE COURT:  By the way, I have read these cases.

4       MR. GILLIS:  Yes, Your Honor.

5       THE COURT:  I've applied them before a time or two.

6       MR. GILLIS:  Yes, Your Honor.

7       THE COURT:  Go ahead.  Direct my attention to

8  anything you think I need.  I don't want to interfere with

9  your argument, but most of these fundamental points I've

10 got a pretty good grasp on.

11      MR. GILLIS:  Yes, Your Honor.  I have no doubt.

12      THE COURT:  Okay.

13      MR. GILLIS:  Then I will leave that part of it to my

14 brief, Your Honor, rather than rehearse that again.

15      THE COURT:  All right.

16      MR. GILLIS:  I would mention only this *McNeil* makes

17 clear that it is the desire for the assistance of an

18 attorney in dealing with custodial interrogation by the

19 police.  That is something that is italicized by the court

20 itself.  So it is that desire, it is that motive, and in

21 fact it's for that reason that in *Barrett*, for example,

22 the court could examine is the defendant while he's

23 invoking a right to counsel, in a sense, not to have a

24 written statement.  He is waiving it with respect to

25 providing an oral statement.  So the context -- the motive

1 of the defendant is certainly important.

2      So, Your Honor, we submit therefore that whatever

3 assertions that were made here, they were ambiguous at

4 best, and that ends the inquiry.  But even if the

5 defendant had made a clear unambiguous assertion of a

6 right to remain silent, the defendant did reinitiate

7 conversation specifically with respect to the practitioner

8 comment.  Even if that did refer to a lawyer, he

9 immediately reengaged the agents in conversation, and did

10 so without the interposition of any questioning from the

11 agents.

12      Similarly, with respect to the right to remain

13 silent.  If that's what was clearly asserted, he reengaged

14 the agents in conversation.  And that is to be judged by

15 the totality of circumstances.  And I don't mean to harp

16 on this, but it does require a look at the three weeks

17 before where there's this back and forth cajoles cat and

18 mouse going on.  That's not -- and in the context of

19 examining the totality of the circumstances, you must look

20 at the age, experience, intellectual capabilities, history

21 of the defendant.

22      This is a defendant who was in the custody of some

23 unsavory characters who he claims, and perhaps was,

24 tortured previously.  And had been witness to, over the

25 course of several weeks, months, that in the United

1 States' custody, that was not going to happen.  In fact,

2 he witnesses from the very get-go, as they mentioned, and

3 the defense mentioned, that the U.S. forces prevented the

4 Afghan forces from abusing him.

5      They carried him up a steep hill where he could be

6 taken away to a hospital.  And he was given first aid on

7 the scene.  They carried him on their backs to get him up

8 this steep hill.  So this is the Americans' way of doing

9 justice.  He was a witness to it firsthand.  He noted it

10 more than one time.

11      He knew, knew, that he would not be subject to any

12 sort of coerce tactics.  He knew that for a certain, and

13 that's why they would laugh.  As you'll see from the

14 clips, that they would laugh about this dance that they

15 were playing, this cat and mouse game that they were

16 playing.

17      And so when -- if there was -- if you say that it was

18 an unambiguous assertion of a right to counsel, what

19 happened -- not right to counsel, Your Honor.  Pardon me.

20 A right to remain silent.  What happens there is a

21 scrupulous honoring of his right to cut off questioning.

22      THE COURT:  Okay.

23      MR. GILLIS:  And that is the touchstone of *Mosley*.

24      THE COURT:  Outstanding.

25      MR. GILLIS:  Yes, Your Honor.  I'm about to sit down.

1  If I may say one more matter?

2       THE COURT:  Go right ahead, sir.

3       MR. GILLIS:  Your Honor, I did not -- I did not brief

4  this because, frankly, it is not permitted by existing

5  case law, but I would like to raise it for the purpose of

6  appeal if one should become necessary.

7       THE COURT:  All right.

8       MR. GILLIS:  So, Your Honor, I submit that the

9  underpinning for all of these rules began with McClain --

10  with *Miranda*, and continued through, and is mentioned in a

11  number of different situations is the concern that the

12  Court could not examine these incommunicado

13  interrogations.  And there was a great deal of concern,

14  rightly so, about the coercive atmosphere and the

15  possibility that the defendant would be --

16       THE COURT:  I don't think any of these issues have

17  been raised in this case.

18       MR. GILLIS:  I'm -- they're not raised in this case

19  except in this context, Your Honor.  The only point I want

20  to make is that these bright-line rules that came after

21  *Miranda*, we submit, I submit, were put in place before a

22  time when virtually every interaction is now being

23  videotaped.  And so I submit, Your Honor, that those rules

24  will have to be examined in an era when, as in this case,

25  the interview was videotaped from before the agents walked

1   in the door until after they walked out of the door.  And

2   I submit, Your Honor, that, again, only for purposes of

3   appeal, that if the wheels fell off this thing, I would

4   like to be able to argue at the time of appeal that the

5   Court can examine, even in the face of transgressing what

6   is now in some cases a bright-line rule.  That when

7   there's a videotape of this kind, that the Court could

8   look behind that bright-line rule.

9        Your Honor, I would move in some exhibits at this

10  time.  Exhibit 10 is a transcript of the pre-attack video.

11       Exhibit 10-A is the CD containing the pre-attack

12  video.

13       Exhibit 11 is the actual 4/17 tape.

14       Exhibit 12 is a transcript of the interviews of the

15  defendant with the exception of the 13th and the 17th, and

16  the subsequent ones.

17       THE COURT:  Hold on just one second, Mr. Gillis.

18       MR. GILLIS:  Yes, sir.

19       THE COURT:  Exhibit 11-A is a transcript of the

20  April 17th tape?

21       MR. GILLIS:  I'm sorry.  Exhibit 11 is the actual

22  April 17th recording.

23       THE COURT:  Right.

24       MR. GILLIS:  Exhibit 12 is a transcript of the

25  interviews conducted of the defendant up through, but not

1  including, April 13th.

2       THE COURT:  All right.  Go ahead.

3       MR. GILLIS:  Exhibit 13 is the interview.  The

4  videotape of the interview of April 13th.

5       THE COURT:  Okay.  Thirteen is the transcript or the

6  video?

7       MR. GILLIS:  Thirteen is the video.

8       THE COURT:  Video of April 13th.  Okay.

9       MR. GILLIS:  Exhibit 14 is a conglomeration of the

10  video excerpts containing all of the *Miranda* warnings that

11  the defendant received.

12       And finally, Exhibit 15 is an e-mail reflecting

13  agreement between defense counsel and us that -- having to

14  do with the transcript.  And in particular, I raise it

15  only with respect to the transcript that's been referred

16  to by the defense, and relied upon quite a bit with

17  respect to the April 17th -- the April 17th interview.

18       That transcript we do not subscribe to, Your Honor.

19  It is true that we provided it, but we provided it, as you

20  will see from Exhibit 15, as an understanding that it was

21  just a draft.  It was provided merely for their

22  convenience, and it was not intended to be introduced as

23  an exhibit at a proceeding.

24       I introduce that solely to explain why we don't

25  subscribe to that particular audio.  And I do -- or that

1  particular written transcript.  And I do submit that the

2  best evidence is the video itself.

3      And, Your Honor, if I may --

4      THE COURT:  Practically speaking, but not necessarily

5  legally speaking, correct?

6      MR. GILLIS:  If I may beg to differ, Your Honor.  I

7  believe that Rule 1002, which contains the Federal Rules,

8  best evidence rule applies to any writing, recording or

9  photograph.  And so I submit, Your Honor, it does apply in

10  this context.

11      THE COURT:  All right.

12      MR. GILLIS:  Thank you.

13      THE COURT:  Thank you, Mr. Gillis.

14      Is there any objection to these exhibits, Mr. Gill?

15      MR. PAUL GILL:  Judge, I question the relevance of

16  them.  I'm not going to object to them.  They can make

17  them a part of the record.

18      THE COURT:  That's fine.

19      They'll be received.

20          (Government's Exhibits 10, 10-A, 11, 12, 13, 14

21          & 15 are received.)

22      MR. PAUL GILL:  Real briefly, Judge, in reply.

23      I think the Court appreciates -- I mean, there's a

24  lot of discussion about the history and circumstance and

25  relationship between my client and his interrogators.

1   We've really not raised a voluntariness or coercion issue.

2   It's a very technical invocation issue.

3        With respect to what we've raised, of course, it's

4   both about the --

5        THE COURT:  The question is really whether or not he

6   exercised his right to cut off interrogation on the 14th

7   of April.

8        MR. PAUL GILL:  Right.  Absolutely.

9        And, again, returning to how the law describes what

10  is appropriate.  Again, *Tice* says if one indicates in any

11  manner during questioning that he wishes to remain silent,

12  that's sufficient to trigger the immediate cessation of

13  discussion.

14       I think clearly when he says, *"I have to talk with my*

15  *practitioner."*

16       He says *"No"* many times.

17       THE COURT:  I don't mean to interrupt you, but you

18  believe that that would apply even if an arrestee says,

19  Detective Gill, if you don't give me a cold beer, I'm not

20  going to talk to you?

21       I mean, that's an extreme example.

22       MR. PAUL GILL:  That's an interesting hypothetical.

23  I guess what I'd say is here that is not what he said.

24       Now, the motive, whether spoken or unspoken behind

25  why he chooses to remain silent, or why he chooses to say

1   I don't want to talk about this, again, I'm not aware of

2   case law that says the motive controls the plain language,

3   as it were.  I think we've talked about plain language a

4   lot for statutory construction, and I think it applies in

5   this context.

6       I do want to address briefly both the reinitiation of

7   discussion point, which is I think related to Your Honor's

8   observation about the videos.

9       THE COURT:  Hold off one second.  I think the

10  interpreters need to change positions.

11      Go right ahead.

12      MR. PAUL GILL:  It is true that he does do some

13  speaking after saying I want my practitioner, and after

14  saying *No* and after saying I've said what I can.  *Now*

15  *you send me away.*  It's also true that he says it not

16  immediately, but as, again, nobody takes him away.  Nobody

17  stops.  The video keeps playing.

18      And that's, of course, the point of the whole

19  interrogation is they want him to watch the whole video

20  and talk to them about it.  So at that point, the damage,

21  as it were, constitutionally has been done.

22      THE COURT:  Mr. Gillis argues that you have to look

23  at the context and the interplay between the defendant and

24  the agents over the course of their continuing

25  discussions.  How does that play into there as far as

1  their interpretation and the legal significance of that

2  comment about the practitioner?

3       MR. PAUL GILL:  Well, Judge, I'd say if maybe we were

4  dealing with one of his statements that I argue amounts to

5  invoking rights that might be important.  But what we have

6  here is repeatedly, in a fairly condensed time period, and

7  then in a less discrete fashion over some time thereafter,

8  he is saying I want my practitioner.  No, I don't want to

9  talk about this.  *"Now you send me away."*

10      At some point, it should have been obvious to them he

11 is doing what the Supreme Court says is sufficient, and

12 what the Fourth Circuit says is sufficient.  He's

13 indicating in some manner during questioning that he

14 wishes to remain silent, and he wishes the interrogation

15 to cease.  He wants to go back to his room.

16      At that point, to the extent we get into the

17 reinitiation cases -- I mean, the reinitiation cases talk

18 about someone invokes and their invocation is scrupulously

19 honored and the interrogation ceases, and then at some

20 later time the suspect says, Well, I'll talk to you again.

21 When they reapproach, re-*Mirandize*, are you willing to

22 talk today?  That's not what we have.  What we have is in

23 a five minute span, or less, he's very much repeatedly

24 saying he doesn't want to speak.

25      There is, I think, a good description in the

1  transcript that Mr. Gillis has some objections to where --

2  I would say this is a perfect characterization.  It

3  describes Mr. Khamidullah as showing *signs of irritation*

4  *when Interviewer asks whether latter can talk to them*

5  *about anything shown in the footage."*  Again, this is a

6  man who says I want my practitioner.  I don't want to

7  talk.  I've said what I'm going to say.  *"Now you send me*

8  *away."*  And they keep playing the video, and keep playing

9  the video.

10       THE COURT:  But isn't that a matter of the agent

11  clarifying whether he's invoked his right to remain

12  silent, or whether he's just upset about not receiving the

13  items he wanted?  Is it designed -- is that designed to

14  elicit incriminating responses?

15       MR. PAUL GILL:  Well, Judge, again, I'd go back to

16  the proposition that when you said words that clearly

17  qualify under the standards of *Tice*, and other cases, for

18  saying I'm done, I don't want to speak about this anymore,

19  then there's no -- I think there's no further inquiry or

20  interrogation to see do you really mean what you said

21  unequivocally?

22       Those would be my points in rebuttal.

23       I will say one thing about Government's Exhibit 15,

24  Judge.  I mean, Government's Exhibit 15, is --

25       THE COURT:  What is 15 again?

1       MR. PAUL GILL:  Judge, in fact, I'll give you my copy

2   of it, if you'd like.  I think that might illuminate

3   things.

4       THE COURT:  All right.

5       MR. PAUL GILL:  And again, to be honest, I have no

6   issue with the Court relying solely on its own listening

7   to the recording, or the latest enhanced audio which I

8   don't think I even had when I filed this motion of the

9   April 17th interrogation.  But essentially what

10  Government's Exhibit 15 is an e-mail that I wasn't part

11  of.  It was Mr. Gillis e-mailing Mr. Wagner and

12  Ms. Cardwell, and saying what we said about this

13  transcript and we consider it a draft, or whatever.

14      I will leave it to the Court's own devices whether

15  somehow that merits the striking of the transcript itself.

16  Again, I wasn't even aware of it until it was brought to

17  my attention after this whole issue was briefed.

18      What was of course produced was a declassified

19  transcription by the FBI from 2013 that even includes the

20  translator note I made reference to in my motion where a

21  Russian translator, looking at everything, basically puts

22  in parentheticals the defendant's reference to

23  *"practitioner"* presumably means attorney.  I don't know

24  that you can glean anymore out of the transcript than you

25  can out of the recording.  I'll leave that to the Court's

 1   discretion.

 2       But, again, for the reasons I've previously stated,

 3   I'd ask the Court to grant this motion.

 4       One other thing I should mention.

 5       THE COURT:  Yes, sir.

 6       MR. PAUL GILL:  I recognize it's maybe not legally

 7   dispositive or relevant, but we are really talking about

 8   an incredibly small amount of statements after this

 9   invocation.  We are not talking -- I would say 95% of what

10   Mr. Khamidullah said --

11       THE COURT:  Mr. Gill, that did not go unnoticed to

12   the Court.

