# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA     )

)

v.     )

)   Case No. 3:14CR140–HEH

IREK ILGIZ HAMIDULLIN,     )

a/k/a Irek Ilgiz Khamidullah,     )

)

     Defendant.     )

```
F I L E D
JUL 1 3 2015
CLERK, U.S. DISTRICT COURT
RICHMOND, VA
```

## MEMORANDUM OPINION
### (Defendant's Motions to Dismiss the Indictment)

This case involves the detention and subsequent prosecution of Defendant Irek Ilgiz Hamidullin (the "Defendant") in the immediate aftermath of his participation in an armed attack on an Afghan Border Police compound in the Khost Province of Afghanistan on November 29, 2009. The case is presently before the Court on a number of challenges to its extraterritorial jurisdiction over the actions of the Defendant. Also at issue is whether, under the law of war, the Defendant is subject to prosecution as a combatant in a theater of war. Both the United States and the Defendant have submitted detailed memoranda supporting their respective positions, and the Court heard evidence and oral argument on June 17–18, 2015. While many of the principles governing the issues at hand have been well-developed in courts of the United States, their application to a group of insurgents purportedly affiliated with the Taliban is a venture into a new frontier.

The complexity of the Court's analysis is compounded in two respects. First, the well of judicial authority applying the law of war to the conflict in Afghanistan and the

various schisms of jihadist fighters is finite. While the legal landscape is filled with

respectable military and scholarly treatises, along with a host of public policy position

papers, few courts have had occasion to venture into this terrain. In according

appropriate weight to these treatises and position papers, courts are confronted with the

often challenging task of parsing out political viewpoints and policy considerations from

unadulterated legal analyses. As defense counsel aptly pointed out, this case presents

issues of war in a unique context. This Court's analysis focuses on the legality, not the

wisdom or foreign policy implications, of this prosecution.

Second, while the law of war is not foreign to federal courts, its application has

been limited to conventional warfare. This case explores the outer perimeter of the

concept of enemy combatants and its width in the present conflict. Central to the analysis

is the question of what constitutes an armed force on the battlefield of Afghanistan.

## I. The Indictment and Jurisdictional Challenges

According to the Second Superseding Indictment in this case, the Defendant, a

former officer and tank commander in the Russian military, was associated with the

Haqqani Network, a Taliban-affiliated group of militants operating in Afghanistan.[1]

(Second Superseding Indictment 2, ECF No. 55.) The Defendant, acting in league with

commanders of other insurgent groups, allegedly participated in the identification of

facilities operated by the United States military and the International Security Assistance

Force as targets to attack. (*Id.*) One of the targets identified was Camp Leyza, an Afghan

---

[1] Defendant allegedly professed allegiance to Taliban leader Mullah Omar. (Gov't's Resp. to Def.'s Mot. Dismiss Indictment 6, ECF No. 71.)

Border Police compound in the Tani District, Khost Province, Afghanistan. (*Id.* at 3.) In preparation for the assault, the Second Superseding Indictment alleges that the Defendant, and others under his direction, conducted preparatory reconnaissance of the compound. (*Id.*) At that time, Camp Leyza was not occupied by U.S. forces, only Afghan Border Police personnel. (*Id.*) These personnel, however, were part of Coalition Forces operating under the aegis of the International Security Assistance Force, of which the United States was a part. (*Id.*)

It is further alleged that on November 29, 2009, the Defendant, in command of three groups of insurgents, attacked Camp Leyza. (*Id.*) The group was armed with assault rifles, rocket-propelled grenade launchers, machine guns, anti-aircraft machine guns, recoilless rifles, portable rockets, grenades, and materials for preparing improvised explosive devices. (*Id.*) When U.S. helicopters responded to the camp, insurgents, under the Defendant's alleged direction, attempted to fire upon them with anti-aircraft weapons. Due to mechanical failure, the weapons were not actually discharged. (*Id.* at 4.) Later that morning, U.S. military personnel, accompanied by Afghan Border Police, conducted a battle damage assessment along the perimeter area where the attack occurred. (*Id.*) During the course of this process, the Defendant purportedly fired upon the combined U.S. and Afghan forces with a machine gun.[2] (*Id.*) The Coalition Forces returned fire, wounding the Defendant and taking him into custody. (*Id.*)

---

[2] The Defendant denies firing upon U.S. military aircraft or personnel, "only Afghan traitors." (Def.'s Mot. Dismiss Indictment Based on Due Process Concerns, Notice and Jurisdictional Defects 4, ECF No. 68.) In addition, he marginalizes his role as leader of the operation: "I don't

3

After a period of detention, the Defendant was indicted by a grand jury in the

Eastern District of Virginia, Richmond Division, on October 8, 2014.  A Superseding

Indictment (ECF No. 52) was returned on April 22, 2015, and a Second Superseding

Indictment (hereinafter "the Indictment") on April 23, 2015.  The Indictment contains

fifteen counts, including:

> Count One: Conspiracy to Provide Material Support to Terrorists, in
> violation of 18 U.S.C. § 2339A;
> Count Two: Providing Material Support to Terrorists, in violation of 18
> U.S.C. § 2339A;
> Count Three: Conspiracy to Destroy an Aircraft of the Armed Forces of the
> United States, in violation of 18 U.S.C. § 32;
> Count Four: Attempt to Destroy an Aircraft of the Armed Forces of the
> United States, in violation of 18 U.S.C. § 32;
> Count Five: Conspiracy to Kill an Officer or Employee of the United States
> or a Person Assisting Such Officer or Employee, in violation of 18
> U.S.C. § 1117;
> Counts Six and Seven: Attempt to Kill an Officer or Employee of the
> United States or a Person Assisting Such Officer or Employee, in
> violation of 18 U.S.C. § 1114;
> Count Eight: Conspiracy to Murder a National of the United States, in
> violation of 18 U.S.C. § 2332(b);
> Counts Nine and Ten: Attempt to Murder a National of the United States, in
> violation of 18 U.S.C. § 2332(b);
> Counts Eleven and Twelve: Engaging in Physical Violence with the Intent
> to Cause Serious Bodily Injury to a National of the United States, in
> violation of 18 U.S.C. § 2332(c);
> Count Thirteen: Conspiracy to Use a Weapon of Mass Destruction, in
> violation of 18 U.S.C. § 2332a;
> Count Fourteen: Possession of a Firearm in Connection with a Crime of
> Violence, in violation of 18 U.S.C. § 924(c); and
> Count Fifteen: Conspiracy to Possess a Firearm in Connection with a Crime
> of Violence, in violation of 18 U.S.C. § 924(o).

Defendant entered a plea of not guilty to all fifteen counts.

---

bring [people].  I only preach them."  (Def.'s Reply Mot. Dismiss Based on Due Process 4, ECF
No. 89.)

In two separate, but interrelated, motions, the Defendant disputes the authority of the United States to prosecute him in a federal court for actions he contends were committed as a lawful combatant engaged in an armed conflict. In his Motion to Dismiss the Indictment (ECF No. 62), the Defendant maintains that he is entitled to combatant immunity under well-established laws of armed conflict. The Defendant further believes, as stated in the motion, that the statutes underlying the charges in the Indictment were not intended by Congress to apply to theaters of war. In his opinion, he should be accorded prisoner of war status under Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War (hereinafter the "GPW"). Accordingly, he asks the Court to dismiss the Indictment.

In a second closely allied motion, the Defendant moves the Court to dismiss the Indictment based on due process concerns, notice and jurisdictional defects (hereinafter "Def.'s Mot. Dismiss Based on Due Process," ECF No. 68). Distilled to its essence, the Defendant argues that his actions had an insufficient nexus to the United States and that he had inadequate notice that he would be prosecuted for such conduct in the field of battle. He asserts that no sensible person could possibly have "reasonably anticipate[d] being haled into court" in the United States for conduct in Pakistan and Afghanistan, and prosecuted for alleged crimes on a battlefield, on foreign soil, against foreign nationals. (Def.'s Mot. Dismiss Based on Due Process 1.) He points out that there is no allegation that he killed or injured any U.S. employee or damaged any U.S. property. He also notes

that no other Taliban solider has been prosecuted in the United States for engaging in combat in Afghanistan.[3]

## II. The Viewpoints of Experts

### A.    History and Governance

Before discussing the appropriate analytical framework for determining the Defendant's legal status, some historical context is instructive. To provide this context, the Court recounts the relevant testimony provided at the evidentiary hearing on June 17, 2015.

