IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:14CR140-HEH |
| ) | |
| IREK ILGIZ HAMIDULLIN, ) | |
| a/k/a Irek Ilgiz Khamidullah, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION
(Defendant's Motion to Suppress Statements)

This case involves the detention and subsequent prosecution of Defendant Irek Ilgiz Hamidullin (the "Defendant") in the immediate aftermath of his alleged participation in an armed attack on Camp Leyza, an Afghan Border Police compound, in the Khost Province of Afghanistan on November 29, 2009. The case is presently before the Court on the Defendant's Motion to Suppress Statements (the "Motion") related to an April 17, 2010 interview with Federal Bureau of Investigations ("FBI") agents.

The Defendant does not dispute either the adequacy of the *Miranda* warnings he received or his acknowledgement that he understood those rights prior to questioning. Rather, the central dispute before the Court is whether the Defendant waived his right to counsel and his right to remain silent as to specific selected topics. Both the United States and the Defendant have submitted detailed memoranda supporting their respective positions, and the Court heard oral argument on June 17–18, 2015. For the reasons stated herein, Defendant's Motion will be denied.

## I. BACKGROUND

Between March 29, 2010 and April 17, 2010, agents from the FBI interviewed the Defendant fifteen times while in U.S. custody following his involvement in the November 29, 2009, attack on Camp Leyza. The Court has received and reviewed compact discs containing video recordings of each of the interrogations as well as the transcripts thereof, prepared by government translators. Before each interrogation began, the Defendant received his *Miranda* warnings and unequivocally consented to questioning. As the Government explains in its brief, and the videos portray, the Defendant was often selective regarding the questions he would answer and the subjects he chose to avoid. (Gov't's Resp. to Mot. Suppress 4–6, ECF No. 76.) Prior to April 17, 2010, he exhibited little hesitation to discuss his personal background, affiliation with the Haqqani Network, political leanings or the events of November 29, 2009.

The April 17, 2010[1] interrogation focused on a "pre-attack" video recovered by U.S. and Afghan forces, a portion of which underlies a motion in limine filed by the Defendant. The Defendant's Motion to Suppress Statements, filed with the Classified Information Security Officer pursuant to the Classified Information Procedures Act,[2]

---

[1] Although the Defendant's Motion to Suppress Statements is based upon the transcript of the video as opposed to the actual video, the Court will use the video recording. At oral argument, the Government disputed the accuracy of the transcript. (June 18, 2015 Mot. Hr'g Tr. 418:12–23.) The Best Evidence Rule, with some exceptions, requires the use of an original writing, recording, or photograph (video recordings are considered "photographs" for purposes of the rule, *see* Fed. R. Evid. 1001 advisory committee's note.) in proving its material contents, but a copy of a video recording is a "duplicate" admissible "to the same extent as the original," Fed. R. Evid. 1001 & Fed. R. Evid. 1003 advisory committee's note. As the Fourth Circuit has explained, "best evidence" is a bit of a misnomer as the rule "exists to afford guarantees against inaccuracies and fraud by requiring that the original of the document be offered subject to exceptions in Rule 1003...and Rule 1004." *United States v. Smith*, 566 F.3d 410, 413 (4th Cir. 2009). "Thus it is more accurate to refer to Rule 1002 as the 'original document rule,' not the 'best evidence rule.'" *Id.* (citation omitted). Accordingly, the Court's reliance upon the recording is appropriate, and the citations used herein will reference the recording.

[2] All of the documents and recordings underlying the Motion have been declassified since the filing of the Motion.

2

focuses on two segments of that April 17, 2010 interview: (1) twenty-five minutes into first session when one of the two interviewing FBI agents asks the Defendant whether he wishes to discuss the video to which the Defendant responds by moving his hand in a disapproving fashion and noting that he needs to speak with his "practitioner" before he speaks to them; and (2) the Defendant's request that the FBI agents send him away to his cell, accompanied by his statement, "you said if I don't want to talk with you, I don't have to." (Def.'s Mot. to Suppress 1–2, ECF No. 61.)

