IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:14CR140–HEH |
| IREK ILGIZ HAMIDULLIN, | ) | |
| a/k/a Irek Ilgiz Khamidullah, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION</u>
(Motion for Acquittal Under Rule 29 or for New Trial
Pursuant to Rule 33(a) and (b)(2))

Following a seven day trial by jury, the Defendant, Irek Ilgiz Hamidullin, was

convicted of fifteen federal offenses related to his participation in an armed attack on an

Afghan Border Police compound in the Khost Providence of Afghanistan on

November 29, 2009. The case is presently before the Court on the Defendant's Motion

for Acquittal Under Rule 29 or for New Trial Pursuant to Rule 33(a) and (b)(2)

("Motion," ECF No. 220). Both the Defendant and the Government filed detailed

memoranda supporting their respective positions. The Court heard oral argument on

November 6, 2015. For the reasons discussed below, the Defendant's Motion will be

denied.

The standard of review for motions seeking relief under Rule 29 is well

established. In assessing the sufficiency of the evidence presented at trial to support the

Defendant's convictions, this Court must first view the evidence in the light most

favorable to the Government. The Government is also entitled to all reasonable

inferences. It must next determine whether any reasonable trier of fact, based on that

evidence, could have found the defendant guilty beyond a reasonable doubt. *See United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004). This necessarily requires the defendant to demonstrate that the evidence is insufficient to prove his guilt as a matter of law. *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003).

A defendant's motion for a new trial under Rule 33 turns on the discretion of the trial court "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 vests the trial court with broad discretion. It is not necessarily required to view the evidence in the light most favorable to the government. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). The court's discretion to award a new trial "should be exercised sparingly." *Id.* at 1486.

Focusing first on Counts Three and Four, charging Conspiracy and Attempt to Destroy an Aircraft in the Special Aircraft Jurisdiction of the United States, the Defendant contends that the attack helicopters responding to Camp Leyza failed to structurally meet the statutory definition of an "aircraft in flight." Title 18 U.S.C. § 32 prohibits the destruction or attempted destruction of an aircraft in the special jurisdiction of the United States. The special aircraft jurisdiction of the United States includes aircraft of the armed forces of the United States in flight. *See* 49 U.S.C. § 46501(2)(B). Title 49 U.S.C. § 46501(1)(A) states that "'aircraft in flight' means an aircraft from the moment all external doors are closed following boarding—(A) through the moment when one external door is opened to allow passengers to leave the aircraft."

The Defendant argues that the two helicopters in this case, an Apache and a Kiowa Warrior, which responded to Camp Leyza, failed to meet the definition of "aircraft in

2

flight." The pilot of the Kiowa helicopter testified at trial that in combat situations his helicopter was not equipped with doors.  (Trial Tr. 664:18, Aug. 3, 2015, ECF No. 213.) There was no testimony presented describing the doors on the Apache.  Defendant argues that the absence of testimony attesting to the presence of doors on the helicopters preclude a conviction on Counts Three or Four for destruction of aircraft in special aircraft jurisdiction.

The Government argues that Defendant's interpretation urges a strained construction of the statutory language which is inconsistent with its legislative history. The United States contends that the language of § 46501(1)(A) are not words of limitation, but an extension of jurisdiction by Congress to include aircraft on the ground in final preparation for takeoff.  It denotes the point in time in which federal jurisdiction under the statute begins.

Although no court seems to have squarely dealt with this precise issue, no reported case from any federal Circuit Court of Appeals appears to embrace Defendant's reasoning.  It is illogical to conclude that a helicopter flying at high speed several thousand feet in the air would not be an aircraft in flight—irrespective of whether it was equipped with doors. During oral argument, the Government pointed out that § 46501(2)(B) specifically includes "an aircraft of the armed forces of the United States." The Government further noted that if the Defendant's construction of the statute was correct, it would exclude the entire fleet of fighter jet aircraft, most of which are not equipped with conventional doors.

