IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 3:14CR140 (HEH) |
| v. | ) | |
| | ) | |
| IREK ILGIZ HAMIDULLIN, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Dana J. Boente, United States Attorney for the Eastern District of Virginia, and the undersigned counsel, respectfully submits the following as its Sentencing Memorandum.

### INTRODUCTION

This case concerns the November 29, 2009, attack on the Afghan Border Police (ABP) compound known as Camp Leyza and defendant Irek Ilgiz Hamidullin's role in orchestrating that attack. Following his capture, the defendant admitted to the FBI on videotape that he planned and led the attack in affiliation with the Taliban. His men were a rogue band of insurgents that lacked any government sponsorship, appropriate military structure, distinctive uniform, or insignia to identify them as an organized military force. At the conclusion of the attack, Afghan and United States forces had completely destroyed the defendant's insurgents with no allied casualties. The defendant was captured the following morning after a brief firefight, and he has remained in the United States custody since that time.

Hamidullin was charged in a fifteen-count Second Superseding Indictment with offenses committed in connection with the November 29, 2009, attack on Camp Leyza. Trial

commenced on July 30, 2015, and ended on August 7, 2015, with a jury verdict of guilty on all counts of the Second Superseding Indictment.

On October 2, 2015, the Presentence Investigation Report was filed, reflecting a sentencing calculation for the defendant at a total offense level of 43 and a criminal history category of VI. The guidelines therefore recommend a sentence of life. As the PSR also noted, one of the counts of the indictment requires a mandatory thirty-year sentence consecutive to any sentence imposed on the other counts of conviction.

On November 20, 2015, a revised Presentence Investigation Report was filed, which contained some factual corrections suggested by government and defense counsel, and included an addendum of objections from the defense that could not be resolved by the parties. The government respectfully submits that the unresolved objections raised by the defense should be rejected by the Court and that the Court should accept the sentencing calculations noted by the Probation Officer.

## STATEMENT OF FACTS AND RESPONSE TO DEFENSE OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

Hamidullin is a fifty-five-year-old Russian national captured on the battlefield by United States military forces in Tani District, Khowst Province, Afghanistan, following an attack on an ABP compound there. While the evidence at trial clearly established that the defendant led a group of insurgents during the attack on Camp Leyza, the defense disputes his characterization in the Presentence Investigation Report, stating that he was a "coordinator," which he "intended to convey to his interrogators to mean, 'translator.'" In fact, the defense disputes many key facts established at trial through the *Mirandized*,[1] videotaped statements of the defendant played for the jury: that he planned the operations, using his prior experience with the Russian military; that

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

he selected the target after consultation with Taliban and Haqqani Network leaders; that he provided weaponry and personnel to support the attack; and that he directed various insurgents to fire upon United States helicopters arriving at Camp Leyza within twenty minutes of the initial attack.[2] Evidence presented at trial from eyewitnesses to the capture of the defendant refutes the claim of the defense that he never fired his weapon, a claim that he presented at trial but, based upon the verdict, was not credited by the jury. In fact, the testimony presented at trial established that United States and Afghan forces encountered Hamidullin, who was hiding behind a rock, armed with an AK-47 assault rifle. According to eyewitness testimony, the defendant fired shots at the combined allied force and was injured by returned fire, receiving bullet wounds to his hip and lower leg.[3]

Testimony from several United States soldiers who responded to the attack on Camp Leyza established for the jury that none of the marauding forces, including the defendant, wore any uniform or distinctive emblem to identify the group as part of a proper, organized military force.[4] While the defense objects to the inclusion of this fact in the Presentence Investigation

---

[2] The jury heard testimony from the FBI Special Agents who interviewed the defendant that he admitted that he planned the attack on Camp Leyza for two months at the behest of Sirajuddin Haqqani, the leader of the Haqqani Network, and in cooperation with the Taliban (Transcript of August 5, 2015, at p.1083); that he selected Camp Leyza from a list of possible targets, which included a nearby United States facility where helicopters were stationed; that he ruled out an attack on that post because he felt it was too strongly defended; that he and others performed reconnaissance missions to Camp Leyza in order to formulate an attack plan, brought this plan back to Pakistan and briefed others, who agreed with the proposal after suggesting minor changes. (Transcript of August 4, 2015, at p.980; Transcript of August 5, 2015, at pp. 1083, 1073, 1078.) The defendant also admitted that he facilitated the supply of weapons for the attack force, stating that he procured two of the heavy weapons, which were purchased on credit, and told the agents what they had cost. (*Id.* at pp.1088-89; 1093-94.)