13       MR. PAUL GILL:  All right.  Thank you.

14       THE COURT:  All right.  We have a number of other

15   motions left.  Some longer than others.  We have the

16   motion to suppress the firearm.  We have the motion to

17   strike the reference to Camp Leyza.  Motion *in limine* on

18   the video.  Exculpatory evidence and bill of particulars.

19   I don't think any of these are going to take a great deal

20   of time.  We can go ahead and proceed now, or if counsel

21   would like to have a lunch break before we do so, I'll bow

22   to that.

23       MR. PAUL GILL:  I think my co-counsel are saying

24   lunch break.

25       THE COURT:  Obviously Ms. Cardwell is in control.

1          MR. PAUL GILL:  She and I share similar habits.

2          THE COURT:  All right.  Let's take a one hour lunch

3   break.  We'll come back at 1:30 and see if we can't wrap

4   the rest of these motions up in about an hour.

5          Court will stand in recess.

6                        (Recess taken.)

7          THE COURT:  Our next motion is the motion to suppress

8   the firearm seized.

9          Who'll be representing the defense on that?

10         MR. PAUL GILL:  I will, Judge.

11         THE COURT:  Okay.  Go right ahead, Mr. Paul Gill.

12         MR. PAUL GILL:  Judge, as a preliminary matter, I

13   have one item simply to add to the record.

14         THE COURT:  Yes, sir.

15         MR. PAUL GILL:  And, Judge, I'm going to mark this, I

16   think, as Defendant's 17, is my recollection.

17         THE COURT:  What's the next number, Ms. Pizzini?

18         THE CLERK:  It's 17, Your Honor.

19         THE COURT:  Seventeen.  Okay.

20         MR. PAUL GILL:  And I'll provide a copy to the Court.

21         THE COURT:  Is there any objection, Mr. Gillis?

22   Mr. Gill?

23         MR. MIKE GILL:  No, Your Honor.

24         THE COURT:  All right.  It will be received without

25   objection.

```
 1              (Defendant's Exhibit 17 is received.)

 2        MR. PAUL GILL:  And, Judge, I'll make reference to

 3   that as appropriate.  The last time I started with the

 4   facts and went to the law.  I will articulate, talk

 5   briefly, about the law and talk about the facts as how I

 6   think I fit in -- how I think they fit into the law for

 7   purposes of this motion.

 8        I agree for purposes of how the Supreme Court

 9   describes things in cases like Trombetta and Youngblood,

10   that the gun in this case is a -- is subject to

11   essentially the Youngblood analysis.  That basically has

12   three parts.  One is whether the exculpatory value of the

13   rifle was apparent before its destruction, or a loss or

14   disposal.

15        Second, could comparable evidence be obtained by

16   other reasonably available means.

17        And third, was the destruction in bad faith within

18   the meaning of that term as applied in cases like

19   Youngblood and its progeny.

20        I'm going to start with the first point about whether

21   the exculpatory value of the weapon was apparent before

22   destruction, and get into a little bit --

23        THE COURT:  Can I simply ask one question.  I don't

24   want to pull you off track here.  Do you think the

25   analysis is somewhat contextual here?  I mean, we're not
```

1  dealing with a police crime scene tech.  We're dealing

2  here with a soldier performing his or her functions in the

3  field of battle.  Is there a different mindset and a

4  different context of the analysis?

5      MR. PAUL GILL:  Well, Judge, I think if it was

6  strictly speaking a time, especially maybe in 2001 when

7  battle first started and it was literally just a

8  battlefield, not in a country that as we heard a lot of

9  testimony about the Taliban had been ousted from, or

10 whatever.  What we have here, though, I think indisputably

11 is there were people -- the battlefield area was assessed

12 and treated like a crime zone by members of military

13 personnel.  I can't remember their exact titles, but as

14 the briefing indicates, there were people who were law

15 enforcement officers, essentially, trained law enforcement

16 officers, going to collect evidence.  Going to even look

17 for DNA.  Look for other things like that.  They clearly

18 were acting like lawyers or police in the field for

19 purposes of examining the end result.

20     THE COURT:  I would ask you to point to that, not

21 today, in the record of materials in this case because I

22 didn't see it.  I'm not saying that I was looking for it,

23 but it would be helpful to me and my staff if you could

24 kind of direct me to that.  You can do that at a later

25 time, Mr. Gill.

1       MR. PAUL GILL:  That's fine, Judge.

2       So going on in terms of the potential exculpatory

3  value, I would emphasize some of the first responder

4  statements, including four sworn statements that were

5  dated either on the date of the incident or the date

6  after.  I do think these matters, I confess, I forgot to

7  identify in my initial briefing, so it's in some of the

8  supplemental briefing on this.  But clearly there were

9  four different sworn statements.

10      And not only did -- none of those four indicated that

11 the person offering the statement observed Mr. Khamidullah

12 fire a weapon.  None of them indicated that

13 Mr. Khamidullah admitted firing a weapon.  And in fact,

14 two of the first responders -- this is at Bates Page --

15      THE COURT:  I thought he denied he fired a weapon.

16      MR. PAUL GILL:  That's correct.  And both Bates Page

17 1078 and Bates Page 1144, those were interviews of some of

18 the first responders saying that the defendant denied

19 firing.

20      Certainly, in his multiple statements to FBI

21 investigators commencing March 2010, he likewise said he

22 never fired the weapon.  Had went so far as to say his

23 magazine would be full.  It's supposed to have 30

24 cartridges in it.  It would have 30.

25      I do understand the government points to the fact

1 that there are other first responders that say otherwise.

2 That say we knew he was shooting.  The point I make is

3 two-fold.

4      First, I think as a legal matter, is the fact that

5 there is competing evidence.  Almost always there will be

6 competing evidence.  If there were literally no competing

7 evidence, if there were no evidence of an incriminating

8 nature, then there would be, in essence, no reason to

9 bring a motion about the evidence at issue.

10      The other thing I would point out is that, again, you

11 look at -- I will now make reference to Defendant's

12 Exhibit 17.  While these notes are from much later,

13 they're from July of 2013, they are essentially notes of,

14 I think, an interview of Todd Marcum.  One of the first

15 responders.

16      And, Judge, for the record, I think -- I think this,

17 and I guess under our discovery protective order, all of

18 the exhibits in this case are to be, at least to the

19 extent they're from discovery, are to be lodged under

20 seal.  But in any event, --

21      THE COURT:  That would include your Exhibit 17, is

22 that correct?

23      MR. PAUL GILL:  I think that's correct.  Because,

24 again, it's part of the discovery.  Even though it's

25 deemed classified, we have a protective order as to that.

1    So if one looks to the third page of the Marcum

2  notes, it's Bates Page 1428, there's some observations

3  there that he saw the suspect who ended up being

4  Mr. Khamidullah moving about, but of course never saw him

5  shooting.  One of the things I want to point out, and the

6  reason I submitted these notes, is that these notes

7  reflect about midway down Page 1428, it says, *Scope 3 1/2*

8  *power, had limited visibility.*"

9    I think there's really only one -- my recollection is

10  there's one, there's maybe two people, claiming to have

11  seen through a scope and to have observed Mr. Khamidullah

12  actually firing a weapon.  I think the fact that

13  Mr. Marcum is saying there was limited visibility, at

14  least as I pick up from these notes, limited visibility

15  through the scope, I think that's relevant to the weight

16  of the evidence that the government relies upon to

17  suggest, look, there's no reason for us to think it was

18  exculpatory.  Everyone saw him firing.

19    I made some observations in the briefing about just

20  how many different people talked about all the different

21  places from which the border patrol believed there was

22  firing.  Again, to set the stage, by the time this is

23  occurring, the battlefield is essentially finally

24  clearing.  It has been the subject of two massive bombing

25  and artillery runs.  And as it were, the smoke is clearing

1  and people are making their way a couple of ridges, a

2  couple of kilometers away, from the border patrol post and

3  assessing the scene.

4      What all of the statements agree upon is that there's

5  a group of border patrol who seem to essentially be in

6  front of, for the most part, American military personnel.

7  And a number of military personnel can hear a skirmish.

8  There's clearly fighting.

9      THE COURT:  This is the damage assessment, right?

10     MR. PAUL GILL:  Right.  This is during the damage

11 assessment.  So again, this is long after, really, the

12 artillery, and all of that is over.  But clearly there is

13 small arms firing, and someone is shooting from just --

14 just over the next ridge that the American soldiers, that

15 I'm referring to as the first responders, first come on up

16 and try to figure out what's happening.

17     What is equally clear is once they get up there, one

18 of the statements that's quoted in -- or referred to in

19 the briefing, is from a gentleman who says he runs into a

20 border patrol commander who, although they don't speak --

21 he doesn't speak particularly good English, he divines

22 from their communication that the commander is saying they

23 are taking fire from multiple locations, and in fact

24 shoots at multiple locations kind of down the hill to

25 identify -- in the American military personnel's

1    observation, identify where shots --

2         THE COURT:   The Afghan Border Patrol or the U.S.

3    soldiers fired downhill?

4         MR. PAUL GILL:   The Afghan Border Patrol.

5         THE COURT:   Okay.

6         MR. PAUL GILL:   That's my understanding of the

7    statements.

8         And, again, there are a couple of other similar items

9    that make reference to firing coming from more than one

10   location.   And in fact, I think I make reference to -- I

11   think there's a -- I want to say Sergeant Loucks who

12   actually was involved in the capture of Mr. Khamidullah

13   down in the wadi.   W-A-D-I.   It's a term for basically the

14   valley between the mountains or the creek down there.

15        So he's down there tending to Mr. Khamidullah.   Helps

16   get him on the ridge.   The helicopter carts him away, and

17   then goes back down in that area.   And in fact, the border

18   patrol come upon another, at least one other, still living

19   member of the attack group, and shoot him.   And in fact, I

20   think it is Loucks, just stands over him just to guard him

21   to make sure he expires and doesn't present any danger.

22        So, again, clearly there is ambiguity in the evidence

23   about whether there's just one person shooting at border

24   personnel or military -- or American military personnel,

25   or multiple persons from multiple places.   In any event,

1  again we cycle back to on the date of capture, as well as

2  at every opportunity he's given to do so after,

3  Mr. Khamidullah denies firing the weapon.

4       There is one reference -- again, I'll rely on my

5  briefing on this, but there's one reference to a military

6  person who is -- who is one of the few that clearly

7  handled what the government posits is Mr. Khamidullah's

8  AK-47.  And probably because the questioner thought, well,

9  a recently fired AK-47 would still be warm to the touch,

10  the questioner asked that question of that first responder

11  who said I don't recall it to have been warm to the touch.

12  So clearly there was --

13       THE COURT:  He said he didn't recall whether it was

14  warm to the touch?

15       MR. PAUL GILL:  I believe his exact words were, *"I*

16  *don't recall."*

17       And so I would suggest to the Court that that, again,

18  is -- again, the legal point is, the mere fact that there

19  is some other evidence of firing is not the dispositive

20  point.  The factual observation, I would make, is there

21  are a lot of sources of evidence suggesting the gun has

22  not been fired.  And of course, the simplicity of checking

23  out Mr. Khamidullah's statements to that effect would have

24  been literally to have had someone inspect the firearm.

25  It would have taken probably 15 seconds.

1          Now, getting to the issue of actually --

2          THE COURT:  Well, once again, Mr. Gill, I see nothing

3    in the record that indicates that those soldiers out there

4    knew that there was any thought of a criminal prosecution.

5          MR. PAUL GILL:  Well, Judge, again --

6          THE COURT:  Is there anything in the record that

7    leads you to believe that anyone told them to put

8    handcuffs on him and take him into custody other than

9    detaining him as a prisoner at the time?

10          MR. PAUL GILL:  Judge, I guess I'd say two things

11   about that.  First, for example, the custody documents.

12   And again, those are referred to, and I have provided

13   chambers with copies of those documents.  They refer to

14   what are essentially, and identified as such, law

15   enforcement personnel coming to the scene.  They describe

16   Mr. Khamidullah, like apparently others captured on the

17   battlefield, gets a designated number.  And clearly there

18   is a procedure.  Again, this is Bates 1140.

19          The government -- and the government makes this a

20   primary feature of its briefing and says, well, we have

21   these procedures for what we do with evidence.  And the

22   thing that's intriguing to me about that is not only does

23   it establish that there's a procedure, but that procedure

24   is inconsistent with what happened here.  What that

25   procedure describes, this is Bates 1140, is that -- is a

1   couple of things.

2       First, at least a number of other weapons, AK-47

3   rifle, rifles, grenade launchers, and other weapons were

4   found associated with three other punitive enemy combatant

5   cases in the lockers in 2013.  It also indicates that the

6   way that the evidence custodian at that time describes to,

7   I think it was, the C.I.D. investigators, the process that

8   takes place is that Afghan detainees, the evidence for

9   Afghan detainees, is sent to the burn pit after they are

10  no longer needed.  That procedure is not the same as for

11  Mr. Khamidullah who's described as a third country

12  national.  Not an Afghan detainee.

13      So, again, I would suggest what that means is that

14  not only is there no evidence that the government followed

15  its established procedures in destroying this weapon, but

16  it seems to be counter to the way that the discovery

17  describes the established procedures.

18      Again, I also think there's no dispute that there was

19  custody of the gun.  The United States, in its responsive

20  briefing, that's Document 77 at Page 6, it cites to

21  statements of a couple of officers found on Bates 1220 and

22  1077.

23      The way the government characterizes it is this,

24  quote, *"Other weapons, including the assault rifle used by*

25  *the defendant, were collected and secured by United States*

1  *military personnel, then given to other United States*

2  *military personnel in a helicopter that arrived to*

3  *evacuate the defendant."*

4      Again, a few months later on April 1, 2010, barely

5  four months after his capture, the government's own

6  discovery documents refer to the idea of keeping and

7  maintaining chain of custody when they identified that the

8  chain of custody hasn't been broken for this defendant

9  identified by his, what they call it, an ISN number,

10  20100.

11      And again, Bates Page 1090 says *"that the Chain of*

12  *Custody has been broken."*  They have figured out, probably

13  because they've figured out now that they've even got

14  these very plain statements from the defendant through the

15  FBI in March, they've figured out, well, we need to go

16  look at that gun.  They look, and clearly it is gone.

17      I'll be the first to concede, I don't have the

18  evidence from the discovery which I know we had briefed

19  the issue of whether an evidentiary hearing should be put

20  on.  I can't tell from the discovery the precise date it

21  was destroyed, or the reason for its destruction other

22  than to go back to my reading of their policy.  As the

23  evidence custodian in 2013 describes it, does not suggest

24  that the evidence belonging to a third-party national that

25  is in custody is the subject of some sort of burn pit

1   procedure.