The government's first witness at the hearing was Barclay Adams ("Adams"), a senior intelligence officer for Afghan political security issues at the United States Central Command, which is the military command responsible for the Middle East, Central, and South Asia. Adams's responsibilities include overseeing a team of intelligence analysts who provide assessments to the general officers in command of the armed forces in Afghanistan. Prior to assuming his present position, Adams served as an intelligence analyst for the Joint Staff Afghanistan/Pakistan Task Force at the Pentagon. In that capacity, he focused specifically on the Afghan insurgency and other militant groups in South Asia. (Mots. Hr'g Tr., June 17, 2015, 7:10–8:19 (hereinafter "June 17 Tr.").)

Adams explained that the Haqqani Network, with which the Defendant is believed to be affiliated, merged with the Taliban in the mid-1990s. (*Id.* at 11:23–12:21.) He identified the leader of the Taliban as Mullah Omar ("Omar"), whose immediate subordinates are referred to as the "Senior" or "Quetta" Shura. (*Id.* at 18:17–22.) This

---

[3] The only other similar prosecution is John Phillip Walker Lindh discussed *infra* at footnote 13.

group, or council, of approximately two dozen governors, is responsible for enforcing and interpreting Omar's directives. (*Id.* at 18:19–25.) Since 2003, the Haqqani Network has had a representative on the Shura. (*Id.* at 25:5–10.)

Adams indicated that during the 2009 timeframe of the Indictment, the Taliban and Haqqani movements were operating from an area within Pakistan known as the Federally Administered Tribal Area ("FATA"). (*Id.* at 14:5–13.) This area, near the Afghan border, is somewhat independent and not under the tight control of the Pakistani government. (*Id.* at 14:13–14.) The Khost Province, where the events in the Indictment occurred, is situated in eastern Afghanistan and is under the general control of the U.S. military operating in association with the Afghan government. (*Id.* at 14:9–18; 14:23–15:4.)

Adams characterized the Taliban as exercising a distinct level of command and control in southern Afghanistan. (*Id.* at 19:14–22.) This structure, according to Adams, is less well-defined in the western, northern, and eastern parts of the country. (*Id.* at 19:23–20:4.) The Taliban has not exercised any general governmental control in Afghanistan since 2001. (*Id.* at 21:10–14.) He described the Haqqani Network as exerting better overall command and control than the Taliban. (*Id.* at 22:13–20.) In his opinion, the Haqqani Network often governs independently of the Taliban, which is tolerated because the Taliban needs them as an ally. (*Id.* at 23:13–18.) Adams also indicated that the Haqqani Network is more brutal than the Taliban, as they are known to indiscriminately kill civilians and kidnap journalists and other individuals, who are typically bartered for ransom. (*Id.* at 23:22–24:7.)

Adams was also asked on direct examination to identify a document entitled "Afghanistan Islamic Emirate, Rules and Regulations for Mujahidin" ("Rules and Regulations for Mujahidin," Gov't's Ex. 3, Mots. Hr'g, June 17; June 17 Tr. 25:18–19.) The version presented to Adams, apparently seized in a combat zone, was published in 2009. (June 17 Tr. at 26:14–17.) Adams spent the rest of his testimony discussing the Taliban's faithfulness to their rules.

First, Adams explained that although Rules 9, 10, 11, and 12 dictate procedures for processing Afghan National Army soldiers or police officers, and generally disallow execution without Omar's authority, the rules are disregarded in practice. (*Id.* at 27:8–30:14.) According to Adams, Afghan military personnel and police officers typically are summarily executed upon capture. (*Id.* at 27:21–23.) Rule 18 dictates that any prisoner to be killed must be hanged or beheaded. (*Id.* at 30:17–20.) With respect to civilian contractors operating in Afghanistan, Rules 19 through 21 set forth procedures for their detention and processing. (*Id.* at 30:21–32:10.) Again, however, Adams explained that most contractors are ambushed and killed on the spot. (*Id.* at 31:20–21.)

Additionally, contrary to Rule 41 of the Rules and Regulations for Mujahidin, Adams noted that children with mental disabilities are frequently used for suicide bombings which often target local civilian populations. (*Id.* at 33:16–17.) He testified that under Rule 41, such assaults were to be limited to high officials. (*Id.* at 33:23–24.) Rule 51 prohibits the mutilation of civilian populations. (*Id.* at 35:22–36:1.) In Afghanistan, according to Adams, citizens who vote in elections are fingerprinted. He

indicated that the Taliban frequently confront voters supporting the official Afghan government and amputate their ink-stained finger. (*Id.* at 36:3–12.)

Of particular importance to the immediate case is Rule 63 of the Rules and Regulations for Mujahidin. This rule directs Taliban fighters to wear the same uniform or clothing as local citizens, or that of the enemy. (*Id.* at 38:16–20.) The objective of Rule 63, as explained by Adams, is to conceal their identity from enemy forces. (*Id.* at 38:21–25.) According to Adams, the Taliban had no uniforms in 2009, nor any type of distinctive insignias. (*Id.* at 39:20–25.) After explaining the Taliban's rules of engagement, Adams's attention was directed to acts of violence against the civilian population from 2009 to the present date. Adams estimated that the Taliban, or their affiliates, perpetrate approximately 10,000 attacks a year on military and civilian targets in Afghanistan. (*Id.* at 40:25–41:13.) He added that approximately sixty-seven percent of all civilian casualties in that country are attributed to the Taliban. (*Id.* at 42:12–16.) He indicated that his research has verified these statistics. (*Id.* at 49:10–25.) Adams identified the government's Exhibit 2, entitled "Sampling of Taliban Acts of Violence," as containing an accurate description of examples of attacks on military and civilian targets between 2009 and the present date. (June 17 Tr. 49:10–25.)

On cross examination, Adams acknowledged that in 2001 the Taliban were in control of most of the territory of Afghanistan and had universally-recognized command of its army. (*Id.* at 50:21–51:11.) He also agreed that the Haqqani Network was declared a foreign terrorist organization in 2012, but the Taliban has never been so designated. (*Id.* at 51:14–23.)

To provide further historical and political background, the government next called John R. Dempsey ("Dempsey") as an expert on "diplomatic activities related to Afghanistan." (*Id.* at 63:13.)  Since August 2010, Dempsey has served as a senior advisor to the United States Special Representative for Afghanistan and Pakistan at the U.S. State Department. (*Id.* at 60:7–10.)  A specialist on Afghanistan political matters, he is primarily responsible for "diplomatic engagement with Afghanistan and Pakistan." (*Id.* at 60:13–14.)  Prior to serving in the State Department, Dempsey resided in Afghanistan while employed with the United States Institute of Peace, and as a lawyer for the International Rescue Committee, and later with the U.S. Agency for National Development. (*Id.* at 60:22–62:1.)  Dempsey received both his master's degree in international affairs and law degree from Georgetown University. (*Id.* at 62:6–8.)

Dempsey acknowledged that the Taliban exercised de facto control over parts of Afghanistan for a few years. (*Id.* at 63:24–64:6.)  During that period, the United States government did not recognize the Taliban as the governing authority. (*Id.* at 78:23–79:1.)  Rather, the United States recognized the government of Burhanuddin Rabbani ("Rabbani"). (*Id.* at 64:12–13.)

According to Dempsey, it was well-known in international circles that for years the Taliban provided sanctuary for Osama Bin Laden and other members of the al-Qaeda Network.  Following the terrorist attacks of September 11, 2001, and after determining that Bin Laden was responsible for those attacks, the United States demanded that the Taliban regime surrender Bin Laden to U.S. forces.  They refused. (*Id.* at 65:15–66:1.)  Consequently, the United States, and several of its coalition partners, invaded

10

Afghanistan and "drove al-Qaeda leaders, and other remaining Taliban, into hiding." (*Id.* at 66:4–6.) Dempsey testified that the Taliban were formally divested of power in November of 2001 when the United Nations Security Council adopted a resolution recognizing a new sovereign government in Afghanistan. (*Id.* at 66:12–16.)