The Government argues that the Defendant's use of "practitioner was – at best – an 'ambiguous or equivocal' reference to an attorney, [which] did not require the agents to cease questioning." (Gov't's Resp. to Mot. Suppress 1.) Similarly, the Government asserts that the Defendant's refusal to answer certain questions concerning the video reflected an "equivocal refusal to answer certain questions," particularly "given his more than two-week history with the agents of selectively waiving his *Miranda* rights for certain topics while willingly answering questions about others." (*Id.*) Additionally, the Government contends that the Court should give particular credence to the interview immediately preceding the April 17, 2010 interview—the April 13, 2010 interview— wherein the Defendant made five demands concerning, *inter alia*, his access to books and contact with his family. (*Id.* at 15.) Because the Defendant's recalcitrance appears to be directly linked to the agents' inability to timely fulfill his requests, the Government maintains that his refusal to talk was merely posturing and therefore an ambiguous invocation or request. As a result, the Government contends, the safeguards provided by *Miranda* and its progeny should not apply.

3

## II. STANDARD OF REVIEW

The Fifth Amendment provides, in pertinent part, that "[n]o person...shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court found that this constitutional right against self-incrimination required certain "procedural safeguards" when a suspect was subject to a custodial interrogation by law enforcement, particularly informing a defendant of his rights to both remain silent and consult an attorney. 384 U.S. 436, 444–45 (1966). "Both [safeguards] protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (internal citations omitted).

Where a defendant invokes only his right to remain silent, "the admissibility of statements obtained after [he] ha[d] decided to remain silent [would] depend[ ] under Miranda on whether his right to cut off questioning was scrupulously honored." *United States v. Johnson*, 400 F.3d 187, 193 n.2 (4th Cir. 2005) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (internal quotation marks omitted)) (alterations in original). "When a suspect 'expresse[s] his desire to deal with the police only through counsel,' the police cannot interrogate him 'until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Johnson*, 400 F.3d at 193 (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). Nevertheless, "the Supreme Court has repeatedly held that although statements obtained in violation of *Miranda* are inadmissible in the government's case-in-chief at trial, such statements, if reliable, may be used for other purposes and in other ways."

*United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006) (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)).

"To invoke the right to counsel, a suspect must take an action that 'can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Johnson*, 400 F.3d at 194 (citation omitted). Likewise, if a suspect "indicate[s] in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74. To avail himself of such protections, he must unequivocally assert his intention to remain silent or consult his counsel. *Berghuis*, 560 U.S. at 381–82. Ambiguous insinuations are ineffectual. *Id.* "[I]f [the] reference [to consult an attorney] is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect." *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis in original). Requiring an unambiguous or unequivocal invocation of *Miranda*'s procedural safeguards protects officers from "mak[ing] difficult judgment calls about whether the suspect in fact wants a lawyer ... with the threat of suppression if they guess wrong." *Id.* at 461. To proceed in any other fashion "would place a significant burden on society's interest in prosecuting criminal activity." *Berghuis*, 560 U.S. at 382 (citation omitted).

Determining whether an invocation is ambiguous or unequivocal is contextual. Several courts of appeal have recognized that the Supreme Court's decision in *Smith v. Illinois*, 469 U.S. 91, 98 (1984) instructs courts to focus only on events prior, not subsequent, to the putative invocation. *United States v. Hunter*, 708 F.3d 938, 945 (7th

Cir. 2013); *Sessoms v. Grounds*, 776 F.3d 615, 627 (9th Cir. 2014). This Court finds the reasoning articulated in *Smith* to be instructive.

But even where a defendant clearly invokes his rights, he may waive those rights based upon behavior occurring after invocation. *Smith*, 469 U.S. at 98. "[W]aivers can be established [by] formal or express statements of waiver," but also can be "implied from all the circumstances." *Berghuis*, 560 U.S. at 383. Whether explicit or implied, a waiver must "be knowing and intelligent" in that it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Dire*, 680 F.3d 446, 455–56 (4th Cir. 2012) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the Miranda warnings." *Dire*, 680 F.3d at 454 (quoting *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) (alteration and internal quotation marks omitted)). In addition to being knowing and intelligent, any waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis*, 560 U.S. at 382 (internal citation omitted).[3]

Based on the foregoing analytical framework, the Court will turn to whether the Defendant unambiguously and unequivocally invoked his right to counsel.

---

[3] The Defendant half-heartedly asserts that one of the FBI agents standing next to him during the interview presented a coercive atmosphere, but the evidence simply does not support a finding that his statements were involuntary. The Court's review of the video recording of the interview reveals that the FBI agent stood next to him sporadically during the interview and was certainly never hovering over him.