3

It is therefore implausible that Congress intended to exclude such combat aircraft from the sweep of the statute.[1] The reference to external doors is more plausibly construed as an expression of jurisdictional boundary than a structural requirement.

The Defendant next contends that during rebuttal argument, the Government misstated the law as to Count Three, Conspiracy to Destroy an Aircraft of the Armed Forces, which may also affect convictions on Counts Five, Eight, Nine, Ten, and Thirteen.

During final argument, the United States maintained that the heavy weapons[2] carried by Defendant's group of insurgents were a precautionary measure, insurance in case aircraft arrived to support the Afghan Border Police ("ABP") during the attack on Camp Leyza. The Defendant contends that the Government misstated the law when it argued to the jury that the procurement of heavy weapons, as simply a precautionary measure, would support a conviction for conspiracy to destroy military aircraft. From the Defendant's perspective, shooting down U.S. aircraft was not an integral part of the conspiracy. The heavy weapons, according to the Defendant, were carried by the insurgents as a part of the conspiracy to attack the ABP camp, not repel responding U.S. military aircraft as the Government alleged.

The Defendant offered no objection to the comment during or after argument and concedes that the jurors were properly instructed on the Defendant's responsibility for

---

[1] Moreover, the Government is correct, from a literal perspective, all external doors on the Kiowa Warrior helicopter were closed.
[2] The heavy weapons included rocket-propelled grenade launchers, DShK anti-aircraft machine guns, and an 82 millimeter recoilless rifle.

4

criminal acts of co-conspirators, which were reasonably foreseeable and in furtherance of the conspiracy. *See United States v. Blackman*, 746 F.3d 137, 141–42 (4th Cir. 2014); *United States v. Ashley*, 606 F.3d 135, 142–43 (4th Cir. 2010). This Court will assume the jury followed its instructions. *United States v. Alerre*, 430 F.3d 681, 692 (4th Cir. 2005), *cert. denied*, 547 U.S. 1113 (2006).

In its rejoinder, the Government stresses that at this stage, the Court must view the evidence in the light most favorable to the prosecution. It also points to evidence which supports its contention that the Defendant arranged for the purchase of the heavy weapons, instructed other insurgents on their use, and in fact gave them the order to fire as helicopters approached. In light of the preparations the Defendant made in anticipation of a response by U.S. helicopters and discussions concerning the weapons' use, a reasonable jury could conclude that use of the heavy weapons was a part of the methods and means of the conspiracy. Moreover, the Defendant's planning and preparation clearly demonstrated the reasonable foreseeability of the use of the weapons against U.S. aircraft. This line of argument by the Government was supported by the evidence.

On another front, the Defendant argues that the Court improperly instructed the jury on what constitutes assisting federal officers under 18 U.S.C. § 1114, necessitating a new trial on Counts Five, Six, and Seven. In the Defendant's view, § 1114 requires proof that the ABP was contemporaneously supporting or assisting a United States officer while that officer was performing his official duty. The Defendant maintains that the evidence shows the converse, namely that the United States, rather than the ABP,

5

provided the assistance when the attack occurred. Moreover, he contends that mere proof of a symbiotic relationship between entities is insufficient.

The Defendant draws the Court's attention to the fact that no United States officer was present at Camp Leyza when the attack occurred, and that the customary procedure for the ABP was to summon the American military when assistance was needed. The Defendant also highlights testimony that the ABP independently policed the Afghan border.

While the Defendant's argument touches on isolated portions of the testimony, when viewed collectively, the evidence was more than sufficient to support the jury's specific finding of an inter-dependent relationship of mutual assistance between the ABP and the U.S. military. Government witnesses described the ABP as an essential part of the U.S. strategy, a force multiplier, working together daily and who accompanied each other routinely on combat missions. One of the Government's experts described the ABP as an integral part of the counter-insurgent strategy and policy.[3]

The issue of whether or not the ABP were assisting the U.S. military at the time of the attack was the subject of a pretrial motion to dismiss. This Court, consistent with most other courts reviewing this issue, found that it required a fact specific analysis. Therefore, the Court concluded that it was an issue of fact for the jury. *See United States v. Luna*, 649 F.3d 91, 99 (1st Cir. 2011). In instructing the jury, the Court explained the requisite relationship, "[t]o assist means to lend aid, help, or to give support to in some