[3] Transcript of July 31, 2015, at pp. 450, 497; Transcript of August 3, 2015, at pp.546, 759-60, 779-80; Transcript of August 4, 2015, at pp. 817, 819, 838, 840, 843.

[4] Transcript of August 3, 2015, at p. 533; Government Exhibit 24; Transcript of August 4, 2015, at p. 861.

Report as "unnecessary and will not be agreed upon," this fact is very significant to the legal conclusion made by the Court that the defendant did not qualify for lawful enemy combatant status in undertaking the assault on Camp Leyza and the subsequent assault on United States and Afghan military personnel during the battle damage assessment.

At some point around midnight on November 29, 2009, the insurgents attacked the camp. As the testimony at trial established, the United States military immediately responded to the attack by sending two Kiowa and two Apache helicopters from another base located in the Khowst Province.[5] The jury heard testimony that Hamidullin told the FBI that when the United States aircraft arrived, he directed two units of his men to respond with anti-aircraft fire. One group's machine gun failed to fire. When Hamidullin ordered the second group to fire its weapon, it too malfunctioned. Soon after the malfunctioning of the second heavy weapon, Hamidullin claims that he ordered the fighters to abandon the attack and regroup at a pre-determined location.[6] According to testimony presented at trial, United States aircraft located the insurgents traveling away from Camp Leyza, identified heavy weaponry and hot spots indicating rocket propelled grenades, obtained approval from superiors to engage the enemy and fired upon the insurgents, killing a number of them.[7] The evidence presented at trial, which included the defendant's own statements to the FBI, therefore supports the narrative included in the Presentence Investigation Report.

The jury also heard that during his FBI interviews, the defendant acknowledged leading a group of fighters made up of members from different insurgent groups during the November

---

[5] Transcript of August 3, 2015, at pp. 602-04, 661-62, 706, 740-41.

[6] Transcript of August 5, 2015, at pp. 1084, 1094-96; Government Exhibits 167, 168, 201, 203, 204.

[7] Transcript of August 3, 2015, at pp. 669-679, 715-721, 745-48.

2009 attack. He explained to the FBI that part of the insurgent force was made up of "Bulghar Jama'at," his own group of combatants.[8] The defendant consistently professed allegiance to the Taliban, proclaiming Taliban leader Mullah Omar as his "emir." According to the defendant, the Taliban had provided for his group of fighters in the past, and the defendant described the Taliban as supporting his "movement."[9] He also acknowledged his operational relationship with the Haqqani Network in executing the attack on Camp Leyza.[10] Thus, the defense objections to the Presentence Investigation Report statements concerning the defendant's relationship with the Bulghar Jama'at, the Taliban, the Haqqani Network, and his commitment to Mullah Omar ignore the evidence presented at trial and should be rejected.

## THE ADVISORY GUIDELINES

The Probation Officer has properly calculated the advisory sentencing guidelines in the Presentence Investigation Report. The base offense for the grouped counts (all but Count 14) has been determined collectively at Level 43 – life in prison. Any number of avenues leads to the same result. The analysis would be as discussed below.

For Counts One and Two, 18 U.S.C. § 2339A, the statutory index points to U.S.S.G. § 2X2.1, the application note for which instructs that for 18 U.S.C. § 2339A, the base offense level is the same as that for the crimes materially supported. Counts One and Two alleged that Hamidullin conspired and attempted to provide material support for violations of 18 U.S.C. §§ 32, 1114, 2332, and 2332a. The sentencing guidelines for these offenses would be applied as follows:

---

[8] *See* Government Exhibit 204.

[9] *See* Government Exhibits 126, 127.

[10] Government Exhibits 161, 162, 163, 164.

1. For 18 U.S.C. § 32(a), the statutory table points most appropriately to section 2A1.1, first degree murder, which is defined in 18 U.S.C. § 1111 as "the unlawful killing of a human being . . . perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him [sic] who is killed." Here, the evidence at trial demonstrated that the defendant's attack upon Camp Leyza was clearly the kind of "premeditated design" contemplated by 18 U.S.C. § 1111.[11] Section 2A1.1 calls for a base offense level of 43 – a life sentence.[12]

2. For 18 U.S.C. § 1114, the statutory table also points to section 2A1.1, which, as discussed above, in the case of first degree murder calls for a base offense level of 43 – life.