2        So what I would suggest, returning back to the law,

3   is this.   It's clear that multiple members of what we

4   would normally call the prosecution team, that is, both

5   the military personnel on the ground, the people helping

6   to process the scene who are in fact legal personnel, the

7   very sort of chain of custody procedures described by the

8   discovery, as I can view it, establish that -- a couple of

9   things.   One, that many members of that team knew the

10  defendant's statements that he had not been shooting, and

11  he did not shoot, and the cartridges would all be there.

12  And two, that there is a procedure that was not followed.

13       Now, --

14       THE COURT:   Explain to me again, so that I completely

15  understand this, Mr. Gill, what the basis is for your

16  assumption, anyway, that this was processed as a crime

17  scene.

18       MR. PAUL GILL:   Well, Judge, if you will give me a

19  moment.   I think it might be easiest if I -- if you can

20  give me about one minute, I think I can find it in these

21  papers.

22       THE COURT:   Sure.   That's fine.   It's important.

23       MR. PAUL GILL:   Sure.

24       Judge, at Page 4 of my opening memorandum on this,

25  that's Document 63 in the court records, I make reference

1   to the "*standard operating procedures called for specially*

2   *deployed Law Enforcement Personnel.*"   They are described

3   as LEPs.   Law Enforcement Personnel.

4        Bates Page 1141, for example, talks about these

5   special agents with Army C.I.D. canvassing the scene on

6   the very day -- I mean, really during, and as part of, the

7   battlefield damage assessment.   They're not going back

8   weeks later.   They are there on the scene.

9        And in fact, they are there early enough that one of

10  them, again Bates 1141, reports noticing a damaged AK-47

11  that he did not -- although he did not personally inspect,

12  retrieve, or retain it, what that again indicates is that

13  before the scene is fully cleared, they do have law

14  enforcement personnel that are specifically assigned from

15  the Army Criminal Investigation Service.

16       I would suggest to the Court, based on the history of

17  Guantanamo, based on the history of Bagram, by 2009,

18  whatever we want to say about the Taliban, I think we

19  would have to say the United States had been taking these

20  people into custody for prosecution.   Maybe not in a

21  civilian court, but clearly for prosecution in some sort

22  of military tribunal.   And they were, of course, then I

23  think obliged, like all civilian prosecution teams, to

24  follow the procedures that they are creating for

25  themselves.

1    So, Judge, then returning to the law, what I would

2   suggest then is this.  What we have is the their -- the

3   three basic questions, like I said, include the first of

4   whether the exculpatory value of the rifle was apparent

5   before destruction.  We know it was not destroyed on

6   November 29, 2009.  I think we can infer it wasn't

7   destroyed the next day.  It clearly was in custody, like

8   other items associated with the defendant were in custody,

9   long enough for that evidence custodian in April of 2010,

10  barely four months later, to observe we had chain of

11  custody and it has been broken.  You don't break chain of

12  custody unless you had it to begin with.

13    Then back to the issue of can comparable evidence be

14  obtained by other reasonable available means.  Again, the

15  case law indicates, and I think one case I cited is

16  actually a Judge Payne opinion, the *Elliott* decision that

17  I cited in my briefing.  That's 83 F.Supp. 2d 637.  And I

18  would say one proposition advanced in this case, and which

19  is consistent with the other cases, is that the form of

20  the evidence matter.

21    Testimony, which is what the -- sort of what the

22  government posits.  Well, we have testimony.  We have

23  people who viewed -- who will say we saw him shoot, and

24  you can cross-examine him.  But testimony is no substitute

25  for a test any more than someone saying I saw what I

1   perceived to be drug residue on some glass tubing is a

2   substitute for testing to see if that glass tubing in fact

3   had residue on it.  And that's essentially a proposition

4   Judge Payne advanced in the *Elliott* decision.  So I think

5   we prevail on that point.

6        Now, the bad faith issue is definitely different.

7   And the bad faith issue, I just want to make clear, it

8   doesn't require proof of subjective bad faith.  Some

9   desire to let's destroy this evidence.  Let's make it

10  harder for the defendant.  That is not the issue.

11       Honestly, I think sometimes the law is less than

12  clear on exactly how one establishes bad faith.  But I

13  think we have to take, to some extent, the Fourth Circuit

14  and the Supreme Court at its word when it says essentially

15  you can show bad faith if the exculpatory value of the

16  evidence was apparent at the time of its destruction.

17       I will concede, I think the toughest problem I have,

18  and it's certainly not of my own doing, it's just the

19  limitations of the discovery, is to identify exactly when

20  the weapon was destroyed.  Whether it's on day two, or

21  day -- or roughly four months later, the moment before

22  that April 1 memo, I don't know.  I cannot tell from the

23  discovery, which is one of the reasons I thought that this

24  Court should take evidence.  I understand the Court has

25  determined otherwise.  But I think that that's one factor

1  the Court should consider.

2      The other thing is, and again we had this briefing on

3  this official policy, I see no evidence that this

4  particular firearm, the firearm attributed by soldiers to

5  Mr. Khamidullah, was -- was slated to be, and actually

6  was, destroyed pursuant to a formal procedure.  As I said,

7  the document, Bates Page 1140, that describes the evidence

8  custody procedures, describes a destruction procedure for

9  people other than Mr. Khamidullah who is not an Afghan

10  detainee but a third country national, to quote that

11  procedure.

12      The case law does make clear one can look at whether

13  the government not only -- if the government did not

14  follow its own procedures in the destruction of a piece of

15  evidence, that is further evidence of bad faith.  Again,

16  not subjective bad faith, but objective bad faith as

17  recognized by the case law.

18      And, Judge, that would be my argument.

19      I would add one other thing I meant to do actually

20  earlier today, but it might be appropriate to do it now.

21  Judge, as you recall, I believe I did last week submit to

22  chambers a letter just identifying and enclosing copies of

23  all the Bates pages, the declassified discovery relied

24  upon in defense motions but that was not part of a prior

25  submission by the United States.

1          THE COURT:  I recall.

2          MR. PAUL GILL:  I have an extra copy of that, and

3     would ask that that be lodged with the Court under seal

4     just so that we have a record of that.

5          THE COURT:  All right.  We can do that.

6          Should that receive an exhibit number, Ms. Pizzini,

7     for your processing?

8          THE CLERK:  Yes.

9          THE COURT:  That would be your Defense 18?

10         MR. PAUL GILL:  That would be fine.

11         THE COURT:  Store it under seal.

12         All right.  That's fine.

13         Any objection to that, Mr. Gill or Mr. Gillis?

14         MR. GILLIS:  No, Your Honor.

15         THE COURT:  Be received.

16              (Defendant's Exhibit 18 is received.)

17         MR. PAUL GILL:  Thank you, Judge.  And I'm sorry for

18    not taking care of that earlier.

19         THE COURT:  That's okay.  Do these include the

20    documents you have referenced in your presentation this

21    afternoon?

22         MR. PAUL GILL:  They do.  And they -- although it

23    does not include Defendant's 17, which I just added today.

24         THE COURT:  Thank you very much.

25         MR. PAUL GILL:  Thank you.

1      MS. LEVY:  First, Your Honor, good afternoon.

2      In an unrelated statement, I have for you -- I have

3  the cite to the *Siddiqui* portion of the opinion that we

4  spoke of this morning.

5      THE COURT:  Okay.  Thank you.

6      MS. LEVY:  That would be 699 F.3rd at 701.

7      THE COURT:  Okay.  Thank you.

8      MS. LEVY:  Sure.

9      In response to the defendant's motion to suppress,

10 the defendant has just offered an exhibit relating to a

11 2013 interview of one of the eyewitnesses, Todd Marcum.

12 Defendant does not advise the Court that in Bates Number

13 1072, which was a 2010 interview of the same witness, the

14 witness stated, *"Initially, there was confusion as to who*

15 *or what the ABP was engaging with gunfire.  Marcum then*

16 *realized one male was sporadically firing at the ABP with*

17 *an AK-47."*

18     So this is the same witness three years later who's

19 now not sure.  But in fact, the point is there is

20 different testimony about what was happening on the

21 battlefield after a group of insurgents had attacked the

22 Afghan Border Police camp, and then attempted to attack

23 the United States military who came to support the

24 Afghanis.  And as counsel just advised the Court, there

25 may be witnesses who saw the defendant fire a weapon.

1  There are at least three witnesses who were also there who

2  will testify, and who have provided statements that we

3  brought to -- that we have produced in discovery, who will

4  testify that they saw the defendant fire an AK-47.  That

5  they know what an AK-47 looks like and sounds like,

6  clearly, because they're in the military.

7       So there is a dispute, factually perhaps.  That is a

8  dispute that, at best, should be brought to the attention

9  of the jury.  The conflicting evidence that the defense is

10 making --

11      THE COURT:  What they're arguing is that if they had

12 had access to the weapon, it is their theory they would

13 demonstrate that this defendant was not the one that fired

14 it.

15      MS. LEVY:  Yes.

16      THE COURT:  That's their contention here.

17      MS. LEVY:  That's their contention.

18      But in fact, the Supreme Court case law, the

19 *Youngblood* case, the *Trombetta* case, they're the two

20 operative cases.  *Youngblood* says that the mere

21 possibility that evidence could have exculpated the

22 defendant is not sufficient to satisfy Trombetta's

23 requirement that the exculpatory value is apparent to the

24 police.

25      The question may be was the exculpatory value

1  apparent to the police.  As Your Honor has noted, this was

2  a battlefield.  The military were in charge of the

3  battlefield.

4       The investigation in this case has revealed, and the

5  defense is correct, there were contractors known as law

6  enforcement personnel contracted for the Department of

7  Defense to come to a battlefield after a battle and

8  collect evidence, sometimes process victims.  They were

9  not given full reign as if it were a crime scene.

10      In fact, I hesitate to go into this because it is not

11 in the record yet, but we are prepared to present

12 witnesses among whom would be the two law enforcement

13 personnel who were at that scene and were not given

14 access, unbridled access, to treat the battlefield as a

15 crime scene.

16      The military have their procedures for clearing these

17 places.  The military, generally, we have been told

18 through investigation, destroys unstable weaponry and

19 equipment for safety reasons, and may well offer certain

20 weapons to their Afghan partners if they are operable and

21 safe.  In fact, the evidence will have to be shown as to

22 what exactly happened to this particular weapon.

23      THE COURT:  So what you're telling me is I need to

24 conduct a hearing on this motion?

25      MS. LEVY:  Well, no, because the hearing is required

1  to show bad faith.  It's not required to determine what

2  are the facts that happened.  The question really is was

3  there bad faith destruction on the part of the government,

4  and was the exculpatory value of an AK-47 on the

5  battlefield apparent to people who collected, or in

6  someway handled, that weaponry.

7      And the government's position would be there was no

8  apparent exculpatory value to a weapon that was seized

9  from an insurgent on the battlefield.

10     THE COURT:  Did the defendant, and refresh my

11 recollection, did he deny at that time that he had fired

12 the weapon?

13     MS. LEVY:  Not on the date of capture.  Not that I'm

14 aware of.  He may well have denied it months later when he

15 was speaking to the FBI.  It is not clear --

16     THE COURT:  Had the weapon been destroyed at that

17 point?

18     MS. LEVY:  It is not clear, Your Honor.  What we

19 know, and we have been attempting to determine this, --

20     THE COURT:  I have no doubt about that.  I'm

21 attempting to determine it right now.

22     MS. LEVY:  Yes.  What we know is that Bates Number

23 1090 is a short memorandum for the record that states,

24 *"While conducting property changeover, it was discovered*

25 *that the Chain of Custody has been broken from the point*

1 *of capture to the Detention Facility in Parwan."*  And that

2 is dated April 1st, 2010.  That is all we know.

3      We do not know exactly when this weapon was destroyed

4 or lost or given to anyone.  We, of course, are continuing

5 to investigate it, but we don't -- we don't have that

6 information.

7      But the defense has not established bad faith.

8      THE COURT:  Now, at the time that the defendant was

9 seized on the battlefield, did the military personnel and

10 the contract law enforcement officers process this as a

11 crime scene?  And I don't know what processing a crime

12 scene means in the military context as opposed to the

13 civilian context.  And I want you to clarify that, if you

14 know.

15      MS. LEVY:  What we do know is that law enforcement

16 personnel were brought to the battlefield, and they

17 were -- there was some that were asked to take photographs

18 of the insurgents who were killed, as well as the weapons

19 that were seized.  And Bates Number 1055 reflects one of

20 those photographs.

21      We do know that one of the law enforcement personnel

22 took DNA as he could from some of the deceased.  But as

23 far as whether it was processed as a crime scene, I'm not

24 equipped to say that.  All I can say is what the witnesses

25 have told us.  And in investigation, we've been told

1  that -- and these are actually former police officers,

2  retired police officers, and they essentially say this

3  isn't how we have processed crime scenes back in the

4  United States.

5       So I think part of the problem --

6       THE COURT:  I don't know whether or not that's

7  determinative, but it's certainly helpful.

8       MS. LEVY:  Yes.

9       And what is also interesting is the timing.  They're

10 brought in shortly before the defendant is medevaced out

11 of the area.  They are not brought in with the battle

12 damage assessment team.  They're brought in separately.

13 They are given a very limited amount of time to do what

14 they've been asked to do because it's a war zone and

15 there's still active fire going on.  So --

16      THE COURT:  Let me ask you another question.

17      MS. LEVY:  Yes, sir.

18      THE COURT:  I don't mean to interrupt you, but the

19 items that they seized from the battlefield where the

20 assessment is being done, are those subject to a chain of

21 custody log?  I mean, as much as a crime scene technician

22 when you see something you put it on your chain of custody

23 log so that it can be tracked when it's taken in and out

24 of evidence; you understand all that?

25      MS. LEVY:  Yes, Your Honor.

1    THE COURT:  Is there such a history in this case?

2    MS. LEVY:  I have not seen it.  I know that the

3 personal possessions of the defendant are taken into

4 custody and put into this evidence processing facility.

5    THE COURT:  Do you want to confer with counsel?  Go

6 right ahead.

7    MS. LEVY:  Your Honor, I'm sorry.

8    In answer to your question, I don't think that we

9 have an evidence log for weapons.  We have been told a

10 variety of answers to that question, one of which is that

11 weapons don't go back to an evidence facility connected to

12 a given detainee.

13    One answer we've been given is that the Afghan Border

14 Police may be offered certain weapons that are operable.

15 We do know that components of improvised explosive devices

16 are usually collected for analysis by the Department of

17 Defense and by the FBI.  But they are treated separately

18 from the weapons themselves.

19    And as the defendant -- defense counsel noted, the

20 evidence custodian in 2013, who had only been there since

21 2012, which is a couple of years after this incident,

22 obviously, said that there was a policy of having a burn

23 of certain types of evidence.