To further stabilize the government in Afghanistan and to provide for its security, the United Nations promulgated several additional agreements and resolutions. (*See* Gov't's Exs. 18, 22, Mots. Hr'g, June 17.) These included an agreement providing for a provisional arrangement in Afghanistan pending the re-establishment of permanent government institutions, and a resolution creating an International Security Assistance Force. (June 17 Tr. 67:11–22; 68:11–15.) The provisional government operated under the leadership of its chairman, Hamid Karzai ("Karzai"). (*Id.* at 68:19–20.) The United Nations formally recognized Karzai as the head of the Afghan government. (*Id.* at 70:3–9.)[4] The United States also introduced, through Dempsey, two additional United Nations Security Council resolutions, one promulgated in 2008 and another in 2010, which reiterated their concern about the continued violence and terrorist activities by the Taliban in Afghanistan. (*Id.* at 74:5–11; 75:1–7.)

Since 2000, only three countries have given diplomatic recognition to the government of Afghanistan Islamic Emirate, which the Taliban called itself. These countries were Pakistan, United Arab Emirates, and Saudi Arabia. However, according

---

[4] In the late 1990s, the government headed by Rabbani, as well as the Taliban, presented their credentials to the United Nations for recognition. The record indicates that the United Nations recognized Rabbani. (*Id.* at 70:13–22.) For additional resolutions recognizing the sovereignty of Afghanistan, see the government's Exhibits 16 and 26 from the June 17 motion hearing.

to Dempsey, these three countries withdrew recognition following the September 11, 2001, attacks. (*Id.* at 75:14–76:4.) In summary, Dempsey testified that no country in the world has recognized the Taliban as a legitimate government of Afghanistan from the year 2000 to the present date. (*Id.* at 76:9–12.)

On cross examination, Dempsey acknowledged that the Taliban continues to exist as an entity (*id.* at 79:10–12), and persistently engages in armed conflict with troops and police in Afghanistan. (*Id.* at 79:22–80:2.)

## B.      Experts on the Law of War

The Defendant and the United States presented expert testimony on the applicable law of war. Both experts are highly respected in their field and have impressive credentials. In some respects, parts of their careers have overlapped; however, the experts viewed the conflict in Afghanistan differently. Because their reasoning and opinions are technical and carefully nuanced, their testimony is recounted in considerable detail.

### i.      Colonel W. Hays Parks, USMC Ret.

Colonel W. Hays Parks ("Colonel Parks"), USMC Retired, testified for the United States as an expert on the law of war. As detailed in his extensive resume, Colonel Parks has served in a variety of military positions involving the crafting, interpretation, and implementation of the law of war. Prior to retirement, from July 2003 to October 2010, he was the Senior Associate Deputy General Counsel in the International Affairs Division of the Office of General Counsel at the Department of Defense. During that time, he was also Chairman of the Department of Defense Law of

12

War Working Group, and principal author and editor-in-chief of the *Department of Defense Law of War Manual*. Following his retirement, he continued to act as a special consultant to the United States Special Operations Command from 2011 until 2014. Not only has Colonel Parks published scores of treatises and manuals, but he also has been a member of various delegations to international conferences dealing with the laws of war, treatment of prisoners of war, and related issues. He received both his bachelor's and law degree from Baylor University. (Gov't's Ex. 4, Mots. Hr'g, June 17.)

Colonel Parks began his analysis with an explanation of the genesis of the law of war starting with an essay authored by Frances Lieber in 1862. The result of his work was the so-called "Lieber Code" adopted by President Lincoln after the Civil War. (June 17 Tr. 93:9–10.) The Lieber Code provided guidance to the Union army in distinguishing state-sanctioned militia from private armies. (*Id.* at 97:7–98:25.) The underlying concepts, according to Colonel Parks, are the central foundation of the modern law of war, principally the GPW. (June 17 Tr. 93:5–14.) This Convention, which followed World War II, was ratified by 195 nations. Both experts in this case agree that the GPW contains the criteria which govern the Defendant's status as a combatant in this case. Unfortunately, their opinions diverge on which specific provisions apply to the Defendant.

In applying the controlling tenets of the GPW, Colonel Parks focused initially on Article 2, which he described as the "trip wire".[5] (*Id.* at 108:3–8.) In his opinion,

---

[5] Article 2 provides, in relevant part, that "the [GPW] shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting

incursions by the Taliban in 2009 do not qualify for protection under the GPW. (*Id.* at

111:19–113:23.)  To qualify, a conflict must satisfy one of three provisions:

> (1) [A]ll cases of declared war or of any other armed conflict which may
> arise between two or more of the High Contracting Parties, even if the state
> of war is not recognized by one of them;
> (2) [A]ll cases of partial or total occupation of the territory of a High
> Contracting Party, even if the said occupation meets with no armed
> resistance; and
> (3) Although one of the Powers in conflict may not be a party to the present
> Convention, the Powers who are parties thereto shall remain bound by it in
> their mutual relations.  They shall furthermore be bound by the Convention
> in relation to the said Power, if the latter accepts and applies the provisions
> thereof.

(Gov't's Ex. 6, Mots. Hr'g, June 17 (citing GPW art. 2).)

Colonel Parks testified that in his opinion, the military conflict between the

Taliban and the United States failed to satisfy any of these criteria.  (June 17 Tr. at

111:19–113:23.)  Since the Taliban does not represent a High Contracting Party, the first

subsection does not apply.  Furthermore, Article 2 is inapplicable because the United

States never had an intention to be an occupying power in 2009.  (*Id.* at 112:5–10.)  To

the contrary, they were invited to provide military assistance by the Karzai government.

(*Id.* at 112:13–18.)  And lastly, because the Taliban and the Haqqani Network have never

embraced, by words or actions, the provisions of the GPW, Article 2(3) offers them no

protection as prisoners of war.  (*Id.* at 113:7–23.)

---

Parties."  *See* GPW art. 2.  In other words, for Article 4, which delineates the criteria for
prisoners of war, to apply, a conflict must satisfy the provisions of Article 2.  *Cf. Hamdan v.
Rumsfeld*, 548 U.S. 557, 628–30 (holding that Article 3's provisions are applicable aside from
Article 2's satisfaction, but refraining from deciding whether Article 2 must be satisfied to reach
other provisions of the GPW).

With respect to this conclusion by Colonel Parks, the defense confronted him with a draft memorandum authored by William H. Taft IV, legal adviser to the United States Department of State, addressing, in pertinent part, the eligibility of the Taliban militia for prisoner of war status. (Def.'s Ex. 9 at 20, Mots. Hr'g, June 17 (hereinafter "Taft Mem.").) In that memorandum, dated January 11, 2002, Taft concluded that Afghanistan qualified as a High Contracting Party under Article 2 of the GPW. (*Id.* at 13–17.) The memorandum further suggested that because the Taliban considered itself to be the representative government of Afghanistan, and that others in the international community embraced this assumption, the Taliban qualified for recognition and protection under Article 2 of the GPW.[6] (*Id.* at 16.)

The Taft memorandum urged the Department of Justice to adopt a broad application of the GPW of 1949. It encouraged the Administration to adopt the view that it applies in circumstances such as those in Afghanistan in which there is occupation by a foreign power where the original governing authority has been displaced and no longer exercises governmental functions. (Taft Mem. at 12.)

Colonel Parks discounts the value of Taft's draft memorandum in resolving the issues at hand. (June 17 Tr. 160:10–162:6.) The memorandum, he explained, was

---

[6] In the memorandum, Taft also concluded that the Taliban met the criteria to be considered an authority or government under Article 4(A)(3) of the GPW, discussed *infra*. (Def.'s Ex. 9 at 17–19, Mots. Hr'g, June 17.) On cross examination, the defense inquired about the absence of any statement that the Taliban would lose protection of prisoner of war status if another government was installed in Afghanistan. Colonel Parks succinctly replied that it was not contemplated at the time that such transition would occur. (June 17 Tr. 160:14–21.) In his view, the position espoused in the memorandum may have been policy-driven. (*Id.* at 122:5–8.) Furthermore, Colonel Parks rejected the significance of any assertion by the Taliban that it represented the government of Afghanistan post-2002 as unmoored to reality. (*Id.* at 193:16–21.)

authored by Taft as part of an interagency debate concerning presidential policy. (*Id.* at

118:11–18.) Outside that context, he felt the document warranted minimal weight as no

action was taken as a result. (*Id.* at 118:15–22.) Colonel Parks also noted that the

political landscape in Afghanistan changed following Karzai's election as President in

2002. (*Id.* at 125:13–17.) At that point, with a democratically-elected government,

whose armed forces were operating in league with those of the United States, the conflict

was no longer international in nature. (*Id.*) Colonel Parks described the election of the

Karzai regime, and its approval by the U.N. Security Council, as a turning point: "the

cessation of the international armed conflict, and a beginning of non-international armed

conflict." (*Id.* at 162:18–21.) Thereafter, the bulk of Taliban forces fled Afghanistan in

December 2001. (*Id.* at 163:12–13.)