6

## III. ANALYSIS

### A. Invocation of Right to Counsel

The April 17, 2010 interview begins about sixteen minutes after the start of the recording.[4] Roughly sixteen and a half minutes into the recording, the Defendant is advised of his *Miranda* rights in Arabic by the interpreter and acknowledges that he understands those rights. (April 17, 2010 Interview 16:17–17:17.001, Gov't's Ex. 11, June 18, 2015 Mot. Hr'g 417:21–22.)[5] Shortly thereafter, one of the FBI agents says "it's movie time!" referring to the pre-attack video. The agent then inquires whether the Defendant enjoys movies, to which the Defendant chuckles and says "just a glance" with a continuing smile. (*Id.* at 17:19–17:26.001.) As the video begins playing, the Defendant watches the video with the other FBI agent standing beside him. The FBI agent comments to the Defendant that "it looks to me like you had four prongs, not three" presumably referring to the map depicted in the pre-attack video's briefing segment. (*Id.* at 18:06–18:13.001.) Soon thereafter, one of the FBI agents notes to the Defendant that if he wants the video to be stopped just let him know. (*Id.* at 18:06–18:13.001.) Thereafter, the Defendant puts on his glasses and begins watching the video more intently. (*Id.* at 18:25–18:28.001.) Roughly nineteen minutes into their meeting, and only three minutes

---

[4] The Defendant is placed in the interview room for roughly ten minutes before he is engaged by the FBI agents. An FBI Agent advises him of his *Miranda* rights, and the Defendant acknowledges that he understands those rights and clarifies with the Agent that if he does not want to speak he does not have to do so. The Agent confirms the Defendant's understanding. The Defendant is then left alone in the interview room until the interpreter enters the room to read the Defendant his *Miranda* rights in Arabic.

[5] For citation purposes, the Court will cite video interviews as follows: [Date of Interview] Intrv. [Insert Time in Minutes and Seconds].[Insert Session .001 or .002].) There is no indication that the "sessions" were actually separate portions of the interview or were preceded by a break. Rather, the different sessions simply indicate when the video recording began the timing anew; and usually this renewal of timing occurs after every thirty-eight minutes.

7

after receiving his *Miranda* warning for the fourteenth time since the initial March 29, 2010 interview, the Defendant, without prompting, begins to spontaneously make comments on the video, including expressing his opinion as to how the United States obtained the video. (*Id.* at 18:57–19:27.001.) The Defendant then exclaims that he has already confessed, and that he would not talk to the agents further until the five demands he made during the April 13, 2010 interrogation were met.[6] (*Id.* at 19:30–20:05.001.)

The Defendant continues to provide unsolicited comments on the ritualistic slaying of an animal in the video, seeming to indicate that it was handled improperly. (April 17, 2010 Intrv. 21:10–21:24.001.) Nearly twenty-two minutes into the video, after the Defendant again notes that he has seen the video, one of the FBI agents explains that he wants the Defendant to keep watching for a minute. (*Id.* at 21:36.001.) The Defendant chuckles at the video and again makes comments about its content. (*Id.* at 21:46–23:15.001.) Approximately twenty-four minutes into the conversation, the Defendant remarks that the Central Intelligence Agency obtained the pre-attack video for the FBI. (*Id.* at 23:57–24:02.001.) He continues his commentary by pointing to objects on the screen. (*Id.* at 24:14–24:48.001.)

After twenty-five minutes an agent intervenes and asks if they may speak to him about the video. The Defendant responds, "no I don't must talk to my practitioner and then I talk to you. About my family. Last time the Red Cross came they did not bring nothing for me." (April 17, 2010 Intrv. 25:01–25:18.001.) The FBI agent then inquires

---

[6] Notably, the Defendant admits that the FBI agents have enough information prior to the April 17, 2010 interview, to jail him. (April 17, 2010 Intrv. 20:00–20:26.002.)

8

about the Red Cross not bringing him anything. (*Id.* at 25:18–25:19.001.) The Defendant responds that they came two times and brought him nothing. (*Id.* at 25:20–25:25.001.) The Defendant then sits back in his chair with his arms folded looking at the video. About twenty seconds later, one of the FBI agents remarks that the individual on the video "is very interesting." (*Id.* at 25:45–25:47.001.) The Defendant replies "not I am." (*Id.* at 25:50.001.)

It is now well established in Fifth Amendment jurisprudence that where "a suspect 'expresse[s] his desire to deal with the police only through counsel,' the police cannot interrogate him 'until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Johnson*, 400 F.3d at 193 (quoting *Edwards*, 451 U.S. at 485). Equally fundamental is the necessity that the invocation of the right to counsel, in the course of an interrogation, must be unambiguous or unequivocal. *Berghuis*, 560 U.S. at 381–82. The determinative question therefore distills to whether within the context of the discussion on April 17, 2010 the Defendant's request for a "practitioner"[7] was a clear invocation of his right to counsel. *See Smith v. Illinois*, 469 U.S. at 98. The Court finds that the invocation taken together with the prior course of dealing renders the Defendant's invocation ambiguous, and as a result the FBI agents were not compelled to cease questioning.