---

[3] *See* Trial Tr. 329:17–348:15, 421:21–433:12, July 31, 2015, ECF No. 212; Trial Tr. 555:17–556:9, Aug. 3, 2015, ECF No. 213.

undertaking or effort to an employee of the United States in the performance of his or her

duties." (Trial Tr. 1352:9–12, Aug. 6, 2015, ECF No. 216.)[4]  In its special verdict, the

jury concluded that the ABP were in fact assisting the U.S. military personnel in its

mission in Afghanistan at the time of the attack.  There is no reason to reject the jury's

unanimous decision.

      The Defendant next urges the Court to grant a new trial under Rule 33 because of

the manifest injustice caused by the persistent failure of a government witness to follow

the admonitions of the Court and the Court's failure to instruct the jury regarding

references to terrorist attacks on civilians.  Prior to trial in this case, this Court instructed

the Government not to elicit testimony referring to the Defendant as a terrorist or as a

person associated with terrorist organizations.  The Court provided some latitude to the

Government to lay a foundation for the involvement of the United States in the conflict in

Afghanistan.  This included limited reference to the attacks of September 11, 2001,

without any mention of Osama bin Laden.  In order to provide context for the attack on

Camp Leyza, the Court also permitted the United States to introduce evidence of other

attacks by the Taliban and Haqqani Network against the ABP, Afghanistan, and the U.S.

---

[4] In defining "assist" in this manner, the Court followed both the Fourth Circuit and Fifth Circuit in utilizing essentially a dictionary definition of the word.  Analyzing the 1994 iteration of § 1114, the Fourth Circuit cited to the dictionary definition of "assist" as "to give support or aid." *United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994) (citing *Webster's Ninth Collegiate Dictionary* 408 (9th ed. 1990)).  Applying that definition, the Fourth Circuit determined that "employed to assist" clearly and unambiguously indicated that a person was "being used to help a federal agent." *Id.*  The Fifth Circuit explained "[t]he meaning of 'assist' does not vary across broad-based English-language dictionaries." *United States v. Reed*, 375 F.3d 340, 344 (5th Cir. 2004).  Listing several dictionary definitions—including aid, help, or support—the Fifth Circuit determined "assist" in § 1114 meant "to provide supplemental help or support to another in carrying out some task of mutual involvement." *Id.*

military.  None of the evidence directly mentioned or implicated the Defendant in such

activity.  It did, however, assist in explaining the interrelationship of these forces and the

United States in the Afghanistan theatre of combat.

During the testimony of Colonel John Agoglia, a Government witness, he

mentioned the al-Qaeda network several times in explaining the U.S. counter-insurgency

strategy.  (Trial Tr. 322:6–327:23, July 31, 2015, ECF No. 212.)  The Defendant's

objections were sustained and the jury was instructed that the al-Qaeda network was not a

part of this case.  That same witness also testified that attacks by the Haqqani Network

and Taliban on Afghan families and civilians factored into the United States' counter-

insurgency strategy.  No testimony was introduced by the United States that the

Defendant was directly affiliated with any terrorist organization or participated in any

attacks on Afghan civilians.  The Defendant is correct that the Court offered to further

instruct the jury, at the close of the case, that the Defendant was not involved in any of

the terrorist attacks on civilians mentioned during the testimony.  The Court neglected to

do so and no such instruction was offered or requested by the Defendant at the close of

the evidence.  In retrospect, an instruction refreshing the jury's recollection of such

evidence prior to deliberation could have magnified its significance.

The nature and setting of this case necessarily required some controlled reference

to terrorist-type activities.  Any resulting prejudice was reasonably contained by the

Court's instructions and exclusion of evidence of Defendant's involvement.