3. For 18 U.S.C. § 2332(a), the statutory table again points to section 2A1.1, which, for the reasons above, calls for a sentence of life.

---

[11] Notably, the application notes for section 2A1.1 state that the guideline applies not only to premeditated murder, but also "when death results from the commission of certain felonies. For example, this guideline may be applied as a result of a cross reference ( e.g., . . . in cases in which the offense level of a guideline is calculated using the underlying crime. . . .)" The jury returned a special verdict finding that death resulted for Counts One and Two.

[12] The next most applicable guideline in the statutory index for 18 U.S.C. § 32(a) would be section 2X1.1, which uses as a base offense the base offense level for the substantive offense plus any adjustments "for any intended offense conduct that can be established with reasonable certainty." Here again, this brings the analysis back to 2A1.1, for first degree murder. Moreover, section 2X1.1(d)(1) explicitly states that the reductions for attempts and conspiracies shall not apply when the offense involved a federal crime of terrorism or when the offense is 18 U.S.C. § 32. Another, less applicable guidelines section listed in the statutory index for 18 U.S.C. § 32(a), section 2A5.2, would lead to the same result. It calls for a base offense level of 30 and specific offense characteristic of 5. However, because death resulted, the cross reference in section 2A5.2 (c)(1) brings the analysis back, once again, to section 2A1.1. Another cross reference in section 2A5.2(c)(2), to section 2M6.1, could also apply since the offense was committed with a weapon of mass destruction. It provides a base offense level of 42; however, the cross reference for section 2M6.1, too, points to section 2A1.1 if death resulted, and thus also leads to a life sentence.

    4. For 18 U.S.C. § 2332a, the statutory table points to section 2M6.1, which calls for a base offense level of 42. However, because the offense resulted in the intentional or knowing death of the defendant's co-conspirators, the cross reference calls for the homicide provisions to apply, and section 2A1.1, for the reasons above, calls for a sentence of life.

A number of the other counts of conviction also lead to a life sentence. With regard to Counts Three and Four, 18 U.S.C. § 32, Counts Six and Seven, 18 U.S.C. § 1114, and Count Thirteen, 18 U.S.C. § 2332a, the guidelines call for a base offense level of 43 and a sentence of life for the reasons discussed above. For Count Fifteen, 18 U.S.C. § 924(o), the statutory table points to section 2K2.1, which for a machine gun or destructive device provides a base offense level of 18 under 2K2.1(a)(5). Because there were at least thirty insurgents with Kalashnikov machine guns, as well as a plethora of heavy weapons and grenades, subsection (b)(1) adds at least 6 levels. Because several of the weapons were rocket propelled grenade launchers, subsection (b)(3)(A) adds 15 levels. Because the weapons were used in connection with other felony offenses, subsection (b)(6)(B) adds 4 levels. The total is thus 43 – again, a sentence of life. Moreover, the cross references state that in these circumstances section 2X1.1 or the homicide guidelines (in this case section 2A1.1) should be applied if greater than the calculation under section 2K2.1. As discussed above, section 2X1.1 results in a life sentence. Thus, either route would lead to a guidelines sentence of life for Count Fifteen.[13]

---

[13] For Count Five, 18 U.S.C. § 1117, the statutory table points to section 2A1.5, which calls for a base offense level of 33. For Count Eight, 18 U.S.C. § 2332(b)(2), the statutory table points to section 2A1.5, while for Counts Nine and Ten, the table points to section 2A2.1. Both guidelines also lead to a base offence level of 33. For Counts Eleven and Twelve, 18 U.S.C. § 2332(c), the statutory table points to section 2A2.2, which calls for a base offense level of 14, plus 2 levels for more than minimal planning and 5 levels for the discharge of a firearm, or a total of 21.

Accordingly, for the grouped counts the highest offense level is 43. *See* U.S.S.G. § 3D1.3. However, as the Probation Officer determined, because these offenses "involved, or were intended to promote, a federal crime of terrorism," an additional 12 levels are to be added to the base offense level of 43. U.S.S.G. § 3A1.4. Further, because the defendant was an organizer or leader of criminal activity involving more than five participants, his offense level is to be increased by 4 levels, as is reflected in the Presentence Investigation Report. U.S.S.G. § 3B1.1(a). The sum of the base offense level and the applicable enhancements leads to an offense level of 59; however, as the Probation Officer points out, the total offense level should be treated as Level 43. The terrorism enhancement, section 3A1.4, calls for the defendant's criminal history category to be increased to Category VI, but at any criminal history category, the recommended sentence for Level 43 is life. Finally, Count Fourteen, 18 U.S.C. § 924(c), requires a mandatory sentence of thirty years' imprisonment, which must be imposed consecutive to the life sentence.