24    So, in all candor, we are not sure.

25    THE COURT:  Was that his policy or the commanding

1  authority's policy?

2      MS. LEVY:  We have not seen any commanding authority

3  policy for this issue.  So it's not clear at this point

4  whose policy this might be.  But we are still

5  investigating.

6      THE COURT:  All right.  I'm not impugning anybody's

7  integrity.  I'm just asking questions.

8      MS. LEVY:  Yes.  We understand.

9      But I think that the really critical point to note is

10  was there bad faith?  That's when you get the hearing if

11  there is an allegation of bad faith on the part of the

12  government -- on the part of the police.  The government

13  would submit that this was not a police operation.  This

14  was a military operation resulting in the capture of an

15  insurgent --

16      THE COURT:  Well, that was my initial impression when

17  I denied the evidentiary hearing.

18      MS. LEVY:  Yes.

19      THE COURT:  But the more I hear and the more I see,

20  it was kind of processed as a crime scene.  And I guess

21  the question has arisen as to whether or not at that time

22  prosecution of these individuals may have been

23  contemplated, which I think is an important factor.  And I

24  have yet to hear that question answered.

25      MS. LEVY:  Yes.  And again, in answer to that, I

1  don't know that any decision was made on an immediate

2  basis upon the capture of anyone on the battlefield.  This

3  is a unique case here.

4      THE COURT:  I doubt anyone on the battlefield had the

5  authority to make that decision.

6      MS. LEVY:  Exactly.

7      THE COURT:  If they were told to gather evidence for

8  possible prosecution, that would be significant.  Do you

9  know what directive they got from command before they went

10  out?

11      MS. LEVY:  I am not aware that we have been told that

12  at all.

13      Court's indulgence.  I'm sorry, Your Honor.

14      THE COURT:  That's okay.

15      MS. LEVY:  So in answer to your question, we -- all

16  we know is that there were some law enforcement personnel

17  sent.  They performed certain functions that looked like

18  crime scene collection.  They were not authorized, or in

19  fact even allowed, to take the weapons with them.  Where

20  those weapons ended up is unclear.  It might have been

21  that they went back to the Afghan base, it might have been

22  that it went to some other location controlled by the

23  United States.  We are not sure.

24      And what we do know is that there really isn't this

25  coordinated consultation between the FBI personnel who

1  interviewed the defendant four months later, and the

2  evidence custodian at a military base who's maintaining

3  custody of the personal property of the detainees.

4      So to assume that the evidence custodian somehow was

5  aware if the weapons actually ended up back with the U.S.

6  military, the assumption that the evidence custodian might

7  be aware that, oh, this is possibly exculpatory evidence,

8  we should probably do something to make this disappear, --

9      THE COURT:  I don't know that it necessarily would

10  have to be the evidence custodian, but someone within the

11  chain of command somewhere.  My question would be whether

12  or not they knew there was any prospect of criminal

13  prosecution at the time they destroyed the weapon?  It may

14  not be dispositive of the case -- of the issue, but it's

15  important in the analytical process.

16      MS. LEVY:  Absolutely.  And that would be -- it would

17  be wonderful if we could respond to that.

18      THE COURT:  All right.

19      MS. LEVY:  Unfortunately, we don't know when the

20  weapon disappeared, and we have not been -- just based on

21  the experience that the United States has had in these --

22  in these battlefield situations, we have held detainees

23  for a particular amount of time.  Sometimes they are

24  proffered to the Afghans.  Or when we were in Iraq, to the

25  Iraqis.  Sometimes they are sent back to their home

1  countries.  Sometimes military commissions from the United

2  States are convened, and sometimes there are criminal

3  prosecutions in Article III courts.

4      So we can continue to attempt to determine what was

5  happening in this particular case.  I'm not sure we are

6  ever going to find out the definitive answer to that.

7      THE COURT:  I respect your candor.  Thank you.

8      MS. LEVY:  I think that's all that we will say at

9  this point.

10     THE COURT:  Thank you.

11     Mr. Gill, I'll give you the final word.

12     MR. PAUL GILL:  Very briefly, Judge.

13     I think it's a little ironic that after over a day of

14 evidence and argument on the combatant and privilege and

15 public authority issue, we hear repeatedly now that this

16 was a battlefield, and this was combat and this was not a

17 crime scene.

18     I think it is self-evident that especially by

19 November of 2009, a lot of people were taken into custody

20 with the contemplation of prosecution if not in the

21 civilian courts, then at least in a place like Guantanamo,

22 or otherwise.

23     And I think to the extent that is relevant, I think

24 that is probably a matter of public record by then.  I

25 think that is consistent with the actual evidence that we

1  do have in discovery, which is that there are chain of

2  custody procedures, and that there are procedures to get

3  trained law enforcement personnel out on the scene.

4      THE COURT:  Mr. Gill, the epicenter of this debate is

5  really whether or not what the government did was in bad

6  faith.  And I understand that the words *bad faith*

7  implies more than a conscious effort to destroy evidence.

8  But I think what I'd like for both sides to do, and I

9  don't want anything lengthy, I'll give you an additional

10 chance to address that issue as to what exactly has

11 constituted bad faith in any context reasonably or

12 arguably close to this one that can guide me.

13     And I will also consider whether or not I think an

14 evidentiary hearing is necessary.  I haven't made my mind

15 up.  My initial impression was that it is not.  I'm not

16 retreating from that now, but the door remains ajar.

17     But I'm more importantly interested in what exactly

18 constitutes bad faith as close to this context as

19 possible.  I don't want anything over 10 pages.  I won't

20 have time to read it.

21     MR. PAUL GILL:  That's fine.  Next Thursday or

22 Friday, Judge?

23     THE COURT:  Ms. Levy, can you do that by then?

24     MS. LEVY:  Yes, Your Honor.

25     THE COURT:  All right.  That's fine.  By next Friday.

1    All right, next we go to the motion to strike the

2 reference to the Afghan Border Patrol, Camp Leyza.

3    Ms. Cardwell.

4    MS. CARDWELL:  Judge, I want to thank the Court for

5 the lunch break so that I can think and talk at the same

6 time.

7    Your Honor, the defense has moved the Court to strike

8 the references to the Afghan Border Police in Counts 5 and

9 6 on the grounds that the circumstances of this case, the

10 Afghan Border Patrol does not fit into the class of

11 protected people contemplated by Congress in enacting that

12 statute.  And the statute I refer to is 18 United States

13 Code --

14    THE COURT:  Doesn't that turn on the issue of whether

15 or not they were assisting?

16    MS. CARDWELL:  Certainly does.

17    THE COURT:  And it depends upon the nature of their

18 contractual obligations, et cetera.  And most importantly,

19 is this a jury question?

20    MS. CARDWELL:  Well, I think as long as there are

21 uncontroverted facts that we're arguing the motion on, the

22 Court can make the determination as a matter of law under

23 Rule 12(b)(1).

24    So if I might, Your Honor?

25    THE COURT:  Go right ahead.

1          MS. CARDWELL:   In their argument, the government has

2    argued that the Afghan Border Police were victims under

3    this statute.   And they've attempted to basically stretch

4    the application of this statute far beyond its intended

5    scope by the charging decision, and by the pleadings of

6    the government's file.   They've taken the position that

7    members of the Afghan Border Patrol who were manning Camp

8    Leyza, and that's L-E-Y-Z-E, at the time of the attack on

9    November 29th of 2009, were assisting the United States

10   military in general.

11        One of the threshold issues for this Court to

12   consider in this motion is the question of who was

13   assisting who, or whom, perhaps.   At least five times

14   yesterday this Court heard from more than one government

15   expert witness that when President Karzai was elected, his

16   administration asked the United States to remain and

17   assist them in stabilizing the country.

18        Even in the government's response, they wrote things

19   like on Page 3, the first full paragraph of the

20   government's response, *The COIN* or counter-insurgency

21   campaign *"was directed at helping Afghanistan 'take charge*

22   *of its own affairs and persuade the populous of its*

23   *legitimacy to govern.'"*

24        THE COURT:   The mere fact they were an invitee to

25   assist the Afghan Border Patrol, would this prelude the

1   fact that the Afghan Border Patrol assisted the U.S. in

2   performing that protective function?

3       MS. CARDWELL:  Well, it would not.  If the Court

4   would let me proceed, I think when we get to the specific

5   incident of the attack, there's a distinction to be made.

6       THE COURT:  All right.

7       MS. CARDWELL:  Also in the pleading, the government's

8   pleading, General McChrystal -- it's noted that General

9   McChrystal emphasized *"a strategy aimed at providing more*

10  *security for Afghan population by diminishing the*

11  *insurgent groups' influence."*

12      The government goes on to note that the U.S. military

13  provided training to the Afghan Border Police.

14      And then again in the footnote on Number 7 on Page 4,

15  *"The United States was primarily responsible for helping*

16  *the Afghanistan government to extend its authority in the*

17  *region."*  And one of the things they did to do that was to

18  train the Afghan National Police, which included the

19  Afghan Border Police.

20      So the government, through its experts and its

21  response, fully acknowledges that the United States was in

22  fact assisting the Afghans, but this -- this is not the

23  way the statute works.  It's not the way the statute is

24  worded.

25      So in response to the Court's question, the

1  government's in the position of saying, well, maybe we

2  were helping or assisting them, but they were helping us

3  to help them.  I would suggest that that's a circular

4  argument.  It's rather acrobatic in its manipulation of

5  logic.

6      The government's argument is basically that because

7  the United States had a common interest in stabilizing

8  Afghanistan, that that means that they were the party --

9  the Afghan Border Police were the party doing the

10  assisting here.

11      And there's a demonstration of why that's not an

12  accurate application of the statute in the *Reed case*.  And

13  we've relied heavily on that in our brief.

14      THE COURT:  Say that again, Ms. Cardwell.

15      MS. CARDWELL:  The *Reed* case.  R-E-E-D.  It's the

16  Fifth Circuit case that's noted in the pleadings.

17      The mere fact that the efforts of the United States

18  may have been mutually beneficial, and that there was a

19  common interest, the stability and security of the

20  country, doesn't change who was really doing the assisting

21  here.  The best example is in *Reed*.  It actually raises

22  this issue, this issue of who is assisting who, and

23  whether that matters under the statute.

24      And what's interesting about *Reed* is it's a very sort

25  of common example stateside of facts that are incredibly

1  analogous to such a unique case coming out of Afghanistan.

2       In *Reed*, there was a task force formed between the

3  Dallas Police Department, and other localities, along with

4  the FBI.  And the purpose of the task force was to conduct

5  coordinated investigations of bank robberies.

6       THE COURT:  And the FBI agent was responding on his

7  own, is that correct?

8       MS. CARDWELL:  Well, that's --

9       THE COURT:  And they held at that time since he

10  hadn't gotten there to assist, they weren't assisting the

11  FBI.

12       MS. CARDWELL:  Yeah.  And the point was -- the point

13  was that the apprehension and the shooting at the non-task

14  force local officer happened before he arrived there,

15  which is precisely what happened here.

16       The Afghan Border Police got attacked by the

17  insurgents, and then the U.S. military shows up at the end

18  of it.  So to suggest that it's the Afghan Border Police

19  that are assisting the U.S. military in that situation is

20  simply backwards.  And in fact, *Reed* actually addresses

21  that on those very analogous facts.

22       I won't use the names of the officers.  I'll just

23  identify that they are either the local officer or the

24  federal officer.  *"Applying"* -- this is directly from

25  *Reed*.  And the Court indicates, *"Applying the plain*

1  *meaning of the words of the statute to the facts of this*

2  *case, [the local police officer] could not have been*

3  *'assisting a federal officer' because nothing he did*

4  *provided support for [the federal officer] in the*

5  *performance of his official duties in any palpable way.*

6  *Indeed, it is far more nearly accurate to say that it was*

7  *the [federal officer] who was 'assisting' [the local*

8  *officer,] by traveling to the scene to lend his support to*

9  *the [local officer] in the post-arrest investigation."*

10        So what we have here is we have the military showing

11  up after the attack has occurred on the Afghan Border

12  Police and the military shows up to lend help.  It is

13  precisely analogous to the facts in *Reed* out of the Fifth

14  Circuit.  And there the Court found that because it had

15  happened, this local officer had done the job and handled

16  it.  And the mere fact that this guy from the task force

17  shows up and he happens to be a federal employee does not

18  make this fit the assistance factor.  The problem is, the

19  assistance is going the wrong way.  And that matters,

20  according to *Reed*.

21        Now, the other thing that *Reed* addresses is -- well,

22  it addresses the who is assisting who.  And I noted that.

23  In evaluating the assistance rule, and whether it applies

24  to the Afghan Border Police, we've noted that there was no

25  federal officer or employee present at Camp Leyza at the

1  time the attack was made on the Afghan Border Police.

2  That's, I think, uncontroverted.  It's been noted in the

3  pleadings, and there's nothing in the discovery indicating

4  otherwise.

5       So contrary to what the government suggests, we did

6  not argue that the presence of the federal employee or

7  officer is absolutely required for the assistance portion

8  of this statute to apply, but we did note it's a very

9  important factor.  It's a very important factor because it

10  could support, at least in part, the government's

11  contention that the Afghan Border Police are protected

12  under these circumstances.  Based upon -- I'm sorry.

13       It's an important factor that no military personnel

14  were there for at least three different reasons.  One is,

15  that fact in this case distinguishes the case from the

16  majority of other cases cited by the government where the

17  assistance portion of this statute has properly been

18  applied.

19       Secondly, it illustrates that under this particular

20  circumstance, there's no identifiable federal employer --

21  or employee, sorry, or officer, or more than one, that the

22  Afghan Border Police is assisting at the time of the

23  attack.

24       Now, they don't have in this case, for example, a

25  contractual arrangement that would have covered the local

1  jailer who's keeping a federal prisoner and is therefore

2  protected as a person assisting pursuant to a contract.

3  They don't have that here.  So they don't have --

4      THE COURT:  They had a mutual assistance agreement,

5  did they not?

6      MS. CARDWELL:  Well, I wouldn't call it

7  contractually, Your Honor.  I think it was a matter of the

8  government, the United States government, coming up with a

9  strategic goal, as the government has described it, and

10  decided that this is the best way to effectuate our

11  strategic goal, and that is to empower or help or assist

12  the Afghans.

13      So the third thing that -- that the fact that there's

14  no presence of a federal employee or officer at the time

15  of the attack shows is that the Afghan Border Police were

16  in no position to act mutually and contemporaneously with

17  federal officials at the time of the attack on them.

18      Now, just as the federal agent in *Reed* arrived after

19  the Dallas police had already completed the

20  apprehension --

21      THE COURT:  Verify one point about *Reed*,

22  Ms. Cardwell.  There was an existing task force

23  relationship between the Bureau and the local police

24  department?