Colonel Parks added, however, that even if it is assumed that the conflict in

Afghanistan in 2009 was international in dimension, members of the Taliban and

Haqqani Network would still not qualify as prisoners of war. (*Id.* at 141:21–142:23.) In

the context of international conflict, in order for a combatant to qualify as a prisoner of

war, it must satisfy the criteria set forth in Article 4 of the GPW. The Defendant in this

case does not qualify in Colonel Parks's opinion. (*Id.* at 141:21–145:7.)

According to Colonel Parks, the Defendant could not satisfy the requirements of

Article 4(A)(1) in that he is not a member of the armed forces of a High Contracting

Party to the conflict, nor is he a member of a militia or volunteer corps forming part of

such armed forces. (*Id.* at 141:21–142:16.) He fairs no better under Article 4(A)(2).

That provision applies to:

> Members of other militias and members of other volunteer corps, including
> those of organized resistance movements, belonging to a Party to the
> conflict and operating in or outside their own territory, even if this territory
> is occupied, provided that such militias or volunteer corps, including such
> organized resistance movements, fulfil [sic] the following conditions: (a)
> that of being commanded by a person responsible for his subordinates; (b)
> that of having a fixed distinctive sign recognizable at a distance; (c) that of
> carrying arms openly; (d) that of conducting their operations in accordance
> with the laws and customs of war.

GPW art. 4(A)(2). In Colonel Parks's opinion, application of the prerequisites stated in

Article 4(A)(2) are logically assumed to apply to 4(A)(1) and 4(A)(3). (June 17 Tr.

192:18–193:4.)

As earlier explained in the testimony of Adams and Dempsey, Colonel Parks

emphasized that leaders of the Taliban and Haqqani Network are not held accountable or

responsible for the actions of their subordinates. In fact, there is often very little

command structure.[7] Furthermore, in 2009, members of the Taliban and Haqqani

Network did not wear distinctive or recognizable clothing or insignias. To the contrary,

under the Rules and Regulations for Mujahidin, insurgent fighters were directed to wear

the clothing of the local population to conceal their identity. (*See* Gov't's Ex. 3, Mots.

Hr'g, June 17.) The Taliban also had a practice of employing suicide bombers and,

consequently, did not carry their weapons openly as required under Article 4. And lastly,

as evidenced by their attacks on the civilian populations, Colonel Parks pointed out that

they did not conduct their operations in accordance with the law and customs of war.

---

[7] In a publication he authored, Colonel Parks concluded that the Taliban was not "a fighting
body." (June 17 Tr. 177:14–15.) "You had tribes, or members of tribes, who would depart one
day to go to the other side. They would constantly switch from the Taliban to the Northern
Alliance. They would go off and go farming for three or four months. . . . They were not acting
like a regular military." (*Id.* at 177:15–21.)

(June 17 Tr. 144:20–145:1.) The Taliban employs a "systematic method of attack using individuals who are in civil attire and attacking civilians." (*Id.* at 211:6–7.)

Colonel Parks further indicated that because members of the Taliban and Haqqani Network were not members of regular armed forces who professed allegiance to a government or authority not recognized by the detaining power, Article 4(A)(3) does not apply. (*Id.* at 155:10–21.) Such insurgent fighters are not members of regular armed forces. Also to meet the criteria of Article 4(A)(3), the Taliban must recognize and abide by the rules of law articulated in the Geneva Convention. (*Id.* at 145:5–12; 113:7–23.)

On cross examination, Colonel Parks declined to adopt the conclusion in the most recent *Department of Defense Law of War Manual*, issued on June 12, 2015 (Def.'s Ex. 5, Mots. Hr'g, June 17), that Taliban fighters, as armed forces of a government-in-exile, or one that ceases to exist, should be granted prisoner of war status.[8] (June 17 Tr. 154:21–155:17.) Colonel Parks amplified his answer by saying that the statement requires more context and noted that the document was a training manual and not a legal treatise. (*Id.* at 151:2–6.) In his opinion, the manual was "a lot more in depth than we anticipated because this was supposed to be for the individual soldier and his commander, not for academics." (*Id.* at 151:4–6.)

When questioned further by defense counsel, Colonel Parks took issue with a number of legal conclusions in the 2015 Manual. For example, he disagreed that if armed forces are fighting "for a government-in-exile or even a government that ceased to

---

[8] Colonel Parks was unable to respond with particularity to questions concerning the 2015 manual, issued five days prior to his testimony, because he had not had an opportunity to read it. (*Id.* at 147:3–6.)

exist, the force would have the right authority to participate in hostilities and receive [prisoner of war] status." (*Id.* at 155:10–17.) Colonel Parks stressed that many of the precepts contained in the 2015 Manual, relied on by the Defendant, cannot be applied in the abstract and are situation-specific. (*Id.* at 204:14–205:7.)

The Defendant's expert, Professor Jordan A. Paust ("Paust") relied on essentially the same legal authority and historical information as Colonel Parks, but reached diametrically different conclusions. The opinions of both experts were an amalgam of law, tradition, and public policy. Paust's conclusions seemed heavily drawn from the teachings of academic treatises. His analysis was articulated at a high level of theoretical abstraction and at times was challenging to follow. Colonel Parks's thoughts, on the other hand, were guided by his personal experience in interpreting and applying the law of war in a contemporary military setting.

### ii.     Professor Jordan A. Paust

Paust is a professor at the University of Houston Law Center. He received his undergraduate and law degrees from UCLA and his LLM from the University of Virginia. He served as a captain in the United States Army, including a tour in the Judge Advocate General's Corps. His service included membership in the facility of the Judge Advocate General's school in the International Law Division. He has published numerous articles and book chapters relating to the laws of war. His complete curriculum vitae was received as Defendant's Exhibit 1 at the June 17 hearing.

Paust also launched his explanation of the law of war with the Lieber Code[9] and

the treatment of prisoners during the Civil War.  In his view, the concept of combat

immunity was a direct outgrowth of rudimentary principles espoused by Lieber.  (*Id.* at

224:14–22.)  Some of the prosecutions of former soldiers from the Confederate States of

America for belligerency were based on elements of the Lieber Code.  In his opinion, the

Lieber Code was a precursor for parts of the Hague Conventions of 1899 and 1907.  (*Id.*

at 221:3–15.)  According to the professor, the Lieber criteria for prisoner of war treatment

was succinct.  "If you're a part of the army, you're covered.  You're a prisoner of war.

There are no other criteria in this document."  (*Id.* at 224:3–5.)  Paust stressed that none

of the conditions contained in Article 4(A)(2) of the GPW are contained in the Lieber

Code, such as distinctive insignia recognizable at a distance.  (*Id.* at 224:8–14.)  Paust

also emphasized that customary international law, such as the Lieber treatise, is a

necessary background for interpretation of treaties like the GPW.  (*Id.* at 224:25–225:2.)

He conceded that the law of war, while premised on durable principles, "is still

developing."  (*Id.* at 271:3.)

After discussing other historical treatises, Paust turned to the 1899 and 1907

Hague Conventions.  In his opinion, these treaties drew a distinction between combatants

who are members of the regular armed forces, and other irregular combatants who must

---

[9] The Lieber Code was developed by Francis Lieber who defined a prisoner of war as "a public enemy armed or attached to the hostile army for active aid, who has fallen into the hands of the captor, either fighting or wounded, on the field. . . . All soldiers, of whatever species of arms." (*Id.* at 223:22–224:2.)

20

fulfill conditions of command, fixed distinction, carrying arms openly, and observing the law of war. The latter group includes militia and volunteer corps. (*Id.* at 228:21–230:1.)

The professor next focused on key provisions of the GPW. Starting with Article 2,[10] Paust took issue with Colonel Parks's opinion that the war in Afghanistan is not an international armed conflict. "The war in Afghanistan has never taken place merely within the confines of a single country." (June 17 Tr. 238:21–22.) He explained that Pakistan's military was fighting with the Taliban against the Northern Alliance. (*Id.* at 238:22–239:5.) He also cited the operation of drones by the United States from locations outside of Afghanistan. (*Id.* at 239:16–21.) With respect to Article 4 of the GPW, which pertains specifically to prisoners of war, Paust again disagreed with Colonel Parks. In Paust's view, the requirements of 4(A)(2), delineating the criteria for certain lawful combatants, apply only to other militia and members of other volunteers corps and not members of the armed forces described in 4(A)(1) and 4(A)(3). (*Id.* at 241:20–242:3.) With respect to combatants described in 4(A)(1) and 4(A)(3),[11] membership is the only criteria. (*Id.* at 242:14–15.) Persons meeting those criteria who commit lawful acts of war cannot be subject to prosecution. In the professor's opinion, they are entitled to the combatant privilege. (June 17 Tr. 245:12–15.)