Within five minutes of the pre-attack video being played, the Defendant, after having made several spontaneous comments, exclaims "as I have explained previously, I am not going to talk to you until you do the five things I have requested." (April 17,

---

[7] The Court will assume that the defendant is using the word "practitioner" as referring to an attorney.

2010 Intrv. 19:30–20:05.001.) Roughly six minutes after reiterating his five demands, the Defendant responds to one of the FBI agents who asks him whether they may speak about the video by saying: "No I don't; must talk to my practitioner and then I talk to you. About my family. Last time the Red Cross came they did not bring nothing for me."[8] (*Id.* at 25:01–25:18.001.)

The Court acknowledges that the phrase "I must speak with my practitioner and then I talk to you" could arguably be sufficient to invoke *Miranda*'s prophylaxis if viewed in isolation and without his earlier demands. *See Johnson*, 400 F.3d at 195–96. That, however, is not the case here. It is the total context that renders the invocation ambiguous and equivocal. Here, the Defendant's refusal to answer questions was inextricably intertwined with his five demands—a cudgel to pressure the agents to fulfill his requests unrelated to counsel or questioning. Moreover, the FBI agents spent a notable portion of the April 13, 2010 interview discussing the Defendant's five demands. (*See* Apr. 13, 2010 Interview, Gov't's Ex. 13.) In light of these circumstances, the FBI agents could have reasonably construed his request to speak with his practitioner as simply a transparent tactic, or at best an equivocal invocation. *Edwards*, therefore, did not require that the agents stop questioning the Defendant at that point.

At oral argument defense counsel, with respect to the legal significance of the Defendant's demands, explained that he could find "no ... rationale for the proposition that [courts] should construe one's request for a practitioner or counsel through some lens

---

[8] The Court includes comments subsequent to the use of "practitioner" in order to provide the complete statement, which was made simultaneously, in its entirety.

10

of a motivation factor." (Mots. Hr'g Tr., June 18, 2015, 396:20–24 (hereinafter, "June 18 Tr.") The Government countered that because the Defendant's use of "practitioner ... related directly to the five conditions that he had made that had nothing to do with his right to counsel or his right to remain silent ... [i]t [was] [ ] ambiguous." (*Id.* at 411:10–18.) Although the Court is not convinced that the motivation factor, standing alone, is necessarily determinative of ambiguity, it is a critical element in the analytical equation. It bears directly on the bona fides of his request.

In elucidating the underpinnings of *Miranda*'s procedural safeguards, the Supreme Court, in *Connecticut v. Barrett*, noted that the "prophylactic rules [delineated in *Miranda* were] designed to insulate the exercise of Fifth Amendment rights from the government 'compulsion, subtle or otherwise,' that 'operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.'" 479 U.S. 523, 528 (1987) (citation omitted). Later, in *McNeil v. Wisconsin*, the Supreme Court reiterated that the "purpose of the *Miranda–Edwards* guarantee" of right to counsel protects "[a] suspect's 'desire to deal with the police only through counsel,'" and thus "at a minimum" requires "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" 501 U.S. 171, 178 (1991) (emphasis in original) (citations omitted); *see also Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (providing that prophylactic rule "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence."). Stated simply, *Miranda*'s protective measures should not be

brought to bear where "no constitutional objective ... would be served by suppression." *Barrett*, 479 U.S. at 529.

It is important to keep in mind that the Defendant never expressed an unconditional intention to curtail further conversation—only to defer it until his unsettled demands were fulfilled. While a defendant's right to remain silent and to seek counsel must be scrupulously honored, the rule is designed to protect against the legal consequences of coerced and uncounseled self-incrimination. The Defendant, by his own admission, had explained his involvement in the attack on Camp Leyza in great detail on prior occasions. His reluctance to continue the discussion on April 17, 2010 obviously had a singularly tactical purpose. The safeguard of *Miranda* was promulgated as a protective shield, not a tool for manipulation.

Accordingly, the Defendant's Motion to Suppress based upon his invocation of counsel is without merit.