Lastly, the Defendant contends that the Court erred by excluding defense evidence

relating to the public authority defense and denying his proposed jury instruction defining

its elements. Defendant's claims of lawful authority and combatant immunity were the

subject of a pretrial motion to dismiss on which this Court heard extensive expert

testimony and legal argument. By Memorandum Opinion issued July 13, 2015 (ECF No.

129), this Court held that neither the Taliban nor the Haqqani Network had the lawful

authority to order the assault on Camp Leyza on November 29, 2009, or attack U.S.

troops. In order to successfully wage a public authority defense, the Fourth Circuit

requires proof that a "government official or officials upon whose authority the defendant

relied possessed actual authority to authorize his otherwise criminal acts." *United States*

*v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001). Reliance on *apparent* authority is

insufficient. *Id.* at 254; *see also United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368

n.18 (11th Cir. 1994). As the Fourth Circuit noted in *Fulcher*, the public authority

defense appears to be rarely recognized in the criminal context. 250 F.3d at 253–54.

Neither the Taliban nor the Haqqani Network is a legitimate military organization that

conducts its operations in accordance with the laws and customs of war. The

Defendant's band of insurgents, a schism known as Bulgars, was simply a group of

ideologically-driven individuals acting in loose association with the Taliban.

Allowing the Defendant to re-litigate the public authority and lawful combatant

defenses would have enabled the Government to again call its expert witnesses who

previously recounted in vivid detail brutal acts of terrorism committed by the Taliban and

Haqqani Network. This, of course, would have been incompatible with the Defendant's

motion to exclude such evidence. While perhaps tactically advantageous, this Court

could not have permitted the defense to argue actual authority without allowing the

9

Government to present rebuttal evidence of the nature and history of these organizations, along with their iniquitous practices.

The Defendant opted to pursue its public authority and lawful combatant defenses in the form of a pretrial motion to dismiss, which was thoroughly briefed and argued. The Court heard an entire day of expert testimony. The Defendant has proffered no new evidence or argument that would support his assertion of actual authority on the part of the Taliban or Haqqani Network, which were characterized by experts as terrorists-type organizations. Based on the record at hand, the Court properly concluded, as a matter of law, that actual authority was not a viable defense. *United States v. Bailey*, 444 U.S. 394, 415–16 (1980).

The same analysis applies to the Defendant's argument that this Court should have allowed him to re-litigate his lawful combatant status before the jury. Here again, this issue was fully litigated in connection with the Defendant's Motion to Dismiss the Indictment. The Court heard expert testimony and reviewed treatises of law. This Court concluded, contrary to the opinion of the Defendant's expert, that the Taliban and Haqqani Network fail to meet the qualifications of a legitimate military organization entitling Defendant to combatant immunity. In reaching that conclusion, this Court applied Article 4(a)(2) of the Geneva Convention Relative to the Treatment of Prisoners of War ("GPW"), as the consensus authority. This Court concluded that the Taliban and Haqqani Network neither identified themselves by a fixed and distinctive sign recognized at a distance, nor conducted their operations in accordance with the laws and customs of war. They also lacked a clearly defined command structure as required under Article

10

4(a)(2) of the GPW.  To revisit the issue of lawful combatant status during trial would have exposed the jury to not only evidence of abuse of Afghan citizens, but also execution of prisoners and police officers by these organizations, kidnapping of journalists, and exchanging prisoners for ransom.

The question of whether or not the Defendant acted as a lawful combatant, entitling him to prisoner of war status under the GPW, was presented as a bar to prosecution.[5]  (Def.'s Mot. Dismiss 12, ECF No. 62.)  It was therefore appropriately resolved by pretrial motion.

The Defendant's Motion for Acquittal or for New Trial will be denied.  An appropriate Order will accompany this Memorandum Opinion.

                                                         /s/
                                            Henry E. Hudson
                                            United States District Judge

Date: Nov. 16, 2015
Richmond, VA

---

[5] As this Court noted in its Memorandum Opinion issued July 13, 2015, this Court's analysis focuses on the legality, not the wisdom or foreign policy implications, of this prosecution. Statecraft is the exclusive realm of other branches of government.