For these reasons, the advisory guidelines call for a sentence of life plus a consecutive thirty-year sentence. As discussed below, such a sentence is well deserved in this case.

### THE RELEVANT FACTORS UNDER 18 U.S.C. § 3553(A)

*The Nature and Circumstances of the Offense*

Few crimes could be more serious than this one. In a well-planned, deliberate, and premeditated attack, the defendant led an assault upon an Afghan outpost by a group of insurgents, many of whom he recruited and trained.[14] He came armed with heavy weapons – 50-caliber anti-aircraft machine guns, 82 millimeter recoilless rifles, and rocket propelled grenades –

---

[14] The defendant told the FBI agents in his first *Mirandized* interview on March 29, 2010, that he trained the "younger brothers" in the group in the use of Kalashnikov weapons. His plan was to take them to the Taliban to receive training in the use of RPGs and mortars.

-8-

not only to attack Camp Leyza, but also the United States forces responding to the attack. The evidence strongly suggests that, as was the case with many other attacks upon the Afghan forces, the defendant's attack was intended to draw in the United States forces. In addition to the anti-aircraft machine guns intended for the United States helicopters that the defendant knew would arrive within twenty minutes of the attack, the defendants' band of attackers brought all the materials needed to make three different types of improvised explosive devices. As the testimony at trial graphically demonstrated, a tactic of the insurgents, particularly in Khowst Province where this attack took place, was to plant IEDs on the routes leading to the site of an attack upon Afghan forces, in the hopes of killing their real target: the responding U.S. ground forces. The evidence at trial is consistent with this being the plan of the defendant's forces when the aircraft overhead reported to SSGT Silva that the insurgents were setting up an ambush for the United States soldiers who were approaching on the other side of the first ridge.[15]

      The defendant intended to kill the Afghan Border Police at Camp Leyza – "Afghan traitors," the defendant called them – precisely because of their assistance to the United States forces. He also intended to kill the United States forces. With the well-placed 50-caliber DShK machine gun and other heavy weapons, the defendant planned to shoot down American helicopters and kill their American pilots. After this part of his plan failed, his insurgents were seen "bounding back" in an organized fashion and appeared to be setting a trap for the American foot soldiers. Even the next morning, after nearly all of his insurgent forces had been killed, the defendant attempted to kill the American soldiers who came upon him during their battle damage assessment.

---

[15] Transcript of July 31, 2015, at pp. 443-44.

The evidence thus established that the defendant intended to kill United States military personnel and the Afghan forces assisting them, planned to shoot down and kill American helicopter pilots, and tried to kill American soldiers when these plans fell apart. Had the defendant's forces been successful, dozens or more Afghan and United States personnel would have been killed in the attack, and more would have been killed by the IED components the defendant and his insurgents were carrying with them. These facts, together with all the evidence presented at trial, strongly support the imposition of the sentence recommended by the guidelines: life plus thirty years.[16]

*The History and Characteristics of the Defendant*

The defendant's history also demonstrates the appropriateness of a sentence of life imprisonment. For years before this attack, the defendant was consorting with Taliban leaders, including Mullah Omar and Sirajuddin Haqqani. The former is the supreme leader of the Taliban, which is known for its brutality in Afghanistan and IED attacks on U.S. forces. The latter is a Specially Designated Global Terrorist, a designation that he held during the time that the defendant was planning this attack and sought Haqqani's approval of it.[17]

In 2005, the defendant offered training to the Taliban in the use of RPGs, PK machine guns, DShKs, and anti-aircraft cannons, as he told the agents on March 30, 2010. He himself sought to obtain training from the Taliban in the use of mines, since the defendant was only "expert" in the use of two kinds of mines. The defendant's allegiance to the Taliban is a central part of his history. As he admitted to the agents, although Mullah Omar "does not want peace,"

---

[16] The same analysis would apply to the factor in section 3553(a)(2), the need for the sentence to reflect the seriousness of the offense and to provide just punishment.

[17] The defendant told the agents on April 2, 2010, that he agreed upon his plan of attack with Haqqani, "the biggest commander in three provinces," including Khowst.