25      MS. CARDWELL:  There was.

1        THE COURT:   And the agent was a part of that task

2   force?

3        MS. CARDWELL:   He was not a part -- the agent was.

4   The local police officer who made the apprehension and got

5   shot at was not.

6        THE COURT:   Okay.

7        MS. CARDWELL:   But the point here is the Dallas

8   Police Department and the federal authorities, the FBI,

9   had a common interest.   They wanted to have a task force

10  that investigated bank robberies together.   And the reason

11  that they wanted to do that was, as you know, the local

12  police respond to bank robberies, but the federal courts

13  are the ones that prosecute them.   So it was a mutual

14  interest to have better apprehensions, better

15  prosecutions, to work together.   Just as the United States

16  and Afghanistan, the new regime in Afghanistan, had a

17  mutual interest to stabilize the country.

18       THE COURT:   So was there a formal agreement between

19  the locals and the federal agency?

20       MS. CARDWELL:   Well, there was a formal agreement

21  that they formed a task force for that specific purpose.

22       THE COURT:   Okay.   All right.

23       MS. CARDWELL:   And I think it was meaningful to the

24  Court that the particular Dallas police officer was not on

25  the task force.   But even more meaningful was the fact

1  that it was all over with by the time the federal employee

2  got there.

3        So even though he was part of the police department

4  that was part of the task force, his police department

5  shared that interest and served on that task force, the

6  *Reed* court still found that this is not a proper

7  application of this assisting statute.

8        THE COURT:  All right.

9        MS. CARDWELL:  So -- sorry, Your Honor.

10       What *Reed* further had to say about this was, and this

11 is a quote, *"We do not hold that federal officers must in*

12 *all cases be the principal agents in a law enforcement*

13 *action to sustain a conviction under Section 111 and*

14 *Section 1114, or even that they must in every case be at*

15 *the scene of the crime."*

16       So we offer this case in support of our position.  We

17 did not argue that presence was essential.  But what *Reed*

18 goes on to say is, *"That will depend on the facts of the*

19 *particular case.  We only make clear that for a 'person'*

20 *to be 'assisting' a federal officer, there must at least*

21 *be some evidence that, at the time relevant to the assault*

22 *or attempt to kill, there was some mutual contemporaneous*

23 *involvement from which a fact-finder can find as an*

24 *evidentiary fact - not as theory - that the person on whom*

25 *the assault or attempt was made was assisting the federal*

1  *officer in the performance of his official duties."*

2      And the Court found that on the evidence in that

3  case, and the record before them, such assistance was

4  lacking.

5      Now probably more importantly, Your Honor, and we've

6  had a lot of talk about a statutory interpretation and

7  plain language, it's incumbent upon this Court to look at

8  the plain language of Section 1114.  Both parties in the

9  pleadings have repeatedly noted that the most basic tenant

10 of statutory construction is that when Congress says

11 something plainly, they mean and intend what it says.  The

12 plain language of the statute reflects that Congress

13 intended that a particular officer or officers or employee

14 or employees, be identified or at least be identifiable,

15 okay.  This was a statute that was enacted to protect

16 federal employees and federal agents.

17     The plain language, even with the 1996 amendment,

18 contemplates an identification of a federal officer or

19 employee.  Because it prescribed, quote, *"the killing or*

20 *attempted killing of a federal officer or employee while*

21 *such officer is engaged in or on account of official*

22 *federal duties."*

23     Now the assisting portions extends that protection to

24 others.  And they're described as any person assisting

25 such an officer or employee.

1        So by this language, Congress clearly contemplated

2   assistance to a particular officer or officers or employee

3   or employees.   Not assistance to a more generalized effort

4   like a robbery task force, or like the U.S.'s interest in

5   stabilizing Afghanistan.

6        There's no such officer or employee alleged in the

7   indictment.   And they don't have to allege the names of

8   the people involved.   But the problem is they're not even

9   identifiable.   From the evidence, they're not

10  identifiable.

11       And that's because the government's theory is that

12  the Afghan Border Police are assisting a general cause,

13  the U.S. military, as the whole.   So if Congress had

14  wanted to make that -- to make that the case, that you

15  could assist a general cause or assist an agency, they

16  would have said a person assisting an entire agency.   A

17  person assisting an entire agency function.   They didn't

18  say that.   They're protecting the people, the employees,

19  the agents that work for the government, and those that

20  help those people at the time that they're helping them in

21  the performance of their duties.

22       THE COURT:   Now, at one time didn't the statute

23  include federal functions, and wasn't that amended out of

24  the statue?

25       MS. CARDWELL:   No.   No, Your Honor, respectfully.

1    What it did initially is it names particular federal

2 agents.  Park Rangers, law enforcement, FBI agents, and it

3 still related to their function.  It had to be something

4 that happened while they were performing their duties.

5 And whoever was in Congress at that time was very

6 concerned about law enforcement, and didn't want it

7 watered down.  Wanted it to focus on law enforcement

8 officers.

9    All the amendment did was change it to apply to all

10 federal employees.  And it was part of an anti-terrorism

11 act.  So the point was we want all of our federal agents

12 and employees to be protected now.  And as long as they're

13 in the performance of their duties, we want the statue to

14 apply.  And the people that are helping them while they're

15 performing their duties, we want them protected, too.

16 That's what the amendment was about.

17    So the overall point I want to make is that it's a

18 statute that intended to protect people.  We don't even

19 have the people that are the primary people being

20 protected, which are the federal employees, identified in

21 this case.  And they appear to be unidentifiable because

22 of the reason the government says they're using the

23 statute, which is to protect a federal function as opposed

24 to a federal employee.

25    Now, there's a lot of talk in the government's

1 response about, well, this statute under all the case law,

2 it indicates that the purpose of the statute is to protect

3 federal employees and federal functions.  But the problem

4 is the government takes it one step too far in their

5 argument.  They seem to believe that the *Feola* case

6 indicates that you can use the statute to protect a

7 federal function independent of the federal employee.  And

8 that's not what *Feola* says, and it's not what any of the

9 cases say.  And that's what they're arguing is the case

10 here.  They're trying to protect the U.S. function,

11 whatever we were doing over there, they're trying to

12 protect that strategic goal and what the employees were

13 doing over there.  And that's not -- that has no support

14 in the case law.  It's never been done.

15      THE COURT:  Refresh my recollection of one other

16 thing, Ms. Cardwell.  In the *Reed* case, did they make that

17 decision in pretrial or was that a decision posttrial?

18      MS. CARDWELL:  It's posttrial.

19      THE COURT:  Posttrial?

20      MS. CARDWELL:  Yes.

21      THE COURT:  Okay.

22      MS. CARDWELL:  So another point I want to make for

23 the Court was if Section 1114 is not read to contemplate

24 the identification of a particular federal officer or

25 employee, and it's read to apply to just any general

1  federal function, how is the trier of fact to determine

2  whether or not an officer who is being assisted was in

3  fact an officer and employee of the United States?  How

4  are the trier of fact to determine whether that officer

5  was engaged in federal duties at the time of the case, or

6  his office, or whether he was targeted on account of his

7  federal duties?  Those are all issues --

8       THE COURT:  In the context of your question, wouldn't

9  the trier of fact have to be able to, in order to satisfy

10 that element, identify a specific federal official that

11 was being protected?

12      MS. CARDWELL:  I think that that's exactly my point,

13 Your Honor.  If you can't identify what person that's the

14 victim here, how can you determine whether or not they're

15 a proper victim under the statute?  And that piggybacks on

16 the fact that this person that's being covered, they're

17 argument is, is also an assistant to that person.  So if

18 the trier of fact has nothing to base that on, how can

19 they make that determination?  And it's part of the

20 elements of the crime.

21      Likewise, how can the trier of fact determine whether

22 the Afghan Border Police were assisting such officer or

23 employee in the performance of such duties at the time of

24 the attack if the officer or the employee is not

25 identifiable?  And the assistance relied upon by the

1   government is simply a general cause of action.  A general

2   function.

3        In the government's attempt to make a government

4   function a proper -- in and of itself independent of a

5   federal employee a victim in this statute, it can point to

6   not a single case where that's ever been done.

7        And for all of those reasons, Your Honor, we would

8   respectfully move that the language regarding the Afghan

9   Border Police -- and we're only asking that that language

10  be taken out.  The counts at this point would survive

11  because they still have the allegations that the U.S.

12  helicopters were victims in this statute as direct

13  employees.

14       THE COURT:  And I guess also during the battle damage

15  assessment there were shots fired, allegedly, at U.S.

16  personnel.

17       MS. CARDWELL:  I think that it's specifically U.S.

18  helicopters in Counts 5 and 6, Your Honor.

19       THE COURT:  Okay.

20       MS. CARDWELL:  But it doesn't make, at this point,

21  the counts fail.  But I think related to making the Afghan

22  Border Police actual victims under the assistance portion

23  of the statute is entirely overreaching under the statute.

24       THE COURT:  Thank you.

25       MS. CARDWELL:  Thank you, Your Honor.

1        THE COURT:  Mr. Gill.

2        MR. MIKE GILL:  Your Honor, in looking at the

3  statute, I want to start off first by pointing out to the

4  Court what Section 1114 covers, and it's broader than the

5  previous version.  And also the context in which -- at the

6  time that this amendment occurs is important because it's

7  at the time they did the Anti-terrorism Death Penalty Act.

8  It was a time that the United States was responding to

9  increased criminal activity internationally.  And Congress

10  explicitly wanted to expand the reach of the statute.  And

11  they did it.

12        It covers, *"Any officer or employee of the United*

13  *States or of any agency in any branch of the United States*

14  *Government (including any member of the uniformed*

15  *services)."*  That wasn't even in it before.

16        And then the next part of it is, *"In or on account of*

17  *the performance of official duties."*

18        Then the next part is it covers people assisting such

19  officers in the performance of their official duties.

20  It's not only about people.  It's about duties.

21        And the United States Supreme Court decision, *Feola*,

22  is directly on point.  And I respectfully disagree with

23  Ms. Cardwell on the point that she says that they have not

24  determined that this statute applies to federal functions

25  as well as federal employees.  The key is, *Feola* focused

1   on 18 U.S.C. Section 111, which is the federal assault

2   statute.

3        But the reason the Courts, every time they look at

4   this issue they harken back to 1114 is because 111

5   explicitly incorporates 1114 as defining the people who

6   are covered, as well as the language in 111 is verbatim.

7   The same as 1114.

8        It protects individuals while engaged in, or on

9   account of, the performance of official duties.  And the

10  U.S. Supreme Court said that that language that Congress

11  showed, and the way that they structured these to have

12  covered not only federal employees, but federal functions.

13  And that's an important distinction.

14       Since this amendment in 1996, every circuit court to

15  have considered this issue has recognized that it still

16  stands as the Supreme Court's rule.  And that includes the

17  First, Second, Fourth, Fifth, Sixth, Eighth, Ninth and

18  Tenth Circuits.  Every one of them, when they look at 111,

19  which incorporates 1114, they have recognized that it

20  protects both federal employees and federal functions.

21       Now, to talk about the Reed case.  That is a case I'm

22  very familiar with because that was my case back in

23  Dallas, Texas.  I handled it, and I argued it on appeal.

24  That was posttrial.

25       The big distinction between Reed, and the reason it

1   does have -- it has no application in this particular case

2   is because in *Reed*, the Dallas police officer who had no

3   part, no training whatsoever from the FBI, no role on the

4   FBI Violent Crimes Task Force, responded to the response

5   of a bank robbery.  Pursued the suspect into a

6   neighborhood.  Chased him on foot.  And that's when the

7   suspect pointed the gun at him.  And that was before the

8   FBI ever arrived at the scene.  The suspect was in custody

9   before the FBI arrived there.  That is very distinct from

10  what we have here with the Afghan Border Patrol.

11        Now, as I understood the defense's position, I

12  understood that they didn't take issue with the policy and

13  undisputed facts represented in the United States'

14  response.  These are all things that are public record.

15  It's beyond dispute that the United States, for

16  Afghanistan, intended to build a country that was never

17  again a safe haven for terrorists and is a reliable,

18  stable ally in the war on terror.  That was one of our

19  country's primary responsibilities and goals for

20  Afghanistan.

21        And we also wanted to create, this is in the same

22  stuff, and it's cited within the United States' response,

23  *"capable of governing its territory and borders."*  The

24  United States knew, and we devoted significant resources

25  and lives to help Afghanistan and to try to make this a

1  success.  In 2009, we sent one of our brightest generals,

2  Stanely McChrystal, over there.  And it was his job to try

3  to fix the problems they were having.  And the problems

4  they were having, it's beyond dispute.

5      And I believe that our intelligence officer testified

6  about this yesterday.  Around 2008, into 2009, the death

7  toll was going up on allied forces, as well as the

8  Afghans.  The insurgents were getting a foothold.  So the

9  United States, and our allies, worked to try to develop a

10  strategy to fight back.

11      THE COURT:  But isn't it significant here that the

12  U.S. was helping the Afghans rather than the Afghans

13  helping the United States?

14      MR. MIKE GILL:  It works both ways, Your Honor.  And

15  the statute certainly does not say that it is required

16  that if the Afghans are helping us that the United States

17  can't help them or vice versa.  The key is was the person

18  attacked helping the United States, or in our functions.

19      Now, on that, the Afghans, unlike the situation in

20  *Reed*, the Afghan Border Patrol -- and I do know that the

21  intelligence officer said this on redirect -- that we

22  trained them.  This is not like the Dallas Police

23  Department in the *Reed* decision.  The FBI did not train

24  the Dallas Police Department.  And the FBI, importantly,

25  was not responsible for Dallas County where that crime

1   occurred involving that bank robbery.

2       Here there is no dispute.  The United States was

3   responsible.  We were the allied force specifically

4   assigned to the Khost Province.  We're in charge of it.

5   That's where we devoted our military resources.  And we

6   trained the Afghan Border Patrol to try to stand up on the

7   border and prevent these insurgents from coming in.

8       Another thing that the defense is overlooking, and

9   this is why this is a fact issue to be resolved by a jury,

10  Your Honor, they're overlooking the time element to this.

11      This attack occurred late in the evening of

12  November 28th into the early morning hours of November 29,

13  2009.  Within 20 minutes, the United States responded with

14  helicopters.  The attack did not end the moment we showed

15  up on the scene.  The Afghans stood their ground at Camp

16  Leyza, and continued to fight while the United States

17  engaged them with our helicopters.  That is on the ground.

18      And using Ms. Cardwell's example, certainly they were

19  not in custody and apprehended by the time we got there.