---

[10] As discussed *supra*, Article 2, in pertinent part, states that the 1949 Geneva Convention "shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them." (Def.'s Ex. 5, Mots. Hr'g, June 17.)

[11] Article 4(A)(1) includes "[m]embers of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces." (Def.'s Ex. 5.) Article 4(A)(3) encompasses "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." (*Id.*)

21

Paust also explained that under Article 2 of the GPW, the law of combatant privilege applies until the conflict is over. (*Id.* at 245:21–246:10.) In his opinion, a conflict that began between state actors could not shift to a non-international armed conflict unless there was a cessation of hostilities. (*Id.* at 247:22–248:19.) He rejected the theory offered by Colonel Parks that the installation of the Karzai administration changed the nature of the conflict in Afghanistan. (*Id.* at 251:14–23.) The professor envisioned the Taliban as continuing to qualify for belligerent status for the purposes of customary international law. Their entitlement to the status post-Karzai was based on "having the semblance of the government[,] . . . claim[ing] to represent the State of Afghanistan subsequently. They had military units." (*Id.* at 251:24–252:7.) As belligerents, in an armed conflict, under international law and the Lieber Code, they are entitled to prisoner of war status. (*Id.* at 252:18–23.)

In further support of this conclusion, Paust described the Taliban as a government-in-exile: "[T]hey are a government or authority. They don't have to be a recognized state or nation. They were a belligerent, and still fighting as a belligerent in parts of Pakistan and parts of Afghanistan, if not with Iran."[12] (June 17 Tr. 254:2–6.) Therefore, Paust opined, the Taliban meet the criteria as an authority or government for purposes of the Geneva Convention under Article 4(A)(3).[13] (*Id.* at 286:14–20.)

---

[12] Paust differentiated belligerents from insurgents. The latter, he argued, lack outside recognition from anyone. (*Id.* at 260:16–25.) The Indictment describes the Defendant as "the commander of a group of insurgents." (Indictment 2.)

[13] Aside from allegations in the Indictment, neither the United States nor the Defendant have advanced evidence describing in detail the Defendant's affiliation with the Taliban. The Indictment alleges that the Defendant "communicated with and received instructions from Sirajuddin Haqqani, a leader of Taliban insurgents . . . and a commander in the Haqqani

Elaborating further, Paust drew the Court's attention to page 20 of the Taft Memorandum (Def.'s Ex. 9, Mots. Hr'g June 17), wherein its author concluded that the Taliban qualified as a government or authority for purposes of Article 4(A)(3) and that its military forces should be considered regular armed forces under that provision of the GPW. Contrary to Parks's analysis, Paust cast aside the significance of evidence that members of the Taliban routinely committed violations of the law of war, such as deliberately targeting civilians. (June 17 Tr. 263:18–264:23; 285:20–286:6.) He also concluded that under Article 4(A)(1), members of the armed forces of a party to a conflict need not follow the law of war to qualify for prisoner of war treatment. (*Id.* at 255:12–22.)

In summation, the professor stated that "under the customary laws of war reflected in the 1863 Lieber Code, the Oxford Manual, The Hague Convention, and the '49 Conventions, the customary international law generally, [the Taliban is] entitled to combatant status and prisoner of war status." (*Id.* at 257:19–23.)

On cross examination, Paust reiterated his opinion that the Taliban had broad recognition prior to 2001 as the governing authority in Afghanistan. (*Id.* at 258:24–259:10.) Specifically, Paust contended that the Taliban "had outside recognition as a de facto government by many enemies, even though they [were] not a de jure government."

---

Network. The Haqqani Network is a Taliban-affiliated group of militants that operates out of . . . Pakistan, and has spearheaded insurgent activity in Afghanistan." (Indictment 2.) As the United States Court of Appeals for the District of Columbia noted in *Uthman v. Obama*, "the determination of whether an individual is part of al-Qaida must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." 637 F.3d 400, 402 (D.C. Cir. 2011) (internal quotations marks and citations omitted). Obviously, the same approach applies here in assessing members of the Haqqani Network.

(*Id.* at 259:8–10.) Paust conceded, however, that only Pakistan, the United Arab

Emirates, and Saudi Arabia recognized the Taliban as the de jure government of

Afghanistan, which was revoked following the events of September 11, 2001. (*Id.* at

259:15–260:1.) Paust was unaware of any country that recognized the Taliban as a de

jure government of Afghanistan after 2001. (*Id.* at 260:20–25.) He also conceded that he

did not have as much depth of information or on-the-ground experience in Afghanistan as

Senior Analyst Barclay Adams. (*Id.* at 266:8–17.) He had also not seen the 2009 Rules

and Regulations of Mujahidin referred to in Adams's testimony. (*Id.* at 266:22–24.)

Paust was also not aware of the provision of the Rules and Regulations for Mujahidin that

directed their fighters to wear civilian clothes so that they would blend in with the

civilian population. (*Id.* at 266:25–267:4.) The professor, however, remained steadfast

in his reasoning.

  With respect to his opinion that Taliban forces fit within the language of Article

4(A)(1) of the GPW, Paust reiterated during cross examination that the Taliban were

members of the armed forces of a party to a conflict when the conflict began. In his

view, they remain a party continuously until the conflict terminates. (*Id.* at 282:1–6.)

The fact that Afghanistan currently has an elected government makes no difference in his

view. (*Id.* at 282:9–13.) "You can have the de jure government and still the armed

conflict of an international character continues. And that's what we have in

Afghanistan." (*Id.* at 282:18–20.) Paust tenaciously maintained that as long as the

Taliban profess allegiance to a government or authority, they enjoy de facto status as a

member of the armed forces of a party and qualify for prisoner of war status under

Article 4(A)(3). (*Id.* at 284:22–285:4.)  Finding that the Taliban qualified for prisoner of war status under Article 4(A)(1) and 4(A)(3), Paust rejected the relevance of the criteria set forth in Article 4(A)(2), finding no necessity for uniforms, command structures, and other prerequisites. (*Id.* at 289:16–290:6.)  Paust concluded by reiterating that the conflict remains an international conflict between the armed forces of two state parties or powers until "the fighting stops." (*Id.* at 296:17–19.)

### III. Arguments and Legal Authorities

Pivotal to the Defendant's Motion to Dismiss Indictment is his asserted status as a *lawful* combatant engaged in armed conflict.  He notes that "[b]y 2009, 'Afghanistan [indisputably] remain[ed] a theater of active military combat.'" (Def.'s Mot. Dismiss Indictment 3 (quoting *Maqaleh v. Gates*, 605 F.3d 84, 88 (D.C. Cir. 2010).)  The critical element is not whether the Defendant was a combatant, but whether he satisfies the requirement of a lawful combatant.  His argument is buttressed by the abiding tenet that Congress did not intend for domestic criminal law to apply to *lawful* combatants in an armed conflict. (Def.'s Mot. Dismiss Indictment 6 (citing *Dow v. Johnson*, 100 U.S. 158, 165 (1879).)  As an overarching argument, the Defendant stresses that each statute the government relies upon requires proof that his acts were unlawful.

The Defendant further contends, specifically with respect to the substantive and predicate offenses described in Counts One and Two, Five through Ten, and Thirteen through Fifteen, that the text of the underlying statute exempts "conduct that is otherwise condoned by a legal authority from the scope of criminal liability." (Def.'s Mot. Dismiss Indictment 6.)  Furthermore, he maintains that "[t]he offense charged in [C]ounts 11 and

12, 18 U.S.C. § 2332(c), necessarily incorporates a similar exception." (*Id.*) Also, according to the Defendant, "18 U.S.C. § 32, which is charged as a predicate in [C]ounts 1 and 2, and as a substantive offense in [C]ounts 3 and 4, on the other hand, was never intended to apply to an armed conflict." (*Id.*) The Defendant claims that the destruction of aircraft statute "focused on the scourge of airplane hijacking." (*Id.* at 9.) This argument is belied by the statute itself, which describes its application to "any aircraft in the special aircraft jurisdiction of the United States." 18 U.S.C. § 32(a). The term "special aircraft of the United States" specifically includes any in-flight aircraft of the armed forces of the United States. 49 U.S.C. § 46501(2)(B). While perhaps arguably excluding lawful acts of war, the plain language of Section 32(a) seems to embrace unlawful acts even in a combat zone.