### B. Invocation of Right to Remain Silent

Closely related to the Defendant's invocation of his right to counsel is the question of whether the Defendant invoked his right to remain silent and, if so, whether his invocation was scrupulously honored by the FBI Agents.

As was this Defendant's practice on various occasions prior to the April 17, 2010 interview, a defendant may selectively waive his Miranda rights by agreeing to answer some questions, but not others. *See Michigan v. Mosley*, 423 U.S. at 103–04 (holding that the right to remain silent includes the ability to "control ... the subjects discussed"); *Burno v. United States*, 953 A.2d 1095, 1102 (D.C. 2008) (recognizing that "an accused

12

may selectively assert his right to silence" by agreeing to answer some questions and not others); *Arnold v. Runnels*, 421 F.3d 859, 864 (9th Cir. 2005) (same).

The Defendant draws the Court's attention to two statements that he maintains invoked his right to remain silent. First, the Defendant points to his declaration that he gave the FBI agents what they wanted so they should send him away to his cell. (April 17, 2010 Intrv. 28:38–28:44.001.) Next, the Defendant characterizes his statement, "you said if I don't want to talk with you, I don't have to" as an unambiguous assertion of his right to remain silent. (*Id.* at 26:28–26:32.001.)

Once the Defendant told the FBI agents to send him back to his cell, he arguably expressed his unwillingness to continue the interview, and thus, intimated his right to remain silent. *Compare Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (suspect's musings that "I just don't think that I should say anything" and "I need somebody that I can talk to" failed to "constitute an unequivocal request to remain silent"). Positing the Defendant's invocation of his right to remain silent, he clearly reversed course by spontaneously re-initiating conversation through his comments on the video within a minute of his request. *See Edwards*, 451 U.S. at 477; *Bui v. DiPaolo*, 170 F.3d 232, 240 (1st Cir. 1999); *Jacobs v. Singletary*, 952 F.2d 1282, 1294–95 (11th Cir. 1992). Considering the Defendant's history with the agents and his full understanding of both his rights and the interrogation process,[9] the Court concludes that he fully

---

[9] As noted earlier, each interrogation of the Defendant prior to April 17, 2010 evidences *Mirandized*, free flowing conversations that are occasionally hampered by the Defendant's inability to speak English fluently. The Defendant himself admitted that he was well-versed in the art of interrogation at the initial interview with FBI agents, explaining that he was interrogated by both the Pakistani and Russian intelligence agencies prior to his interviews

understood his rights and made the deliberate choice to re-engage in conversation thereby waiving his right to remain silent with respect to the video.

The next putative invocation of the right to remain silent was the Defendant's comment, "you said if I don't want to talk with you, I don't have to" in response to a question about identifying a flag in the video. Given the Defendant's selective invocation of his right to remain silent throughout the interrogation process, the FBI agent reasonably understood the Defendant's invocation of his right to remain silent as one indicating an unwillingness to discuss the flag in the video. The FBI agent clarified that the Defendant did not have to answer the question. *See United States v. Gordon*, 895 F.2d 932, 940 (4th Cir. 1990) (holding where a defendant "ambiguously asserts his right to remain silent, the police are allowed to ask only limited questions to clarify the ambiguity.") The Defendant then spontaneously points to the interpreter suggesting that the interpreter explain the flag in the video. The FBI agent simply retorts that the Defendant is the one being asked to respond. Thereafter, the Defendant offers his opinion on the flag in the video. Contrary to his prior selective invocations, the Defendant did not choose to completely evade the subject. He resumes the conversation by half-heartedly directing the FBI agent to ask the interpreter. Again, it was the Defendant, not the agent, who rekindled the conversation.

As with the purported invocation of his right to counsel, a critical defect of the Defendant's invocation of his right to remain silent was that he explicitly premised it on

---

with the FBI agents. (*See* March 29, 2010 Interview.) He very clearly understood and manipulated the give and take of the interrogation process.

14

demands met. Notwithstanding that critical defect, the Defendant himself re-initiated conversations after each invocation. The Defendant, well-versed in the art of interrogations and his *Miranda* rights, faced no pressure to speak and ultimately decided to do so spontaneously. Therefore, any invocation of Miranda was knowingly, intelligently, and voluntarily waived.

Accordingly, the Defendant's Motion to Suppress Statements on the basis of invoking his right to remain silent is without merit and will be denied.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress Statements is denied.

An appropriate Order will accompany this Memorandum Opinion.

                                               /s/
                                   Henry E. Hudson
                                   United States District Judge

Date: July 14, 2015
Richmond, Virginia