Omar is the defendant's "leader" and "emir" and Allah supposedly directed that the defendant obey him.

The characteristics of the defendant, as they came into play in this attack, also weigh in favor of a sentence of life imprisonment. In planning and carrying out this attack, the defendant brought to bear his considerable military training in weaponry and tactics, which he learned after years with the Russian military.[18] As already discussed, he offered this training to the Taliban at least as long ago as 2005, and he used it in the reconnaissance, planning, training, and execution of the sophisticated, three-pronged attack on Camp Leyza.

*The Need To Protect the Public*

The defendant is a charismatic proselytizer of the radical views that animate Islamist violence such as that perpetrated by the Taliban and the Haqqani Network upon Americans and Afghans – civilian and military targets alike – especially in 2009 when this attack took place. He is skilled in the use of heavy weaponry and military assault machine guns. He has, in essence, the terrorist equivalent of "street creds." His ability to recruit, train, and lead a well-armed band of militants in a complex attack has been demonstrated by this attack upon Camp Leyza and by his admissions to the agents. Moreover, he told the FBI agents that as long as American forces were present in Afghanistan, if he met them or other Americans on the street, he would be obligated by his religion to kill them.[19] Thus, the defendant is one who not only has the will to do violence himself, but perhaps more dangerously, has the ability and the desire to enlist others

---

[18] The use of this special skill in carrying out the attack could well have resulted in an additional two-level increase in his guidelines, although given that he was already assessed at an offense level of 59, it would have had no effect upon his total offense level of 43, the highest level under the guidelines.

[19] Transcript of August 5, 2015, at pp. 1085-86.

to engage in violence. Clearly, the defendant presents a danger to the community and, by all indications, will continue to do so for the rest of his life.

*The Need To Avoid Unwarranted Sentence Disparities*

Obviously, this case is unique, and therefore it is difficult to discuss the sentences of "defendants . . . who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The most analogous case, however, would be the one in this District against the Somali pirates who were found guilty after a trial for two separate attempts at piracy. The defendants there all received life sentences, plus eighty years for multiple counts involving machine guns and RPGs. There was no injury to any of the intended victims, but one of the attackers was killed.

> The defendants contend that life sentences would be grossly disproportionate to their conduct, which, echoing the district court, they describe as mere "attempted robbery on the high seas" that "resulted in no property damage to the USS Ashland and no physical harm to any of its occupants."
>
> As discussed above, however, the defendants' § 1651 piracy offenses included committing illegal acts of violence for private ends (Cabaase), operating a pirate ship (Farah), and otherwise facilitating the violent acts (Said, Jama, and Osman). When the defendants engaged in that conduct, their piracy offenses were complete. Those offenses were hardly "passive"; rather, they involved "violence [ ]or threat[s] of violence to [m]any person[s]." Indeed, the defendants' violent conduct was at least as severe as the cocaine possession in *Harmelin [v. Michigan,* 501 U.S. 957 (1991)]. It is of no moment that no one aboard the USS Ashland was harmed before the defendants' attack was thwarted. *Cf. [United States v. Dowell,* 771 F.3d 162,169 (4th Cir. 2014)] ("We reject out of hand the notion that the sexual abuse of a child can be considered nonviolent merely because it does not lead to physical or life-threatening injuries."). That is, "[t]he mere fact that [the defendants'] acts of [violence] did not inflict ... physical injury [to the Ashland's personnel] does not render [life sentences] disproportionate." *See id.*

*United States v. Said*, 798 F.3d 182, 198-99 (4th Cir. 2015) (citations and footnote omitted).

While it is true that the life sentences were mandatory under the piracy statute, this should not enter into the analysis of whether a less-than-life sentence in this case would create an "unwarranted sentence disparity" when compared to the life sentences imposed for the factually very similar crimes. For this reason, too, the factors to be considered under 18 U.S.C. § 3553(a) strongly support the sentence recommended by the guidelines.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully submits that the most appropriate sentence is the one suggested by the sentencing guidelines and supported by the sentencing factors in 18 U.S.C. § 3553(a): a sentence of life plus thirty years in prison.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:         /s/
James P. Gillis
Virginia Bar No. 65055
Assistant United States Attorney
Jennifer E. Levy
D.C. Bar No. 291070
Trial Attorney
The Justin W. Williams
   United States Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3897
(703) 299-3982 (fax)
james.p.gillis@usdoj.gov
jennifer.e.levy@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/
James P. Gillis
Assistant United States Attorney