20  It continued on until we wiped out the insurgents, and

21  then continued on to the next day when the defendant was

22  finally found and taken into custody.  So it's more of a

23  fact issue.  It's not so simple, Your Honor.  We believe a

24  jury should make that determination.

25      With respect to the defense's argument that we should

1  identify an individual, we have a case directly on point

2  on this, Your Honor.  It's the *Siddiqui* decision.  The

3  citation on this, and I believe it's cited, and if it

4  isn't, I apologize, in our brief.  It's an unpublished

5  Second Circuit decision, 2012 Westlaw 5382674.

6      THE COURT:  538?

7      MR. MIKE GILL:  2674.

8      And, Your Honor, it was handed down, and this case

9  addresses this very argument when you're dealing with an

10 attempted murder situation as opposed to murder.  And the

11 Court said here -- and the defense was arguing there that

12 the government should have identified the person covered

13 by the statute.

14     And the Court reasoned, *"Here, the relevant statutory*

15 *language-prohibiting the attempted killing of 'a national'*

16 *and 'any officer or employee' - suggests that Congress did*

17 *not intend that the government had to prove that the*

18 *defendant had a particular individual in mind as an*

19 *element of the crime.  Viewing the identity of the*

20 *intended victim as a 'brute fact' rather than as an*

21 *element does not implicate fairness concerns.  It does not*

22 *allow for wide juror disagreement as to the defendant's*

23 *acts and does not create or aggravate the risk that the*

24 *jury would convict on bad reputation alone."*

25     And then they continue to the next paragraph.  And

1  this is a very good policy reason as to why this makes

2  sense in an attempted murder situation.

3      *"Indeed, a contrary interpretation would lead to*

4  *absurd results.  For instance, under Siddiqui's*

5  *interpretation of this statute, a defendant who fired one*

6  *shot at a group of United States employees or nationals*

7  *with the intent to indiscriminately kill one of them, but*

8  *not an intent to kill a particular individual, could not*

9  *be convicted under the statutes.  For these reasons, we*

10  *reject Siddiqui's argument that the district court was*

11  *required to instruct the jury that they had to be*

12  *unanimous as to which United States employee or national*

13  *Siddiqui intended to kill."*

14      And that's exactly the kind of situation we have

15  before the Court.  This was a large-scale attack on a

16  camp.  And many people were involved.  Fortunately, nobody

17  was killed.  Nobody was hit.

18      The key for a jury to determine is whether any

19  employee or national of the United States was involved.

20  The United States doesn't have to identify specifics.

21      I'm just looking real quick, Your Honor.  I believe

22  I've wrapped up.

23      I believe that is it, Your Honor.  We believe under

24  the Supreme Court's interpretation of the previous

25  statute -- and another case I want to point out to the

1  Court.  When we talk about that 1996 amendment that the

2  defense claims changed 1114 so radically, look at the

3  *Smith* decision.

4      THE COURT:  *Smith*?

5      MR. MIKE GILL:  Yes.  And it's cited in our brief in

6  a footnote.  It's out of the Fifth Circuit.  And that was

7  also my case.

8      And it is a case that acknowledges that when Congress

9  amended 1114, that they actually broadened the reach of

10  1114.  It was not a narrower interpretation or reach than

11  before.

12      So we believe under all the previous authority,

13  interpretation of the statute, that the statute certainly

14  as a matter of law reaches the charged conduct.  And we

15  believe that Ms. Cardwell makes excellent arguments, like

16  she always does, but they're jury arguments and needs to

17  be determined by a jury.

18      THE COURT:  Thank you, Mr. Gill.

19      MR. MIKE GILL:  Thank you.

20      THE COURT:  Ms. Cardwell, I'll give you the final

21  word.

22      MS. CARDWELL:  Thank you, Your Honor.

23      So once again the government takes *Feola* and

24  overstates what it says, with all due respect to Mr. Mike

25  Gill.  *Feola* was an undercover operation.  And in the

1  process of a drug deal that was supposed to be undercover,

2  the bad guys assaulted the federal officer.

3       So the issue that was raised was whether or not to

4  violate the statute, the person doing the assaulting had

5  to know that that was a federal officer.  And what *Feola*

6  fell back on was --

7       THE COURT:  Slow down just a little bit for the

8  interpreter.

9       MS. CARDWELL:  Sorry.  I was working really hard to

10  go slow.

11       What *Feola* fell back on on saying that this was a

12  proper application of the statute was that it's not

13  necessary because the function is also important.  And

14  this was interfering with the function of these officers

15  in doing their duties.

16       What *Feola* does not say is that the cause or the

17  function independent of the federal employee can be a

18  victim of this crime.  So that's how the government has

19  overstated what *Feola* says.

20       One of the big differences in this case and *Reed* is

21  actually a fact that's in favor of the defense's argument,

22  and that is that in *Reed* the federal officer was

23  identifiable.  We know who came to the scene afterwards,

24  and came too late.

25       I'd ask the Court to take a careful look, and I know

1  the Court's familiar with this particular code section, in

2  18 U.S.C. 1127(a)(2).

3         THE COURT:  1127(a)(2)?

4         MS. CARDWELL:  I think it's 27, unless my writing's

5  unclear.  It's either 27 or 21.  I'm sorry, Your Honor.

6         It prescribes assisting with killing, or attempting

7  to kill, or assaulting someone, or interfering with, one

8  who is assisting with a federal criminal investigation.

9         If Congress had intended the function to be the

10  victim in Section 1114, they wouldn't use that kind of

11  language in terms of prescribing, assaulting, or attempted

12  to kill, or interfering with one who is assisting with a

13  federal function.  They could have made that kind of a

14  general statute the same way they made a very general

15  statute about attempting to kill or assault federal

16  employees.

17         But there is no basis whatsoever for arguing that

18  independent of the federal employee, the cause, the

19  function, the duty, the performance of the duty, can be

20  the victim.

21         THE COURT:  Can be what?

22         MS. CARDWELL:  Can be the victim of the statute

23  independent of its relation to a federal employee.  It's a

24  statute independent to protect federal employees.

25         Now, the government made some --

1    THE COURT:  Well, if the government is able to

2  establish that there is a "compact," for lack of a better

3  word here, between the Afghan Border Patrol and the United

4  States to control migration from Pakistan of insurgents

5  into Afghanistan, and they're both working together, the

6  fact that they fired upon or attacked the Afghan base, you

7  don't think that is sufficient to show that they're in the

8  course of assisting the government in the compact function

9  of protecting migration from that border?

10    MS. CARDWELL:  Well, from my perspective that's

11  assuming quite a bit because there's nothing in the

12  discovery reflecting that at all.  There's a reference

13  made to some training being offered in the government's

14  pleadings, but there's been nothing offered in discovery

15  in support of that.  And it certainly would be relevant to

16  this statute.

17    And, secondly, it's still incumbent upon the

18  government to show that at that time a federal employee

19  was being assisted at the time of the attack.  And without

20  something in writing, some sort of contractual document

21  that indicates that they -- these folks, these particular

22  Afghan Border Police were working on a contract the same

23  way that a local jailer might be, in the absence of that,

24  the government simply is overreaching the use of this

25  statute.

1      THE COURT:  Well, Ms. Cardwell, you've teed up my

2  final question.  With those issues unresolved, isn't it

3  appropriate for it to be reserved for trial for the jury?

4      MS. CARDWELL:  I think with -- the government hasn't

5  said that they have such a compact.  They haven't said --

6  they haven't said that they can refute the position that

7  I'm taking --

8      THE COURT:  I don't think they have to at this stage

9  though.

10      MS. CARDWELL:  Or we can have an evidentiary hearing.

11      THE COURT:  I don't think so.  I appreciate it, as

12  always.

13      MS. CARDWELL:  Thank you, Your Honor.  Thank you.

14      THE COURT:  I think the bottom line here is that this

15  is an element of the offense.  And I feel that it should

16  be reserved for the trier of fact.  It will be presented

17  to the jury during the course of the evidence as well as

18  the instructions.

19      I'll certainly give you leave to renew it at the

20  close of the government's case if they haven't satisfied

21  the requirements of that statute.

22      So that motion will be denied.

23      All right, Mr. Wagner, I assume you're coming up for

24  the video motion, are you?

25      MR. WAGNER:  I am, Judge.

1        THE COURT:  All right.  Fine.

2        MR. WAGNER:  Judge, we have moved in limine to

3   exclude the introduction and evidence in this trial of the

4   video that I'm sure the Court has had an opportunity to

5   review.

6        THE COURT:  Yes, sir.

7        MR. WAGNER:  And the transcripts that have come --

8        THE COURT:  Just for the purpose of the record, you

9   only want to exclude the first 2 minutes and 48 seconds

10  right?

11       MR. WAGNER:  Absolutely, Judge.

12       THE COURT:  Okay.

13       MR. WAGNER:  And I think we've done some briefing

14  subsequent to the motion and the response and the reply to

15  make that clear.

16       THE COURT:  Yes, sir.

17       MR. WAGNER:  On the record, Judge.

18       Our position here is, Judge, that unless the

19  government can tell this Court with reasonable certainty

20  that this video, and the transcripts supporting this

21  video, addresses the operation charged in this case, then

22  under both the hearsay argument that we present, and the

23  403 argument, the video must be excluded.

24       The government must be able to prove to this Court

25  that the defendant was part of that conspiracy that was

1  shown in that video in order for that video to be

2  admissible.

3       THE COURT:  Now, let's dissect the argument just a

4  little bit here.

5       MR. WAGNER:  Sure.

6       THE COURT:  I'm making a threshold decision, okay?

7       Now, do I have to find by a preponderance of the

8  evidence that this is part of the conspiracy to attack

9  Camp Lejeune?

10       Is this a part of the conspiracy among the Taliban,

11  in which the defendant purports to be a party, to attack a

12  military reservation?

13       What do I have to find here in order to resolve this

14  motion?

15       MR. WAGNER:  I believe that the indictment, the

16  second superseding indictment, outlines what this

17  conspiracy is.  And this conspiracy is a group of people

18  who are attacking an Afghanistan outpost.  Now, the

19  Taliban are --

20       THE COURT:  -- as far as a specific date and time?

21       MR. WAGNER:  Exactly.  Right.  For that November 29,

22  2009, attack.  I don't believe that the government has

23  alleged that the conspiracy is the entire Taliban

24  organization or the Haqqani organization, but simply that

25  this was a conspiracy to conduct this particular attack.

1    And you've heard -- we have provided Bates Stamped

2  documents which demonstrate that there were three prior

3  attacks on Camp Leyza before this one.  And no indication

4  that Mr. Khamidullah was a part of either of those

5  attacks.  We provided in our surreply, in our response to

6  the surreply by the government, an additional Bates

7  Stamped document which shows later on in this video that

8  the people who are talking in that video, and during the

9  surveillance position, that this camp had been attacked

10 previously.

11    So, Judge, with that in mind, the government's burden

12 under the Fourth Circuit law is to show that this

13 defendant was a part of this conspiracy at the time the

14 video was made.  And because the defendant is never

15 mentioned in this video, because the video is undated,

16 because of the three previous attacks, the government

17 cannot meet that burden.  Cannot show by a preponderance

18 of the evidence that the defendant was a part of that

19 conspiracy that was meeting in that video at the time the

20 video was made.

21    And I think the government, to a certain extent, has

22 conceded this to a certain -- has conceded this to a

23 certain extent.  On Page 4, Footnote 4 of their surreply,

24 they say even if the video did refer to an earlier attack,

25 there's a strong suggestion that the declarant and the

1  defendant were part of the same conspiracy.

2      Judge, that's not referencing the time that the video

3  was made.  And I don't believe that the government can

4  satisfy their burden by suggesting that the defendant was

5  not part of the conspiracy at the time the video was made.

6      If we look at the hearsay analysis under 801, the

7  first thing that --

8      THE COURT:  Slow down just a little bit for the

9  interpreter.

10     MR. WAGNER:  I'm sorry.

11     THE COURT:  All right.  Go ahead.

12     MR. WAGNER:  We look at the hearsay analysis under

13 801.  The government's first claim is that these

14 statements in the video were not assertions.  Were not

15 statements offered to prove the truth of the matter

16 asserted.

17     I don't see how the government can take this

18 position, Judge.  I don't see how these statements in the

19 video could be anything other than assertions, and other

20 than statements being offered to prove the truth of the

21 matter asserted.

22     If you look to the transcript, --

23     THE COURT:  Tell me what the assertion is.

24     MR. WAGNER:  Sure.  And we've provided that in our

25 response to the government's surrebuttal.  We've given

1  great detail about exactly what those assertions are.  And

2  they're in the transcript of the video itself.

3      It talks about a road to a village.  It talks about

4  the Khost side.  And it talks about the road coming from

5  Pakistan.  All of those, Judge, are assertions to try to

6  show that Mr. Khamidullah was attached to this particular

7  conspiracy because it's trying to reference -- at least

8  the government's position is, it's trying to demonstrate

9  that this was Mr. Khamidullah --

10      THE COURT:  Is the truth of those -- and I'm talking

11  academically now.  Is the truth of those comments at issue

12  that there's a road, that there's a camp?

13      MR. WAGNER:  Well, it is an issue --

14      THE COURT:  Is it just a mere fact of utterance that

15  they're talking about the physical attributes of this

16  camp?

17      MR. WAGNER:  Not if the intent is to take that video

18  and that transcript and tie that to Mr. Khamidullah, and

19  Mr. Khamidullah's there.  If Mr. Khamidullah was at that

20  meeting and discussing this information at that meeting --

21      THE COURT:  Then it would come in under the

22  co-conspirator's exception?

23      MR. WAGNER:  Right.  It would come in as an admission

24  by the defendant.  There are any number of ways.

25      But because the government is trying to tie

1   Mr. Khamidullah to that conspiracy, to that meeting, the

2   words that are spoken at that meeting must be offered for

3   the proof of the matter asserted.  They're trying to say,

4   okay, this is an attack on Camp Leyza, and this is why.

5   And so they point to the truth of those matters asserted

6   in order to make that connection, Judge.

7       It talks about how the attack will be mounted in the

8   morning.  And that's an important point, Judge.  That

9   distinguishes this particular meeting in the video from

10  the attack that has been charged in the indictment,

11  because the attack in the indictment happened at midnight.

12  Nowhere near the morning, as referenced in this video,

13  which lends more credence that our position that this

14  video was not portraying the attack that's charged in the

15  indictment.

16      And so, first of all -- and I can go through all of

17  the references in the transcript, all of the references in

18  that video that are statements.  It talks about

19  helicopters.  Certainly, the government wants to show that

20  the plan discussed in the video involves helicopters to

21  tie Mr. Khamidullah to this attack because he was talking

22  about helicopters in his interrogation to the FBI in March

23  and April of 2010.