In its response, the United States emphasizes that "Hamidullin and his cohorts had no legitimate authority for their attack, and neither international nor U.S. law cloaks them with any kind of combatant privilege or immunity." (Gov't Resp. to Def.'s Mot. Dismiss Indictment 7, ECF No. 71.) The United States further contends that because "the continued conflict against the Taliban in Afghanistan is not an international armed conflict under Article 2 of the GPW[,] . . . the Taliban and Taliban-affiliated groups do not qualify for prisoner-of-war protections under Article 4 of the GPW." (*Id.*) Secondly, the United States maintains that the Defendant's "claim for immunity under a public authority defense fails because [the Defendant's] attack was not authorized by a recognized government or military organization." (*Id.*) Finally, the United States

contends that the criminal statutes relied upon in the Indictment are clearly applicable by their very terms and history of use to the Defendant's actions in this case. (*Id.* at 7–8.)

The United States acknowledges that "[l]awful combatant immunity is a doctrine reflected in the customary international law of war. It 'forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets.'" (*Id.* at 8 (quoting *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002))); *see also Ex Parte Quirin*, 317 U.S. 1, 30–31 (1942). On the other hand, unlawful combatants may be detained and prosecuted as criminals for unlawful combat actions.

## A.      Entitlement to Prisoner of War Status

As the court in *Lindh* recognized, and both Colonel Parks and Professor Paust agreed, the lawful combatant immunity doctrine is an integral part of the GPW. *Lindh*, 212 F. Supp. 2d at 553. Moreover, because the United States is a party to the GPW, under the Supremacy Clause of the United States Constitution, its provisions have the force of federal law. *Id.* Provisions of the GPW, "when read together, make clear that a belligerent in a war cannot prosecute the soldiers of its foes for the soldiers' lawful acts of war." *Id.* The court in *Lindh*, however, added this cautionary comment,

> Importantly, this lawful combatant immunity is not automatically available to anyone who takes up arms in a conflict. Rather, it is generally accepted that this immunity can be invoked only by members of regular or irregular armed forces who fight on behalf of a state and comply with the requirements for lawful combatants.

*Id.* at 554.

27

Article 4(A)(2) of the GPW sets forth four criteria an organization must meet for its members to qualify for lawful combatant status: (1) the organization must be commanded by a person responsible for his subordinates; (2) the organization's members must have a fixed distinctive sign recognizable at a distance; (3) the organization's members must carry arms openly; and (4) the organization's members must conduct their operations in accordance with the laws and customs of war. GPW art. 4(A)(2).[14]

To invoke the affirmative defense that he is entitled to lawful combatant immunity, the Defendant must demonstrate that his group of Taliban-affiliated insurgents satisfies the criteria for lawful combatant status articulated under the GPW. *Mullaney v. Wilbur*, 421 U.S. 684, 697–99 (1975); *Smart v. Leeke*, 873 F.2d 1558, 1567 (4th Cir. 1989).

Under the Defendant's reasoning, he has a right to be "treated as a prisoner of war . . . unless and until his status has been determined by a competent tribunal." (Def.'s Mot. Dismiss Indictment 20 (internal citation and quotation marks omitted).) The Defendant adds that as discussed by Paust, the language of the GPW Article 4(A)(3) "defines prisoners of war to include 'members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power.'" (*Id.* at 27 (quoting GPW art. 4(A)(3)).) The Defendant claims such allegiance.

The only other court to squarely evaluate the Taliban under the Article 4(A)(2) criteria in a reported decision was Judge T.S. Ellis of the Eastern District of Virginia in

---

[14] The court in *Lindh* noted that this criteria was first recognized in the Brussels Declaration of 1874, Article IX, July 27, 1874, *reprinted in The Laws of Armed Conflicts* 25 (3d ed. 1988). They represent the established customs of international law. *Lindh*, 212 F. Supp. 2d at 557 n.34.

*United States v. Lindh*, discussed *supra*.[15] The court in *Lindh* began its analysis by acknowledging that the President of the United States, as Commander-in-Chief, announced "that the Taliban militia were unlawful combatants pursuant to GPW and general principles of international law, and, therefore, they were not entitled to [prisoner of war] status under the Geneva Conventions." *Lindh*, 212 F. Supp. 2d at 554–55. While the court in *Lindh* declined to recognize the President's treaty interpretation as conclusive, it was, in the court's opinion, "entitled to some degree of deference." *Id.* at 556.

Applying the GPW criteria, the *Lindh* court concluded from the record evidence that the Taliban militia lacked command structure for a regular or disciplined army, wore no distinctive uniform or insignia, and targeted civilian populations in clear contravention of the law and customs of war. *Id.* at 558.[16] Therefore, *Lindh*, as a member of the Taliban, in the court's view, did not qualify for lawful combatant status. *Id.*

On an alternative but related front, the Defendant claims that as a combatant in armed conflict, he is entitled to immunity from criminal prosecution under the common law doctrine of public authority. (Def.'s Mot. Dismiss Indictment 12.) The Defendant argues that his entitlement to immunity under this doctrine does not hinge on

---

[15] John Phillip Walker Lindh, an American citizen, traveled to Afghanistan and, after receiving military training, joined Taliban forces to fight the Northern Alliance and American forces. Lindh was captured by Northern Alliance troops in the field of battle. During an escape attempt, Taliban detainees overpowered the military guards and killed a CIA agent. Lindh was subsequently apprehended in Afghanistan by American forces and transferred to the United States for trial. *Lindh*, 212 F. Supp. 2d at 546–57.

[16] For alleged examples of acts of violence against civilians in which the Taliban claimed responsibility, see the Government's Response to Defendant's Motion to Dismiss Indictment 19–20.

qualification as a lawful combatant under international law. (*Id.* at 19.) The apparent

genesis of the public authority doctrine springs from the teachings of *Dow v. Johnson*,

discussed *supra*, and additional post-Civil War jurisprudence. *Dow*, 100 U.S. at 165; *see*

*also Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 261 (4th Cir. 2012) (Niemeyer, J.,

dissenting).[17] *Dow* "involved a challenge to a civil judgment entered in Louisiana against

a Union general after forces under his command had seized the plaintiff's private

property in furtherance of the war effort." *Al Shimari*, 679 F.3d at 215. Judge Wilkinson

explained that occupying forces are not subject to the laws of the occupied territory. *Id.*

at 228 (Wilkinson, J., dissenting).

In urging application of the doctrine of public authority to the circumstances at

hand, the Defendant draws the Court's attention to cases where U.S. military personnel

were found to be immune from the jurisdiction of the courts of conquered or occupied

countries under this theory. *See Dostal v. Haig*, 652 F.2d 173, 176 (D.C. Cir. 1981);

*Bennett v. Davis*, 267 F.2d 15, 18 (10th Cir. 1959). To bolster his argument that the

doctrine of public authority has enduring viability, the Defendant cites *United States v.*

*Fulcher*, 250 F.3d 244 (4th Cir. 2001). In *Fulcher*, however, after observing that the

public authority defense appeared to be rarely recognized in the criminal context, the

United States Court of Appeals for the Fourth Circuit adopted the prevailing view that its

application is limited. *Id.* at 254 ("adopt[ing] the unanimous view of . . . sister circuits

that the defense of public authority requires reasonable reliance upon the actual authority

---

[17] The majority in *Al Shimari* commented that "it seems a bit curious to imagine the nineteenth century Court regarding its decisions in the Civil War cases as having durable precedential effect." 679 F.3d at 217.

of a government official"). But, in discussing the common law defense, the Fourth

Circuit embraced the opinion of the Eleventh Circuit that "[i]f the [government] agent

had no such power, then the defendant may not rest on the 'public authority' [defense]."

*Id.* (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir.

1994)). Defendants relying on *apparent* authority for their actions have no safe

sanctuary. *Fulcher*, 250 F.3d at 254.