24      So clearly, again, the truth of the matters asserted

25  here are important to the government's position that

1  Mr. Khamidullah is part of this conspiracy that's

2  presented in the video.  And so I point to our briefing

3  there to show all of the assertions that are provided in

4  that video which are being offered to prove the truth of

5  the matter asserted.

6      So the Fourth Circuit has made clear through the

7  *Shores* case, through the *Rhynes* case, through the *Blevins*

8  case that the defendant must be a member of the conspiracy

9  at the time of the assertion that the declarant makes a

10 statement in order for that particular statement to be

11 introduced under the conspiracy exception to the hearsay

12 rule.

13     If you rule in our favor with regard to the hearsay

14 issue, there's no need to undergo a 403 analysis.  But

15 under a 403 analysis, again, the government taking the

16 position this -- this may very well, this video may very

17 well depict a different attack other than that that's been

18 charged in the indictment should be all this Court needs

19 in order to exclude that evidence under 403 because there

20 the prejudice, overwhelming prejudice, of the admission of

21 that statement outweighs any probative value.

22     Thank you.

23     THE COURT:  Mr. Gillis.

24     MR. GILLIS:  Thank you, Your Honor.

25     First I go right to the point that the Court raises.

1 If the -- if in the video the briefer had said we're going

2 to go up this road to attack that fort, and that fort is

3 10 miles from Khost, if that were all false -- but what

4 the defendant had said when he was -- when he was

5 interrogated was that we planned to attack this fort that

6 was up this road, and that was 10 miles from Khost.  Let's

7 say that the truth is that the road actually ran the other

8 way.  And let's say that the fort, instead of being

9 10 miles, was 20 miles from Khost.

10      It is the fact that the defendant describes a scheme,

11 an entire plan of attack, of this fort.  And the fact that

12 in this video they are discussing and describing the exact

13 same plan as close as human ingenuity can make it.  These

14 descriptions are the same.  It does not matter whether

15 they were true or not true.  It's not being offered for

16 that purpose.

17      THE COURT:  The greatest concern I have here as far

18 as the hearsay issue --

19      MR. GILLIS:  Yes, sir.

20      THE COURT:  A law professor of evidence could argue

21 this all day.  It grinds the salt about as finely as one

22 can imagine in order to have an evidentiary issue.

23      However, my concern in this case, Mr. Gillis, is the

24 timing.  I don't know when this video was made.  I don't

25 know when the -- if the defendant was a member of the

1  conspiracy.  I don't know whether it was this attack or

2  one of the other two or three.  That's the concern I have.

3      MR. GILLIS:  Yes, Your Honor.  All right.

4      First, those considerations are part of the hearsay

5  analysis.  Whether it was during and in furtherance of a

6  conspiracy.  But where it's being offered to prove the

7  conspiratorial act, it is not hearsay in the first place.

8  It is a verbal act and it is -- if I may, Your Honor,

9  there are two cases that I alerted counsel to a day or so

10 ago.  They are *Faulkner* and *Lynn*.  And I have copies of

11 them for the Court.

12     THE COURT:  Yes.  I'd like to have a look at those.

13     MR. GILLIS:  So if I may give these to the gentleman.

14 Thank you.  If I can ask Mr. Clifton to give those to the

15 Court.

16     In the *Faulkner* case, Your Honor, from the Tenth

17 Circuit on what is Page 7 of that printout that you have

18 there, they say that, "*Statements by coconspirators are*

19 *commonly introduced at trial simply because the statements*

20 *themselves are part of the plotting to commit a crime.*"

21     THE COURT:  I understand all that.

22     The question is at the point in time this video was

23 made was he a member of the conspiracy?

24     MR. GILLIS:  Well, yes, Your Honor.  And if I can get

25 to that?

1    THE COURT:  Go ahead.  I don't want to interrupt you,

2  but I just want to keep you on track of what my concerns

3  are.  I understand, as I think every judge would, that if

4  he was a co-conspirator, they would be admitted as the

5  co-conspirator's exception.  Sure.

6    MR. GILLIS:  Yes.

7    THE COURT:  But I want you to, first of all, address

8  the predicate issue of whether or not he is a member of

9  the conspiracy.  And that's a timing thing.  There were

10  three attacks here.  Was this planning this attack, was

11  he -- and/or was he a member of the group at that time?

12    MR. GILLIS:  Well, Your Honor, I submit that it's a

13  relevance question.  It is not a hearsay question because

14  it is -- it is not being offered as a co-conspirator's

15  statement.  We submit that it is also admissible on that

16  ground if it were being offered as an assertion for the

17  proof of some assertion in the video.

18    As I tried to explain with my analogy, the truth of

19  whether their description of the locations is true or not

20  true is irrelevant.  The question is that they're

21  discussing exactly the same plan.  And but -- so it's a

22  question of relevance, I believe, Your Honor, rather than

23  a question of whether it's part of the same conspiracy.

24    So if I could just -- as the *Faulkner* case says, *"the*

25  *conversation in which they plan the venture and agree to*

1    *participate is not hearsay."*  So this is --

2        THE COURT:  You're talking about them planning the

3    venture that forms the basis of the prosecution?

4        MR. GILLIS:  What I'm talking about, Your Honor, is

5    that -- and I can see that I'm not persuading the Court

6    much.

7        THE COURT:  No.  I'm trying to get a handle on it

8    here.  I've certainly not made any decision, but I just

9    want to get a handle on this here, Mr. Gillis.

10       MR. GILLIS:  Yes, Your Honor.

11       THE COURT:  I would certainly agree that planning,

12   for example, a bank robbery that precedes the event that

13   forms the basis of the indictment, there's no question

14   that that's admissible.

15       MR. GILLIS:  Yes, Your Honor.

16       THE COURT:  But I can't -- I'm waiting for you to

17   connect this discussion with this particular attack.

18       MR. GILLIS:  All right, Your Honor.  Thank you.

19       So our Count 1, which describes the conspiracy, and

20   the indictment as well in the general allegations, makes

21   clear that the defendant planned this attack.  He planned

22   it.  He admitted to planning it.  He admitted to being the

23   one that devised the placement of the anti-aircraft heavy

24   machinery on two hills.  That was his plan.  And to have a

25   phalanx that would attack from the third with -- with

1  AK-47s, he admitted to devising that plan.

2      He admitted that he obtained the specific weaponry

3  that he described as a BM and as a -- as a PK.  And that

4  he had to obtain those on credit.  In fact, he said he

5  still owed the guy the money for that weaponry.

6      So he selected the site.  And he did so after

7  consulting with several people, including people very high

8  in the Taliban and the Haqqani Network, as well as a local

9  Pashtun tribesman -- tribal leader.  So -- and in order

10 for him to carry out this attack, then he had to go

11 through these steps.  We don't know how long that took,

12 but it took some time.

13     And then he also had to recruit about 30 or so

14 insurgents to go on this thing.  So this -- this plan took

15 some planning.  But he devised it.

16     So what you have in this video, Your Honor, is -- is

17 a description of that plan.  He says he devised that plan.

18 He says he devised --

19     THE COURT:  Whoa.  He looked at the video and said

20 that that was the plan he devised?

21     MR. GILLIS:  No, Your Honor.

22     THE COURT:  Okay.

23     MR. GILLIS:  What he said was he described the plan

24 in detail to the agents before he ever saw the video.

25     Then you look at the video, and it is the plan that

1  he described.  Not only described, but he said that he

2  devised.  If he devised it, and it's in the video, that's

3  a very strong -- that's strong evidence, Your Honor.  And

4  that we're talking about the very same conspiracy, it

5  would be a remarkable coincidence if the choice of

6  location which he said he chose from those given to him by

7  the Taliban and by the Haqqani Network.

8       They said, here, choose among these six.  You know,

9  any one of these six will be all right with us.  He chose

10 the one.

11      So the fact that these insurgents in the videotape

12 are discussing that -- attacking that fort that he

13 selected is strong evidence that it's part of the same

14 conspiracy.  The fact that they verbalized --

15      THE COURT:  Now, do we know that he selected it

16 before they developed that plan?  I mean, did his

17 selection of that fort occur prior to the events in the

18 video?

19      MR. GILLIS:  Well, Your Honor, if -- I think that it

20 is a fair inference that it was because he said he

21 selected that attack site, and that he devised the plan

22 for the attack.

23      THE COURT:  Okay.

24      MR. GILLIS:  In the video they're describing that

25 attack site and the plan that he says he devised.  And so

1  it necessarily came after or at the same time as it.  It

2  may be that this was a little bit like, you know, may have

3  been.  Presumably there was a little bit of back and forth

4  in the process of describing -- in selecting which site

5  and why.  He said he chose that site because it was

6  nearest the Pakistani border so that he could get in and

7  get out quickly.

8       And so that's why he chose that site from among the

9  ones that Haqqani, and others, offered to him.  So the

10  fact that it's being discussed -- if they just said, hey,

11  let's attack this fort, that would be one thing.  But the

12  fact that they say let's attack this fort, let's use a BM

13  and a PK, the same weapons that he went into debt for, and

14  let's put them on these hills the same way that he said

15  they were going to put them, and let's wait for the

16  helicopters and when they come our anti-aircraft machinery

17  on these two hills are going to shoot down the U.S.

18  helicopters that will be coming from Khost, which is

19  exactly what he said, so it's --

20       THE COURT:  Now, did the other two attacks on the

21  camp, were they part of your -- of this defendant's plan?

22       MR. GILLIS:  Well, first of all, Your Honor, he said

23  there were prior attacks.  He's the one that says there

24  were --

25       THE COURT:  Your evidence doesn't confirm any prior

1   attacks?

2       MR. GILLIS:   I don't know of any prior attacks.   I

3   have not -- I can't say one way or the other, Your Honor.

4       But what I can say is this, if they were describing

5   some prior attack, it would be a remarkable coincidence

6   that it involved the same two hills, the same

7   anti-aircraft machinery, the PK and the BM, and the plan

8   to lob in mortars, which is also in the attack video which

9   is exactly what he planned to do.

10      Soften up the fort first by lobbing the mortars in.

11  Wait for the helicopters.   The helicopters are even drawn

12  in the little map that -- that's in this -- in this video.

13  So if it were some other attack, it would be a remarkable

14  coincidence.

15      And I submit, Your Honor, that a preponderance of the

16  evidence would favor that it's not some prior -- even if

17  were some prior attack, and this is why I think the

18  relevance issue rather than the hearsay issue was the one

19  that I wanted to stress, even if it were some prior

20  attack, it is relevant to show to support what he said,

21  which is that he's working with others, he's working with

22  the Haqqani and the Taliban and that -- and that this was

23  a site that I selected from the ones they offered to me.

24      So if it had been attacked before, and if this in

25  fact were a description of some prior attack, that's

1  strong evidence of what he said.  It could be that it's

2  part of the very same conspiracy.  It would seem that it

3  would, but it doesn't necessarily have to be.  It is

4  certainly strong evidence to support what he's admitted

5  to, which is that he worked with others and that -- I beg

6  your pardon, Your Honor.

7        That he worked with others.  That he selected this.

8  That it was a site that was important enough that

9  apparently they -- I mean, if that's the case that they

10 attacked it before; however, Your Honor, I submit that the

11 evidence strongly supports the conclusion that it's the

12 very -- that it's the very same -- that it's the very same

13 attack site.

14       THE COURT:  All right.

15       MR. GILLIS:  If I may just review my notes for one

16 moment, Your Honor?

17       THE COURT:  You go right ahead.  Sure.

18       MR. GILLIS:  I also should submit, Your Honor, I

19 think it is quite significant that he -- if it's true, he

20 says that there were three prior attacks on this fort.

21 Well, Your Honor, he's not from around there, okay?  So

22 how does he know there were three prior attacks?

23       And so the fact that we have a video that, if, as

24 they claim was some prior attack, I mean, the fact that he

25 knows that there were three prior attacks and that we've

1  got a video of an attack here, that is pretty strong

2  evidence of his participation in this conspiracy as well.

3      And of his disposition to commit the crime, of the

4  scope of the organizations with which he's involved, of

5  the threat; it doesn't all necessarily have to go solely

6  to the conspiracy.  There are a number of relevant parts

7  of this case that those -- that that video and that

8  admission would support -- would be probative of.

9      It doesn't have to be conclusive.  It has to make a

10  fact of significance.  I don't mean to tell you your

11  business, Your Honor, but it would certainly make these

12  facts more likely than not.

13      THE COURT:  Okay.

14      MR. GILLIS:  Finally, Your Honor, the significance of

15  the video and its -- and it's relevance, and it's -- the

16  likelihood that it is with co-conspirators is brought home

17  even more forcefully by the comments that he made when the

18  video was shown to him.  And so in the September 14th --

19  or rather the April 17, 2010, interview that you have, the

20  pre-attack video is begun around 1730 on the time stamp on

21  the video.  And around 1806, a few seconds into it, the

22  agent confronts the defendant and says it looks like you

23  had four prongs, not three.  Suggesting that he was hiding

24  something in what he had told them about, or holding back

25  on the existence of others.

1    He had said frequently, Your Honor, I will answer

2  your questions, but I won't do anything to hurt Islam or

3  to identify any of my brothers.

4    Now he's confronted with a video that has a room full

5  of his brothers, and somebody who appears to be in a

6  leadership position indicating how this attack is going

7  to -- is going to go down.  So it's certainly

8  understandable that he would want to distance himself or

9  refuse to answer questions that --

10    THE COURT:  Slow down a little bit, Mr. Gillis.

11    MR. GILLIS:  I beg your pardon.

12    It's understandable that he might want to prevaricate

13  about how the attack was exactly going to be carried out

14  to the extent that it might implicate others still living.

15    But then at 1824, Your Honor, he puts his glasses on

16  to watch the video.  And then at 1922 he says, oh, you

17  guys took that when you gathered -- when you did the

18  battle.  That was not used for something.  That's not

19  entirely clear.

20    A few seconds later he says, what I have done, I have

21  already confessed to.

22    And then finally at 2005 he says, I spoke of that

23  already.

24    These statements by the defendant while the video was

25  being played, quite contrary from established -- from

1  suggesting that this is something that comes out of left

2  field, it isn't.  The jury should be entitled to look at

3  that video while he's looking at the pre-attack video and

4  judge his reaction to it and to hear him say these things

5  like, oh, you guys took that when you gathered -- you

6  know, when you did the battle.  Presumably referring to

7  the battle damage assessment.

8      What I have done I've already confessed to it - while

9  he's watching the video.  It's not like what is this?

10 That's a completely different team.  Those are guys.  I

11 have no idea what you're talking about.

12     THE COURT:  I get it.

13     MR. GILLIS:  So I submit, Your Honor, that there is

14 plenty of evidence to support that finding.