Here, the Defendant's argument relies heavily on theoretical concepts of limited

application. As a supporting ballast, he highlights the reasoning of the Second Circuit in

*New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100 (2d Cir. 2014). He offers a

passage from the Office of Legal Counsel's ("OLC") Memorandum at issue in that case,

which states that "lethal activities conducted in accord with the laws of war, and

undertaken in the course of lawfully authorized hostilities, do not violate *the laws of war*

by virtue of the fact that they are carried out in part by government actors who are not

entitled to the combatant's privilege." *Id.* at 133–34 (emphasis in original). Premised on

these thoughts, the Defendant urges this Court to adopt the notion that, "participation in

the armed conflict with al Qaida, even by a civilian, 'would constitute the lawful conduct

of war' – a well-established variant of the public authority justification." (Def.'s Mot.

Dismiss Indictment 18.)[18]

---

[18] *N.Y. Times Co. v. U.S. Dep't of Justice* concerned the release of an internal OLC memorandum analyzing the legality of an operation in Yemen conducted by the Central Intelligence Agency targeting a leader of a terrorist organization. The OLC memorandum noted that "[s]pecifically, we understand that the CIA, like [the Department of Defense], would carry out the attack against an operational leader of an enemy, force, as part of the United States's ongoing non-international armed conflict with al-Qaida." 756 F.3d at 144; *see also id.* at 144 n.44 ("If the killing by a

The United States counters that the Defendant's group of insurgents were neither affiliated with a bona fide military organization, nor received actual authority from a recognized nation state.[19] Absent proof that the Defendant was operating "under national military authorities, occurring during a state of war and in accordance with the principles of civilized warfare," his purported authority affords him no protection under the common law. (Gov't's Resp. to Def.'s Mot. Dismiss Indictment 21.) As the Fourth Circuit emphasized in *Fulcher*, the public authority defense is grounded on actual authority. *Fulcher*, 250 F.3d at 254; *see also United States v. Yunis*, 924 F.2d 1086, 1097 (D.C. Cir. 1991). Drawing from the testimony of Colonel Parks, the United States maintains that "[t]he Taliban leadership in 2009 (and today) was not a government recognized by the United States or even a *de facto* government . . . ." (Gov't's Resp. to Def.'s Mot. Dismiss Indictment 24.) This Court agrees.

In *Yunis*, the D.C. Circuit also approved the trial court's instruction defining a military organization in the context of obedience to military orders. The district court instructed the jury that it could find the existence of a military organization "only if the group has a hierarchical command structure and conducts its operations in accordance with the laws and customs of war, and if its members have a uniform and carry arms openly." *Yunis*, 924 F.2d at 1097 (internal quotation marks omitted). Of particular relevance to the attack lead by Hamidullin, the court in *Yunis* reaffirmed the necessity

---

member of the armed forces would comply with the law of war and otherwise be lawful, actions of CIA officials facilitating that killing should also not be unlawful.").

[19] The government points out that the Defendant has not identified "a legitimate public official that could actually authorize his November 29, 2009, attack." (Gov't's Resp. to Def.'s Mot. Dismiss Indictment 23.)

32

that a member of a military organization must have a fixed and distinctive emblem or symbol recognizable at a distance. *Id.* at 1098 (citing the GPW art. 4(A)(2)).

**B.    Due Process Concerns**

The second facet of the Defendant's jurisdictional challenge is presented in a separate Motion to Dismiss Indictment Based on Due Process Concerns, Notice and Jurisdictional Defects. In essence, he contends that he could not have "reasonably anticipate[d] being haled into court" in the United States for his conduct in Pakistan and Afghanistan. (Def.'s Mot. Dismiss Based on Due Process 1.) He argues that "[w]here, as here, a foreign defendant is charged for conduct taking place outside the United States, the Due Process Clause of the Fifth Amendment requires that the defendant both (i) have a 'sufficient nexus' to the United States; and (ii) receive 'fair notice' that the alleged conduct was criminal." (Def.'s Mot. Dismiss Based on Due Process 4.) In the Defendant's view, absent a sufficient nexus, prosecution under the criminal laws of the United States would be arbitrary and fundamentally unfair. *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

The Defendant reiterates that his case involves battlefield conduct never previously prosecuted in the United States. "Nothing could be more arbitrary than the fact that, of all of the Taliban and other fighters who have fought against the United States in the longest continuous armed conflict in the nation's history, only one has ever been brought to the United States for criminal prosecution." (Def.'s Mot. Dismiss Based on Due Process 8.)

The government begins its response by dispelling any suggestion that Congress lacks the authority to enforce its laws beyond the territorial boundaries of the United States. As the Fourth Circuit restated in *United States v. Shibin*, 722 F.3d 233, 245 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014), the extension of territorial jurisdiction of a federal statute requires an affirmative expression by Congress. Each of the federal statutes underlying the offenses charged in the Indictment either contain specific language extending its reach extraterritorially, or is intended to protect United States personnel from harm when acting in their official capacity and performing their duties outside of U.S. territory. *See Al Kassar*, 660 F.3d at 118; *see also United States v. Siddiqui*, 699 F.3d 690, 700–701 (2d Cir. 2012).

The Fourth Circuit stressed in *Shibin* that, "Congress' power to enact statutes that extend extraterritorially is derived generally from the Define and Punish Clause, U.S. Const. art. I, § 8, cl. 10; the Treaty Power, U.S. Const. art. II, § 2, cl. 2; and the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18." 722 F.3d at 247. Moreover, as the United States accentuates in its response, the offenses charged in the Indictment allege criminal conduct that has a severe and adverse impact on the security of the United States and its citizens. (Gov't's Resp. to Def.'s Mot. Dismiss Based on Due Process 7.)

The government maintains that the intention of Congress to extend the reach of 18 U.S.C. § 2339A—prohibiting material support to terrorists—is implicit in its 2001 amendment. Originally, application of § 2339A was circumscribed to cover only material support provided within the United States. However, the USA PATRIOT Act eliminated this jurisdictional limitation. (Gov't's Resp. to Def.'s Mot. Dismiss Based on

Due Process 6 (citing Pub. L. No. 107-56, § 805, 115 Stat. 377 (2001).)  This reasoning

appears sound.

The statutes under which the acts of aggression in Counts 8 through 13—18

U.S.C. §§ 2332(b), 2332(c), and 2332a—contain specific language authorizing

extraterritorial application.  With respect to Counts Fourteen and Fifteen, charged under

18 U.S.C. §§ 924(c) and (o), the "jurisdictional reach [of Section 924] is coextensive with

the jurisdiction of the underlying crime. *Shibin*, 722 F.3d at 246.  Moreover, "[t]he text

of the applicable federal statutes makes it clear that Congress intended § 32(a) to apply

extraterritorially." *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003).

An associated component of the Defendant's Motion to Dismiss Based on Due

Process Concerns, Notice and Jurisdictional Defects is his contention that in addition to

the requirement that the government demonstrate a sufficient nexus between the

Defendant and the United States, "the Due Process Clause also requires that foreign

defendants receive fair warning that their conduct could expose them to criminal

liability." (Def.'s Mot. Dismiss Based on Due Process 9.)  Although the Fourth Circuit

has acknowledged that "a criminal statute having extraterritorial reach is declared or

conceded substantively valid under the Constitution, its enforcement in a particular

instance must comport with due process." *United States v. Brehm*, 691 F.3d 547, 552

(4th Cir. 2012).  In its analysis, the court in *Brehm* concluded that even though "Brehm

did not target his conduct toward American soil or American commerce . . . his actions

affected significant American interests." *Id.*  Significantly, the Fourth Circuit also noted

that "[a]lthough [the Kandahar Airfield in Afghanistan] was not technically territory of

the United States, the American influence was so pervasive that we think it a suitable proxy for due process purposes, such that the imposition of American criminal law there is not arbitrary." *Id.* at 553.[20] So too was Camp Leyza, as part of the International Security Assistance Force.

As to the fair notice requirement, the Fourth Circuit has adopted a more narrow standard. The court chose to draw upon the teachings of the Second Circuit in *Al Kassar*, stating that "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Brehm*, 691 F.3d at 554 (quoting *Al Kassar*, 660 F.3d at 119 (emphasis in original)). In the immediate case, the Defendant's directed attack on the Afghan Border Police camp—which was operating in league with U.S. military forces—and his alleged orders to shoot down U.S. military helicopters, coupled with the assault on military personnel conducting the damage assessment within the combat zone, would appear to satisfy this standard. As discussed *supra*, the Defendant's band of insurgents was not a regular military force but simply a band of ideologically-driven individuals acting in association with the Taliban.