15     THE COURT:  All right.  Thank you, Mr. Gillis.

16     MR. GILLIS:  Thank you.

17     THE COURT:  Mr. Wagner.

18     MR. WAGNER:  Frankly, there wasn't much that I heard

19 from the government to advance the ball in the

20 government's favor here.  The video is undated.  It is --

21 there is no proof that the government has provided to show

22 that that video was made at a time when this defendant was

23 a member of the conspiracy.  And that's particularly

24 important in light of Mr. Khamidullah's statement of three

25 prior attacks on Camp Leyza.

1        And if you look at 1396, Bates Stamp 1396, which is

2   part of the transcript of a later portion of the video,

3   the speaker in the video specifically says during the

4   surveillance of Camp Leyza that earlier this post was

5   attacked by the Taliban.  So it wasn't just the defendant

6   in his interrogation by the FBI --

7        THE COURT:  But do we know that it was the same modus

8   operandi and battle strategy that was used in this case?

9        MR. WAGNER:  Well, I don't believe that the statement

10  in the video shows the same modus operandi.  The

11  government talks about the same weapons.  Well,

12  interestingly, Mr. Khamidullah, during his interrogation,

13  refers to a 75 weapon, an 82 weapon, a DShK weapon.  None

14  of those weapons are referenced in the video.

15       Again, the video talks about a morning attack.  This

16  attack was clearly not in the morning.  So there are a lot

17  of distinguishing features between the video that the

18  government intends to introduce and the statements that

19  the defendant made, so many that there is no proof here

20  that the defendant was part of the conspiracy at the time

21  the video was made.

22       THE COURT:  But, Mr. Wagner, let's -- let me back up

23  one frame here.  This video would depict a conference

24  among Taliban leaders planning an attack on Camp Leyza.

25       MR. WAGNER:  I don't know if it's clear they're

1   Taliban leaders, but certainly a group that's planning an

2   attack on what is arguably Camp Leyza.

3        THE COURT:  Well, depending upon the evidence being

4   able to identify them as Taliban leaders we'll leave that

5   to the evidence at trial.

6        And the government's theory is that your client was

7   acting as an affiliate of the Taliban, and carrying out

8   the exact plan that's depicted in that video.

9        MR. WAGNER:  Again, Judge, I don't think we can say

10  that it was the exact plan because of the distinctions

11  between what's in that transcript and what Mr. Khamidullah

12  described and what was found at --

13       THE COURT:  Doesn't this go to the weight and not the

14  admissibility, Mr. Wagner?

15       MR. WAGNER:  Oh, I beg to differ, Judge.  Because it

16  goes to whether the defendant was a member of the

17  conspiracy at the time the video was made.  And that would

18  preclude the video from coming into evidence.

19       I mean, we can't get to the point of the

20  confrontation clause here because we can't argue that that

21  video was testimonial.  But clearly there are problems

22  with us cross-examining the person who was speaking in

23  that video.  And that should be part of this Court's

24  consideration of the issues in this case.  That's why it's

25  hearsay, and that's why it should be excluded under the

1  hearsay rules because we can't cross-examine the

2  individual who was speaking, the declarant, in that video.

3      We can't determine what the timing was that the video

4  was created.  And that timing is critical to determine

5  whether or not the defendant was a member of the

6  conspiracy at the time.

7      THE COURT:  Okay.  Very good.  Thank you, Mr. Wagner.

8      MR. GILLIS:  Your Honor, if I may?  I'm sorry.  I

9  meant to include in the record the sketch that I referred

10 to, as well as --

11     THE COURT:  Why don't you come up to podium so we can

12 hear you.  Go right ahead, Mr. Gillis.

13     MR. GILLIS:  Your Honor, what I proposed to admit is

14 this sketch that the defendant adopted during the

15 interview, the satellite image of the overhead area, and

16 the 3/29 video, or at least the portions of the 3/29 video

17 that I referred to in my brief.

18     I've described them in the brief, but to have them in

19 the record I would ask that --

20     THE COURT:  All right.  It's a sketch of Camp Leyza,

21 is that correct?

22     MR. GILLIS:  Yes, Your Honor.

23     THE COURT:  And the video depicts the March 29 --

24     MR. GILLIS:  The March 29 video in which he describes

25 the -- there's a March 29 and March 30 -- short segment

1  from March 30 that -- in which he describes the plan of

2  attack, and the placement of the weapons and the like.

3      I don't believe that those portions are reflected in

4  the transcripts, which is why I would like to include the

5  videos themselves, or those segments of the videos

6  themselves.

7      THE COURT:  Any objection, Mr. Wagner?

8      MR. WAGNER:  I'm not exactly sure what the relevance

9  is in relation to this motion.

10     THE COURT:  I don't recall having looked at these

11  portions of the videos, so it's going to be difficult for

12  me to rule on that one.  I have no idea what you're moving

13  into evidence.

14     MR. GILLIS:  I'm sorry, Your Honor.  I have

15  identified in my brief, and refer -- for example, in my

16  response to their motion, I should have had them -- and I

17  apologize for this, Your Honor.

18     THE COURT:  That's okay.

19     MR. GILLIS:  I should have had them marked as

20  exhibits for this hearing.  But in the -- on Page 3 of my

21  response to their motion *in limine*, I refer to a sketch of

22  the battle plan that he adopted --

23     THE COURT:  You don't have an objection to the sketch

24  of the battle plan, do you, Mr. Wagner?

25     MR. WAGNER:  I don't know what sketch he's referring

1  to.

2      THE COURT:  All right.  Have a look at it.

3      What is the government's next exhibit number, Becky?

4      MR. GILLIS:  Your Honor, I will run them by defense

5  counsel first, if I may.  And again, I apologize.

6      THE COURT:  All right.  You talk about it and you can

7  submit them to the Court and I'll look at them, okay?  But

8  get them to me as soon as I can because I want to try to

9  rule on those motions as quick as I can.

10      MR. GILLIS:  Yes, sir.  I sure will.

11      THE COURT:  All right.  Thank you, sir.

12      Who's going to argue the motion on exculpatory

13  evidence?

14      MS. CARDWELL:  I am, Your Honor.  Briefly.

15      THE COURT:  Come on up.

16      Ms. Cardwell, I may not have a good grip on

17  exculpatory evidence, but as I understand the law, your

18  motion merely puts them on notice that they should be

19  reviewing these items.  It makes a much more

20  particularized search required on the government's part,

21  but no ruling on this Court's part.

22      MS. CARDWELL:  Well, Judge, the reason I asked the

23  Court to consider granting it is it makes it a matter of

24  record that the specific requests were made.

25      THE COURT:  But the discovery order requires them to

1  provide all the exculpatory evidence.  I've already done

2  that.

3       MS. CARDWELL:  I understand that, Judge.  And I

4  understand the Court's irritation with me.

5       THE COURT:  I'm not irritated.

6       MS. CARDWELL:  Judge Payne got very irritated with me

7  about this kind of motion.

8       THE COURT:  Then I'll adopt his irritation.  Go

9  ahead.

10      MS. CARDWELL:  Judge, the reason that the motion was

11  filed in this particular case, and I think it's been borne

12  out in some of today's arguments, and frankly based upon

13  the candor that you thanked Ms. Levy for, and we thanked

14  her as well, let me just give you one example as to why

15  we'd ask the Court to grant --

16      THE COURT:  Hold off one second.

17      MS. CARDWELL:  I'm sorry.

18      Let me just give you one indication as to why we

19  would ask that the Court grant the motion.  One is --

20      THE COURT:  Well, for me to grant the motion is for

21  me to indicate that it is in fact exculpatory.  And first

22  of all, I don't even know whether or not it exists.

23      The only thing I'm going to do, and I'll tell you

24  right now, is I'm going to require the government to

25  review those items with a more particularized eye as to

1  whether or not it's exculpatory.  And if it is, they have

2  an obligation to reveal it.  If not, they do so -- they

3  fail to do so at their peril.

4      MS. CARDWELL:  Well, I guess the point I wanted to

5  make is the unique circumstances of this case, and based

6  upon what the government has said it's done, is that it

7  sent out to all the various agencies, and there are a few

8  of them in this case, and asked them to comb their files

9  carefully for any possible exculpatory evidence.

10 Certainty, counsel -- and I don't plant any bad faith on

11 this team at all, and I don't have to ask for *Brady*, to

12 trust that to agencies to determine whether or not

13 something is exculpatory, concerns me.

14     Ms. Levy was candid enough to say they're having

15 trouble getting an answer about this gun.  One of the

16 things we've asked for is for them to look at whether any

17 evidence was lost, mishandled, or destroyed.  And I'm

18 concerned that this isn't your typical case where your

19 local FBI agent or local police are the people you're

20 talking to.  You're talking to agencies who can be quite

21 possessive about their information.

22     You're talking about a situation where there are

23 quite a few possibilities that potentially statements have

24 been made by people with the military, people in these

25 agencies.  And for that reason, I'd like it to be made a

1  part of the record that these are specific things that

2  have been requested by the defense.

3      THE COURT:  You've made the record by filing it.

4  You've done that.  And they're on notice of their

5  requirement to make sure that their subordinates and

6  agents comply with it.

7      But I'm not going to grant the motion because I don't

8  believe that they individually should have a

9  responsibility to personally review it.  They can delegate

10 that to their subordinates.  And that's all the law

11 requires, Ms. Cardwell.

12     MS. CARDWELL:  Very well, Your Honor.

13     THE COURT:  But they're held accountable for it.  I

14 agree with you.

15     MS. CARDWELL:  Thank you.

16     THE COURT:  Okay.

17     MS. CARDWELL:  At this time, Your Honor, so we don't

18 forget, we would like to ask the government to put on the

19 record whether or not there exists any video from the

20 aircraft -- the helicopters and the aircraft.

21     THE COURT:  Okay.

22     MS. CARDWELL:  That came up earlier.

23     THE COURT:  All right.

24     MS. CARDWELL:  Thank you.

25     THE COURT:  Mr. Gillis, can you do that?

1        MR. GILLIS:  Your Honor, as of today we have none.

2   There is no videotape of the contemporaneous recording of

3   the battle as it took place.

4        THE COURT:  Well, I'm going to ask you and/or your

5   agents to make inquiry, okay?

6        MR. GILLIS:  Well, Your Honor, we are, and certainly

7   have, and we will continue to do so.  I'd be delighted to

8   find it.  They would certainly be the first to know.  As

9   of now, we have not.

10       THE COURT:  That's fine.  Thank you very much, sir.

11       All right.  Motion for Bill of Particulars.

12       MR. WAGNER:  Last one, Judge.

13       Judge, under the indictment in this case, the

14   government has charged our client with conspiring to, and

15   attempting to kill and injure American employees, officers

16   and nationals.  Our point is, Judge, to the extent that

17   the government has not identified those officers,

18   employees and nationals, that they be required to do so.

19       THE COURT:  Under your request here, Mr. Wagner, if

20   some terrorist fired into a crowd of 100 people and they

21   couldn't identify which one he wanted to shoot, the

22   prosecution would fail.  That's not the law.

23       MR. WAGNER:  I agree, Judge.  But if the government

24   in their indictment has indicated that the person, the

25   terrorist who shoots into a group, is shooting at an

1  American national or an employee, that they, as a matter

2  of proof, have to prove that someone is an American

3  national.   They would have to at least identify someone in

4  the group who's an American national or employee.

5       THE COURT:   I think all they have to prove is that

6  one of the individuals being fired upon is an American

7  national, a soldier or employee that qualifies under that

8  statute.   I don't think they need to identify the name, so

9  to speak, of the individual, but only that they qualify

10 under that description.

11      MR. WAGNER:   We put this motion in the posture of the

12 government in essence filing a case involving a juvenile

13 minor or involving a hate crime.   Certainly, under those

14 situations where there is a characteristic or a status of

15 the victim, the government would be compelled to indicate

16 who those people were and what their characteristics were

17 so we could confirm that.

18      We believe the same principle applies here, Judge,

19 where they've given a particular characteristic of a

20 victim in a case.   They should be required -- and for this

21 case let me be even more specific, Judge.   We are simply

22 asking for the identity of the people on the helicopter

23 that responded to this situation that were allegedly

24 victims of Mr. Khamidullah's plan, or attempt to kill or

25 injure.

1        We just want to be able to confirm that they weren't

2  coalition forces, for instance, that were responding.   A

3  British helicopter or an Australian helicopter.   Clearly,

4  there were coalition forces --

5        THE COURT:   Well, Mr. Wagner, if they can't prove at

6  trial that they were an American national, a U.S. soldier,

7  or an employee of the United States, your Rule 29 motion

8  is going to be granted, isn't it?

9        MR. WAGNER:   It should, Your Honor, but we certainly

10 want the opportunity to -

11       THE COURT:   I think it will.

12       MR. WAGNER:   - be able to investigate that issue

13 before trial to confirm whether the government can meet

14 its burden.

15       THE COURT:   I'm not going to require them to identify

16 each individual.   I'm sorry.   The motion is denied.

17       MR. WAGNER:   Very well.

18       THE COURT:   Now, according to my notes, that covers

19 all the motions.   Am I correct?

20       MR. WAGNER:   It does, Judge.

21       MR. GILLIS:   Yes, Your Honor.

22       THE COURT:   I say this very advisedly.   Are there any

23 other issues we need to address today?

24       Will that take less than five minutes?

25       MS. LEVY:   Yes, Your Honor.

1          THE COURT:  All right.  You've got the floor.

2          MS. LEVY:  Actually, I'd like to do a Bench

3   conference on it.

4          THE COURT:  Sure.  Come on up.

5          MS. LEVY:  It's on a CIPA issue.

6          THE COURT:  Okay.  Would it be more convenient to

7   meet back in the jury room on this?

8          MS. LEVY:  No.  Less than a minute.

9      (Bench conference heard outside the hearing of the

10                      courtroom.)

11        (This portion of the transcript is sealed.)

12             (Conclusion of Bench conference.)

13         THE COURT:  At this point, the Court will stand in

14   recess.  The defendant is remanded to the custody of the

15   U.S. Marshal.

16             (The proceeding concluded at 3:52 p.m.)

17                  REPORTER'S CERTIFICATE

18          I, Krista Liscio Harding, OCR, RMR,
     Notary Public in and for the Commonwealth of
19   Virginia at large, and whose commission expires
     March 31, 2016, Notary Registration Number 149462,
20   do hereby certify that the pages contained herein
     accurately reflect the notes taken by me, to the
21   best of my ability, in the above-styled action.
          Given under my hand this 10th day of July, 2015.

22

23                    _____
                      Krista Liscio Harding, RMR
                      Official Court Reporter

24

25