To reinforce his argument that he was operating with actual authority, the Defendant turns again to Paust's opinion that the armed conflict in Afghanistan is "of an international character and has been one between two or more High Contracting Parties

---

[20] The Fourth Circuit in *Brehm* chose not to specifically apply the sufficient nexus test, but its opinion necessarily concludes that its requirements were satisfied in that case. 691 F.3d at 552 n.7.

to the Geneva Conventions."[21]  (Def.'s Reply to Mot. Dismiss Indictment, Ex. 1 at 3,

ECF No. 83-1 (hereinafter "Paust Decl.").)  "Afghanistan was a party to the 1949 Geneva

Conventions and, therefore, has been a 'High Contracting Party,' along with the United

States and several allies." (*Id.* at 2.)  The professor is steadfast that an armed conflict, in

the technical sense, does not require that a state of war be recognized.[22]  (*Id.*)  After

noting that,

> The Taliban had also been recognized by a few states as the *de jure*
> government of Afghanistan.  In all respects, the armed conflict that arose
> between U.S. military forces, allied forces, and Taliban military forces on
> and after October 7, 2001 and that has continued for nearly fourteen years
> has been an armed conflict of an international character and has been one
> between two or more High Contracting Parties to the Geneva Conventions.

(*Id.* at 3.)

Paust concludes "[i]n this case, the defendant had 'been a follower of . . . the head

of the Taliban in Afghanistan,' was 'the commander' of a unit that 'received instructions

from' and 'permission from' a Taliban leader, 'plotted with the commanders of other

---

[21] The government takes issue with the characteristics of the conflict in Afghanistan as an
international armed conflict between any States or High Contracting Parties, noting that:

> By November 2009, however, the Taliban had been removed from power in
> Afghanistan for eight years and was not the government for Afghanistan (the
> GPW "High Contracting Party").  At the time of Hamidullin's attack . . . the two
> powers, along with other States, were working together in a coalition directed at
> assisting the legitimate Afghan government to stop the Taliban's unlawful attacks
> within the country's borders.

(Gov't's Resp. to Def.'s Mot. Dismiss Indictment 11 (emphasis in original).)

[22] The Defendant contends that the government's argument flows from the faulty premise that "a
political change that is induced by an invading power can[] alone transform the nature of an
ongoing conflict." (Def.'s Reply to Mot. Dismiss Indictment 15.)

groups,' and 'was the main commander of these groups.'" (*Id.* at 7.) Therefore, in

Paust's view, the Defendant is entitled to combat immunity under either theory presented.

The Defendant asserts that common law immunity is broader than the combat

privilege under international law. He maintains that common law immunity is not

foreclosed simply because a defendant did not act on behalf of a belligerent nation.

Quoting Paust, the Defendant argues that "the Taliban in the current armed conflict in

Afghanistan constitute 'a belligerent' within the meaning of the customary laws of

war. . . . Consequently, for purposes of the public authority defense, the Taliban is a party

to the conflict and is 'entitled to the benefit of belligerent rights.'" (Def.'s Reply Mot.

Dismiss Indictment 6–7.) He reasons that common law immunity applies to individuals

committing lawful acts of war on behalf of a party to the conflict. (*Id.* at 9.)[23]

In urging the Court to adopt a broad definition of lawful belligerent to include

Taliban-associated fighters, Paust cautions that "[a] decision to deny combat immunity to

members of armed forces of the Taliban would have serious unwanted repercussions for

U.S. military personnel in the future." (Paust Decl. 13.) Unfortunately, such wide

application of the combat immunity doctrine, particularly with respect to construction of

the term "member of the armed forces," could afford legal protection to peripheral groups

undertaking terrorist acts in Afghanistan at the request of Taliban leaders, as long as they

---

[23] The Defendant suggests that the government's reliance on *Yunis*, 924 F.2d 1086, is misplaced. He contends that *Yunis* did not purport to address the public authority defense, but addressed the military orders defense which applies in the context of soldiers who take lawful military orders from superiors in an armed conflict. (Def.'s Reply to Mot. Dismiss Indictment 11.) The Defendant, however, describes the public authority defense as applying "in the context of soldiers who take lawful military orders from superiors in an armed conflict." (Def.'s Mot. Dismiss Indictment 16.) The arguments appear to focus on strands of the same doctrine.

claimed some arguable military objective. The Professor's analysis exemplifies the difficulty of applying the law of conventional warfare to unconventional combat.

## IV. Conclusion

While the evidentiary hearing in this case was rich in the history and evolution of the law of war and the developing political situation in Afghanistan, little was said about the Defendant as an individual military actor. The Court will therefore assume that both the government and the Defendant rely on the allegations in the Indictment, which describe him as the principal commander of an insurgent group. It further casts him as part of the Haqqani Network, a Taliban-affiliated group of militants spearheading insurgent activity in Afghanistan. The Haqqani Network was portrayed by Adams as a ruthless terrorist group that targeted civilians, kidnapped journalists, and exchanged prisoners for ransom. He further described the Haqqani Network as structurally independent, but allied with, the Taliban.

Assuming the existence of a close affiliation, the central issue for the Court is whether the Taliban are lawful combatants entitled to prisoner of war treatment under the 1949 Geneva Convention, or a band of insurgent outlaws to be dealt with as criminals. A review of informative treatises and law of war jurisprudence provides minimal illumination when applied to loosely affiliated groups engaged in the conflict in Afghanistan. As Paust noted, the law of war is founded on a body of enduring principles, but is developing in its application to modern warfare. Both experts in this case, Colonel Parks and Professor Paust, differed on which provisions of the GPW should guide the Court; however, it is apparent from the evidence that the Haqqani Network falls beyond

39

the outer perimeter of the armed entities described in Article 4, particularly when measured against the criteria of Article 4(A)(2).

In order to resolve the core issues, this Court need not determine whether the conflict in Afghanistan is international in nature as contemplated by Article 2 of the GPW. The experts disagreed on this point—which may elude a definitive answer—but even Colonel Parks, who believed that it was of a non-international nature after 2002, assumed *arguendo* that the conflict satisfied Article 2 criteria. Surmounting this hurdle, the Court will turn to Article 4, which specifically addresses prisoners of war.

Paust's interpretation of Article 4 carves a wide swath of entitlement. His expansive interpretation would encompass a broad array of affiliates who would be treated as prisoners of war until hostilities cease. As long as they professed allegiance to an authority or power, they are essentially immune from criminal prosecution for violating the laws of the country in which they are operating. This interpretation could arguably include suicide bombers and other terrorist operatives claiming allegiance or working in association with armed groups.

This Court finds the logic employed by Colonel Parks to be the most compelling. Parks testified that the criteria set forth in Article 4(A)(2) applied in this case, even for combatants qualifying under Article 4(A)(1) and 4(A)(3). This Court, however, is of the opinion that the Haqqani Network and Taliban fit most compatibly within Article 4(A)(2). These groups are not members of militias or volunteer corps forming part of the armed forces of a party to the conflict. Furthermore, they are not members of a regular

40

armed force as contemplated by Article 4(A)(3). Therefore, the Court will turn to the criteria for inclusion of combatants under Article 4(A)(2).

The expert testimony adduced by the government revealed that neither the Taliban nor the Haqqani Network fulfills the conditions of Article 4(A)(2). They do not have a clearly defined command structure nor a fixed distinctive sign recognizable at a distance. To the contrary, the Taliban's Rules and Regulations for Mujahidin counsel its fighters to adopt local clothing to conceal their identity. Although some Taliban and Haqqani fighters carry arms openly, they frequently utilize suicide bombers with concealed explosives. Lastly, neither entity conducts their operations in accordance with the laws and customs of war. Adams described a number of incidents in which the Taliban have killed large numbers of civilians. Adams testified that prisoners of war and captured police officers are summarily executed. He also testified that Afghans voting in national elections were subject to mutilation. Consequently, this Court finds that neither the Taliban nor Haqqani Network satisfies the criteria for prisoner of war status articulated in Article 4(A)(2), or any other provision of the GPW.

This Court is also unpersuaded that the Defendant was acting under the auspices of a government official with actual authority to attack U.S. troops or members of the International Security Assistance Force. Based upon the foregoing analysis, the Defendant's Motion to Dismiss the Indictment and Motion to Dismiss the Indictment Based on Due Process Concerns, Notice and Jurisdictional Defects will be denied.

An appropriate Order will accompany this Memorandum Opinion.

                                    /s/
                              _____
                              Henry E. Hudson
                              United States District Judge

Date: July 13, 2015
Richmond, Virginia